IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | Case No. 18-12808 (KG) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MIRIAM MARTINEZ,**
**CHIEF FINANCIAL OFFICER, IN SUPPORT OF FIRST DAY MOTIONS**

I, Miriam Martinez, hereby declare that the following is true and correct to the

best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of the above-captioned debtors and

debtors in possession (collectively, the "Debtors").  In such capacity, I oversee certain of the

financial and operational aspects of the Debtors' business.  I have more than 30 years'

experience in the financial services industry.  I joined the Debtors' parent, ECI (as defined

below), in 2010 as Senior Vice President, Finance and Operations.  I currently manage ECI's and

the Debtors' financial resources and functions, participate in strategic planning, and oversee

operational departments, including human resources and servicing.  Prior to joining ECI and the

Debtors, I served as Regional President and Chief Financial Officer of Qimonda North America

and was Vice President and Chief Financial Officer of Infineon North America, a $1.5 billion

U.S. subsidiary of German-based Infineon AG.  I also have held several senior positions in

accounting management for various U.S. entities of Siemens AG.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738).  The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

I received a Bachelor of Business Administration in Accounting from Pace University and a

Master of Business Administration from Nova Southeastern University.

2.      I submit this declaration (the "Declaration") in support of the Debtors'

petitions and "first day" motions, as described further below (collectively, the "First Day

Motions").  Except as otherwise indicated, all statements in this Declaration are based upon my

personal knowledge, my review of the Debtors' books and records, relevant documents, and

other information prepared or collected by the Debtors' representatives, or my opinion based on

my experience with the Debtors' operations and financial condition.  In making my statements

based on my review of the Debtors' books and records, relevant documents, and other

information prepared or collected by the Debtors' representatives, I have relied upon these

representatives accurately recording, preparing, or collecting such documentation and other

information.  I am authorized to submit this Declaration on behalf of the Debtors.

3.      Part I of this Declaration describes the business of the Debtors and the

developments that led to their filing for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  Part II sets forth the relevant facts in support of the First Day

Motions filed by the Debtors concurrently herewith in support of their chapter 11 cases.

Capitalized terms not defined herein shall have the same meanings as set forth in each relevant

First Day Motion.

# PART I

# BACKGROUND

**A.     Description and History of the Debtors' Business**

4.      The Debtors are indirect subsidiaries of Emergent Capital, Inc. ("ECI"), a publicly traded company.  ECI is a global leader in the life settlements industry.  An organizational chart for ECI and the Debtors is attached hereto as **Exhibit A**.

5.      A life settlement is a transaction in which an individual sells an insurance policy to a third-party investor for an amount less than the policy's face value, but greater than its net cash surrender value.  The investor becomes responsible for paying future premiums on the policy and, upon the death of the individual, receives the policy's death benefits.

6.      Life settlements allow senior insureds who can no longer afford their premiums, or who desire additional liquidity, to shed their policies for an immediate infusion of cash at a premium over the cash surrender value offered by the insurance companies.  The investor makes projections concerning the individual's probability of survival and life span, pays out the required premiums on the policy, and projects discounted cash flows for each policy. The investor assumes the risk that the death benefit will be less than the sum of the purchase price, the aggregate future premiums, and any additional fees.  The insured receives the benefit of an immediate cash payment above that of the cash surrender value offered to the insured.

7.      Life settlement assets are subject to uneven cash flows that can be difficult to predict, and that can lead to liquidity issues if the benefit payouts received are insufficient to cover the cash outlays from operating expenses, the required premium payments, and the interest

3

payments on the debt needed to finance the business.  However, the investment carries the benefit of cash flows that are uncorrelated to market returns.

8.      Debtor White Eagle Asset Portfolio, LP ("WEAP") owns a portfolio of 586 life insurance policies – also known as life settlements – with an aggregate death benefit of approximately $2.8 billion.  The partnership interests in WEAP are owned by Debtors White Eagle General Partner, LLC ("WEGP") and Lamington Road Designated Activity Company ("LRDA").  WEGP is the general partner of WEAP, manages WEAP, and holds 0.10% of the interests therein.  LRDA is the limited partner of WEAP and holds 99.90% of the interests therein.

9.      The Debtors do not have any employees.  The Debtors are operated and administered by employees of non-Debtor Imperial Finance & Trading, LLC ("Imperial Finance"), a direct subsidiary of ECI, under an administrative services agreement.

**B.      The Debtors' Prepetition Capital Structure**

10.      WEAP, as borrower, LNV Corporation ("LNV"), as lender, and CLMG Corp. ("CLMG"), as administrative agent, are parties to that certain *Second Amended and Restated Loan and Security Agreement*, dated as of January 31, 2017 (as subsequently amended and/or restated, the "Prepetition Loan Agreement").  Additional parties to the Prepetition Loan Agreement are non-debtor affiliates of ECI:  Imperial Finance, as initial servicer, initial portfolio manager, and guarantor of certain portfolio management obligations, and Lamington Road Bermuda, Ltd., as portfolio manager.  LNV and CLMG are affiliates of Beal Financial Corporation.

DOCS_SF:98214.5 93856/001

11.     Under the Prepetition Loan Agreement, the total aggregate lending commitment of LNV was $370 million.  As of the date hereof, approximately $367.9 million in principal obligations is due and owing to LNV.  The Prepetition Loan Agreement also provides LNV with a "Participation Interest" equal to forty-five percent (45%) of the revenue generated by WEAP's life settlement portfolio (after interest, expenses, and required amortization has been paid).  Such Participation Interest, as addressed further below, is subject to dispute.

12.     The obligations under the Prepetition Loan Agreement are secured by purported liens in favor of CLMG on substantially all of the assets of WEAP, including its interests in life insurance policies and the proceeds therefrom.  CLMG also purportedly has control of WEAP's funds and collections from insurance policies through a custodial arrangement with Wilmington Trust, N.A. ("WT")

13.     Although Debtors WEGP and LRDA are not obligors under the Prepetition Loan Agreement, they are pledgors under that certain *Partnership Interest Pledge Agreement*, dated as of May 16, 2014 (as subsequently amended and/or restated, the "Partnership Pledge"), pursuant to which WEGP and LRDA pledged their interests in WEAP in favor of CLMG, as secured party, in order to secure WEAP's obligations under the Prepetition Loan Agreement.  Under the Partnership Pledge, WEGP and LRDA were required to deliver the pledged certificates representing their interests in WEAP to WT as securities intermediary for the benefit of CLMG.  Upon the occurrence of an event of default and absent a bankruptcy filing, CLMG could instruct WT to deliver the pledged certificates to CLMG, effectively taking ownership of WEAP and its valuable life insurance policies.

C.    **Events Leading to the Debtors' Bankruptcy Filings**
      **and Commencement of the Chapter 11 Cases**

        14.    Beginning in 2015, WEAP and its ultimate parent, ECI, faced liquidity

problems due to a mismatch between cash inflows (death benefit payouts and fair value

adjustments) and outflows (operating expenses, interest and premium payments, and legal and

professional fees).

        15.    In late 2016, WEAP restructured its existing loan facility with LNV.  The

Prepetition Loan Agreement executed in January 2017 is the result of such restructure.

Unfortunately, LNV has abused the discretion that it was granted under the terms of the

Prepetition Loan Agreement to starve WEAP and its parent of the cash flows to which they are

rightfully entitled and which are necessary to administer WEAP's insurance portfolio.  For

example, pursuant to section 5.2 of the Prepetition Loan Agreement, available amounts collected

from matured life insurance policies are distributed through a waterfall.  Certain fees and costs,

including fees to the custodian, securities intermediary, and CLMG are paid first.  Then LNV as

lender is entitled to receive the "Required Amortization," which is equal to the cash available at

that point in the waterfall multiplied by a percentage (*i.e.*, the "Cash Flow Sweep Percentage")

that varies based on the loan-to-value of WEAP's policy portfolio.  Specifically, if the loan-to-

value is greater than 65% – meaning that the outstanding amount of the loan equals more than

65% of the value of the policies as determined by LNV (in its discretion) – 100% of the cash

available for distribution at that point in the waterfall must be paid entirely to LNV as

amortization of the principal due under the facility.  LNV has improperly exercised its discretion

by undervaluing the insurance portfolio and LNV has charged excessive fees in order to disallow any distributions to WEAP.

16.    The Debtors believe that LNV's conduct with respect to the Prepetition Loan Agreement is actionable and intend to commence a lawsuit against LNV and its co-conspirators for breaches of contract, breaches of fiduciary duty, and other claims.  The Debtors also intend to challenge LNV's rights to the "Participation Interest" referenced above.

17.    In an effort to resolve these disputes without the need for a bankruptcy filing, the Debtors and ECI attempted to negotiate a restructuring with LNV.  This process was complicated by announcements in October and November 2018 by the leading underwriters in the life settlements industry regarding increases in projected life expectancies, which would have the effect of reducing the value of the Debtors' insurance portfolio.  As a result of these announcements and potentially other factors, the Debtors' negotiations with LNV stalled and the Debtors were required to commence chapter 11 cases for WEGP and LRDA on November 14, 2018.

18.    Subsequent to such filings, the Debtors and LNV entered into a standstill agreement in an effort to negotiate the terms of a possible global resolution of their disputes. The initial term of the standstill agreement was through November 26, 2018, but was subsequently extended on six occasions ultimately ending on December 13, 2018.

19.    Because no consensual resolution was reached, WEAP commenced a chapter 11 case of its own on the date hereof.  The filing of the Debtors' cases was necessary in order to prevent LNV from exercising remedies that would have allowed LNV to take possession

7

of the pledged interests in WEAP and/or otherwise sweep the Debtors' funds and insurance proceeds.

20.     Notwithstanding the recent changes in life expectancy projections described above, it should be undisputed that LNV is substantially oversecured.  LNV's own valuation firm has concluded that the fair value of the insurance portfolio is $552 million as of October 31, 2018, an equity cushion of approximately $184 million, subject to a reservation of rights to assert a downward adjustment based on revised life expectancy models that are currently pending.  The Debtors also filed these cases with an aggregate cash balance of approximately $33 million.

21.     The purpose of these chapter 11 cases is to ensure that the equity value in the Debtors' estates is preserved for the benefit of all stakeholders, and not just LNV.  Along these lines, the Debtors intend to propose a chapter 11 plan of reorganization that will provide for the payment of LNV's allowed claims in full, while maximizing the value of the Debtors' assets for all concerned.

## PART II

## FIRST DAY MOTIONS

22.     In order to enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases, the Debtors have requested various types of relief in the First Day Motions filed simultaneously with this Declaration.  A summary of the relief sought in each First Day Motion is set forth below.

23.     I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

8

information, and belief.  I believe that the type of relief sought in each of the First Day Motions:

(a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption; and (b) is

essential to maximizing the value of the Debtors' assets for the benefit of their estates and

creditors.

A.      **Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing (the "Cash Collateral Motion")**

24.     Through the Cash Collateral Motion, the Debtors seek the entry of interim

and final orders: (a) authorizing the Debtors to use cash collateral, (b) providing adequate

protection to the prepetition secured parties, CLMG, as administrative agent, and LNV, as sole

lender ("Prepetition Secured Parties"), and (c) modifying the automatic stay.

25.     The Debtors have an urgent and immediate need for the use of cash

collateral.  The Debtors have not obtained postpetition financing and, without the use of cash

collateral, the Debtors will not be able to preserve their assets or to effectuate a reorganization

that will maximize value for creditors.

26.     Although the Debtors do not have any employees, Debtor WEAP has

ongoing premium obligations under its portfolio of life insurance policies and intercompany

administrative obligations to its affiliates, and also incurs various servicing obligations and

professional fees as part of its ordinary course operations.  Without immediate access to cash

collateral, WEAP would be forced to cease payments to carriers, abandon its assets, and

otherwise cease operations, causing immediate and irreparable harm to these estates.

Accordingly, it is essential that the Debtors have access to cash collateral in order to preserve

and maximize the value of the Debtors' assets.

27.     As noted above, LNV has the benefit of a substantial equity cushion in these cases.  LNV also will be adequately protected by a replacement lien, adequate protection lien, adequate protection claim, and adequate protection payments to avoid any risk in the diminution in the value of its prepetition collateral.

28.     Without immediate access to cash collateral, the repercussions to the Debtors' restructuring efforts will be catastrophic and likely irreparable, ending their ability to maximize value for the benefit of all constituents.  The Debtors need to fund, among other things, premium payments to insurers, servicing obligations, and other administrative costs.

29.     If the Cash Collateral Motion is not approved, the Debtors' only alternative would be a piecemeal liquidation that would substantially handicap recoveries by creditors and negatively impact recoveries from WEAP's life settlement portfolios, which need to be serviced, monitored, and maintained on an ongoing basis.  Access to cash collateral will: (a) preserve the Debtors' interests in life settlements, (b) allow the Debtors to continue to generate cash flow from their inventory of life settlements, and (c) maximize the value of the Debtors' assets as part of an ongoing reorganization process.  The Debtors do not have adequate available sources of working capital or financing without the use of cash collateral.

**B.      Motion of Debtors for Order Authorizing (A) Continuance of Existing Cash Management System, (B) Intercompany Transactions, (C) Limited Waiver of Section 345(b) Deposit and Investment Requirements, and (D) Granting Related Relief ("Cash Management Motion")**

30.     Pursuant to the Cash Management Motion, the Debtors seek the entry of an order authorizing: (a) the Debtors to continue using their existing cash management system and related bank accounts in the ordinary course of business; (b) the Debtors to make

10

intercompany transactions; and (c) a limited waiver of section 345(b) deposit and investment requirements.

31.     The Debtors' cash management system (the "Cash Management System") is maintained consistent with the requirements of the Prepetition Loan Agreement.  The Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business.  The Cash Management System currently consists of four accounts (the "Domestic Accounts" and, together with the Foreign Accounts (as defined below), the "Accounts") held in the name of WEAP at WT, as custodian for CLMG pursuant to that certain *Second Amended and Restated Account Control and Custodian Agreement* dated as of January 31, 2017 (the "Account Control Agreement").[2]  In addition, there are two Irish bank accounts held in the name of LRDA at Ulster Bank (Republic of Ireland) (the "Foreign Accounts").  WT and Ulster Bank are together referenced herein as the "Banks."

32.     The following chart sets forth the list of Accounts and balances as of December 12, 2018:

| Debtor | Account Name | Bank | Account Type | Account No. | Balance |
|--------|--------------|------|--------------|-------------|---------|
| WEAP | Borrower Account | Wilmington Trust | Trust | 104671-001 | $4,132,227.87 |
| WEAP | Collection Account | Wilmington Trust | Trust | 104671-002 | $28,092,987.34 |
| WEAP | Escrow Account | Wilmington Trust | Trust | 104671-003 | $0.00 |
| WEAP | Payment Account | Wilmington Trust | Trust | 104671-004 | $969,363.70 |
| WEAP | Policy Account | Wilmington Trust | Trust | 104671-005 | N/A |
| LRDA | Euro Account | Ulster Bank | Checking | XXXX-3983 | €1,408.12 |

---

[2]  Pursuant to the Prepetition Loan Agreement and the Account Control Agreement, the Debtors also maintain a policy account with WT (the "Policy Account").  The Policy Account (Account No. 104671-005) is a non-interest bearing account.  Pursuant to the Account Control Agreement, the Debtors delivered or caused to be delivered the Policies that were purchased in the ordinary course of business to WT, which holds the Policies in the Policy Account.  WT may not debit or release the Policies held in the Policy Account except as permitted by the terms of the Account Control Agreement.

| LRDA | USD Account | Ulster Bank | Checking | XXXX-7129 | $23,989.92 |
|------|-------------|-------------|----------|-----------|------------|

33.     The function of the Domestic Accounts is mandated and delineated in the Prepetition Loan Agreement and Account Control Agreement.  All funds, securities, and insurance policies held in the Domestic Accounts are maintained at WT, as custodian under the Prepetition Loan Agreement and Account Control Agreement.  The Debtors have signature authority for the Borrower Account.  For the remaining Domestic Accounts, the Debtors are required to send payment instructions to WT, which then makes all disbursements and transfers between the Accounts in accordance with the Prepetition Loan Agreement and Account Control Agreement.

34.     Pursuant to Section 9.2(e) of the Prepetition Loan Agreement, any change to the Cash Management System requires the prior written consent of LNV.  Section 9.1(k) of the Prepetition Loan Agreement further mandates that WEAP not maintain any bank accounts other than the Domestic Accounts and prohibits WEAP from closing any of the Domestic Accounts without the prior consent of LNV.

35.     The Prepetition Loan Agreement requires the Debtors to maintain the following Accounts to be used as described below:

a.      Payment Account (Account 004).  The Payment Account receives funds from LNV pursuant to the Prepetition Loan Agreement.  The funds in the Payment Account are used to pay the premiums of the Policies and other fees approved by LNV.  WT disburses the funds in the Payment Account in accordance with the Account Control Agreement.

b.      Collection Account (Account 002).  The Collection Account is the central account whereby all collections from the sale of the Policies, death benefits received from the Policies, and any other cash or other proceeds received with respect to the Policies is deposited.  In accordance with the Account Control Agreement, the funds in the Collection Account are swept by LNV on a quarterly basis and distributed pursuant to a waterfall set forth in the Prepetition Loan

Agreement. Postpetition, the Debtors will not make draws under the Prepetition Loan Agreement. Accordingly, the Debtors seek authority to transfer funds from the Collection Account to the Payment Account for disbursements in accordance with the Budget.

c.   Borrower Account (Account 001). The Borrower Account is an operating account used to pay, among other things, (a) accrued interest under the Prepetition Loan Agreement when there are insufficient funds available in the Collection Account and (b) the ordinary course business expenses of WEAP, including legal expenses.

d.   Escrow Account (Account 003). The Escrow Account is a dormant account that was originally established and maintained to receive the residual amount of any distributions from the Collection Account.

36.    Debtor LRDA is an Irish entity that maintains two bank checking accounts – a Euro denominated account and a U.S. dollar denominated account – at Ulster Bank, an Irish bank. In the aggregate, the balance of the Foreign Accounts is less than $25,000. The funds in the Foreign Accounts are used by LRDA for general corporate expenses (*e.g.*, director fees, annual corporate filing fees, and professional fees). In addition, the Foreign Accounts are not controlled accounts or otherwise subject to the Account Control Agreement.

37.    The Cash Management System described above implements a controlled system of collections and disbursements consistent with the terms of the Prepetition Loan Agreement and Account Control Agreement. The Cash Management System manages the payment of premiums for 586 insurance policies. Any disruption caused by requiring the Debtors to close their existing bank accounts and establish new bank accounts and implement a new cash management system is unnecessary under the circumstances here and could jeopardize the Debtors' ability to timely pay insurance premiums and other administrative obligations – putting at risk the primary assets of these estates.

38.    As referenced above, the Debtors do not have any employees and are instead operated and administered by employees of non-debtor Imperial Finance, a direct

13

subsidiary of ECI, under an administrative services agreement.  Prior to the Petition Date, Imperial Finance would invoice the Debtors for services provided under the administrative services agreement.  Historically, because CLMG would not consent to the release of funds from the Accounts, ECI would contribute capital to Imperial Finance in satisfaction of these invoices.

39.     Pursuant to the Cash Collateral Motion, the Debtors seek authority to fund these chapter 11 cases with the use of cash collateral pursuant to the Budget, which among other items, contemplates payments from the Debtors to Imperial Finance on account of services rendered on behalf of the Debtors pursuant to the administrative services agreement (the "Intercompany Transactions").

40.     By the Cash Management Motion, and out of an abundance of caution, the Debtors seek authority to make the Intercompany Transactions (*i.e.*, directly pay Imperial Finance on account of costs incurred postpetition under the administrative services agreement) and to satisfy postpetition administrative obligations associated with the Intercompany Transactions, in accordance with the Budget.  Moreover, the Debtors seek authority, as described above, to transfer funds between Accounts in accordance with the Budget.

**C.     Motion of Debtors for Entry of Order (A) Authorizing Debtors to (i) Maintain Life Settlements Insurance and Pay Any Prepetition Obligations Relating Thereto and (ii) Satisfy All Servicing Obligations Regarding Life Settlements in the Ordinary Course of Business and (B) Granting Related Relief (the "Life Settlements Motion")**

41.     Through the Life Settlements Motion, the Debtors seek the entry of an order (A) authorizing, but not directing, the Debtors to (i) maintain life settlements insurance and pay any prepetition obligations related thereto and (ii) satisfy all servicing obligations regarding life settlements in the ordinary course of business.

14

42.     As discussed above, a life settlement is a transaction in which an individual sells an insurance policy to a third-party investor for an amount less than the policy's face value, but greater than its net cash surrender value.  The investor (*i.e.*, WEAP) becomes responsible for paying future premiums on the policy and, upon the death of the individual, receives the policy's death benefits.  WEAP is not aware of any prepetition amounts currently outstanding in connection with its life settlements.

43.     The servicer for WEAP's life settlements is MLF LexServ, L.P. ("LexServ"), an entity otherwise unaffiliated with the Debtors.  Debtor WEAP and LexServ are parties to a *Servicing Agreement* dated as of May 16, 2014 (the "Servicing Agreement").  Pursuant to the Servicing Agreement, LexServ provides certain services relating to the administration and servicing of certain insurance policies for the benefit of WEAP.  LexServ is normally paid quarterly for its services.  The typical quarterly fee is approximately $145,000, most of which for the current quarter has been incurred and is unpaid for the prepetition period.

44.     By the Life Settlements Motion, the Debtors seek authority to pay any prepetition amounts currently due and owing to LexServ under the Servicing Agreement.  Given the critical significance of WEAP's life settlements to this case and the need to continue to service such life settlements in order to maximize the value of these assets for the benefit of these estates, the Debtors seek authority to continue to honor all of their obligations under the Servicing Agreement, whether incurred prepetition or postpetition.

45.     The Debtors' ability to maintain the life settlements is essential to maximizing the value of these estates.  The life settlements represent hundreds of millions of dollars in value.  The Debtors must take whatever actions are necessary to preserve and maintain

15

these assets, which includes continuing to service these assets through LexServ pursuant to the

terms of the Servicing Agreement.  If the Debtors fail to maintain the life settlements, the impact

to the value of these estates would be devastating.

46.    The Debtors have sufficient funds to pay the amounts described in the Life

Settlements Motion in the ordinary course of business by virtue of anticipated access to cash

collateral.  In addition, under the Cash Management System, the Debtors can readily identify

checks or wire transfer requests as relating to an authorized payment in respect of the payments

to be authorized by an order approving the Life Settlements Motion.  Accordingly, there is

minimal risk that checks or wire transfer requests the Court has not authorized will be made

inadvertently.

**D.    Motion of Debtors for Entry of an Order (I) Directing
Joint Administration of Chapter 11 Cases and (II) Granting
Related Relief (the "Joint Administration Motion")**

47.    Through the Joint Administration Motion, the Debtors seek the entry of an

order authorizing and directing the joint administration of the Debtors' related chapter 11 cases

for procedural purposes only.

48.    Joint administration is warranted in these chapter 11 cases because (a) the

Debtors' financial affairs and business operations are closely related and (b) such administration

will ease the administrative burden on the Court and other parties.

49.    With respect to the proximity of relations, as discussed above, the Debtors

are under common ownership and management.  They also share certain creditors and parties in

interest.  As a result, joint administration will prevent duplicative efforts and unnecessary

expenses, without any risk of prejudice.

50.     The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors.  With three affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists.

**E.      Motion of Debtor White Eagle Asset Portfolio, LP for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs, and (II) Granting Related Relief (the "Schedules Extension Motion")**

51.     Through the Schedules Extension Motion, Debtor WEAP seeks the entry of an order extending the deadline by which it must file its schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by an additional fourteen (14) days, for a total of twenty-eight (28) days from the Petition Date.  The other Debtors have already filed their Schedules and Statements.

52.     To prepare the Schedules and Statements, WEAP must compile information from books, records, and documents relating to creditor claims, as well as WEAP's various assets and contracts.  WEAP's assets consist of a portfolio of hundreds of life insurance policies – also known as life settlements.  This information is voluminous and collecting the necessary information requires a significant expenditure of time and effort on the part of WEAP and its professional advisors in the near term.

53.     Given the amount of work entailed in completing the Schedules and Statements, WEAP requires more time to complete the Schedules and Statements within the required time period.

F.    **Motion of Debtors for Entry of Order Authorizing Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor (the "Consolidated Matrix Motion")**

54.    Through the Consolidated Matrix Motion, the Debtors seek the entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor.

55.    The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the obligatory notices and other documents in these chapter 11 cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2.  Requiring the Debtors to segregate and convert their computerized records to an entity-specific creditor matrix format would be an unnecessarily burdensome task and would result in duplicate mailings.  Accordingly, by the Consolidated Matrix Motion, the Debtors seek authority to file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

56.    I believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these chapter 11 cases.

G.    **Motion of Debtors for an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Procedures Motion")**

57.    Through the Interim Compensation Procedures Motion, the Debtors seek the entry of an order establishing procedures for interim compensation and reimbursement of

DOCS_SF:98214.5 93856/001

expenses for professionals and official committee members, if any.  The proposed interim

compensation procedures set forth in the Interim Compensation Procedures Motion will provide

for an orderly, regular process for the allowance and payment of compensation and

reimbursement of expenses for attorneys and other professionals whose retentions are approved

by this Court and who will be required to file applications for allowance of compensation and

reimbursement of expenses.  The Interim Compensation Procedures Motion also seeks approval

of a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of

any official committee of unsecured creditors that may be appointed in these cases.

**H.      Motion of Debtors for an Order Authorizing Debtors to Retain, Employ, and
         Compensate Certain Professionals Utilized by Debtors in the Ordinary Course of
         Business (the "OCP Motion")**

58.      Through the OCP Motion, the Debtors seek the entry of an order

authorizing the Debtors to employ and compensate certain professionals utilized in the ordinary

course of the Debtors' business.

59.      The Debtors customarily retain or benefit from the services of various

attorneys and accountants to represent them in matters arising in the ordinary course of their

business, unrelated to these bankruptcy cases (the "Ordinary Course Professionals").  A list of

the Ordinary Course Professionals utilized or expected to be utilized by the Debtors during the

pendency of these cases is attached to the OCP Motion as Exhibit B.

60.      The Debtors anticipate employing, among others, certain of the Ordinary

Course Professionals to perform ongoing services during the pendency of these cases.  The

Ordinary Course Professionals will not be involved in the administration of these cases.  Rather,

they will primarily provide services in connection with the Debtors' ordinary course litigation

and corporate matters.  The litigation matters generally involve coverage disputes with insurance carriers.  Given that the value of the Debtors' estates is largely dependent on realizing value from the Debtors' insurance portfolio, it is critical that the Debtors continue to employ the Ordinary Course Professionals to litigate coverage disputes where necessary in the ordinary course of business.

61.    The value of the Debtors' business would be hindered if the Ordinary Course Professionals were delayed in performing their work on behalf of the Debtors while the Debtors (i) submitted to this Court an application, affidavit, and proposed retention order for each Ordinary Course Professional, (ii) waited until such order was approved before such Ordinary Course Professional continued to render services and (iii) withheld payment of the normal fees and expenses of the Ordinary Course Professionals until they complied with the compensation procedures applicable to chapter 11 professionals.

62.    Further, a number of Ordinary Course Professionals may be unfamiliar with the fee application procedures employed in bankruptcy cases.  Some Ordinary Course Professionals might be unwilling or unable to assume the administrative and cost burden of such procedures, and may therefore be unwilling to work with the Debtors if these requirements are imposed, forcing the Debtors to incur additional and unnecessary expenses to retain other professionals without such background and expertise, and at potentially higher rates.  The uninterrupted services of the Ordinary Course Professionals are vital to the Debtors' maximizing the value of these estates and their ultimate ability to pursue an orderly restructuring.  More importantly, the cost of preparing and prosecuting these retention applications and fee applications would be significant and such costs would be borne by the Debtors' estates.

DOCS_SF:98214.5 93856/001

63.     Although certain Ordinary Course Professionals may hold unsecured claims against the Debtors in respect of prepetition services rendered, I do not believe that any of the Ordinary Course Professionals have an interest materially adverse to the Debtors, their estates, their creditors, or other parties in interest.  Subject to the requirements set forth in the OCP Motion, the Debtors propose that they be permitted to pay fees and expenses of an Ordinary Course Professional, without formal application to this Court by any one Ordinary Course Professional, provided, however, that (i) the fees and disbursements for any one Ordinary Course Professional shall not exceed a total of $75,000 per month on average over a rolling four-month period to any Ordinary Course Professional, unless otherwise authorized by this Court and (ii) the aggregate monthly payments to Ordinary Course Professionals be limited to $250,000 unless otherwise authorized by this Court.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

Executed this _13_ day of December, 2018 at Boca Raton, Florida.

Miriam Martinez