## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | ) | Case No. 18-12808 (KG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: Docket Nos. 2–8** |
| | ) | |

## PRELIMINARY RESPONSE OF CLMG CORP. AND LNV CORPORATION TO DEBTORS' FIRST DAY MOTIONS AND TO DECLARATION OF MIRIAM MARTINEZ IN SUPPORT OF FIRST DAY MOTIONS

CLMG Corp. ("CLMG") and LNV Corporation ("LNV" and, together with CLMG, the "Lender Parties"), as administrative agent and sole lender, respectively, under the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"),[2] submit their preliminary response (this "Preliminary Response") to the *Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration") and the first day motions referenced therein (the "First Day Motions"):[3]

---

[1] The Debtors in these chapter 11 cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, where applicable, include: White Eagle Asset Portfolio, LP (0691) ("White Eagle"); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738). The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

[2] A copy of the Loan Agreement is attached as Exhibit 1 to the *Declaration of Andrew Zatz in Support of the Preliminary Response of CLMG Corp. and LNV Corporation to Debtors' First Day Motions and to Declaration of Miriam Martinez in Support of First Day Motions* (the "Zatz Declaration"), which is being filed concurrently with this Preliminary Response.

[3] This Preliminary Response addresses some, but not all, of the allegations made in the First Day Declaration. The Lender Parties do not waive any right, and expressly reserve all rights, to respond to the First Day Declaration at a later time.

## PRELIMINARY RESPONSE

1.      As the Court will soon see, these chapter 11 cases (the "Chapter 11 Cases") have not been filed to advance any proper rehabilitative purpose.  Rather, they are the direct product of irreconcilable conflicts of interest between the Debtors and their indirect parent, Emergent Capital, Inc. ("Emergent"), and are intended to shift leverage in a two-party dispute between Emergent and the Lender Parties by serving as a platform for litigation brought for the sole benefit of Emergent.

2.      The contemplated litigation will seek to re-write the Loan Agreement to eliminate or modify certain of the Lender Parties' bargained-for rights (including with respect to the Participation Interest (as described below)) and thereby create a windfall for Emergent.[4] Notably, the Debtors contend that White Eagle has substantial equity value[5] and, contrary to the position they are taking in these Chapter 11 Cases, have repeatedly recognized the validity and enforceability of the very obligations they now seek to avoid as allegedly unenforceable, including as recently as November 28, 2018.[6]

3.      To explain their chosen course of action and in support of their first day pleadings, the Debtors have filed the First Day Declaration.  By the First Day Declaration, the Debtors falsely contend that the Chapter 11 Cases are the result of the Lender Parties' abuse of discretion under the Loan Agreement to improperly "starve" White Eagle and Emergent of cash

---

[4]  See First Day Declaration ¶16 ("The Debtors believe that LNV's conduct with respect to the [Loan Agreement] is actionable and intend to commence a lawsuit against LNV and its co-conspirators . . . [and] challenge LNV's rights to the 'Participation Interest[.]'").

[5]  Id. ¶20.

[6]  Zatz Declaration, Exhibit 2 (Borrowing Request from White Eagle to CLMG dated November 28, 2018).

flows.[7]  These baseless allegations, offered by way of a conflicted declarant who is the Chief Financial Officer of Emergent,[8] do not – and will not – withstand even cursory scrutiny.  As will be demonstrated at the appropriate time, the Lender Parties have never abused the discretion afforded to them by the Loan Agreement – discretion that is the product of an arm's-length transaction.

## I.     The Interests of White Eagle and Emergent Are In Conflict

4.     Although White Eagle is a wholly-owned indirect subsidiary of Emergent, the two entities have conflicting interests.  Emergent and White Eagle each have their own debt but rely almost exclusively upon White Eagle's assets, and the revenues they generate, to service such debt.  As such, the use of funds by White Eagle to pay down its debt and thereby create additional borrowing capacity for its business reduces the amount of cash that would otherwise theoretically be made available for distribution to Emergent to be used to service Emergent's entirely separate debt obligations.  The opposite is also true – to the extent White Eagle funds are distributed to Emergent, they cannot also be used to increase White Eagle's liquidity by paying down the obligations under the Loan Agreement.  These conflicting interests are compounded because White Eagle derives its income from life settlement assets with cash flows that are uneven, are difficult to predict, and can easily result in liquidity issues if such cash flows are insufficient to cover operating expenses.[9]

---

[7]  First Day Declaration ¶15.

[8]  See Emergent Capital, Inc., Quarterly Report (Form 10-Q) (Nov. 16, 2018), at 65.

[9]  See First Day Declaration ¶7.

5.     Unlike White Eagle, which is able to pay all of its debts as they come due, Emergent has serially been in danger of imminent default under its own debt obligations.[10]  To that end, Emergent recently entered into a supplemental indenture for certain of its outstanding bonds that provides an election for the holders of such bonds to receive interest in kind (i.e., applied to principal) to prevent what would otherwise be a payment default under such notes.[11] It is Emergent's need for cash to pay its own creditors, and not any financial problems at White Eagle, that is the source of friction between the Debtors and the Lender Parties and the reason that these Chapter 11 Cases have been filed.  The irony of the allegations set forth in the First Day Declaration is that the Debtors accuse the Lender Parties of trying to starve White Eagle and Emergent of cash when, in fact, Emergent has directed the filing of these Chapter 11 Cases (which it, notably, has kept itself out of) for the purpose of removing cash from White Eagle. Rather, what the Debtors are actually complaining about is that the Lender Parties (i) refused a request to waive or modify the terms of the Loan Agreement so that certain restricted cash could be dividended to Emergent, rather than run through the Loan Agreement waterfall (as required by the Loan Agreement), and (ii) used the discretion afforded to the Lender Parties under the Loan Agreement to ensure that cash has remained at White Eagle and available to service White Eagle's business and expenses, rather than being used to pay dividends for the benefit of Emergent and its creditors.

6.     The fact that the Debtors are complaining about efforts to protect White Eagle's own cash brings into sharp focus the glaring conflict between White Eagle and Emergent, and

---

[10] See Emergent Capital, Inc., Quarterly Report (Form 10-Q) (Nov. 16, 2018), at 9-10 (noting that Emergent's cash balance "create[s] a substantial doubt of the Company's ability to meet [its] financial needs.").

[11] See Emergent Capital, Inc., (Form 8-K) (Dec. 14, 2018).

may require extraordinary steps to protect the Debtors' estates, such as appointment of a chapter 11 trustee.[12]  In addition, the Lender Parties may seek dismissal of these Chapter 11 Cases as bad faith filings,[13] as it appears that the Debtors have commenced these proceedings simply as a platform to file a lawsuit against the Lender Parties to benefit Emergent and its creditors.[14]

## II.    The Loan Agreement Terms Preserve the Value of White Eagle

7.      The terms of the Loan Agreement, which provide the Lender Parties with the rights with which the Debtors and Emergent now take issue, were originally negotiated in 2012 and 2013.   At that time, Emergent (then known as Imperial Holdings, Inc.) was seeking financing proposals while being the target of investigations by multiple government agencies relating to, among other things, its financial reporting.[15]   The Lender Parties understand that, although Emergent received other financing proposals, the Loan Agreement was pursued because it provided the best terms that were available in the market (including runway to operate the portfolio of life settlements).   In conjunction with putting in place the financing under the

---

[12] See In re Marvel Entm't Grp., 140 F.3d 463, 472 (3d Cir. 1998) (recognizing that a court may find cause to appoint a trustee when the inherent conflicts extend beyond the typical conflicts that exist between a debtor and its creditors).

[13] See NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 129 (3d Cir. 2004) ("To be filed in good faith, a petition . . . must seek to create or preserve some value that would otherwise be lost--not merely distributed to a different stakeholder--outside of bankruptcy."); see also In re Rent-A-Wreck of Am., Inc., 580 B.R. 364, 366 (Bankr. D. Del. 2018) (dismissing chapter 11 cases where the debtors were not in financial distress and were using the bankruptcy to "redistribute value from a long-time adversary to enrich their ultimate shareholder"); In re 15375 Mem'l Corp., 589 F.3d 605, 624 (3d Cir. 2009) (taking into consideration in its good faith analysis that "the Debtors' representative was primarily concerned with protecting [the ultimate parent entities], not the Debtors").

[14] As addressed more fully below, the Debtors' claims that they had to file these Chapter 11 Cases to avoid enforcement of some unnamed default ring false.  See First Day Declaration, ¶13 ("Upon the occurrence of an event of default and absent a bankruptcy filing, CLMG could instruct WT to deliver the pledged certificates to CLMG, effectively taking ownership of WEAP and its valuable life insurance policies.").

[15] Imperial Holdings, Inc., Annual Report (Form 10-K) (Mar. 28, 2013), at 1 (providing that, at the end of 2012, Emergent had a "limited cash position [that] was primarily as a result of the legal and other costs of the defense and investigation of the Company and certain employees in connection with the USAO Investigation, SEC investigation and related shareholder litigation, which required significant, unbudgeted cash outlays.").

Loan Agreement, Emergent created White Eagle, a special purpose entity formed to acquire, and obtain financing secured by, life insurance policies, which serve as the primary collateral for the Lender Parties.

8.      The Loan Agreement has provided White Eagle with access to up to $370 million of capital (subject to the terms thereof),[16] generally accrues interest at LIBOR (subject to a floor) plus a fixed margin of 4.5%,[17] and, absent acceleration, matures on December 31, 2031.[18]  In addition to the LIBOR plus 4.5% interest component of the Loan Agreement, the Loan Agreement further provides for LNV to be paid a "Participation Interest."  The Participation Interest generally entitles LNV to a 45% share (lowered from an initial 50% share pursuant to a January 2017 amendment to the Loan Agreement) of revenues generated from White Eagle's insurance policies, which is paid (contemporaneously with White Eagle's 55% share) after payment of other amounts, fees, and expenses under a waterfall set forth in the Loan Agreement (including, among other things, amortization and interest payments owed under the Loan Agreement and the operational expenses of servicing and maintaining the policies).[19]  The remaining 55% share may be used by White Eagle "for any purpose, including, without limitation, the payment of Premiums or Expenses."[20]  The Participation Interest is included among the "Obligations" (as defined in the Loan Agreement) for which White Eagle is obligated under the Loan Agreement and, like other Obligations, is secured by liens on substantially all of the Debtors' assets.  Further, the Participation Interest survives the maturity or repayment of the

---

[16] Loan Agreement § 2.1(a), Schedule 2.1(a).

[17] Id. § 3.1, Annex I.

[18] Id. § 4.1, Annex I.

[19] Id., clause "Thirteenth" of § 5.2(b), and clause "Twelfth" of § 5.2(e)

[20] Id. § 5.1(c).

loans and other Obligations under the Loan Agreement.

9.      However, following the maturity or repayment of the loans and other Obligations under the Loan Agreement, no distributions are made with respect to the Participation Interest unless certain restricted cash at White Eagle, which is reserved to ensure that White Eagle has sufficient liquidity to support the policies it owns, is released into the waterfall.[21]   Reserving such cash is necessary to protect against the "uneven cash flows that can be difficult to predict, and that can lead to liquidity issues if the benefit payouts received are insufficient to cover the cash outlays from operating expenses, the required premium payments, and the interest payment on the debt needed to finance the business."[22]   LNV, for its part, has received only about $806,000 of distributions from the Participation Interest since the January 2017 amendment.

### III.    Emergent's Own Financial Difficulties Caused Friction

10.      In 2015, Emergent began experiencing liquidity issues and sought to renegotiate the terms of the Loan Agreement.  Those discussions resulted in the restructuring of the Loan Agreement in January 2017 in a manner that provided additional flexibility for White Eagle to dividend cash to Emergent if certain conditions were satisfied.[23]   Thereafter, in July 2017, a recapitalization of Emergent resulted in a change of control as a result of an acquisition of Emergent by PJC Investments, LLC (Emergent's current largest shareholder) and certain other parties.[24]   Shortly thereafter, a representative of Emergent approached the Lender Parties with a

---

[21] Id. clause "Seventh" of § 5.2(e) and § 5.2(g).

[22] First Day Declaration ¶7.

[23] The January 2017 amendment to the Loan Agreement, among other things, (i) reduced the Participation Interest from 50% to 45% and (ii) changed the "cash flow sweep" formula to allow more cash to be distributed to Emergent (subject to a loan-to-value ratio).  In addition, the Lender Parties, subject to certain conditions, separately waived a yield maintenance fee that would have otherwise been due after a separate facility was paid off under which an affiliate of Emergent was the borrower.

[24] Emergent Capital, Inc., Current Report (Form 8-K) (July 28, 2017).

series of requests for amendments to the Loan Agreement, purportedly to provide White Eagle with the flexibility necessary to continue as a going concern and to service its portfolio of insurance policies.[25]   In the course of these negotiations, it became clear that the requested amendments were not for the benefit of White Eagle, which did not need the proposed amendments in order to continue its business, but were instead intended to benefit Emergent by, among other things, reducing the Participation Interest and allowing cash at White Eagle to be upstreamed to Emergent.

11.    Again, there is no indication that White Eagle requires additional liquidity or flexibility to preserve its insurance policies, but the Lender Parties, in the past, have been willing to provide such liquidity to protect the value of their collateral (as they did in January 2017). This makes perfect sense.  The Lender Parties have no interest in "starving" White Eagle of cash, as doing so would risk diminution in the value of their collateral (by virtue of premiums not being paid) and increase the possibility that the $367.9 million of funds advanced under the Loan Agreement to date, and related Obligations, would not be repaid.[26]   As the Lender Parties and White Eagle directly negotiated over the course of the summer of 2018, LNV continued to express a willingness to provide any necessary funds to maintain and preserve White Eagle's life insurance policies.[27]   In fact, on December 5, 2018, LNV provided a protective advance under the Loan Agreement notwithstanding the continuing default under the Loan Agreement caused by the bankruptcy filing of White Eagle's limited partner and general partner.

---

[25] Zatz Declaration, Exhibit 3 (Email from William M. Issac to Jacob Cherner and Brian Bailey dated April 10, 2018).

[26] The Lender Parties' adherence to the terms of the Loan Agreement has benefited White Eagle even in circumstances when LNV could have received distributions from restricted funds being applied to the waterfall.

[27] Zatz Declaration, Exhibit 4 (Email from Thomas E Lauria to Eric Taube dated July 26, 2018) and Exhibit 5 (Email from Thomas E Lauria to Eric Taube dated July 30, 2018).

12.     Clearly, these negotiations did not go as Emergent had hoped, particularly with respect to the Lender Parties' decision not to allow certain otherwise restricted funds to be dividended by White Eagle to Emergent in lieu of those funds flowing through the waterfall set forth in the Loan Agreement (which would have benefitted White Eagle while still providing the possibility of a dividend – albeit a smaller one – to Emergent).  While the parties did not reach an agreement on amendments to the Loan Agreement or other potential resolutions of their issues, to the Lender Parties' respective knowledge, White Eagle did not default under the Loan Agreement, and there was no need for White Eagle to seek bankruptcy protection.  Nevertheless, White Eagle's general and limited partners decided to initiate these Chapter 11 Cases, which was what caused White Eagle to default under the Loan Agreement, a default for which – importantly – the Debtors have never requested a waiver.

## IV.    White Eagle's Bankruptcy Filing is Unnecessary

13.     Nothing in the First Day Declaration justifies the Debtors' decision to pursue these Chapter 11 Cases.  The First Day Declaration does not claim that White Eagle lacks sufficient liquidity to operate its business or even that it was in default under any of its obligations.  Moreover, the Debtors allege that White Eagle has substantial equity value (as it must for the Debtors' arguments with respect to the Participation Interest to be relevant).  Finally, as explained above, even if White Eagle did experience liquidity concerns, the Lender Parties have historically been willing to work with White Eagle on issues relating to the payment of premiums and the maintenance of the portfolio and have never denied a borrowing request from White Eagle.[28]

---

[28] Zatz Declaration, Exhibit 6 (Email from Boris Ziser to Eric Taube dated September 2, 2018) and Exhibit 7 (Email from Thomas E Lauria to Eric Taube dated November 2, 2018).

14.     Indeed, the only reason that these Chapter 11 Cases were filed was to create a platform for Emergent, through the Debtors (and perhaps in its own name), to assert causes of action against the Lender Parties.  In sum, because the Loan Agreement does not provide White Eagle with as much flexibility to make dividends as Emergent would like, the Debtors have pointed to the possibility of a potential default (a default which they do not identify and never discussed with the Lender Parties prepetition) to file these Chapter 11 Cases and thereafter file an adversary complaint against the Lender Parties.  Emergent's position appears to be that, because it cannot persuade the Lender Parties to agree to deprive their borrower, White Eagle, of value for Emergent's benefit, Emergent will force the issue by using novel (and meritless) legal theories in a lawsuit that asks the Court to rewrite the terms of the Loan Agreement, including the Participation Interest.  With no other secured debt at White Eagle, virtually no unsecured creditors, and Emergent as the indirect sole equity owner of White Eagle, the success of these lawsuits would benefit Emergent <u>exclusively</u>, and with the cost of paying both sides of the litigation to be borne entirely by White Eagle.

## V.     Allegations Against the Lender Parties in the First Day Declaration Are Improper

15.     In any event, all of the Debtors' allegations regarding the Lender Parties' alleged abuse of their discretion under the Loan Agreement are irrelevant to the relief sought in the First Day Motions (which relief the Lender Parties do not oppose).  Given their irrelevance, the Lender Parties object to the admission of such allegations,[29] as well as any other portions of the First Day Declaration that purport to support the Debtors' claims against the Lender Parties. Those provisions, which all relate to the claims that the Debtors (and possibly Emergent) seek to

---

[29] <u>See</u>, without limitation, First Day Declaration ¶¶15-16.

bring against the Lender Parties solely for the benefit of Emergent, are not relevant to the first day relief being sought by the Debtors, which relief can be granted without resolving any of these issues.  At the appropriate time, the burden will be on the Debtors and Emergent to prove their allegations by admissible evidence and subject to cross-examination.  Such issues are not, however, properly considered at a first day hearing, and thus, the Lender Parties do not believe that an evidentiary hearing on these matters is necessary or appropriate at this time.

## VI.    The Lender Parties Reserve Rights

16.    Notwithstanding their obvious concerns about the Debtors, Emergent, and the circumstances of these Chapter 11 Cases, the Lender Parties engaged with the Debtors prior to the filing of White Eagle's Chapter 11 Case.  As a result of those discussions, the Lender Parties agreed to certain relief sought by the First Day Motions (as modified as a result of such negotiations), on an interim basis.  Nonetheless, the Lender Parties reserve all of their respective rights with respect to the Debtors, Emergent, the Loan Agreement, these Chapter 11 Cases, and otherwise (including with respect to any final or further interim relief regarding the First Day Motions).

*[Remainder of Page Intentionally Left Blank]*

Dated: December 17, 2018
       Wilmington, Delaware

Respectfully submitted,

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (No. 3047)
**FOX ROTHSCHILD LLP**
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone:  (302) 654-7444
Facsimile:  (302) 463-4971
jschlerf@foxrothschild.com

Thomas E Lauria (*pro hac vice* admission pending)
Jesse L. Green (*pro hac vice* admission pending)
**WHITE & CASE LLP**
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com
jgreen@whitecase.com

  –and–

David M. Turetsky (*pro hac vice* admission pending)
Andrew T. Zatz (*pro hac vice* admission pending)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
dturetsky@whitecase.com
azatz@whitecase.com

  –and–

Jason N. Zakia (*pro hac vice* admission pending)
**WHITE & CASE LLP**
227 West Monroe Street, Suite 3900
Chicago, IL 60606-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
jzakia@whitecase.com

*Attorneys for CLMG Corp.*
*and LNV Corporation*