**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | ) | Case No. 18-12808 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 7** |
| | ) | |

**PRELIMINARY OBJECTION OF CLMG CORP. AND LNV CORPORATION TO
MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) PROVIDING
ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY, AND
(D) SCHEDULING A FINAL HEARING**

CLMG Corp. ("CLMG") and LNV Corporation ("LNV" and, together with CLMG, the "Lender Parties"), as administrative agent and sole lender, respectively, under the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), submit this preliminary objection (the "Preliminary Objection") to the *Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling A Final Hearing* [Docket No. 7] (the "Motion") and respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      The Lender Parties have significant concerns about the conduct of these chapter 11 cases (the "Chapter 11 Cases") and the undue influence over the Debtors that is being exerted by their ultimate parent, Emergent Capital, Inc. ("Emergent"), which has not filed for

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, include:  White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738).  The Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

bankruptcy.  These Chapter 11 Cases were filed to serve Emergent's interests, not the Debtors', with the sole purpose of the filings being to bring meritless litigation against the Lender Parties for Emergent's benefit.  The Debtors have no independent management (the Debtors' lone alleged officer is also the chief financial officer of Emergent) or even employees of their own, and are instead entirely subject to the direction of Emergent.

2.      Moreover, Debtor White Eagle Asset Portfolio, LP ("White Eagle") and Emergent have significant and irreconcilable conflicts of interest.  Emergent needs liquidity to survive and avoid a chapter 11 case of its own, and it wants to access cash at White Eagle, the borrower under the Loan Agreement, to satisfy those needs.  It was Emergent's inability to extract cash from White Eagle without causing a default under the Loan Agreement and desire to pursue litigation against the Lender Parties at White Eagle's expense that was the cause of these Chapter 11 Cases.  Moreover, because White Eagle has no independent management or employees of its own, with its lone alleged officer also being the chief financial officer of Emergent, White Eagle has no ability to resist Emergent's demands.  And every dollar that leaves White Eagle to pay for Emergent or Imperial Finance's expenses is value lost at White Eagle with nothing in return.  This is particularly problematic because White Eagle derives its income from life settlement assets with cash flows that are uneven, are difficult to predict, and can easily result in liquidity issues if such cash flows are insufficient to cover operating expenses.[2]

3.      The relief that the Debtors seek under the Motion is one example of the manner in which these Chapter 11 Cases are being improperly directed to pursue Emergent's interests at the expense of White Eagle.  By the Motion, the Debtors seek to use White Eagle's cash – which  is

---

[2]    *See Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration") at ¶ 7.

also the Lender Parties' cash collateral – for a number of expenses that have historically been paid by Emergent with its own cash and that are not necessary to maximize the value of White Eagle or to protect and maintain White Eagle's assets but are instead designed to benefit Emergent to the detriment of White Eagle.  In fact, a number of the Debtors' requested transfers to non-Debtor affiliate Imperial Finance & Trading, LLC ("Imperial Finance"), a direct subsidiary of Emergent, would pay for expenses that are for the benefit of Emergent.  The Debtors allocate 100% of the expenses at Imperial Finance to White Eagle even though White Eagle has no obligations to pay for services that benefit non-Debtor affiliates and derives no or little benefit from such services, and with the result being that Emergent and any of the non-Debtor affiliates who are beneficiaries are paying nothing for their benefit under the Debtors' proposal.  Moreover, certain of such expenses exclusively benefit Emergent by paying for Emergent's overhead but providing no direct benefit to White Eagle.  And White Eagle substantially overpays Imperial Finance for services compared to what it would need to pay a third party for the same services.

4.    This lopsided arrangement is the result of negotiations between Emergent and itself because White Eagle has no independent management or employees of its own and thus there is no party who is negotiating on White Eagle's behalf with respect to the terms of these services, let alone on anything resembling an arms'-length basis.  Importantly, none of these payments is consistent with the Loan Agreement or common practice prepetition; the Debtors point to an Administrative Services Agreement between White Eagle and Imperial Finance to justify such payments, but this agreement does not require White Eagle to make the payments in question (and certainly not of the magnitude in question), and in any event has not been assumed by the Debtors.  Moreover, no payments were made by White Eagle under such agreement

3

prepetition.  As such, the Lender Parties do not consent to the use of Cash Collateral for these expenses and the Debtors cannot satisfy their required burden to substantiate making such payments on a nonconsensual basis.

5.    Given the Lender Parties' concern over certain of the expenses proposed to be paid by the Debtors with the Cash Collateral, on December 21, 2018, the Lender Parties served on the Debtors document requests and interrogatories related to the Motion, each of which requested responses by January 7, 2019.[3]  On December 31, 2018, the Lender Parties and the Debtors held a meet and confer to discuss certain consensual limitations to the requests.  On January 7, 2019, the Debtors responded to the discovery requests and began rolling production of documents.[4]  The Debtors' response to 24 of the Lender Parties' 25 interrogatories cited to Federal Rule of Civil Procedure 33(d) and referred the Lender Parties to the produced documents.  However, few – if any – of the interrogatories are, in fact, answered in any way by the documents produced, which consist largely of engagement letters and invoices.  Moreover, the Debtors ignored the Lender Parties' "Interrogatory No. 22," which requested information related to line items in the budget including (a) the identity of the persons or entities who determined or will determine the amount of each charge, (b) any negotiations pertaining to the

---

[3]    *See Notice of Service of CLMG Corp. and LNV Corporation's First Request for Production of Documents to the Debtors in Connection with the Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing; Notice of Service of CLMG Corporation's First Set of Interrogatories to the Debtors in Connection with the Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket Nos. 55 and 56].

[4]    *See Notice of Service of (I) Debtors Responses and Objections to CLMG Corp. and LNV Corporations First Set of Interrogatories to the Debtors in Connection with the Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing; and (II) Debtors Responses and Objections to CLMG Corp. and LNV Corporations First Request for Production of Documents to the Debtors in Connection with the Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 59].

amount of each charge, (c) the legal or contractual basis for the imposition of each charge on White Eagle, (d) the allocation of costs between White Eagle and other entities, (e) the basis of any allocation of costs between White Eagle and other entities and (f) any efforts or analysis by Emergent, Imperial Finance, or White Eagle to determine whether the amount charged to White Eagle was or will be consistent with the fair market value of the services provided, regardless of whether the services were or will be performed by Imperial Finance, Emergent, or another party. The Debtors also did not respond to interrogatories that would show whether any party other than the Debtors would benefit from amounts to be paid to Imperial Finance and what those benefits would be.  Without this crucial information, the Lender Parties cannot fully evaluate the proposed 13-week budget sent by the Debtors to the Lender Parties on January 8, 2019 or the proposed expenses thereunder.

6.      To be clear, the Lender Parties do not ask that the Court deny White Eagle authority to make payments for expenses that are necessary to maintain White Eagle's assets and preserve their value.[5]  To that end, the Lender Parties would be willing to agree to a further cash collateral order on the same terms as the *Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 37] (the "Interim Cash Collateral Order") (including a reservation of rights for the Lender Parties to request the offset of any distributions or transfers

---

[5]     The Lender Parties have repeatedly demonstrated their willingness to agree to the payment of the necessary expenses of White Eagle; most importantly, the payment of premiums for White Eagle's portfolio of insurance policies as they come due.  Such support has included the making of a protective advance of approximately $4.2 million prior to White Eagle's bankruptcy filing during the continuance of the event of default caused by the bankruptcy filings of White Eagle's limited partner and general partner. The Lender Parties' motivation for such support is simple – to do otherwise would potentially harm the Lender Parties' collateral and, thus, decrease their chances of being repaid in full under the Loan Agreement.

made to any non-Debtor affiliate in these Chapter 11 Cases)[6] that includes a budget reflecting payments to Imperial Finance only for expenses that benefit White Eagle at market rates and with the appropriate allocation, so that Emergent and Imperial Finance are required to pay their fair share.  The Lender Parties request that the Court deny approval of the Motion on a final basis absent the Debtors' acceptance of modifications to their proposed budget that address the proposed improper payments.

## BACKGROUND

### I.    The Chapter 11 Cases

7.    On November 14, 2018, White Eagle's limited partner, Lamington Road Limited ("Lamington Road"), and its general partner, White Eagle General Partner, LLC ("White Eagle GP"), filed chapter 11 cases.  As a justification for filing their chapter 11 cases, Lamington Road and White Eagle GP cited concerns that the Lender Parties would call an unspecified default under the loan documents, despite no such default having been identified or asserted by the Lender Parties.  White Eagle filed its Chapter 11 Case on December 13, 2018, citing, as a justification, the default under the Loan Agreement precipitated by the filings of Lamington Road and White Eagle GP.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committee has been appointed.

### II.    Operations of White Eagle

8.    White Eagle is a special purpose entity formed by its indirect parent, Emergent, to acquire and hold life insurance policies.  White Eagle is a pass-through entity and, thus, does not

---

[6]    This reservation reflects that such distributions or transfers to non-Debtor affiliates were intended to (and outside chapter 11, would) flow through the Loan Agreement and its waterfall provisions.  To the extent the Debtors now need to make direct payments to preserve their assets and the Lender Parties' collateral, such payments should reduce distributions to non-Debtors affiliates pursuant to a chapter 11 plan or otherwise to avoid what would otherwise, in essence, result in priority shifting through the use of Cash Collateral.

AMERICAS 97999904

have any obligation to pay federal income taxes.[7]  White Eagle has not been, and likely will no

longer be, pursuing the purchase of additional policies; rather, it is currently primarily in runoff

whereby it simply owns the policies, ensures that premiums on them are paid, and receives

proceeds in the ordinary course.  White Eagle obtained the funds necessary to purchase such

policies with the approximately $367.9 million loaned by LNV under the Loan Agreement.

9.      As security for the loans, and all other obligations under the Loan Agreement, the

Lender Parties were granted first priority liens and security interests on, among other things,

substantially all of White Eagle's assets, including White Eagle's interests in its life insurance

policies and the proceeds therefrom, and all other cash held by White Eagle.[8]  As described in

the *Motion of Debtors for Order Authorizing (A) Continuance of Existing Cash Management*

*System, (B) Intercompany Transactions, (C) Limited Waiver of Section 345(b) Deposit and*

*Investment Requirements, and (D) Granting Related Relief* [Docket No. 6], such cash is held in

several pledged accounts (the "<u>Pledged Accounts</u>") in accordance with the Loan

Agreement.  CLMG has perfected security interests in the Pledged Accounts pursuant to the

Second Amended and Restated Securities Account Control and Custodian Agreement, dated as

of January 31, 2017, among CLMG, White Eagle, and Wilmington Trust, N.A., as securities

intermediary and custodian (the "<u>Account Control Agreement</u>").[9]  As the Debtors stipulate and

---

[7]    *See, generally*, *Partnerships*, Internal Revenue Service ("A partnership must file an annual information return to report the income, deductions, gains, losses, etc., from its operations, but it does not pay income tax.  Instead, it 'passes through' any profits or losses to its partners.  Each partner includes his or her share of the partnership's income or loss on his or her tax return."),  https://www.irs.gov/businesses/small-businesses-self-employed/partnerships (last visited Jan. 3, 2019).

[8]    Loan Agreement § 2.6(a) and Account Control Agreement (as defined herein) § 3.1.

[9]    The Account Control Agreement is attached as Exhibit 1 to the *Declaration of Andrew Zatz in Support of Preliminary Objection of CLMG Corp. and LNV Corporation to Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying  the Automatic Stay, and (D) Scheduling a Final Hearing* (the "<u>Zatz Declaration</u>"), filed concurrently herewith.

AMERICAS 97999904

agree in the Interim Cash Collateral Order, the liens and security interests in favor of CLMG, including its interests in the Pledged Accounts, are legal, valid, binding, enforceable non-avoidable and properly perfected.[10]  The Debtors have also stipulated and agreed to the legality, validity, non-avoidability, proper perfection, and enforceability of CLMG's liens and security interests – and to the obligations under the Loan Agreement themselves – in numerous borrowing requests, including as recently as November 28, 2018.[11]

10.    White Eagle has no employees of its own.[12]  White Eagle's only officer is Miriam Martinez, who is also the chief financial officer of Emergent.[13]  Most of the necessary services that benefit White Eagle are provided by (i) MLF LexServ LP, as servicer of White Eagle's portfolio, (ii) Wilmington Trust, N.A., as custodian and securities intermediary, and (iii) Lamington Road Bermuda Ltd. ("Lamington Bermuda"), as portfolio manager.[14]

11.    White Eagle is also party to an Administrative Services Agreement, dated as of May 16, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Administrative Services Agreement"),[15] with Lamington Bermuda, as portfolio manager, and Imperial Finance, whereby White Eagle has agreed to pay Imperial Finance for certain

---

[10]    Interim Cash Collateral Order at ¶ 3(a)(v).  LRDA also maintains two foreign accounts with an aggregate balance of less than $25,000 (the "Foreign Accounts").  The funds in the Foreign Accounts are used by LRDA for general corporate purposes.  The Foreign Accounts are not controlled accounts or otherwise subject to the Account Control Agreement.

[11]    *See* Borrowing Request.

[12]    *See Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration") at ¶ 9.

[13]    *Id.* ¶ 1.

[14]    *See* Loan Agreement, Annex I, at I-7 and I-28.

[15]    The Administrative Services Agreement is attached as Exhibit 2 to the Zatz Declaration.

AMERICAS 97999904

administrative services and support.  Specified services and support to be provided by Imperial Finance to White Eagle include information systems services, financial reporting, preparation of borrowing certificates and requests under the Loan Agreement, insurance, and audit and tax services.[16]  The Administrative Services Agreement does not require the payment by White Eagle of Imperial Finance's employees, office space or other overhead expenses nor does it provide for the payment of expenses for services that do not benefit White Eagle.  The services to be provided by Imperial Finance under the Administrative Services Agreement are to be rendered at "reasonable, fair market value"[17] and "bill[ed] . . . based on actual costs, or an appropriate allocation methodology reasonably reflecting actual costs, for the [s]ervices provided."[18]  The Debtors have made no efforts to assume the Administrative Services Agreement under section 365 of the Bankruptcy Code.

12.    Although the Loan Agreement identifies the Administrative Services Agreement as a "Transaction Document,"[19] the Loan Agreement does not expressly contemplate that payments be made by White Eagle under the Administrative Services Agreement.  Payments under the Administrative Services Agreement were never included in any annual budgets for payments to be made by White Eagle under the "Expenses" distribution in the Loan Agreement payment waterfall, nor was any such request ever made by Emergent or Imperial Finance.  In fact, the Lender Parties believe White Eagle has never made any payments under the Administrative Services Agreement.

---

[16]    *See* Administrative Services Agreement, Exhibit A.

[17]    *Id.*, § 2 and Exhibit B.

[18]    *Id.* § 2, Exhibit B.

[19]    *See* Loan Agreement, Annex I, at I-29.

### III.    Operations of Emergent

13.    Emergent, formerly known as Imperial Holdings, Inc., is a publicly-filed corporation that formerly traded on the New York Stock Exchange and now trades on the over-the-counter market under the ticker EMGC.[20]  Emergent was formed and structured to pursue a variety of business opportunities, including investing in short and long-term life settlement investments, providing premium financing for individual life insurance policies issued by insurance companies,[21] building specialty finance companies, and providing market leadership to the life settlement industry.[22]  However, Emergent's only apparent source of significant revenue is currently from its indirect equity interests in White Eagle (which, itself, is largely in runoff). Regardless of this limited scope, Emergent maintains essentially the same structure and operations as it always has, employing thirteen employees at Emergent and Imperial Finance.[23] Emergent has its own debt obligations consisting of over $115.8 million of secured notes.[24] Further, Emergent has its own expenses, unique to Emergent, including (a) preparing its tax returns, (b) maintaining its status as a public company,[25] (c) preparing deliverables required under its note indentures,[26] and (d) negotiating with its noteholders.[27]

---

[20]    *See* Emergent Capital, Inc., Annual Reports (Form 10-K) (Mar. 14, 2018), at 1, 13, and 15.

[21]    *See* Emergent Capital, Inc., Annual Reports (Form 10-K) (Mar. 31, 2011).

[22]    *See About Us*, EMERGENTCAPITAL.COM, http://emergentcapital.com/site/ (last visited Jan. 3, 2019).

[23]    *See* Emergent Capital Inc., Annual Reports (Form 10-K) (Mar. 14, 2018), at 2.

[24]    *See* Emergent Capital, Inc., Current Reports (Form 8-K) (Aug., 1, 2017).

[25]    *See* Zatz Declaration, Exhibit 3 (White Eagle – Cash Variance Report, dated December 21, 2018 (reflecting higher personnel expenses due to taxes on vested RSUs)).

[26]    *See* Emergent Capital, Inc., Current Reports (Form 8-K) (Aug. 1, 2017), Exhibit 4.3 § 6.02-03 (Amended and Restated Indenture, dated as of July 28, 2017, by and among Emergent Capital, Inc. and US Bank National Association) ("The Company shall deliver to the Trustee copies of all annual reports, quarterly reports and other

AMERICAS 97999904

## IV.    The Interim Cash Collateral Order

14.    During the period between the filing of Lamington Road and White Eagle GP's Chapter 11 Cases and the filing of White Eagle's Chapter 11 Case, White Eagle and the Lender Parties entered into six standstill agreements in an attempt to resolve the issues among the parties.  Although, such attempts were unsuccessful, during the period between the two filings dates the parties negotiated the terms of first day relief in the Chapter 11 Cases.  Such relief included the Interim Cash Collateral Order, which incorporated an agreed-upon 45-day budget (the "Interim Budget").  The Lender Parties consented to the expenses in the Interim Budget on an interim basis only and fully reserving rights to contest any use of Cash Collateral on a final basis.[28]

## V.    Proposed Payments to Imperial Finance and Ordinary Course Professionals

15.    On January 8, 2019, the Debtors sent the Lender Parties a proposed budget (the "Debtors' Proposed Budget"), which includes a line item of approximately $560,000 per month to be made for "Overhead/Operating Costs" to be transferred to Imperial Finance.  A separate

---

documents . . . an Officer's Certificate as to the signer's knowledge of the Company's compliance with all conditions and covenants on its part contained in this Indenture").

[27]    See Emergent Capital, Inc., Current Reports (Form 8-K) (Dec. 10, 2018) (detailing Emergent's entry into a supplemental indenture for certain of its outstanding bonds that provides an election for the holders of such bonds to receive interest in kind (i.e., applied to principal), likely to prevent a payment default under such notes); see also Emergent Capital, Inc., General Statement of Acquisition of Beneficial Ownership (Schedule 13D/A) (Jan. 2, 2019) (referencing a letter agreement between Ironsides Partners LLC and Emergent whereby Ironside Partners LLC agreed to invest in Emergent's notes for a substantial discount); Emergent Capital, Inc., Current Reports (Form 8-K) (Jan. 3, 2019) (detailing Emergent's entry into a subscription agreement for the sale of its senior secured notes).

[28]    See Interim Cash Collateral Order ¶ 3(d) ("This Interim Order is without prejudice to, and nothing contained in this Interim Order constitutes or shall be deemed a waiver (expressly or implicitly) by any Prepetition Secured Party of, any rights, claims or defenses that it may have against the Debtors or any other party-in-interest in these chapter 11 cases or otherwise.  The Prepetition Secured Parties reserve all such rights, claims and defenses in all respects, including, without limitation, the right to contest or object on any basis to . . . (ii) any further request by the Debtors for the use of Cash Collateral beyond the terms of this Interim Order (whether on a final or further interim basis), including any proposed budget in connection therewith, on the terms set forth in the Motion or otherwise"); Interim Budget at 1 ("All of the Debtors and CLMG and LNV's rights with respect to any future budget are reserved in full, and any agreement on amounts or types of expenses set forth in this interim budget are not, in any way, intended to suggest approval of any similar amounts or types of expenses in any future budget.").

AMERICAS 97999904

page in the Debtors' Proposed Budget itemizes that line item and includes charges labeled "audit and tax," "office space" and "salaries and wages" (collectively, the "Disputed Expenses").

16.     As set forth above, the Lender Parties have conducted discovery to assess the various expenses for which the Debtors have requested authorization to use Cash Collateral, including whether, and to what extent, such expenses benefit White Eagle and whether such expenses are commensurate with prevailing market rates.   Given the timeline and the deficiencies in the Debtors' production, the Lender Parties have not yet had a reasonable opportunity to adequately review the Debtors' production to fully assess whether amounts proposed to be charged to White Eagle under the Debtors' Proposed Budget are appropriate (and reserve all rights with respect thereto).   Nonetheless, and notwithstanding the glaring deficiencies in the Debtors' productions, the Lender Parties' initial review suggests that many of the proposed charges in the Debtors' Proposed Budget, including the Disputed Expenses, are not properly allocable to White Eagle.

17.     In this regard, the Lender Parties believe there are numerous proposed payments under the Debtors' Proposed Budget that benefit, in whole or in part, non-Debtor affiliates of White Eagle.   First, the Debtors seek to pay $118,500 in January and $138,500 per month thereafter for audit and tax services solely for Emergent, which – unlike the Debtors – is required to pay taxes.   Second, the Debtors seek to pay $244,281 in January and $172,914 per month thereafter for the salaries, benefits and related expenses of each of Emergent and Imperial Finance's thirteen employees, who manage Emergent and Imperial Finance and do not work directly for the Debtors.  Based on the documents produced by the Debtors, these salaries include the full salaries of the chief executive officer and the chief financial officer of Emergent and other employees of Emergent and/or Imperial Finance.   Third, there are various other expenses

12

uncovered in discovery that appear to be exclusively the obligations of Emergent, as set forth in detail below.  The Debtors' Proposed Budget – if approved – would require White Eagle to bear 100% of the foregoing expenses.

18.      Further, the payments to Imperial Finance for services that may arguably benefit the Debtors are substantially above-market compared to what the Debtors would pay for such services from a third party.  As set forth in detail in the *Declaration of Mark Venn in Support of Preliminary Objection of CLMG Corp. and LNV Corporation to Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling A Final Hearing* filed concurrently herewith (the "Venn Declaration"), the expert opinion of Mark Venn is that the services currently provided by Imperial Finance could be outsourced to a corporate services provider for an all-in cost of approximately $204,750 per month.[29]  Even taking into account a potential $150,000 expense of transitioning to a new corporate services provider, such transition would result in an at least 60% reduction in the amount of such expenses.[30]  This reduction in cost is explained, in part, by the fact that the Debtors would not have to pay directly for the overhead expenses of the new corporate services provider, such as office space and office supplies.  It also is partially explained because White Eagle could negotiate market terms with a third party while, with Emergent (or an Emergent controlled entity such as Imperial Finance) as its service provider, it suffers from inherent conflicts of interests and merely accepts whatever terms Emergent demands.

---

[29]    Mark Venn is the chief executive officer and managing director of ClearLife Limited with over 25 years of experience in the life insurance industry.

[30]    Venn Declaration, ¶¶ 14-15, 18.

## PRELIMINARY OBJECTION

**I.    The Lender Parties Have Valid Perfected Security Interests in the Cash Collateral**

19.    The Motion seeks authority to use the Debtors' cash, which the Debtors concede is subject to the Lender Parties' security interests.[31]  The Lender Parties' sole burden in this proceeding is to demonstrate the "validity, priority, or extent of [its] interest" in the property that is the subject of the Motion.  11 U.S.C. § 363(p)(2).

20.    The Lender Parties have carried this burden by submitting to the Court the Loan Agreement and Borrowing Request dated November 28, 2018 (the "Borrowing Request") attached as Exhibits 1 and 2 to the *Declaration of Andrew Zatz in Support of the Preliminary Response of CLMG Corp. and LNV Corporation to Debtors' First Day Motions and to Declaration of Miriam Martinez in Support of First Day Motions* [Docket No. 24] and the Account Control Agreement.

21.    As stated above, pursuant to section 2.6(a) of the Loan Agreement and section 3.1 of the Account Control Agreement, White Eagle has pledged and granted to the Lender Parties a first priority lien on and security interest in, among other things, all of White Eagle's cash.  The Lender Parties' security interests in the securities accounts are duly perfected and fully enforceable pursuant to the Account Control Agreement.  In addition, in paragraph 3(a)(v) of the Interim Cash Collateral Order, the Debtors stipulate and agree that the liens, security interests and pledges granted in favor of CLMG are legal, valid, binding, enforceable, non-avoidable and properly perfected.  As such, White Eagle's cash constitutes "cash collateral" as defined in section 363(a) of the Bankruptcy Code and the Lender Parties have a valid and fully perfected

---

[31]    *See* Interim Cash Collateral Order ¶ 3(a)(v).

AMERICAS 97999904

interest in the Cash Collateral that is the subject to the Motion.[32]  As noted above, White Eagle

also conceded to this in the Borrowing Request on November 28, 2018.[33]

## II.     The Disputed Expenses Are Not Ordinary Course

22.     If a chapter 11 debtor seeks to use cash collateral, it must obtain court approval

after notice and a hearing regardless of whether such proposed use is in or outside the ordinary

course of business.  *See* 11 U.S.C. § 363(b) ("The trustee, after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate"); § 363(c)(2)

("The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection

[which generally authorizes the use of collateral in the ordinary course of business absent notice

and a hearing] unless–(A) each entity that has an interest in such cash collateral consents; or (B)

the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section.").

23.     While the Debtors suggest that their proposed use of Cash Collateral is in the

ordinary course of business,[34] this characterization is false.  In determining whether a transaction

is ordinary course, most courts, including in the Third Circuit, engage in a "two-step inquiry,"

---

[32]   Section 363(a) of the Bankruptcy Code states:

> In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property… subject to a security interest as provided in section 552(b) of this title, whether existing before or after commencement of a case under this title.

[33]   *See* Borrowing Request at 1-2 ("The undersigned hereby certifies that as of the date hereof, and as of the date of the requested Advance . . . all conditions precedent to the making of the Advance as set forth in Section 7.2 of the Loan Agreement have been met."); Loan Agreement §§ 7.2 ("On and as of the date of such Ongoing Maintenance Advance: (i) the representations of . . . the Borrower . . . set forth in the Transaction Documents [including the Loan Agreement] shall be true and  correct in all material respects with the same effect as if made on such date, and (ii) . . . the Borrower . . . shall be in compliance with the covenants set forth in the Transaction Documents to which it is a party."), 8.2 (containing White Eagle's representation and warranty that, among other things, the liens, security interests and pledges granted in favor of CLMG are legal, valid, binding, enforceable, non-avoidable and properly perfected).

[34]   *See* Motion ¶ 32 (citing section 363(c) of the Bankruptcy Code).

AMERICAS 97999904

which consists of analyzing (i) whether the use is of the sort commonly undertaken by companies in the industry (*i.e.*, the "horizontal" test) and (ii) whether the use subjects a creditor to greater risk than it expected when it decided to extend credit (*i.e.*, the "vertical" test). *See In re Roth Am., Inc.*, 975 F.2d 949, 952–53 (3d Cir. 1992); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del. 2007). If either test is not satisfied, the disputed use is not in the ordinary course of business. *See In re Leslie Fay Cos.*, 168 B.R. 294, 303–05 (Bankr. S.D.N.Y. 1994).

24.     Here, the Debtors fail on both accounts. <u>First</u>, neither the direct payment of overhead expenses of a services provider unrelated to the services provided nor the substantial overpayment (of over 60%) for such services is common in the industry or expected by creditors. <u>Second</u>, as set forth above, the requested uses for Cash Collateral to which this Preliminary Objection applies were not expenses White Eagle paid in the ordinary course of business prepetition, and accordingly the Debtors' requested use subjects the Debtors' creditors to greater risk than was expected at the time that credit was extended. Accordingly, the proposed use of Cash Collateral to pay such expenses cannot now be deemed to be in the ordinary course of the Debtors' business, and such use is properly analyzed under section 363(b) of the Bankruptcy Code.

## III.    The Debtors Cannot Satisfy the Burden Required for the Use of Cash Collateral for the Disputed Expenses

25.     The Debtors cannot carry their required burden for approval of the Disputed Expenses. The Debtors may argue that the Lender Parties are adequately protected by certain provisions of a final order authorizing the use of Cash Collateral or possibly by an equity cushion. The Lender Parties reserve all rights with respect to whether they are adequately

protected and any related valuation issues.[35]    Yet, this is not the end of the inquiry because "[e]ven in situations where adequate protections are available cash collateral can not be used for a nonbusiness purpose." *In re Plaza Family P'ship*, 95 B.R. 166, 174 (E.D. Ca. 1989).

26.    The Court should apply heightened scrutiny in the form of the entire fairness standasrd in deciding whether to approve the Disputed Expenses.    In determining whether to authorize the use of cash collateral outside of the ordinary course of business, courts must, under normal circumstances, find a "good business reason" to grant such application, such as "act[ing] to further the diverse interests of the debtor, creditors and equity holders." *In re Enron Corp.*, 335 B.R. 22, 28 (Bankr. S.D.N.Y. 2005) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *see also In re Express One Int'l, Inc.*, 2002 Bankr. LEXIS 1952, at *10-11 (Bankr. N.D. Tex. April 16, 2002) (considering whether to authorize the debtor to use cash collateral "with appropriate deference to Debtor's business judgment, whether the proposed use of cash is consistent with the interests of creditors and the estate."); *In re Podzemny*, No. 09-14226 2011 Bankr. LEXIS 567, at *23 (Bankr. D.N.M. Feb. 8, 2011) ("In considering a debtor's request to use estate property . . . the Court must determine whether the debtor has sufficiently justified the proposed transaction[, which] requires a showing of an 'articulated business justification' for use of the estate property.").

27.    However, where the proposed transfers involve a conflicted transaction, heightened scrutiny in the form of the entire fairness standard should apply.    *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) ("In evaluating a transaction between a controlling shareholder and its corporation, the Delaware courts require a showing that

---

[35]    In October and November 2018, leading underwriters in the life settlements industry released announcements regarding increases in projected life expectancies, which would have the effect of reducing the value of the Portfolio and, therefore, the Lender Parties' collateral. *See* First Day Declaration ¶ 17.

the transaction is entirely fair."); *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1115 (Del. 1994) (entire fairness applies when a controlling shareholder stands on both sides of a transaction); *NL Indus., Inc. v. Maxxam, Inc. (In re Maxxam, Inc.)*, 659 A.2d 760, 771 (Del. Ch. 1995) (holding that a parent company standing "on both sides of a challenged transaction . . . will be required to demonstrate that the transaction was entirely fair to the corporation"); *In re Residential Capital, LLC*, Case No. 12-12020, 2013 Bankr. LEXIS 2601 at *64 (Bankr. S.D.N.Y. June 27, 2013) ("in interested party transactions, an entire fairness/heightened scrutiny analysis applies").

28.     Here, the Court should apply heightened scrutiny and not give any deference to the Debtors' business judgment because the Debtors are conflicted and, thus, the entire fairness standard should apply.  Whoever is making decisions for the Debtors (and, at this point, we do not know who that is) is also an employee or officer of Emergent, whose compensation is paid from amounts paid by the Debtors to Emergent under the Debtors' Proposed Budget.  It is difficult to imagine a more obvious or problematic conflict.  As such, the Debtors' determination regarding expenditures, when it comes to payments to be made to Emergent and/or Imperial Finance, do not enjoy the protection of the business judgment rule.

29.     Under the entire fairness standard, the Debtors must demonstrate fair dealing and fair price, a burden that they cannot satisfy.  *See Solomon v. Armstrong*, 747 A.2d 1098, 1113 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000) ("[T]he burden of proving entire fairness is often a daunting task"); *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.)*, 323 B.R. 345, 385 (Bankr. S.D.N.Y. 2005) (same); *see also Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 106 (Bankr. D. Del. 2010) ("The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire

18

fairness, sufficient to pass the test of careful scrutiny by the courts.") (quoting *Weinberger v. UOP*, 457 A.2d 701, 710 (Del. 1983)).

30.     Indeed, courts have refused to authorize proposed payments of cash collateral that would benefit non-debtor affiliates without any benefit provided to the debtor.  For example, in *In re Plaza Family P'ship*, the debtor moved for permission to use cash collateral to satisfy federal tax liabilities of its non-debtor partners.  95 B.R. at 168.  The bankruptcy court granted the request, finding that the appellant's interest was adequately protected and the proposed use of cash was proper.  *Id.*  On appeal, the district court reversed, holding that, notwithstanding that the secured creditor was adequately protected by an equity cushion, the debtor had the duty to protect and conserve property in its possession for the benefit of its creditors, and could not discharge this duty by using funds for "personal use," such as paying the tax obligations of its individual partners.  *Id.* at 173.  As the court stated:

> The individual partners of the debtor are not entitled to a distribution before …secured creditor[s].  The effect of such use would be to subordinate secured claims to the claims of the debtor and others.  Such a result is inconsistent with the intent and purpose of the Bankruptcy Code.

*Id.* at 174.  Similarly, in *In re Universal Fin., Inc.*, the bankruptcy court denied a debtor's motion to use cash collateral to the extent it would authorize payments to creditors of the debtor's shareholders, stating that it was "not convinced that it would be a sound business judgment for the Debtor to use its limited resources to make such payments."  493 B.R. 735, 739 (Bankr. M.D.N.C. 2013).

### A.     Expenses to be Borne Entirely by White Eagle that Benefit Non-Debtor Affiliates Should Not Be Authorized

31.     The Debtors cannot demonstrate entire fairness or even a sound business purpose with respect to payments proposed to be made to Imperial Finance that benefit Emergent,

19

Imperial Finance or any other non-Debtor affiliate.  The Debtors' Proposed Budget contemplates $118,500 in January and $138,500 for each month thereafter for "Audit and Tax" services.  It provides for approximately $190,000 per month of other SG&A costs, including "Office Space," "Travel and Entertainment," "Office Materials and Supplies," and "Insurance".  The Debtors' Proposed Budget also provides for approximately $240,000 per month of employee-related expenses, including "Salaries and Wages," "Health Insurance," and "Payroll Taxes."  Moreover, the Debtors' document production seemingly reveals that the Debtors' Proposed Budget would apparently require White Eagle to pay for all of the salaries and compensation (excluding stock-based compensation) of Emergent and Imperial Finance's thirteen employees, including Emergent's chief executive officer and chief financial officer as well as other employees of Emergent and Imperial Finance.

32.     The foregoing expenses all provide a meaningful benefit to Emergent and Imperial Finance – in some cases, exclusively to such entities.  Yet, under the Debtors' Proposed Budget, White Eagle would be bearing 100% of such costs.  Moreover, most (if not all) of these expenses fall outside the scope of services to be provided under the Administrative Services Agreement, which in any event has not been assumed by the Debtors.  White Eagle, therefore, has no legal obligation to make the payments on behalf of any other entity and, in any event, should only be paying for services for which it receives a benefit.

33.     First, the Debtors should not pay the tax-related expenses of Emergent because such burdens are borne entirely by Emergent.  As stated above, the Debtors have no tax liabilities of their own and, yet, the Debtors' Proposed Budget provides for meaningful "Audit and Tax" services ($118,500 in January and $138,500 for each month thereafter).  Therefore, just as was the case in *In re Plaza Family P'ship*, the Debtors should not use Cash Collateral to pay for the

tax-related expenses of its equity holders.  95 B.R. at 172 (holding that a partnership could not use cash collateral to pay for the taxes of its partners when it had no tax obligations of its own). Moreover, the tax and audit invoices produced thus far in discovery reveal that the Debtors' proposed budget apparently includes expenses for services that have nothing to do with White Eagle, including over $100,000 in expenses related to the 2018 audit of Emergent, services related to the financial statements of Emergent, and analysis of the corporate level federal and state income tax consequences of a potential transaction.

34.    <u>Second</u>, the Debtors should not be paying for the salaries, benefits and related expenses of each of Emergent and Imperial Finance's thirteen employees.  These are employees of Emergent and Imperial Finance, not the Debtors and the Debtors have no legal obligations to pay such salaries, benefits, or related obligations whether under the Administrative Services Agreement or otherwise.  As set forth in the Venn Declaration, the necessary services currently provided to White Eagle by Imperial Finance can be accomplished by the equivalent of 35 hours a week for two highly experienced (over 10 years) life settlements professionals.[36]  That work can be provided through a third party servicer at an all-in cost of approximately $204,750 per month (plus a one-time transition expense of $150,000).[37]  There is therefore no justification for saddling White Eagle with the obligation to fund excessive employee costs that arise (i) as a legacy from Emergent's original hopes of expanding its business and (ii) to support Emergent's independent needs, including its public filing requirements and coordinating with Emergent's own noteholders.  Moreover, even if it would somehow be argued that White Eagle is obligated to, and derives some benefit from, paying such amounts, there is no justification for compelling

---

[36]    Venn Declaration, ¶ 14.

[37]    *Id.*

White Eagle to pay 100% (or even a significant portion) of salaries with no allocation to the actual entities who employ such persons and require their services (*i.e.*, Emergent and Imperial Finance).

35.     <u>Third</u>, the Debtors' initial document production reveals several additional expenses that benefit the non-Debtor affiliates and Emergent, rather than White Eagle:

- The Debtors' Proposed Budget would require White Eagle to pay data processing expenses of Emergent and the non-Debtor affiliates; indeed, several of the invoices produced by Debtors are addressed directly to Emergent.

- Based on documents produced by the Debtors, it appears that their proposed budget would require White Eagle to pay for director and officer insurance for Emergent, even though there is no conceivable benefit to White Eagle from the purchase of such insurance.

- The Debtors' Proposed Budget would also require White Eagle to pay for rent and operating expenses for Emergent's corporate headquarters in Boca Raton, FL.

- The Debtors' Proposed Budget also includes professional fees and contractor services, but Debtors' production includes invoices for consulting services for Emergent, bills for legal services for "general corporate matters," and invoices for accounting services for Emergent.

- The Debtors' Proposed Budget would also require White Eagle to pay a variety of other expenses billed to Emergent that have no benefit to White Eagle, including communications expenses, travel and entertainment expenses, and membership dues and subscriptions.

36.     With respect to each of the foregoing expenses, just as in *In re Plaza Family Partnership* and *In re Universal Finance, Inc.*, the proposed use of Cash Collateral for such purposes is unnecessary under the Administrative Services Agreement, unrelated to the Debtors' business and for the benefit only of non-Debtor affiliates and Emergent, as the ultimate equity owner of the Debtors.  To prioritize such payments at the expense of the Debtors and their

AMERICAS 97999904

secured creditors is unacceptable, as there can be no business justification for them and therefore, they do not satisfy either the business judgment or entire fairness standard.[38]

### B. Above-Market Payments to Imperial Finance for Necessary Services Should Not Be Approved

37. Further, under the Debtors' Proposed Budget, White Eagle is inappropriately overpaying for the services it does need. With respect to services provided by Imperial Finance, which cover all of the Disputed Expenses, White Eagle could procure the services it requires from a third party corporate services provider at a fraction (at most 40%) of the cost it seeks to pay Imperial Finance, as set forth in greater detail in the Venn Declaration.[39] Applying the heightened scrutiny standard for the conflicted transactions that the Debtors seek court approval of, the Debtors cannot justify paying expenses that are extravagant compared to what they could procure in the market. The only purported justification the Debtors could articulate for relying on Imperial Finance for such services at such prices is that such amounts are necessary to pay for Emergent and Imperial Finance's overhead and to ensure that such entities continue to survive. But shouldering the burdens of such costs is inconsistent with market practice and contrary to the Administrative Services Agreement and the Loan Agreement. Therefore, these costs should not be authorized here. Moreover, White Eagle's complete lack of negotiating capacity vis-à-vis Emergent and Imperial Finance further demonstrates that its payment for such amounts to

---

[38] Certain payments to law firms that the Debtors seek to pay as ordinary course professionals under the Debtors' Proposed Budget may be improper for similar reasons. Each such professional may provide some benefit to White Eagle, as they have all been retained to defend lawsuits that, if successful, would negatively impact the overall value of White Eagle's insurance policies. However, certain of such law firms are also prosecuting and defending claims that exclusively or partially impact Emergent. Emergent should pay the costs of such services (and should pay its proportional share with respect to lawsuits on which it derives a shared benefit with Emergent). Notably, prior to the Petition Date, it was Emergent's responsibility to pay all law firms. The Lender Parties reserve all rights with respect to any fee or retention application filed by any of the Debtors' professionals on that, or any other, basis.

[39] Venn Declaration, ¶18.

Imperial Finance cannot pass scrutiny and should not be approved.

## RESERVATION OF RIGHTS

38.    This Preliminary Objection is submitted without prejudice to, and with a full express reservation of, the Lender Parties' rights to supplement and amend this Preliminary Objection and to introduce evidence at any hearing relating to this Preliminary Objection, and further object to the Motion on any and all grounds, including in light of the deficiencies in the Debtors' discovery production and responses.  Moreover, the Lender Parties expressly reserve all of their rights with respect to the relief granted in the Motion and to request adequate protection pursuant to section 363(e) of the Bankruptcy Code.

## CONCLUSION

WHEREFORE, the Lender Parties respectfully request that the Court (a) deny the Motion or condition approval of the Motion on submission by the Debtors' of a revised Cash Collateral budget that address the issues raised in this Preliminary Objection, and (b) grant such other and further relief as the Court deems just and proper.

24

Dated: January 11, 2018
          Wilmington, Delaware

*/s/ Carl D. Neff*

Jeffrey M. Schlerf (No. 3047)
Carl D. Neff (No. 4895)
**FOX ROTHSCHILD LLP**
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Facsimile: (302) 463-4971
jschlerf@foxrothschild.com
cneff@foxrothschild.com

Respectfully submitted,


Thomas E Lauria (admitted *pro hac vice*)
Jesse L. Green (admitted *pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com
jgreen@whitecase.com

  –and–

David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
dturetsky@whitecase.com
azatz@whitecase.com

  –and–

Jason N. Zakia (admitted *pro hac vice*)
**WHITE & CASE LLP**
227 West Monroe Street, Suite 3900
Chicago, IL 60606-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
jzakia@whitecase.com

*Attorneys for CLMG Corp.*
*and LNV Corporation*

AMERICAS 97999904