IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | ) Case No. 18-12808 (KG) |
| Debtors. | ) (Joint Administration Requested) |

**DECLARATION OF MARK A. VENN IN SUPPORT
OF PRELIMINARY OBJECTION OF CLMG CORP. AND LNV CORPORATION TO
THE MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING THE USE OF CASH COLLATERAL,
(B) PROVIDING ADEQUATE PROTECTION,
(C) MODIFYING THE AUTOMATIC STAY, AND
(D) SCHEDULING A FINAL HEARING**

I, Mark A. Venn, a citizen of the United Kingdom, hereby declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States as follows:

I submit this declaration in support of the *Objection of CLMG Corp. and LNV Corporation to the Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing.*

**I.    BACKGROUND AND QUALIFICATIONS**

1.    I am the CEO and Managing Director of ClearLife Limited ("ClearLife"). I founded ClearLife in November 2007 to provide software and services to U.S. and European participants in longevity risk markets. ClearLife's services include valuation, workflow management and risk analytics for life settlements market participants and reverse mortgage lenders. ClearLife has also

---

[1] The Debtors in these chapter 11 cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, where applicable, include: White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738). The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

developed an information management and analytics platform for life settlements (ClariNet LS) which, as of January 2019, has over US$30 billion in face amount of life settlements managed through it on a daily basis. Subscribers to ClariNet LS include some of the largest active life settlements funds. To my knowledge, the life settlements pricing model which is part of ClariNet LS is the only one in the market to have been validated by a "Big 4" international accounting firm.

2.      Prior to founding ClearLife, I was an Executive Director at Mizuho International plc, where I formed Mizuho's Asset Finance Group as a proprietary trading team for non-traditional asset classes, with a focus on mortality risk products, including life settlements and premium finance. During my time at Mizuho, I also founded the Institutional Life Markets Association ("ILMA"), an association of leading investment banks (including Bear Stearns, Credit Suisse, Goldman Sachs, UBS and West LB), established for the purpose of promoting best practices in the life settlements and premium finance markets.

3.      My publications include "*Life Settlements and Longevity Structures: Pricing and Risk Management*" by Jim Aspinwall, Geoff Chaplin and Mark Venn (published August 2009 by Wiley Finance); and "*Guide to Life Settlements*" (published June 2010, produced for distribution to over 5,000 independent financial advisors in the United Kingdom).

4.      My résumé, including a full list of my professional experience, university education and professional training, is attached hereto as **Exhibit 1**.

5.      To assist this Court in its consideration of *the Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, I submit this declaration describing the workload likely to be required to maintain the portfolio of life settlements (the

"Portfolio") owned by White Eagle Asset Portfolio LP ("White Eagle"). I also review the costs sought by White Eagle to be paid from cash collateral arising from the Portfolio.

### II.    WHITE EAGLE'S EXISTING ARRANGEMENTS

6.    The Portfolio provides security for the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), with White Eagle as the borrower.

7.    The Portfolio is held with Wilmington Trust, N.A. ("Wilmington Trust") as custodian and securities intermediary; I understand that Wilmington Trust also functions as paying agent (with respect to premiums, servicing fees and other expenses) and collections agent (with respect to the receipt of death benefit).

8.    MLF LexServ, L.P. ("LexServ") provides servicing to White Eagle, which includes the collection and distribution of correspondence, health status tracking, ordering life expectancy reports and medical records. LexServ provides these services pursuant to a Servicing Agreement between, *inter alia*, LexServ and White Eagle.

### III.    MANAGEMENT OF WHITE EAGLE'S PORTFOLIO

9.    In general terms, the duties of a competent manager of a portfolio of life settlements include: (i) purchasing and selling life insurance policies to grow the portfolio and mitigate risk; (ii) conducting valuation and risk modelling on the portfolio; (iii) supervising the activities of other service providers, such as the custodian, securities intermediary, paying agent, life settlements servicer and legal adviser(s); and (iv) reporting to investors and other parties on the performance of the portfolio, both in terms of valuation and risk.

3

10. Beyond these general duties, the Portfolio has some specific issues which need to be addressed:

- The Portfolio should be managed on behalf of all those with an interest in its performance, namely, the lenders under the Loan Agreement and White Eagle;

- The Portfolio must be managed in accordance with the terms of the Loan Agreement;

- The Portfolio has effectively been in run-off, so no further purchases have been, or are likely to be, made;

- There is active litigation ongoing with respect to several policies (and groups of policies) in the Portfolio; and

- The life expectancy reports on all policies in the Portfolio need to be updated to reflect the recently announced changes in underwriting methodology and mortality tables by ITM TwentyFirst LLC and AVS Underwriting, LLC. I understand that this project has been started with LexServ but needs to be monitored and valuations updated as the new life expectancy reports are received.

### IV. ANALYSIS OF WHITE EAGLE'S PROPOSED FINAL BUDGET

11. The interim order authorizing the Debtors to use cash collateral entered on December 17, 2018 [Docket No. 37] provides, *inter alia*, that White Eagle shall be permitted to disburse the cash collateral held at Wilmington Trust for payment of expenses listed in a budget attached to the order (the "Interim Budget"). I have also been provided with a copy of the Debtors' proposed final budget for a period of 20 weeks out to the week ending April 26, 2019 (the "Proposed Final Budget"). I comment below on certain line items listed in the Proposed Final

Budget; in particular, I consider whether some items listed in the Disbursements section are required for the ongoing management of the Portfolio.

12.     According to the Proposed Final Budget, all overhead and operating costs are to be transferred to Imperial Finance, but it is unclear from the Proposed Final Budget what proportion of these costs are reasonably required for the management of the Portfolio and what is down to the general business expenses of Imperial Finance and Emergent.

13.     Specifically, I have compared the figures in this section to what I would expect a competent life settlements service provider to charge for the ongoing management of the Portfolio, bearing in mind that the Portfolio has been, and likely will continue to be, in run-off, so future purchases will likely not be required. The Proposed Final Budget includes line items which do not appear to relate directly or indirectly to the management of the Portfolio, such as audit and tax, office materials and office space. I believe that the monthly figures shown in the Proposed Final Budget for "Overhead/Operating Costs" significantly overstate the amount required to manage the Portfolio in the interests of all parties.

14.     I consider that the general duties and the specific tasks listed in Section III above will require the equivalent of 35 hours a week for two highly experienced (over 10 years) life settlements professionals, on an ongoing basis. Assuming an hourly rate of $650[2] per hour, this equals $45,500 per week, or approximately $204,750 per calendar month.

15.     I would also allow for a data migration cost of approximately $150,000 to move current policy information from the existing Portfolio Manager to the new manager. This includes

---

[2] I use $650 as an indication of the hourly rate I would expect to be charged by a highly experienced life settlements consultant.  Other competent professionals with less experience may command lower hourly rates.

an estimate of travel costs and time to visit with Imperial Finance, LexServ, and other parties in order to build the data set ahead of the migration.

16. I have assumed that the new manager will have ongoing access to the information generated by LexServ and will be empowered to instruct the payment of premiums by Wilmington Trust (subject to the terms of the loan agreement).

17. The figures outlined above exclude any sales tax and any out-of-pocket expenses for the new manager (other than some travel costs for the data migration). I would not expect out-of-pocket expenses to be significant, other than those associated with the life expectancy report updating project.[3]

## CONCLUSION

18. As explained above, management of the Portfolio has a number of specific requirements in relation to litigation and compliance with the Loan Agreement. A competent, experienced life settlements service provider could manage the Portfolio at greatly reduced ongoing costs. I would expect at least a 60% reduction in ongoing management costs if management of the Portfolio moves to an experienced life settlements service provider.

---

[3] I have not considered any issues that may arise in relation to taxation; specifically, whether recommendations as to policy sales have to pass through the Irish corporate structure. Some additional travel costs may arise if it is necessary for the new manager to conduct physical meetings outside the US and/or in Ireland.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on January 11, 2019 in Taunton, United Kingdom.

_____
Mark A. Venn

## Exhibit 1

**Résumé of Mark A. Venn**

AMERICAS 97961678

**ClearLife Limited**
**Triscombe House**
**Triscombe**
**Taunton TA4 3HG**
**United Kingdom**
**www.clearlifeltd.com**



Mark A. Venn

Résumé

Professional Experience

*CEO and Managing Director – ClearLife Limited*
November 2007 to date.  Founded ClearLife to provide software and services to US and European participants in longevity risk markets.  Services include valuation, workflow management and risk analytics for life settlements market participants and reverse mortgage lenders.  ClearLife has developed an information management and analytics platform for life settlements (ClariNet™ LS) which – as at January 2019 - has over US$30 billion in face amount of life settlements managed through it on a daily basis by its subscribers, including some of the largest active life settlements funds.  The life settlements pricing model inside ClariNet's life settlements product is the only one in the market to have been validated by a "big 4" international accounting firm.  Publications include:
- "*Life Settlements and Longevity Structures: Pricing and Risk Management*" by Jim Aspinwall, Geoff Chaplin and Mark Venn (published August 12 2009 by Wiley Finance); and
- "*Guide to Life Settlements*" (published June 2010, commissioned for distribution to over 5,000 independent financial advisors in the United Kingdom).

*Executive Director – Asset Finance Group, Mizuho International plc, London*
January 2005 to November 2007.  Formed Asset Finance Group as a proprietary trading team for non-traditional asset classes.  Focussed on mortality risk products (life settlements, premium finance) but also developed agricultural credit aggregation platform in the UK.  Grew business from scratch to a portfolio of over US$1.1 billion of life settlements, managing structuring, trading and development teams within the Asset Finance Group and co-ordinating other support teams within the bank.  Founded the Institutional Life Markets Association ("ILMA"), an association of leading investment banks (including Bear Stearns, Credit Suisse, Goldman Sachs, UBS and West LB), established for the purpose of promoting best practices in the life settlements and premium finance markets.

*Executive Director – Structured Credit Products Group, Mizuho International plc, London*
November 2000 to January 2005 (promoted to Executive Director from Director in April 2004).  Responsible for structuring and marketing for synthetic CDO and other structured credit products originated by the Structured Credit Products Group.  Completed synthetic CDO transactions referencing a total of US$3 billion in high yield debt, using credit default swaps, credit-linked notes and financial guaranty insurance.  Responsible for pre-and post-deal client and rating agency liaison.  Led marketing efforts outside Japan and supported marketing efforts in Japan (via Mizuho Securities).

*Director – Structured Credit Products, Credit Suisse First Boston Corporation, New York*
January 2000 to October 2000.  Responsible for synthetic asset securitization and developed market credit products, including synthetic CDOs.  Liaison for Fixed Income Division with Investment Banking Division for balance sheet and capital restructuring within financial institutions.

*Director – Credit Derivatives Structuring, Credit Suisse Financial Products, London*
February 1997 to January 2000 (appointed Director January 1999). Emerging and developed market credit products.  CSFP awarded "Credit Derivatives House of the Year" 1997 (IFR), "Top House – Credit Derivatives" 1998 (Risk Magazine).  Co-author, "Investment and Hedging with Credit Derivatives", *The Treasurer*, February 1999.

*Vice President and Legal Counsel, CS First Boston (Japan) Limited, Tokyo*
September 1996 to February 1997. Structuring and documenting OTC transactions.

ClearLife Limited is a company registered in England & Wales.  Registration number 06424296
Registered office: Priory House, Pilgrims Court, Sydenham Road, Guildford GU1 3RX



*Vice President and Legal Counsel, CS First Boston (Hong Kong) Limited, Hong Kong*
September 1995 to August 1996.  Structuring and documenting derivative transactions for CSFP in Sydney, Tokyo and Hong Kong.  Member of ISDA Legal & Regulatory Committee and the Derivatives Working Group, both based in Hong Kong.

*Vice President, Credit Suisse Financial Products, London*
January 1993 to September 1995 (appointed Vice President January 1995).  Structuring and documenting derivative transactions for CSFP marketers world-wide.  Spoke at conferences in Paris and London on the 1993 ISDA Commodity Derivatives Definitions.

*Barrister, Chambers of Robert Webb Q.C., 5 Bell Yard, London WC2*
September 1991 to December 1992.  Twelve month pupillage in banking and commercial law.

University Education and Professional Training
Securities and Futures Authority General Representative (June 1997)
NASD Series 7 and Series 63 examinations (July 2000)

*Inns of Court School of Law, Gray's Inn, London*
September 1990 to June 1991.  Middle Temple Bursary recipient.  Graduated in top 5% of year group with "Very Competent" grade.  Called to the Bar in November 1991.

*Trinity Hall, University of Cambridge*
October 1987 to June 1990.  Graduated B.A.(Hons.) (M.A. in 1996) in Law (Upper Second).  Trinity Hall Law Bursary recipient.