## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | Case No. 18-12808 (KG) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: February 7, 2019 at 4:00 p.m. (ET)** |
| | **Hearing Date: February 14, 2019 at 11:00 a.m. (ET)** |

### MOTION OF CLMG CORP. AND LNV CORPORATION FOR ENTRY OF AN ORDER DIRECTING DISCOVERY FROM THE DEBTORS PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

CLMG Corp. ("CLMG") and LNV Corporation ("LNV" and, together with CLMG, the "Lender Parties"), as administrative agent and sole lender, respectively, under the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), submit this motion (the "Motion"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District Court of Delaware (the "Local Rules"), for the entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit E**, authorizing and compelling discovery (the "Requested Discovery") from the Debtors in the form of (i) production by the Debtors of documents responsive to the requests set forth in the attached **Exhibit A** within 15 days after the Court enters the Order and (ii) authorization to conduct a deposition of the Debtors' purported Chief Financial Officer,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, include:  White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738).  The Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

Miriam Martinez, on the topics set forth in the attached **Exhibit B**, a deposition of the Debtors'

Independent Manager on the topics set forth in the attached **Exhibit C**, and a deposition of the

Debtors' Independent Director on the topics set forth in the attached **Exhibit D**, in each case

within 15 days after the Debtors produce to the Lender Parties all responsive documents, without

the need for further relief from this Court.  In support of the Motion, the Lender Parties

respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Lender Parties are filing this Motion for the purpose of bringing much needed

transparency to the manner in which these chapter 11 cases (the "Chapter 11 Cases") are being

conducted and on whose behalf.  Debtor White Eagle Asset Portfolio, LP ("White Eagle") is the

borrower under the Loan Agreement and relies on availability under the Loan Agreement to

maintain its portfolio of life insurance policies.  However, that availability was cut off by White

Eagle's bankruptcy filing, which was directed by, and principally benefits, White Eagle's

ultimate parent, non-Debtor Emergent Capital, Inc. ("Emergent").  Emergent has creditors and

obligations of its own, and its main source of revenue is its ability to extract cash from White

Eagle.  Simply put, every dollar that White Eagle transfers to Emergent is a dollar that White

Eagle cannot use to service its own obligations.  This creates an obvious conflict between the

interests of White Eagle and the interests of Emergent.

2.      The Debtors and Emergent have taken no visible steps to mitigate this conflict.

This conflict is particularly concerning, given that it is far from clear whether these Chapter 11

Cases serve the Debtors' interests in light of the lack of any liquidity issues at White Eagle prior

to filing for bankruptcy, the Lender Parties' repeated willingness to provide liquidity under the

Loan Agreement to protect their collateral, and the absence of any asserted default under the

Loan Agreement.  The Debtors have no other meaningful creditors other than the Lender Parties,

2

no prospect of reorganization, and no legitimate need for chapter 11 relief as a general matter. Indeed, the Debtors have given every indication that these Chapter 11 Cases were filed solely to create a platform for the Debtors to pursue causes of action against the Lender Parties as part of Emergent's continuing efforts to manufacture leverage in an attempt to renegotiate the Loan Agreement.  The fact that these Chapter 11 Cases were filed solely to pursue a two-party dispute without any legitimate reorganization rationale calls into question these filings and the Debtors' related behavior.

3.     White Eagle has no independent decision-makers – its only purported officer or employee is Miriam Martinez, who is also the Chief Financial Officer of Emergent.  Certain specified corporate decisions on behalf of White Eagle and White Eagle's general partner, Debtor White Eagle General Partner, LLC ("White Eagle GP") are approved by the independent manager at White Eagle GP (the "Independent Manager"), but such approval rights are limited to any "Material Action" by the Debtors, such as the filing of bankruptcy.  White Eagle's limited partner, Debtor Lamington Road Designated Activity Company ("Lamington Road"), has an independent director (the "Independent Director") who does not appear to have any special authority or veto rights.  Given that Mrs. Martinez is conflicted and the Independent Manager and Independent Director have extremely limited roles and decision-making authority, the Debtors appear to have no truly independent fiduciary making decisions in these Chapter 11 Cases.

4.     As a result, White Eagle appears entirely unable to negotiate anything resembling arms'-length terms in dealings with Emergent.  This was demonstrated in recent negotiations regarding cash collateral, where the Debtors initially proposed paying the full salaries of every employee at non-Debtor affiliate Imperial Finance and Trading, LLC ("Imperial Finance")

3

despite the fact that such funds would pay for certain services that, in whole or in part, benefitted Emergent. Although the Debtors backed down from this position in the face of an objection from the Lender Parties, their initial position raises obvious concerns about the Debtors' independence and their ability to preserve value for the benefit of their stakeholders.

5.      Given these realities, the Lender Parties require Rule 2004 discovery to protect their collateral and the Debtors' estates. Such discovery must extend to why these Chapter 11 Cases were filed and how they are in the best interests of the Debtors (as opposed to Emergent and any other non-Debtor affiliates). It also must include the administration of these Chapter 11 Cases, including what independent fiduciary, if any, is making decisions on behalf of the Debtors and what controls are in place to protect against abuse by Emergent. For example, it must address the Debtors' determination to make payments to non-Debtor affiliate Imperial Finance that the Debtors never paid for prepetition. By this Motion, the Lender Parties seek to obtain the information necessary to fully evaluate these and other issues relevant to the administration of these Chapter 11 Cases. This Motion does not seek discovery in connection with the adversary complaint recently filed by the Debtors.

6.      This Motion seeks relief consistent with the broad discovery rights that Rule 2004 provides to creditors. The Lender Parties are virtually the only creditor in these Chapter 11 Cases, and the Lender Parties' cash collateral is funding these Chapter 11 Cases. With no official committee appointed, the Lender Parties are left as the only party to investigate the Debtors' administration of these Chapter 11 Cases. The alternative of appointing an examiner to investigate these matters would cause a financial burden on the Debtors' estates and is unnecessary given the fact that the Lender Parties are the only true creditors. For all of these

4

reasons, the Court should grant the Motion and compel the Debtors to provide the Requested

Discovery to the Lender Parties.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested

in this Motion are section 105 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2004, 7037,

9014 and 9016, and Local Rule 2004-1.

## BACKGROUND AND RELEVANT FACTS

8.    White Eagle is a special purpose entity formed by its indirect parent, Emergent, to

acquire and hold life insurance policies.  White Eagle obtained the funds necessary to purchase

and maintain these policies with the approximately $367.9 million loaned by LNV under the

Loan Agreement.  These loans, and related interest, fees, and other amounts owed under the

Loan Agreement, are White Eagle's only secured obligations, and the Lender Parties comprise

virtually all of White Eagle's creditors.[2]  As security for the obligations under the Loan

Agreement, the Lender Parties were granted first priority liens and security interests on, among

other things, substantially all of White Eagle's assets, including White Eagle's interests in its life

insurance policies and the proceeds therefrom, and all other cash held by White Eagle.[3]  The

---

[2]    In White Eagle's Schedules of Assets and Liabilities [Docket No. 62], White Eagle purports to have $6.1 million of unsecured claims, of which $5.4 million is allegedly owed to non-Debtor affiliate Imperial Finance.  Even taking the insider unsecured claims into account, the Lender Parties hold over 98% of White Eagle's debt.

[3]    *Decl. of Andrew Zatz in Support of the Preliminary Response of CLMG Corp. and LNV Corporation to Debtors' First Day Motions and to Decl. of Miriam Martinez in Support of First Day Motions;* Ex. 1 Loan Agreement, at § 2.6(a) [Docket No. 24].; *Decl. of Andrew Zatz in Support of Preliminary Objection of CLMG Corp. and LNV Corporation to Motion of Debtors for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing;* Ex. 1 Account Control Agreement, at § 3.1 [Docket No. 65]; *see also Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration") ¶ 12 ("The obligations under the Prepetition Loan Agreement are secured by purported liens in favor of CLMG on substantially

5

Lender Parties also have liens on the interests in White Eagle held by White Eagle's limited partner, Lamington Road, and White Eagle's general partner, White Eagle GP.

9.    White Eagle has no employees of its own.[4]  White Eagle's only purported officer is Miriam Martinez, who is also the Chief Financial Officer of Emergent.[5]  Certain specified decisions for White Eagle also require the approval of the Independent Manager at White Eagle GP, which are limited to decisions to (i) consolidate or merge White Eagle, (ii) sell all or substantially all of White Eagle's assets, and (iii) file a bankruptcy proceeding for White Eagle (or a similar restructuring or liquidation event).[6]  The Independent Manager has the same limited authority with respect to the management of White Eagle's general partner, White Eagle GP.[7] Such decisions for White Eagle's limited partner, Lamington Road, must be approved by its board of directors, which includes one Independent Director.[8]

10.    Emergent, formerly known as Imperial Holdings, Inc., is a public corporation that formerly traded on the New York Stock Exchange and now trades on the over-the-counter market under the ticker EMGC.[9]  Emergent's only apparent source of material revenue is currently from its indirect equity interests in White Eagle (which, itself, is largely in runoff,

---

all of the assets of [White Eagle], including its interests in life insurance policies and the proceeds therefrom. CLMG also purportedly has control of [White Eagle]'s funds and collections from insurance policies through a custodial arrangement with Wilmington Trust, N.A."); Dec. 17, 2018 Hr'g Tr. at 9:25-10:2 [Docket No. 50] (the "First Day Hr'g Tr.")  ("[T]he debtor has acknowledged a gazillion times that [the Lender Parties have] validly perfected security interests.").

[4]    *See* First Day Declaration ¶ 9.

[5]    *Id.* ¶ 1.

[6]    *See* Declaration of Andrew Zatz in support of this Motion filed concurrently herewith (the "Zatz Declaration"), Ex. 1 White Eagle Asset Portfolio, LP Agreement of Limited Partnership, at ¶ 5(a).

[7]    *See* Zatz Declaration, Ex. 2 Limited Liability Company Agreement of White Eagle General Partner, LLC, at ¶ 9(d)(iii).

[8]    *See* Zatz Declaration, Ex. 3 Articles of Association of Lamington Road Designated Activity Company, at ¶¶ 3.3, 120; *see also Chapter 11 Voluntary Petition* (Case No. 18-12615-KG) [Docket No. 1] (the "Lamington Road Petition").

[9]    *See* Emergent Capital, Inc., Annual Report (Form 10-K) (Mar. 14, 2018), at 1, 13, and 15.

meaning that it is servicing its existing policies but not purchasing any new policies).  Emergent employs thirteen employees at Emergent and Imperial Finance[10] and has its own debt obligations consisting of more than $112 million of notes.[11]

11.     On November 14, 2018, Lamington Road and White Eagle GP filed their respective Chapter 11 Cases.  As a justification for filing their Chapter 11 Cases, Lamington Road and White Eagle GP cited concerns that the Lender Parties might call an unspecified default under the Loan Agreement, despite no such default having been identified or asserted by the Lender Parties.  White Eagle filed its Chapter 11 Case on December 13, 2018, citing the default under the Loan Agreement precipitated by the filings of Lamington Road and White Eagle GP.[12]  The filing of the Chapter 11 Cases by each of the Debtors was approved by the Independent Director, and the filing of the Chapter 11 Cases for White Eagle GP and White Eagle was approved by the Independent Manager.[13]

12.     The Debtors are continuing to operate their business as debtors in possession.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committee has been appointed.[14]  The Debtors have stated their clear intention to use the Chapter 11 Cases as a platform to bring an adversary proceeding against the Lender Parties to,

---

[10]    *Id.* at 2.

[11]    *See* Emergent Capital, Inc., Quarterly Report (Form 10-Q) (Nov. 16, 2018); Emergent Capital, Inc., Current Report (Form 8-K) (Jan. 3, 2019).

[12]    First Day Declaration ¶¶ 13 ("Upon the occurrence of an event of default and absent a bankruptcy filing, CLMG could instruct WT to deliver the pledged certificates to CLMG, effectively taking ownership of [White Eagle] and its valuable life insurance policies."), 19 ("The filing of the Debtors' cases was necessary in order to prevent LNV from exercising remedies that would have allowed LNV to . . . sweep the Debtors' funds and insurance proceeds.").

[13]    *See* Lamington Road Petition; *Chapter 11 Voluntary Petition* (Case No. 18-12614-KG) [Docket No. 1]; *Chapter 11 Voluntary Petition* (Case No. 18-12808-KG) [Docket No. 1].

[14]    *See Statement That Unsecured Creditors Committee Has Not Been Appointed* [Docket No. 94] (indicating "Insufficient response to the United States Trustee communication/contact for service on the committee.").

ACTIVE\87298118.v1-1/30/19

among other things, reclassify, and subordinate portions of the Lender Parties' loan.[15] The Debtors filed that adversary complaint on January 25, 2019.[16]

13.    On the Petition Date, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Docket No. 7] (the "Cash Collateral Motion") seeking interim and final approval of the use of the Lenders Parties' cash collateral to fund the administration of the Chapter 11 Cases.  On December 17, 2018, the Court entered an order granting the Cash Collateral Motion on an interim basis with the Lender Parties fully reserving rights to contest any use of cash collateral on a final basis.[17]

14.    On January 11, 2019, the Lender Parties filed an objection to approval of the Cash Collateral Motion on a final basis [Docket No. 61].  The fundamental issue addressed in that objection was the Debtors' proposal to use the Lender Parties' cash collateral to fund the entirety of overhead and operating expenses of Emergent through its non-Debtor subsidiary, Imperial Finance.  The Lender Parties and the Debtors ultimately resolved this dispute by reaching agreement on a new cash collateral budget pursuant to which White Eagle will pay only a portion of such costs, with all parties reserving the right to later argue the proper allocation of such expenses as between the Debtors and their non-Debtor affiliates.[18]

---

[15]    *See* First Day Declaration at ¶¶ 16, 21; First Day Hr'g Tr. at 13:10-12 ("We were prepared at the time we filed the White Eagle chapter 11 to file the complaint."), 18:17-21 ("What's going to happen in this case if we can't get it resolved is we are going to propose a plan that will pay off the LNV in full, based on whatever claim Your Honor determines is going to be the case after a determination of the complaint.").

[16]    *See Complaint* [Docket No. 90] (the "Adversary Complaint").

[17]    *See Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing*, at ¶ 3(d) [Docket No. 37].

[18]    *See Final Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Modifying the Automatic Stay*, at ¶ 3(d) [Docket No. 81] (the "Final Cash Collateral Order").

8

## RELIEF REQUESTED

15.      By this Motion, the Lender Parties respectfully request entry of an order authorizing the examination of the Debtors, pursuant to Rule 2004 of the Bankruptcy Rules ("Rule 2004"), including that (i) the Debtors be required to produce, not later than 15 days after the Court enters an order granting the Motion, all documents requested in the attached **Exhibit A**, and (ii) the Lender Parties be authorized to conduct a deposition of Miriam Martinez on the topics set forth in the attached **Exhibit B**, a deposition of the Independent Manager on the topics set forth in the attached **Exhibit C**, and a deposition of the Independent Director on the topics set forth in the attached **Exhibit D**, in each case not later than 15 days after the Debtors produce to the Lender Parties all relevant documents, without the need for further relief from this Court.

## BASIS FOR RELIEF

16.      Rule 2004(a) provides that "on motion of any party in interest, the court may order the examination of any entity."  Rule 2004(b) provides, in turn, that an examination under Rule 2004 may relate to:

> [T]he acts, conduct, or property or to the liabilities and financial condition of the debtor, or to *any matter which may affect the administration of the debtor's estate*, or the debtor's right to a discharge. . . .  *And any other matter relevant to the case or to the formulation of a plan.*

Fed. R. Bankr. P. 2004(b) (emphasis added); *In re Pan Am. Hosp. Corp.*, No. 04-11819, 2005 Bankr. LEXIS 734, at *14 (Bankr. S.D. Fla. Feb. 25, 2005) (holding "[t]he acts and conduct that [the] Debtor's management engages in . . . are undoubtedly 'matters which may affect the administration' of the estate").

17.      A Rule 2004 inquiry is "broad and unfettered."  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) (citations omitted); *accord In re Wash. Mut., Inc.*, 408 B.R. 45, 49 (Bankr. D. Del. 2009) ("The scope of a Rule 2004 examination is unfettered and

broad.") (internal quotation marks and citations omitted); ¶ 2004.01 (16th ed. 2018) ("The scope

of a Rule 2004 examination is exceptionally broad[.]").  As one court explained it:

> The understanding generally acceptable today is that the scope of a
> Rule 2004 examination is very broad.  Rule 2004 discovery is
> broader than discovery under the Federal Rules of Civil Procedure,
> and has fewer procedural safeguards.

*In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (citations

omitted); *accord In re Larkham*, 24 B.R. 70, 71-72 (Bankr. D. Vt. 1982) ("[t]he scope of

examination is extremely broad and . . . It is in the nature of an inquisition and consequently the

field of inquiry is wide . . . .").

18.     Rule 2004 thus permits a party to undertake a broad inquiry and "has been likened

to a 'fishing expedition' and 'an inquisition.'" *Millennium Lab*, 562 B.R. at 626; *accord In re

Wash. Mut.*, 408 B.R. at 50 ("A Rule 2004 examination is commonly recognized as more in the

nature of a fishing expedition.") (internal quotation marks and citations omitted).  Courts have

allowed examination of both debtors and any third party who can be shown to have had dealings

with the debtor.  *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citing *Air Line

Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. Of Chi. (In re Ionosphere Clubs, Inc.)*, 156

B.R. 414, 432 (S.D.N.Y. 1993)).

19.     In deciding whether to permit Rule 2004 discovery, courts "balance the

competing interests of the parties, weighing the relevance of and necessity of the information

sought by examination." *Drexel Burnham Lambert Grp.*, 123 B.R. at 712.  The purpose of the

request and its degree of intrusiveness are relevant to this determination.  *See id.* at 711-12; *In re

Hawley Coal Mining Corp.*, 47 B.R. 392, 394 (S.D. W. Va. 1984).

20.     The Lender Parties have a substantial interest in, and are entitled to, Rule 2004

discovery.  The Lender Parties are by far the Debtors' largest creditor and only secured creditor,

and their cash collateral is funding these Chapter 11 Cases.  The Debtors are incurring significant expenses and, according to their current cash collateral budget, are projected to significantly deplete their cash (and the Lender Parties' cash collateral), with the Debtors' cash position projected to decrease from approximately $20.6 million for the week ending January 18, 2019 to approximately $7.6 million for the week ending April 26, 2019.[19]  Therefore, the Lender Parties have a significant stake in the conduct, purpose, and outcome of these proceedings.  Moreover, there is no official committee appointed in these Chapter 11 Cases, leaving the Lender Parties as the party best suited to examine the Debtors' activities.  The alternative of having an examiner appointed to investigate the Debtors would create additional costs and would contravene the general bankruptcy principal of efficient administration of the Debtors' estates.

21.    Further, the filing of these Chapter 11 Cases, and the Debtors' conduct in these cases, suggests the lack of any independent fiduciary to represent the Debtors and a lack of any controls to prevent abuse of power by Emergent.  First, the filing of the Chapter 11 Cases itself is suspect given that the Lender Parties never asserted a default under the Loan Agreement, White Eagle did not have any liquidity issues prior to filing for bankruptcy, and the Lender Parties have repeatedly been willing to provide funds to White Eagle under the Loan Agreement to protect White Eagle's assets (i.e., the Lender Parties' collateral), even after the default caused by the filing of the Chapter 11 Cases for Lamington Road and White Eagle GP.  This calls into question the Independent Manager's and Independent Director's respective approvals of the filing of the Debtors' Chapter 11 Cases.  Second, the Debtors' stated course for these Chapter 11 Cases is the pursuit of causes of action against the Lender Parties, the motivation for which is Emergent's desire to pursue a modification of the Loan Agreement in order to extract cash from White

---

[19]    See Final Cash Collateral Order, Ex. 1 (Budget).

ACTIVE\87298118.v1-1/30/19

Eagle.  This further highlights the pervasive conflict in these Chapter 11 Cases.  Third, the Debtors initially sought to pay for 100% of the overhead and expenses of services at Imperial Finance without seeking any burden of such costs to be borne by Emergent despite the fact that certain of such services, in whole or in part, benefit Emergent.  In sum, while little has transpired in these Chapter 11 Cases to date, the very filing of them and the actions taken by the Debtors in them thus far indicate that Emergent is directing the management of these Chapter 11 Cases despite not having filed for bankruptcy itself.

22.    Therefore, the Lender Parties should be permitted to explore and test in discovery how the Chapter 11 Cases serve the interests of the Debtors, as opposed to those of Emergent to the detriment of the Debtors.  The Lender Parties likewise should be permitted to inquire into the administration of these Chapter 11 Cases, including the filing of these Chapter 11 Cases, and the degree to which they have been and will be dictated by Emergent's interests.

23.    With respect to the Debtors' use of the Lender Parties' cash collateral, the Lender Parties served discovery on the Debtors in connection with the Cash Collateral Motion, the response to which left numerous questions unanswered.  The Debtors did not respond to discovery requests regarding whether any party other than the Debtors would benefit from amounts to be paid to Imperial Finance and what those benefits would be.  Documents produced by the Debtors provided little, if any, color on issues related to who is making decisions for the Debtors and on what basis those decisions are being made.  The Lender Parties expressly reserved their right to contest the allocation of expenses paid with their cash collateral as between the Debtors and their non-Debtor affiliates and should be permitted to obtain further information to fully assess what that allocation may be.

12

24.     Further, the request for depositions of Miriam Martinez, the Independent Manager, and the Independent Director are warranted.  As the Chief Financial Officer of both White Eagle and Emergent and the Independent Manager and Independent Director who authorized the filing of the Debtors' Chapter 11 Cases, respectively, they each have substantial knowledge of the Debtors' operations and the decisions affecting the Debtors.  Depositions of these parties are critical to the Lender Parties' understanding of the basis for their decisions related to the Debtors and what evidence they considered.  It will also further clarify what management is currently doing to ensure that the Debtors' interests are properly protected.

25.     This case does not fall into any of the narrow exceptions to the use of Rule 2004 examinations, such as when the purpose of the examination is to abuse or harass, or once an adversary proceeding or contested matter is commenced.  *See In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002).  The Requested Discovery is targeted to the core issues in the case. And here, the Lender Parties' cash collateral is funding these cases and the Debtors' legal expenses.

26.     Nor is the Requested Discovery related to the Debtors' Adversary Complaint. The Lender Parties will take discovery related to that adversary in the course of that case, as necessary.   The allegations of the Adversary Complaint are separate from the filing and administration of these Chapter 11 Cases, which are the focus of this Motion.  *See Wash. Mut., Inc.*, 408 B.R. at 51 ("[d]iscovery of evidence *related* to the pending proceeding must be accomplished in accord with more restrictive provisions of [the Federal Rules of Bankruptcy Procedure], while *unrelated* discovery should not be subject to those rules simply because there is an adversary proceeding pending.") (quoting *In re Bennett Funding Grp., Inc.*, 203 B.R. 24, 29 (Bankr. N.D.N.Y. 1996)).  The allegations in the Adversary Complaint relate entirely to the

13

terms of the Loan Agreement and the behavior of the Lender Parties (and certain other unaffiliated parties) prior to the Petition Date.  To the extent the Requested Discovery touches on the Adversary Complaint, it seeks only information regarding how the Debtors determined that bringing the Adversary Complaint would be in the best interests of their estates.

27.    For the reasons set forth in detail above, the Lender Parties must conduct Rule 2004 discovery in the near-term in order to examine and scrutinize the financial dealings of the Debtors and ascertain whether the proposed reorganization of the Debtors is being conducted in good faith and in accordance with the Bankruptcy Code.

## CERTIFICATION OF CONFERENCE

28.    In accordance with Local Rule 2004-1, prior to filing this Motion, counsel to the Lender Parties conferred with counsel for the Debtors to arrange for a cooperative document production and examination pursuant to Rule 2004.  The Debtors indicated that they would object to the discovery sought by this Motion.

## NO PRIOR REQUEST

29.    No previous motion for the relief sought herein has been made to this or any other court.

## RESERVATION OF RIGHTS

30.    The Lender Parties reserve all rights to request, pursuant to Rule 2004 or otherwise, additional documents or examination of any party, including but not limited to the Debtors.

## NOTICE

31.    Notice of this Motion will be provided pursuant to Local Rule 2004-1 to the following parties, through their counsel, if represented: (a) counsel to the Debtors; (b) the Office of the United States Trustee; and (c) all parties requesting notice pursuant to Rule 2002.

## **CONCLUSION**

WHEREFORE, the Lender Parties respectfully requests that the Court enter an order, substantially in the form attached as **Exhibit E** hereto, granting the Motion and such other and further relief as this Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

15

Dated: January 30, 2019
       Wilmington, Delaware

Respectfully submitted,

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (No. 3047)
Carl D. Neff (No. 4895)
**FOX ROTHSCHILD LLP**
919 North Market St., Suite 300
Wilmington, DE 19801
Telephone:  (302) 654-7444
Facsimile:  (302) 463-4971
jschlerf@foxrothschild.com
cneff@foxrothschild.com

Thomas E Lauria (admitted *pro hac vice*)
Jesse L. Green (admitted *pro hac vice*)
**WHITE & CASE LLP**
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
tlauria@whitecase.com
jgreen@whitecase.com

–and–

David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Kimberly A. Haviv (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
dturetsky@whitecase.com
azatz@whitecase.com
khaviv@whitecase.com

–and–

Jason N. Zakia (admitted *pro hac vice*)
**WHITE & CASE LLP**
227 West Monroe Street, Suite 3900
Chicago, IL 60606-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
jzakia@whitecase.com

*Attorneys for CLMG Corp.*
*and LNV Corporation*

ACTIVE\87298118.v1-1/30/19