## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | Case No. 18-12808 (KG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 95** |

## DECLARATION OF ANDREW ZATZ IN SUPPORT OF
## MOTION OF CLMG CORP. AND LNV CORPORATION FOR ENTRY
## OF AN ORDER DIRECTING DISCOVERY FROM THE DEBTORS PURSUANT
## TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

I, Andrew T. Zatz, declare as follows:

1.      I am a partner of the firm of White & Case LLP, counsel to CLMG Corp. and LNV Corporation, as administrative agent and sole lender, respectively, under the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017, in the above-captioned cases.  I submit this declaration in support of the *Motion of CLMG Corp. and LNV Corporation for Entry of an Order Directing Discovery from the Debtors Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* [Docket No. 95] (the "Motion").[2]

2.      Attached to this declaration are, to the best of my knowledge, true and correct copies of the following documents:

> **Exhibit 1**:      White Eagle Asset Portfolio, LP Agreement of Limited Partnership

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, include:  White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738).  The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**Exhibit 2**:    Limited Liability Company Agreement of White Eagle
General Partner, LLC

**Exhibit 3**:    Articles of Association of Lamington Road Designated
Activity Company

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my

knowledge, information and belief.


Dated: January 30, 2019               */s/ Andrew T. Zatz*
      New York, New York           ANDREW T. ZATZ

AMERICAS 98111360
ACTIVE\87299743.v1-1/30/19

## Exhibit 1

**White Eagle Asset Portfolio, LP**
**Agreement of Limited Partnership**

## WHITE EAGLE ASSET PORTFOLIO, LP

## AGREEMENT OF LIMITED PARTNERSHIP

This Agreement of Limited Partnership (together with the attached schedules, this "Agreement") effective as of May 16, 2014 (the "Effective Date"), is between White Eagle General Partner, LLC, a Delaware limited liability company, as general partner, and Markley Asset Portfolio, LLC, a Delaware limited liability company, as limited partner.

## PRELIMINARY STATEMENTS:

White Eagle Asset Portfolio, LLC, a Delaware limited liability company (the "Company") was formed on March 27, 2013. Effective May 16, 2014, the Company was converted from a Delaware limited liability company into a Delaware limited partnership pursuant to Section 17-217 of the Delaware Revised Uniform Limited Partnership Act (6 Del. C. § 17-101 et seq.), as amended from time to time (the "Act"). The Partners agree that upon conversion of the Company into a limited partnership (the "Partnership"), the Agreement of Limited Partnership of the Partnership shall read as follows:

## AGREEMENT:

In consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties to this Agreement agree as follows:

Section 1. Definitions.

When used in this Agreement, the following terms shall have the meanings set forth below:

"Act" has the meaning set forth for such term in the Preliminary Statements.

"Administrative Agent" means the Person acting in its capacity as Administrative Agent under the Loan and Security Agreement, and its permitted successors and assigns

"Affiliate" means, as to any Person, any other Person (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities/equities of such Person, or (iii) ten percent (10%) or more of the voting securities/equities of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities/equities, by control, or otherwise.

"Aggregate Participation Interest" has the meaning assigned to that term in the Loan and Security Agreement.

"Agreement" means this Agreement of Limited Partnership as from time to time amended pursuant to Section 12.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if sixty (60) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within sixty (60) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within sixty (60) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy," in conjunction with Section 9(f) of this Agreement, is intended to and shall supersede the events of withdrawal set forth in Sections 17-402(a)(4) & (5) of the Act.

"Borrower Interest Pledge Agreement" has the meaning set forth in the Loan and Security Agreement.

"Capital Contribution" means, as to any Partner, the sum of (i) the Partners' initial capital contribution payments actually made to the Partnership and (ii) the Partner's additional capital contributions, if any, to the Partnership.

"Certificate of Limited Partnership" means the Certificate of Limited Partnership of the Partnership filed with the office of the Secretary of State of the State of Delaware on May 16, 2014.

"Change of Control" has the meaning set forth in the Loan and Security Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable United States Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Contribution Agreement" means each of (i) that certain Contribution Agreement, dated as of April 29, 2013, by and between Markley Asset Portfolio, LLC, a Delaware limited liability company, as the transferor, and the Partnership, as the transferee, and (ii) that certain Contribution Agreement, dated as of May 16, 2014, by and between the Limited Partner, as the transferor, and the Partnership, as the transferee, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the Transaction Documents.

-2-

"General Partner" means White Eagle General Partner, LLC, a Delaware limited liability company, together with any other Person who becomes the or a general partner of the Partnership pursuant to this Agreement.

"General Partner Independent Manager" means the individual who is designated as the "Independent Manager" of the General Partner pursuant to the terms of the General Partner Limited Liability Company Agreement.

"General Partner Limited Liability Company Agreement" means that certain Limited Liability Company Agreement of White Eagle General Partner, LLC, a Delaware limited liability company, effective as of May 16, 2014, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the Transaction Documents.

"Limited Partner" means Markley Asset Portfolio, LLC, a Delaware limited liability company, together with any other Person who is admitted in accordance with the terms of Section 11(b) (but such additional Persons shall become Limited Partners only upon their having been formally admitted under the terms hereof). Such term shall also include those Persons who become a Substituted Limited Partner pursuant to this Agreement.

"Loan and Security Agreement" means that certain Amended and Restated Loan and Security Agreement intended to be entered into on or around May 16, 2014 by and among the Partnership, as the borrower, the Administrative Agent and the other Persons parties thereto.

"Majority in Interest of the Partners" means Partners owning in the aggregate more than fifty percent (50%) of the Percentage Interests in the Partnership.

"Material Action" means to consolidate or merge the Partnership with or into any Person or sell all or substantially all of the assets of the Partnership, or institute proceedings to have the Partnership be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Partnership or file a petition seeking, or consent to, reorganization or relief with respect to the Partnership under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Partnership or a substantial part of its property, or make any assignment for the benefit of creditors of the Partnership, or admit in writing the Partnership's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Partnership.

"Obligations" shall mean the indebtedness, liabilities and obligations of the Partnership under or in connection with the Transaction Documents or any related document as in effect as of any date of determination, including, without limitation, the Aggregate Participation Interest.

"Partners" means, collectively, the General Partner and the Limited Partners who have executed this Agreement.

"Partnership" means the limited partnership formed pursuant to this Agreement.

-3-

"Percentage Interest" has the meaning set forth for such term in Section 6(b).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Policies" has the meaning assigned to that term in Section 4(a).

"Special Purpose Entity" means a Person (other than a natural person) whose organizational documents contain restrictions on its purpose and activities and impose requirements to preserve its separateness that are substantially similar to those of the Partnership or the General Partner and which has an independent director or an independent manager whose function is similar to those of the Partnership or the General Partner.

"Special Purpose Provisions" means Sections 1, 4, 5, 7, 9, 10, 11, 12, 13, 15, 16(a), 16(b), 16(e) and 16(f) of this Agreement.

"Substituted Limited Partner" means a Person who is admitted to the Partnership by the General Partner according to Section 11(b).

"Transaction Documents" has the meaning assigned to that term in the Loan and Security Agreement.

"Transferred Assets" has the meaning set forth in each of the Contribution Agreements.

Section 2.    Formation and Agreement of Limited Partnership.

(a) The Partners have caused the formation of WHITE EAGLE ASSET PORTFOLIO, LP, a Delaware limited partnership (the "Partnership"), by filing the Certificate of Limited Partnership and the entering into of this Agreement.

Section 3.    Name; Term; Places of Business; Registered Agent and Offices.

(a) Name.    The name of the Partnership is "WHITE EAGLE ASSET ASSET PORTFOLIO, LP". All business of the Partnership shall be conducted under such name and titles to all assets or property owned by the Partnership shall be held in such name.

(b) Term. Subject to the provisions of Section 5 and Section 13 hereof, the term of the Partnership shall commence as of the Effective Date and shall, unless earlier dissolved pursuant to Section 13 hereof, continue for a period ending on the date on which the Partnership is dissolved by judicial decree. To the fullest extent permitted by law, each Partner expressly waives any right it might have to seek a judicial decree dissolving the Partnership for so long as any Obligations are outstanding.

(c) Principal Place of Business. The principal place of business and the office of the Partnership and the address where records are kept for inspection purposes is the office of the

-4-


General Partner as set forth in Section 3(d). General Partner may designate such other principal place of business or other places to be used as additional Partnership offices for the purpose of carrying on the business of the Partnership.

(d) Address of General Partner. The address of the General Partner is c/o AMS Limited, The Continental Building, 25 Church Street, PO Box Hm265, Hamilton HMAX, Bermuda, or such other location as may hereafter be determined by the General Partner.

(e) Registered Office and Agent. The name of the Partnership's registered agent for service of process shall be Corporation Service Company, and the address of the Partnership's registered agent and the address of the Partnership's registered office in the State of Delaware shall be c/o Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901. The registered agent and the registered office of the Partnership may be changed from time to time by the General Partner.

(f) Names and Addresses of the Limited Partners. The name and business address of each Limited Partner is set forth on the attached Schedule A.

(g) Treatment of Interest. Each Partner's partner interest in the Partnership shall constitute a "security" within the meaning of (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 Del. C. § 8-101, et seq.) and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each partner interest in the Partnership shall be treated as such a "security" for all such purpose, including, without limitation perfection of the security interest therein under Article 8 and 9 of the applicable Uniform Commercial Code as the Partnership has "opted-in" to such provisions). The Partnership shall maintain books for the purpose of registering the transfer of the partner interests in the Partnership and all pledges of a partner interest, an Interest Certificate (as hereinafter defined) and the rights represented thereby shall be recorded on Schedule B hereto, as amended from time to time. Notwithstanding any other provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any no-waivable provision of Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 Del. C. § 8-101, et seq.), such provision of Article 8 shall control.

(h) Interest Certificates. Upon the issuance of a partner interest to a Partner in accordance with the provisions of this Agreement, the Partnership shall issue one or more Interest Certificates in the name of such Partner. Each such Interest Certificate shall be denominated in terms of the percentage of partner interest evidenced by such Interest Certificate and shall be signed by the General Partner of the Partnership. "Interest Certificate" means a certificate issued by the Partnership which evidences the ownership of one or more Interests.

Section 4.    Purposes.

(a) The purpose to be conducted or promoted by the Partnership is to engage in the following activities:

(i)    to acquire, own, hold, transfer, otherwise deal with, and exercise any right, power, privilege, or other incident of ownership, possession, or control relating to life settlements ("Policies"), which Policies shall be pledged to the Administrative Agent pursuant to the Transaction Documents;

(ii)    to execute and deliver, and to exercise and perform all of its rights and obligations under or relating to, the Transaction Documents;

(iii)    to engage in any lawful act or activity and to exercise any powers permitted to limited partnerships organized under the laws of the State of Delaware that are necessary, appropriate, or convenient to accomplishing the preceding purposes; and

(iv)    to take all other actions that are necessary to maintain the existence of the Partnership in good standing under the laws of the State of Delaware and to qualify the Partnership to do business in any other jurisdiction in which that qualification, in the judgment of the General Partner, is required or appropriate.

(b) The Partnership, and the General Partner on behalf of the Partnership, may enter into and perform the Transaction Documents and all documents, agreements, certificates or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any other Partner or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the General Partner or any other Person to enter into other agreements on behalf of the Partnership.

Section 5.    Limits on Powers of the General Partner; Special Purpose Entity/Separateness.

(a) Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Partnership, the General Partner, the Limited Partners or any other Person, so long as any Obligation is outstanding, none of the General Partner, the Limited Partners or any other Person shall be authorized or empowered, nor shall they permit the Partnership, without the prior unanimous written consent of the General Partner and the General Partner Independent Manager, to take any Material Action; provided, however, that, so long as any Obligation is outstanding, the General Partner may not vote on, or authorize the taking of, any Material Action unless there is at least one General Partner Independent Manager then serving in such capacity.

(b) Without limiting any, and subject to all, other covenants of the Partnership contained in this Agreement, so long as any Obligation is outstanding, the Partnership shall

-6-

conduct its business and operations separate and apart from that of any other Person and in furtherance of the foregoing:

    (i)    The Partnership shall maintain its accounts, financial statements, books, accounting and other records, and other documents of the Partnership separate from those of any other Person and ensure all audited financial statements of any Person that uses consolidated financial statements to include the Partnership contain notes clearly stating that (1) all of the Partnership's assets are owned by the Partnership and (2) the Partnership is a separate entity.

    (ii)    The Partnership shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person, and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Transaction Documents.

    (iii)    The Partnership shall conduct its own business in its own name and, for all purposes, shall not operate, or purport to operate, collectively as a single or consolidated business entity with respect to any Person.

    (iv)    The Partnership shall pay its own debts, liabilities and expenses (including overhead expenses, if any, and operating expenses) only out of its own assets as the same shall become due.

    (v)    The Partnership has observed, and shall observe all (A) Delaware limited partnership formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited partnership agreement in a manner that would adversely affect the existence of the Partnership as a bankruptcy-remote special purpose entity.

    (vi)    The Partnership does not, and shall not, (A) guarantee, become obligated for, or hold itself or its credit out to be responsible for or available to satisfy, the debts or obligations of any other Person or (B) control the decisions or actions respecting the daily business or affairs of any other Person.

    (vii)    The Partnership shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person.

    (viii)    The Partnership shall not identify itself as a division of any other Person.

-7-

(ix) The Partnership shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

(x) The Partnership shall not use its separate existence to perpetrate a fraud in violation of applicable law.

(xi) The Partnership shall not act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

(xii) The Partnership shall maintain an arm's length relationship with its Affiliates.

(xiii) Except as permitted by or pursuant to the Transaction Documents, the Partnership shall not grant a security interest or otherwise pledge its assets for the benefit of any other Person.

(xiv) The Partnership shall not acquire any securities or debt instruments of any other Partnership, its Affiliates or any other Person.

(xv) The Partnership shall not make loans or advances to any Person, without the prior written consent of the Administrative Agent, except as permitted by or pursuant to the Transaction Documents.

(xvi) The Partnership shall make no transfer of its assets except as permitted by or pursuant to the Transaction Documents.

(xvii) The Partnership shall file its own tax returns separate from those of any other Person or entity, except to the extent that the Partnership is not required to file tax returns under applicable law or is not permitted to file its own tax returns separate from those of any other Person.

(xviii) The Partnership shall not acquire obligations or securities of its members.

(xix) The Partnership shall use separate stationery, invoices and checks.

(xx) The Partnership shall correct any known misunderstanding regarding its separate identity.

(xxi) The Partnership shall intend to maintain adequate capital in light of its contemplated business operations.

(xxii) The Partnership shall comply with all of the covenants described in Section 9(f) of the Loan and Security Agreement.

-8-

Failure of the Partnership, or the Member on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Partnership as a separate legal entity or the limited liability of the General Partner.

(c) As long as any Obligation is outstanding, the Partnership shall have a Special Purpose Entity holding at most a 0.01% interest in the Partnership acting as the General Partner. Upon the withdrawal, dissolution, or other event that causes White Eagle General Partner, LLC, to cease to be a general partner of the Partnership, a new general partner shall immediately be appointed and an acceptable non-consolidation opinion concerning such new general partner and its equityholders shall be delivered to the Administrative Agent. As long as any Obligation is outstanding, the Partnership shall not have any general partners that are not Special Purpose Entities.

(d) Notwithstanding anything to the contrary contained in this Agreement, for so long as any Obligation remains outstanding, the Partnership shall always have only one General Partner and one Limited Partner.

Section 6.    Capital Contributions; Percentage Interests.

(a) Each Partner will make Capital Contributions to the capital of the Partnership as soon as reasonably practicable and in amounts requested by the General Partner. The General Partner shall be under no obligation to request additional Capital Contributions from the Partners and the obligation of the Partners to make such Capital Contributions shall not be deemed to be an asset of the Partnership until such time as all of the Partners have made their pro rata share of such Capital Contribution to the Partnership.

(b) Each Partner shall have an interest in the Partnership expressed as a percentage of the whole ("Percentage Interest"), with the current Percentage Interest in the Partnership of each Partner being as follows:

| Partner | Percentage Interest |
|---|---|
| White Eagle General Partner, LLC | 0.10% |
| Markley Asset Portfolio, LLC | 99.90% |

(c) The Limited Partner shall not be liable for any of the debts, obligations or other liabilities of the Partnership solely by reason of being a limited partner of the Partnership, and no Partner shall be required to contribute any additional capital to the Partnership other than the initial contributions heretofore made. No Partner will have any obligation to restore any negative or deficit balance in its capital account, including any negative or deficit balance in its capital account upon liquidation and dissolution of the Partnership. Any additional funds required by the Partnership to meet its cash requirements shall, to the extent possible, be provided by Partnership borrowings from third parties, upon such terms and conditions as determined appropriate by the Partners; provided that in lieu of causing the Partnership to borrow from third parties, with the unanimous approval of the Partners, the Partners may from time to time make additional Capital Contributions to the Partnership.

-9-

Section 7.    Distributions.

(a) After providing for the satisfaction of all the current debts and obligations of the Partnership and after any required payments on any loan or other financing, the Partnership shall, as soon as reasonably practical, make quarterly distributions and annual adjusting distributions of the Partnership's net cash flow available for distribution (as determined by the General Partner), including distributions of net cash flow from operations, net proceeds of any interim capital transaction and net proceeds available upon dissolution and winding up of the Partnership (in each case after establishment of appropriate and reasonable reserves, as determined by the General Partner), to the Partners in accordance with and in proportion to their respective Percentage Interests in the Partnership.

(b) Notwithstanding the foregoing to the contrary, upon the dissolution and winding up of the Partnership, all assets of the Partnership, including cash, shall be distributed to the Partners in proportion to their respective positive capital account balances, as such balances have been adjusted to reflect allocations of gains and losses for all periods, and such distributions shall be made within the time periods set forth in Treasury Regulation Section 1.704-1(b)(2)(ii)(B)(3).

(c) Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, shall not make a distribution to any Partner on account of its interest in the Partnership if such distribution would (i) violate the Act or other applicable law or any Transaction Document or (ii) constitute an Event of Default under the Loan and Security Agreement or breach any of the terms or provisions of any Transaction Document.

Section 8.    Bank Accounts; Books of Account; Reports; Fiscal Year.

(a) Books and Records. The Partnership shall maintain, or cause to be maintained, in a manner customary and consistent with good accounting principles, practices and procedures, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the Partnership) in which shall be entered fully and accurately each and every financial transaction with respect to the ownership and operation of the property of the Partnership. Such books and records of account shall be prepared and maintained at the principal place of business of the Partnership or such other place or places as may from time to time be determined by the General Partner. Each Partner or its duly authorized representative shall have the right to inspect, examine and copy such books and records of account at the Partnership's office during reasonable business hours. A reasonable charge for copying books and records may be charged by the Partnership.

(b) Accounting and Fiscal Year. The books of the Partnership shall be kept on the accrual basis in accordance with generally accepted accounting principals and on a tax basis and the Partnership shall report its operations for tax purposes on the accrual method. The fiscal year of the Partnership shall end on December 31 of each year, unless a different fiscal year shall be required by the Code.

-10-

(c) Reserves. Subject to the terms and conditions of the Transaction Documents, the General Partner may, subject to such conditions as it shall determine, establish reserves for the purposes and requirements as it may deem appropriate.

Section 9.    Rights and Obligations of the General Partner.

(a) Subject to Section 5 or to the extent delegated by the written agreement of the General Partner, (i) the business and affairs of the Partnership shall be vested in and controlled exclusively by the General Partner, which shall have the exclusive power and authority, on behalf of the Partnership to take any action of any kind not inconsistent with this Agreement and to do anything and everything they deem necessary or appropriate to carry on the business of the Partnership, (ii) each of the General Partners (if there shall be more than one) shall have full, exclusive and complete discretion in the management and control of the Partnership for the purposes set forth above in Section 4, (iii) all decisions relating to the business and affairs of the Partnership including, without limitation, all decisions required or permitted to be made by the General Partner under this Agreement, may be made by, and all action proposed to be taken by or on behalf of the Partnership, may be taken by any one of the General Partners (if there shall be more than one) and (iv) any one of the General Partners (if there shall be more than one) shall have full power and authority to execute all documents and take all other actions on behalf of the Partnership and thereby bind the Partnership and the Partners with respect thereto.

(b) The implementation of decisions made by the General Partner may be through any Person selected by the General Partner.

(c) The General Partner is, to the extent of their rights and powers set forth in this Agreement, an agent of the Partnership for the purpose of the Partnership's business, and the actions of the General Partner taken in accordance with such rights and powers shall bind the Partnership.

(d) Any of the Partners may engage in or possess an interest in other business ventures of every nature and description, independently or with others, and neither the Partnership nor the Partners shall have, or have the right to acquire, by virtue of this Agreement, any right in and to such venture or to the income or profit derived therefrom.

(e) For so long as any Obligation remains outstanding, (i) each General Partner shall be a Special Purpose Entity, (ii) no additional General Partner may be admitted if the addition of such General Partner would cause a Change in Control and (iii) no General Partner shall be permitted to withdraw from the Partnership. A Person shall be deemed admitted as a General Partner at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a General Partner on the attached Schedule A.

(f) Notwithstanding any other provision of this Agreement, the Bankruptcy of the General Partner shall not cause the General Partner to cease to be a general partner of the Partnership and upon the occurrence of such an event, the Partnership shall continue without dissolution. This Section 9(f), together with the definition of "Bankruptcy" set forth in this Agreement, is intended to and shall supersede the events of withdrawal set forth in Sections 17-402(a)(4) & (5) of the Act.

-11-

Section 10.    Rights and Obligations of Limited Partners.

(a) Limited Liability. No Limited Partner shall be personally liable for any of the debts of the Partnership or any of the losses thereof other than (i) the amount contributed by the Limited Partner to the Partnership, (ii) the share of undistributed profits of the Partnership attributable to such Limited Partner, (iii) its obligation to make other payments expressly provided for in this Agreement and (iv) the amount of any distributions wrongfully distributed to it.

(b) No Management Responsibility. No Limited Partner, as such, shall take part in the management of the business or transact any business for the Partnership. All management responsibility is vested in the General Partner.

(c) No Authority to Act. No Limited Partner, as such, shall have the power to sign for or to bind the Partnership. All authority to act on behalf of the Partnership is vested in the General Partner.

(d) Withdrawal. No Limited Partner shall be entitled to withdraw from the Partnership.

(e) Bankruptcy; Death. The Bankruptcy, death, disability or declaration of incompetence of a Limited Partner shall not, in and of itself, dissolve the Partnership, but the rights of a Limited Partner to share in the profits and losses of the Partnership and to receive distributions of Partnership funds shall, on the happening of such an event, devolve upon the Limited Partner's personal representative (as defined in the Act), subject to this Agreement, and the Partnership shall continue as a limited partnership. The Limited Partner's personal representative shall be liable for all of the obligations of the Limited Partner. In no event shall the personal representative become a substituted limited partner, except in accordance with Section 11 or Section 10(g).

(f) Admission. A Person shall be deemed admitted as a Limited Partner at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Limited Partner on the attached Schedule A. For so long as any Obligation remains outstanding, no additional Limited Partner may be admitted if the addition of such Limited Partner would cause a Change in Control.

(g) Continuation of Partnership Notwithstanding Loss of Limited Partners. Upon the occurrence of any event that would result in there being no limited partner in the Partnership, the Partnership shall not dissolve and the general partners or the personal representative of the last remaining limited partner is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such limited partner in the Partnership, agree in writing (i) to continue the Partnership, and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute limited partner of the Partnership, effective as of the occurrence of the event that terminated the continued membership of the last remaining limited partner of the Partnership in the Partnership.

-12-

Section 11.    Transfer of Rights.

(a) Conditions on Transfers by Limited Partners. Subject to Section 5 and Section 10(f), any transfer of a Partner's Percentage Interest in the Partnership shall be subject to the conditions that no such sale, assignment, or other transfer may be made, to the fullest extent permitted by law, (i) except pursuant to an effective registration statement under all applicable federal and state securities laws or in a transaction which is exempt from registration under such laws, (ii) if such sale, assignment or transfer, when considered with all prior sales, assignments or transfers, would result in the termination of the Partnership for federal income tax purposes and (iii) (if the General Partner shall request) unless the transferor delivers to the General Partner an opinion, in form and substance and issued by counsel acceptable to the General Partner, covering such securities laws, tax and other aspects of the proposed transfer as the General Partner may request. Any Limited Partner who sells, assigns or otherwise transfers all or any portion of his interest in the Partnership shall promptly notify the General Partner of such transfer and furnish the General Partner the name and address of the transferee and such other information as might be required under Section 6050K of the Code and the Treasury Regulations thereunder. No transfer of any direct or indirect ownership interest in the Partnership may be made except as permitted by the Transaction Documents. Each Partner hereby consents to the transfer of an ownership interest in the Partnership pursuant to the terms of the Borrower Interest Pledge Agreement.

(b) Substituted Limited Partner. Subject to Section 5 and Section 11(f), each Partner hereby confers upon the General Partner the right to admit a transferee of the Percentage Interest of a Limited Partner as a Substituted Limited Partner in the Partnership. Any transferee who desires to become a Substituted Limited Partner shall (i) deliver to the General Partner such information and opinions of counsel, execute such documents, and take such other action as the General Partner may deem appropriate with respect to such substitution, including, without limitation, the written acceptance and adoption by the transferee of the provisions of this Agreement and the Act and the assumption by the transferee of the obligations of its transferor and (ii) pay all expenses incurred by the Partnership in connection with such transfer and admission, including the cost of preparing and filing an amendment to the Certificate of Limited Partnership, if required, and such expenses shall not be deemed Capital Contributions by the Substituted Limited Partners. A transferee shall be deemed admitted to the Partnership as a Substituted Limited Partner at the time such transferee is listed on the attached Schedule A. The Partnership shall continue with the same basis and capital account for the Substituted Limited Partner that was attributable to his transferor. The name, address and Percentage Interest of the Substituted Limited Partner shall be duly noted on the attached Schedule A.

(c) Right of Transferee. Unless and until any assignee, transferee, heir or legatee becomes a Substituted Limited Partner (in accordance with Section 11(b), his status and rights shall be limited to the rights of an assignee of a limited partner interest under Section 17-702 of the Act.

(d) Basis Adjustment. Upon the transfer of all or part of an interest in the Partnership, at the request of the transferee of the interest, the General Partner may, in his sole discretion, cause the Partnership to elect, pursuant to Section 754 of the Code or the corresponding provisions of subsequent law, to adjust the basis of the Partnership properties as provided by Sections 734 and 743 of the Code.

-13-

(e) Transfer by General Partner. The Limited Partners will be excused from accepting the performance of and rendering performance to any other person as general partner hereunder (including any trustee or assignee of or from the General Partner). Notwithstanding the foregoing, the General Partner may make an assignment of its interest as General Partner which vests in the assignee the rights of an assignee under the Act and which does not result in a change or substitution of the General Partner.

(f) Special Loan Provisions. Notwithstanding any provision of the Act or this Agreement to the contrary, to the fullest extent permitted by law, no transfer of any direct or indirect ownership interest in the Partnership may be made except as expressly permitted by the Transaction Documents.

(g) Withdrawal of Partner. Subject to the provisions of Section 5, except as provided in Section 11 and Section 13, no Partner shall, to the fullest extent permitted by law, be entitled to withdraw or retire from, or dissolve, the Partnership, or require any partition of the Property of the Partnership.

Section 12.    Amendment of Limited Partnership Agreement; Meetings.

(a) Amendments to be Adopted Solely by the General Partner. Subject to Section 5, the General Partner may, without the consent of any Limited Partner, amend any provision of this Agreement, and execute whatever documents may be required in connection therewith, to reflect:

- (i) a change in the name of the Partnership or the location of the principal place of business of the Partnership; provided, so long as any Obligation remains outstanding, the prior written consent of the Administrative Agent shall be required;

- (ii) the admission of Substituted Limited Partners in accordance with the terms of Section 11;

- (iii) a change which is necessary to qualify the Partnership as a Limited Partnership under the laws of any state or which is necessary and advisable in the opinion of the General Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes; or

- (iv) any other amendments similar to the foregoing.

(b) Other Amendments. Subject to Section 5, amendments to this Agreement other than those described in Section 12(a) may be adopted by the affirmative vote of both the General Partner and a Majority in Interest of the Partners. The General Partner may seek the written vote of the Limited Partners or may call a meeting.

(c) Amendments not Allowable. Subject to Section 5 and unless otherwise approved by the Partner(s) affected thereby, no amendment to this Agreement shall be permitted if the effect of same would be to:

-14-

       (i)       increase the duties or liabilities of the General Partner or of any Limited Partner; or

       (ii)      increase or decrease the interest of any Partner hereto in the assets, profits or losses of the Partnership.

(d) Administrative Agent Consent.  Notwithstanding anything to the contrary in this Agreement, so long as any Obligation is outstanding, neither this Agreement nor the Certificate of Limited Partnership may be modified, altered, supplemented or amended unless the Administrative Agent has consented in writing.

(e) Meetings of the Partners.  Meetings of the Partners to vote upon any matters on which the Limited Partners are authorized to take action under this Agreement may be called by the General Partner or by the written request of Limited Partners holding not less than a majority of the total Percentage Interest in the Partnership.  The call will state the nature of the business to be transacted, and the meeting will be held at the offices of the General Partner (or at such other mutually-agreeable location), not less than 10 nor more than 60 days from the date of the notice. The notice may also state that the meeting will be held via telephone conference. Limited Partners may vote in person or by proxy at any such meetings.  Action may be taken without a meeting provided that the General Partner and the Limited Partners owning the requisite Percentage Interests in the Partnership sign written authorizations approving such action.  Limited Partners entitled to vote shall be those shown on the records of the General Partner to be Limited Partners in good standing as of a date 10 days prior to the meeting or the effective date of any written authorization. Any Limited Partner who is in default under this Agreement shall not be entitled to vote and his Percentage Interest shall be excluded in calculating the percentage required for approval, unless and until the default is cured.

Section 13.    Dissolution.

(a) Causes.  To the fullest extent permitted by law, each Partner expressly waives any right which it might otherwise have to dissolve the Partnership by affirmative vote or written consent of the partners or otherwise except as set forth in this Section 13 and, for so long as any Obligation remains outstanding, waives any right withdraw from or assign its partnership interest if such withdrawal or assignment would result in a dissolution of the Partnership.  Subject to Section 5, the Partnership shall be dissolved upon the first to occur of one of the following events:

       (i)      subject to Section 5, the occurrence entry of a judicial decree dissolving the Partnership pursuant to Section 3(b);

       (ii)      subject to Section 10(g), at any time there are no limited partners of the Partnership, unless the business of the Partnership is continued in accordance with the Act;

       (iii)     subject to Section 9(f), any events that result in the General Partner ceasing to be a general partner of the Partnership under the Act, provided that the Partnership shall not be dissolved and required to be wound up in connection with any such event if (A) at the time of the occurrence of such event there is at least one remaining general partner of the Partnership who

-15-

> is hereby authorized to and does carry on the business of the Partnership, or (B) within 90 days after the occurrence of such event, a majority of the limited partners agree in writing or vote to continue the business of the Partnership and to the appointment, effective as of the date of such event, if required, of one or more additional general partners of the Partnership; or

(iv)     the date on which the Partnership is voluntarily dissolved by the agreement of the Partners as herein; provided; however, that the Partners hereby waive such right for as long as the Obligations are outstanding.

(b) Notice of Dissolution. Upon the dissolution of the partnership, the General Partner or the liquidating trustee, as the case may be, shall promptly notify the Partners of such dissolution.

(c) Liquidation. Upon dissolution of the Partnership, the General Partner or, in the event that the dissolution is caused by an event described in Section 13(a)(iii) and there is no other General Partner within 90 days, a Person who may be approved by a Majority in Interest, shall immediately commence to wind up the Partnership's affairs; provided that a reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the Partners to minimize the normal losses attendant upon the liquidation. The Partners shall continue to share profits and losses during liquidation in the same proportions as specified in Section 14(b) as before liquidation. Each Partner shall be furnished with a statement prepared by the Partnership's certified public accountant that shall set forth the assets and liabilities of the Partnership as of the date of dissolution. The proceeds of liquidation shall be distributed, as realized, in the following order and priority:

(i)     first, to creditors of the Partnership, including Partners who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Partnership (whether by payment or the making of reasonable provision for payment thereof);

(ii)     next, to the Partners in proportion to their respective positive capital account balances, as such balances have been adjusted to reflect allocations of gains and losses for all periods, until such capital accounts have been reduced to zero; and

(iii)     thereafter, to the Partners the remaining proceeds of liquidation in accordance with the Percentage Interests of the Partners.

(d) Methods of Liquidation. The Partnership may be liquidated by either:

(i)     selling the Partnership assets and distributing the net proceeds therefrom in the manner provided in Section 13(c). Any net gain or loss realized by the Partnership on the sale or other disposition of Partnership assets in the process of liquidation of the Partnership shall be allocated to the Partners in the ratios specified for allocating profits or losses in Section 14(b); or

-16-

(ii)    subject to the order of priority set forth in Section 13(c), distributing the Partnership assets proportionately to the Partners in kind with each Partner accepting an undivided interest in the Partnership assets, subject to Partnership liabilities, in satisfaction of its proportionate interests in the Partnership; for the purpose of determining the amount distributed to each Partner, any property distributed in kind in the liquidation shall be valued at fair market value.

(e) Termination of Partnership. The Partnership shall terminate when all of the assets of the Partnership, after payment of or due provision for all debts, liabilities and obligations of the Partnership, shall have been distributed to the Partners in the manner provided for in Section 13, and the Certificate of Limited Partnership shall have been cancelled in the manner required by the Act. Upon cancellation of the Certificate of Limited Partnership in accordance with the Act, this Agreement shall terminate.

Section 14.    Tax Matters.

(a) In accordance with the capital accounting rules of Treasury Regulation Section 1.704-1(b) (relating to maintenance of capital accounts), a separate capital account shall be determined and maintained for each Partner, and such capital accounts of the Partners shall be subject to such adjustments as may be required to comply with Treasury Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulation. Without limiting the generality of the foregoing, the General Partner may modify the manner in which capital accounts are maintained in order to comply with the provisions of Section 704(b) of the Code and Treasury Regulation Section 1.704-1(b).

(b) For any taxable year of the Partnership all net income, net gains and net losses of the Partnership from operations, interim capital transactions or in connection with a dissolution and winding up of the Partnership shall be allocated to the Partners in accordance with and in proportion to their respective Percentage Interests in the Partnership.

(c) Without limiting the generality of the foregoing, the General Partner may modify the manner in which the capital accounts are maintained in order to comply with the provisions of Section 704(b) of the Code and the Treasury Regulations thereunder. In addition, the Partners agree that the Partnership's income, gain and loss (or items thereof) shall be specially allocated to the Partners to the extent necessary to comply with the provisions of Section 704(b) and 704(c) of the Code, including minimum gain chargebacks, qualified income offsets, etc., as required by the Treasury Regulations thereunder. No allocation of income, gain or loss will be made to a Partner if the allocation would not have "economic effect" or otherwise would not be in accordance with the Partner's interest in the Partnership, in each case within the meaning of Treasury Regulation Section 1.704-1(b). The Partners will have authority to reallocate any item in accordance with the immediately preceding provisions of this Section 14(c).

(d) The General Partner shall act as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code.

Section 15.    Indemnification.

-17-

(a) No Partner shall be liable to the Partnership or to any other Partner for monetary damages for any losses, claims, damages or liabilities arising from any act or omission performed or omitted by it arising out of or in connection with this Agreement or the Partnership's business or affairs, except for any such loss, claim, damage or liability primarily attributable to such Partner's gross negligence or willful misconduct. The Partnership shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless each Partner (collectively, the "Covered Persons") against any losses, claims, damages or liabilities to which such Covered Person may become subject in connection with any matter arising out of or in connection with this Agreement or the Partnership's business or affairs, except for any such loss, claim, damage or liability primarily attributable to such Covered Person's gross negligence or willful misconduct. If any Covered Person becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with this Agreement or the Partnership's business or affairs, the Partnership shall reimburse such Covered Person for its reasonable legal and other reasonable out-of-pocket expenses (including the cost of any investigation and preparation) as they are incurred in connection therewith; provided that such Covered Person shall promptly repay to the Partnership the amount of any such reimbursed expenses paid to it if it shall ultimately be determined that such Covered Person was not entitled to be indemnified by the Partnership in connection with such action, proceeding or investigation. If for any reason (other than the gross negligence or willful misconduct of such Covered Person) the foregoing indemnification is unavailable to such Covered Person, or insufficient to hold it harmless, then the Partnership shall contribute to the amount paid or payable by such Covered Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect the relative benefits received by the Partnership on the one hand and such Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations. The provisions of this Section 15 shall survive for a period of four years from the date of dissolution of the Partnership; provided that (i) if at the end of such period there are any actions, proceedings or investigations then pending, any Covered Person may so notify the Partnership and the other Partners at such time (which notice shall include a brief description of each such action, proceeding or investigation and the liabilities asserted therein) and the provisions of this Section 15 shall survive with respect to each such action, proceeding or investigation set forth in such notice (or any related action, proceeding or investigation based upon the same or similar claim) until such date that such action, proceeding or investigation is finally resolved and (ii) the obligations of the Partnership under this Section 15 shall be satisfied solely out of Partnership assets and no Covered Person shall have any personal liability on account thereof. Notwithstanding anything to the contrary contained in this Agreement, the obligations of the Partnership or any Covered Person under this Section 15 shall (a) be in addition to any liability which the Partnership or such Covered Person may otherwise have and (b) inure to the benefit of such Covered Person, its Affiliates and their respective members, directors, officers, employees, agents and affiliates and any successors, assigns, heirs and personal representatives of such Persons.

(b) Any indemnification obligations of the Partnership to a Covered Person under this Agreement shall be fully subordinated to any obligations respecting the Transferred Assets (including, without limitation, the Obligations) and such indemnification obligations shall not constitute a claim against the Partnership in the event that cash flow in excess of amounts

-18-

necessary to pay holders of such obligations respecting the Transferred Assets is insufficient to pay such indemnification obligations.

(c) The foregoing provisions of this Section 15 shall survive any termination of this Agreement.

Section 16.    Miscellaneous Provisions.

(a) Waiver of Partition; Nature of Interest.  To the fullest extent permitted by law, each Partner (and any additional partner admitted under Section 11) hereby irrevocably waives any right or power that such Person might have to cause the Partnership or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Partnership, to compel any sale of all or any portion of the assets of the Partnership pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Partnership. No Partner shall have any interest in any specific assets of the Partnership, and no Partner shall have the status of a creditor with respect to any distribution pursuant to Section 7. The interest of the Partners in the Partnership is personal property.

(b) Benefits of Agreement; No Third-Party Rights.  Except for the Administrative Agent, its successors and assigns with respect to the Special Purpose Provisions, (i) none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership or by any creditor of the Partners, (ii) nothing in this Agreement shall be deemed to create any right in any Person not a party hereto, and (iii) this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third person (except as provided in Section 16(e). The Administrative Agent and its successors and assigns are intended third-party beneficiaries of the Special Purpose Provisions.

(c) Severability of Provisions.    Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

(d) Entire Agreement.  This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

(e) Binding Agreement.  Notwithstanding any other provision of this Agreement, the Partners agree that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Partners, and is enforceable in accordance with its terms. This Agreement shall be binding upon the parties hereto and their respective executors, administrators, legal representatives, heirs, successors and assigns, and shall inure to the benefit of the parties hereto and, except as otherwise provided herein, their respective executors, administrators, legal representatives, heirs, successors and assigns.

(f) Governing Law.  This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

-19-

(g) Counterparts.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

(h) Notices. Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (i) in the case of the Partnership, to the Partnership at its address in Section 3(c), (ii) in the case of a Partner, to such Partner at its address as listed on the attached Schedule A and (iii) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

(i) Attorney Fees. If the Partnership or the General Partner obtains a judgment against any other Partner of the Partnership by reason of the breach of this Agreement or the failure to comply with the terms hereof, reasonable attorneys' fees and costs as fixed by the court shall be included in such judgment.

(j) Further Assurances. The General Partner agrees to execute, acknowledge, deliver, file, record and publish such further instruments and documents, and do all such other acts and things as may be required by law, or as may be required to carry out the intent and purposes of this Agreement.

-20-

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement of Limited Partnership as of the date first above written.

GENERAL PARTNER:

WHITE EAGLE GENERAL PARTNER, LLC, a Delaware limited liability company

By: _____

Name: Richard S. O'Connell
Title: President and Chief Financial Officer

LIMITED PARTNER:

MARKLEY ASSET PORTFOLIO, LLC, a Delaware limited liability company

By: _____

Name: Richard S. O'Connell
Title: President and Chief Financial Officer

[Signature page to Agreement of Limited Partnership for White Eagle Asset Portfolio, LP]

## SCHEDULE A

### Partners

| Name and Address | Percentage Interest |
| --- | --- |
| White Eagle General Partner, LLC | 0.10% |
| c/o AMS Limited | |
| The Continental Building | |
| 25 Church Street | |
| PO Box Hm265 | |
| Hamilton HMAX | |
| Bermuda | |
| | |
| Markley Asset Portfolio, LLC | 99.90% |
| 701 Park of Commerce Blvd., Suite 301 | |
| Boca Raton, FL 33487 | |
| | |
| TOTAL | 100% |

-2-

4816-5664-1050.4

## SCHEDULE B

### Pledges of Interests

| Pledgor | Pledgee | Partnership Interest Pledged | Interest Certificate No. |
|---|---|---|---|
| White Eagle General Partner, LLC | CLMG Corp. | 0.10% | 1 |

## FIRST AMENDMENT TO LIMITED PARTNERSHIP AGREEMENT OF WHITE EAGLE ASSET PORTFOLIO, LP

This First Amendment to the Agreement of Limited Partnership of White Eagle Asset Portfolio, LP, a Delaware limited partnership (the "Partnership") shall be effective as of May 16, 2014.

### FACTUAL BACKGROUND

A.  White Eagle Asset Portfolio, LLC, a Delaware limited liability company, converted to a Delaware limited partnership under the name "White Eagle Asset Portfolio, LP" on May 16, 2014 pursuant to Section 17-217 of the Revised Uniform Limited Partnership Act of the State of Delaware.

B.  At the time of formation of the Partnership, White Eagle General Partner, LLC, a Delaware limited liability company, as the general partner (the "General Partner"), and Markley Asset Portfolio, LLC, a Delaware limited liability company ("Markley"), as the limited partner, adopted an Agreement of Limited Partnership (the "Original Agreement") effective as of May 16, 2014.

C.  Markley has assigned its entire Percentage Interest in the Partnership to Lamington Road Limited, an Irish Section 110 company, pursuant to that certain Assignment of Partnership Interest of even date herewith (the "Assignment"), and the Partnership has consented to the admission of Lamington as a Substituted Limited Partner.

D.  The undersigned, being all of the current partners of the Partnership after giving effect to the Assignment, wish to amend the Original Agreement as set forth herein.

E.  Capitalized terms not defined herein shall have the meanings assigned to them in the Original Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Amendment to Schedule A. Schedule A of the Original Agreement is hereby amended and restated in its entirety as set forth on Schedule A hereto.

2.  Amendment to Schedule B. Schedule B of the Original Agreement is hereby amended and restated in its entirety as set forth on Schedule B hereto.

### [signatures appear on next page]

IN WITNESS WHEREOF, the parties have executed this document as of the date set forth above.

**GENERAL PARTNER**

WHITE EAGLE GENERAL PARTNER, LLC,
a Delaware limited liability company

By: _____

Name: Richard S. O'Connell
Title: President and Chief Financial Officer


**LIMITED PARTNER**

LAMINGTON ROAD LIMITED, an Irish
Section 110 company

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this document as of the date set forth above.

**GENERAL PARTNER**

WHITE EAGLE GENERAL PARTNER, LLC,
a Delaware limited liability company

By:_____
Name: Richard S. O'Connell
Title: President and Chief Financial Officer

**LIMITED PARTNER**

LAMINGTON ROAD LIMITED, an Irish
Section 110 company

By:_____
Name:_____Rodney O'ROURKE_____
Title:_____Director_____

## SCHEDULE A

### Partners

| Name and Address | Percentage Interest |
| --- | --- |
| White Eagle General Partner, LLC<br>c/o AMS Limited<br>The Continental Building<br>25 Church Street<br>PO Box Hm265<br>Hamilton HMAX<br>Bermuda | 0.10% |
| Lamington Road Designated Activity Company<br>2nd Floor Palmerston House<br>Fenian Street<br>Dublin 2<br>Ireland | 99.90% |
| TOTAL | 100% |

## SCHEDULE B

### Pledges of Interests

| Pledgor | Pledgee | Partnership Interest Pledged | Interest Certificate No. |
|---|---|---|---|
| White Eagle General Partner, LLC | CLMG Corp. | 0.10% | 1 |
| Lamington Road Designated Activity Company | CLMG Corp. | 99.9% | 2 |

## Exhibit 2

**Limited Liability Company Agreement
of White Eagle General Partner, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**WHITE EAGLE GENERAL PARTNER, LLC**

This Limited Liability Company Agreement (together with the Schedules attached hereto, this "Agreement") of White Eagle General Partner, LLC (the "Company"), is entered into by Lamington Road Limited, an Irish Section 110 company, as the sole equity member of the Company (the "Member"), and Michelle A. Dreyer, as the initial Independent Manager (as defined on Schedule A hereto), effective as of May 16, 2014 (the "Effective Date"). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

WHEREAS, the Company was formed as a limited liability company on May 14, 2014 by the filing of a Certificate of Formation with the Secretary of State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act"); and

WHEREAS, the Member and the Independent Manager agree that the membership in and management of the Company shall be governed by the terms set forth herein.

NOW, THEREFORE, the Member and the initial Independent Manager hereby agree as follows:

Section 1.     Name.

The name of the limited liability company formed hereby is White Eagle General Partner, LLC.

Section 2.     Principal Business Office.

The principal business office of the Company shall be located at c/o AMS Limited, The Continental Building, 25 Church Street, PO Box Hm265, Hamilton HMAX, Bermuda, or such other location as may hereafter be determined by the Member.

Section 3.     Registered Office.

The address of the registered office of the Company in the State of Delaware is c/o Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901.

Section 4.     Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901.

Section 5.     Members.

(a)     The mailing address of the Member is set forth on Schedule B attached hereto.

The Member is hereby admitted to the Company as a member of the Company simultaneously with its execution of a counterpart signature page to this Agreement.

(b)    Subject to <u>Section 9(d)</u>, the Member may act by written consent.

(c)    Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to <u>Sections 19 and 21,</u> or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to <u>Sections 20 and 21,</u> the person acting as the Independent Manager pursuant to <u>Section 10</u> shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as the Special Member and shall continue the Company without dissolution. The Special Member may not resign from the Company or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to the Company as the Special Member by executing a counterpart to this Agreement and (ii) such successor has also accepted its appointment as the Independent Manager pursuant to <u>Section 10</u>; provided, however, the Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member. The Special Member, in its capacity as Special Member, shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, the Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. The Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act or this Agreement, the Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to reflect its agreement to be admitted to the Company as the Special Member, the person acting as the Independent Manager pursuant to <u>Section 10</u> shall execute a counterpart to this Agreement. Prior to its admission to the Company as the Special Member, the person acting as the Independent Manager pursuant to <u>Section 10</u> shall not be a member of the Company.

Section 6.    <u>Certificates.</u>

Robert S. Bernstein, whom the parties hereto hereby confirm was designated as an "authorized person" within the meaning of the Act, has executed, delivered and filed the initial Certificate of Formation with the Secretary of State of the State of Delaware and all actions taken by him or her in connection with the organization of the Company, including such filing of the Certificate of Formation and obtaining an Employer Identification Number for the Company, are hereby adopted, approved and ratified by the Member. Upon the filing of the initial Certificate of Formation with the Secretary of State of the State of Delaware, his or her powers as an "authorized person" ceased, and the Member thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act. The Member shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary or desirable for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act and this Agreement.

Section 7.    Purposes.

(a)        The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)    to acquire, own, hold, manage and otherwise deal with its general partner interest in White Eagle Asset Portfolio, LP, a Delaware limited partnership (the "Partnership"), and to engage in such actions and exercise such authority as are consistent with being the general partner of the Partnership, in each case, in accordance with the terms and conditions of the Transaction Documents;

(ii)    to execute and deliver, and to exercise and perform all of its rights and obligations under or relating to, the Transaction Documents, including the pledge its general partner interest in the Partnership pursuant to the Transaction Documents; and

(iii)    to cause the Partnership to engage in the following activities:

A.    to acquire, own, hold, transfer, otherwise deal with, and exercise any right, power, privilege, or other incident of ownership, possession, or control relating to life settlements ("Policies"), which Policies shall be pledged to the Administrative Agent pursuant to the Transaction Documents;

B.    to execute and deliver, and to exercise and perform all of its rights and obligations under or relating to, the Transaction Documents;

C.    to engage in any lawful act or activity and to exercise any powers permitted to limited partnerships organized under the laws of the State of Delaware that are necessary, appropriate, or convenient to accomplishing the preceding purposes; and

D.    to take all other actions that are necessary to maintain the existence of the Partnership as a limited partnership in good standing under the laws of the State of Delaware and to qualify the Partnership to do business in any other jurisdiction in which that qualification, in the judgment of the Board is required or appropriate.

(iv)    to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies under the laws of the State of Delaware that are necessary, appropriate, or convenient to accomplishing the preceding purposes; and

(v)   to take all other actions that are necessary to maintain the existence of the Company as a limited liability company in good standing under the laws of the State of Delaware and to qualify the Company to do business in any other jurisdiction in which the at qualification, in the judgment of the Board, is required or appropriate.

(b)   The Company, and the Member on behalf of the Company, may enter into and perform their respective obligations under the Transaction Documents and all documents, agreements, instruments, certificates or financing statements contemplated thereby or related thereto, and any amendments thereto, all without any further act, vote or approval of any Independent Manager or other Person notwithstanding any other provision of this Agreement or the Act. The foregoing authorization shall not be deemed a restriction on the powers of the Member to enter into other agreements or documents on behalf of the Company, so long as doing so is consistent with the terms and provisions of the Transaction Documents.

Section 8.    Powers.

Subject to Section 9(d), the Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.    Management.

(a)   Member Management. Subject to Section 9(d), the business and affairs of the Company shall be managed by or under the direction of the Member.

(b)   Powers. Subject to Section 9(d), the Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise. Subject to Sections 7 and 9, the Member has the authority to bind the Company.

(c)   Designation of Officers. The Member may, from time to time, designate one or more persons to be officers of the Company (the "Officers"), which officers include a chief executive officer, a chief operating officer, a president, one or more vice presidents, a secretary, treasurer and one or more assistant secretaries. Until such person shall die, be removed by the Member or resign, or until his or her successor shall be duly appointed or designated by the Member, the following persons shall hold the following offices:

| Richard S. O'Connell | Chief Financial Officer |
| Jason Sutherland | Vice President |

(d)   Limitations on the Company's Activities.

(i)   This Section 9(d) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)     Neither the Company nor the Member shall, so long as any Obligation is outstanding, amend, alter, change or repeal the definition of "Independent Manager" or Sections 5(c), 7, 8, 9, 10, 15, 18, 19, 20, 21, 22, 23, 24, 27, 28, 29, 30 or Schedule A of this Agreement (collectively, the "Special Purpose Provisions") without the written consent of the Member, the Independent Manager and the Administrative Agent. Subject to this Section 9(d), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 29.

(iii)    Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, the Independent Manager or any other Person, so long as any Obligation is outstanding, none of the Member, the Independent Manager or any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Member and the Independent Manager, to take any Material Action; provided, however, that, so long as any Obligation is outstanding, the Member may not vote on, or authorize the taking of, any Material Action unless there is at least one Independent Manager then serving in such capacity.

(iv)     Without limiting any, and subject to all, other covenants of the Company contained in this Agreement, so long as any Obligation is outstanding, the Company shall conduct its business and operations separate and apart from that of any other Person and in furtherance of the foregoing:

   A.    The Company shall maintain its accounts, financial statements, books, accounting and other records, and other documents of the Company separate from those of any other Person and ensure all audited financial statements of any Person that uses consolidated financial statements to include the Company contain notes clearly stating that (1) all of the Company's assets are owned by the Company and (2) the Company is a separate entity.

   B.    The Company shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person, and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Transaction Documents.

   C.    The Company shall conduct its own business in its own name and, for all purposes, shall not operate, or purport to operate, collectively as a single or consolidated business entity with respect to any Person.

   D.    The Company shall pay its own debts, liabilities and expenses (including overhead expenses, if any, and operating expenses) only out of its own assets as the same shall become due.

E.  The Company has observed, and shall observe all (A) Delaware limited liability company formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited liability company agreement in a manner that would adversely affect the existence of the Company as a bankruptcy-remote special purpose entity.

F.  The Company does not, and shall not, (A) guarantee, become obligated for, or hold itself or its credit out to be responsible for or available to satisfy, the debts or obligations of any other Person or (B) control the decisions or actions respecting the daily business or affairs of any other Person.

G.  The Company shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person.

H.  The Company shall not identify itself as a division of any other Person.

I.  The Company shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

J.  The Company shall not use its separate existence to perpetrate a fraud in violation of applicable law.

K.  The Company shall not act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

L.  The Company shall maintain an arm's length relationship with its Affiliates.

M.  Except as permitted by or pursuant to the Transaction Documents, the Company shall not grant a security interest or otherwise pledge its assets for the benefit of any other Person.

N.  The Company shall not acquire any securities or debt instruments of any other Company, its Affiliates or any other Person.

O.  The Company shall not make loans or advances to any Person, without the prior written consent of the Administrative Agent, except as permitted by or pursuant to the Transaction Documents.

P.  The Company shall make no transfer of its assets except as permitted by or pursuant to the Transaction Documents.

Q.   The Company shall file its own tax returns separate from those of any other Person or entity, except to the extent that the Company is not required to file tax returns under applicable law or is not permitted to file its own tax returns separate from those of any other Person.

R.   The Company shall not acquire obligations or securities of its members.

S.   The Company shall use separate stationery, invoices and checks.

T.   The Company shall correct any known misunderstanding regarding its separate identity.

U.   The Company shall intend to maintain adequate capital in light of its contemplated business operations.

Failure of the Company, or the Member on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member.

Section 10.    Independent Manager.

As long as any Obligation is outstanding, the Member shall cause the Company at all times to have at least one Independent Manager who will be appointed by the Member. The initial Independent Manager appointed by the Member is Michelle A. Dreyer. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, the Independent Manager shall consider only the interests of the Company, including its respective creditors, in acting or otherwise voting on the matters referred to in Sections 9(d)(ii) and 9(d)(iii). Unless otherwise restricted by law, the Independent Manager may resign, with or without cause, at any time, and any vacancy caused by any such resignation shall be filled by action of the Member. Unless otherwise restricted by law, the Independent Manager may be removed, with or without cause, at any time by the Member, and any vacancy caused by any such removal may be filled by action of the Member. Notwithstanding the forgoing, to the fullest extent permitted by law, no resignation or removal of the Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor (i) shall have accepted his or her appointment as an Independent Manager by a written instrument, which may be a counterpart signature page to this Agreement or another written instrument, and (ii) shall have executed a counterpart to this Agreement as required by Section 5(c). In the event of a vacancy in the position of Independent Manager, the Member shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Manager shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement. Except as provided in the third sentence of this Section 10, in exercising its rights and performing its duties under this Agreement, the Independent Manager shall not have any fiduciary duties to the Member or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and

fair dealing. To the fullest extent permitted by law, including Section 18-1101(e) of the Act, an Independent Manager shall not be liable to the Company, the Member or any other Person bound by this Agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Manager acted in bad faith or engaged in willful misconduct. The Independent Manager shall not at any time serve as trustee in bankruptcy for any Affiliate of the Company.

Section 11.    Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Member, the Special Member or the Independent Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Special Member or Independent Manager of the Company.

Section 12.    Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto. In accordance with Section 5(c), the Special Member shall not be required to make any capital contributions to the Company.

Section 13.    Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member. To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise Schedule B of this Agreement. The provisions of this Agreement, including this Section 13, are intended to benefit the Member and the Special Member and, to the fullest extent permitted by law, other than as provided in Section 24 of this Agreement, shall not be construed as conferring any benefit upon any creditor of the Company (other than Covered Persons) (and, other than as provided in Section 24 of this Agreement, no such creditor of the Company (other than Covered Persons) shall be a third-party beneficiary of this Agreement) and the Member and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 14.    Allocation of Profits and Losses; Tax Characterization and Returns.

(a)    The Company's profits and losses shall be allocated to the Member.

(b)    Until such time as the Company shall have more than one member of the Company, it is the intention of the Member that the Company be disregarded for federal and all relevant state tax purposes and that the activities of the Company be deemed to be activities of the Member for such purposes. All provisions of the Certificate of Formation and this Agreement are to be construed so as to preserve such tax status. The Member is hereby authorized to file any necessary elections with any tax authorities and shall be required to file any necessary tax returns on behalf of the Company with any such tax authorities.

Section 15.    Distributions.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any Transaction Document.

Section 16.    Books and Records.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The books of the Company shall at all times be maintained by the Member. The Company's books of account shall be kept using the method of accounting determined by the Member. The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 17.    Other Business.

Notwithstanding any duty otherwise existing or anything to the contrary at law (whether common or statutory) or in equity, the Member, the Special Member, the Independent Manager, any employee or agent of the Company and any Affiliate of the Member, the Special Member or the Independent Manager may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 18.    Exculpation and Indemnification.

(a)    To the fullest extent permitted by applicable law, none of the Member, the Independent Manager, the Special Member, any employee, officer, or agent of the Company or any employee, officer, representative, agent or Affiliate of the Member, the Independent Manager or the Special Member (collectively, the "Covered Persons") shall be liable to the Company or any other Person that is a party to or is otherwise bound by this Agreement or who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under

this Section 18 by the Company shall be provided out of and to the extent of Company assets only, and the Member, the Independent Manager and the Special Member shall not have personal liability on account thereof; and provided, further, that so long as any Obligation is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under this Section 18 shall be payable from amounts allocable to any other Person pursuant to the Transaction Documents.

(c)     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 18.

(d)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)     To the extent that, at law (whether common or statutory) or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall, to the fullest extent permitted by applicable law, not be liable to the Company, to any other Covered Person or to any other Person that is a party to or is otherwise bound by this Agreement for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law (whether common or statutory) or in equity, are agreed by the Member, the Independent Manager and the Special Member to replace such other duties and liabilities of such Covered Person.

(f)     Any indemnification obligations of the Company to a Covered Person under this Agreement shall be fully subordinated to any obligations respecting the Transferred Assets (including, without limitation, the Obligations) and such indemnification obligations shall not constitute a claim against the Company in the event that cash flow in excess of amounts necessary to pay holders of such obligations respecting the Transferred Assets is insufficient to pay such indemnification obligations.

(g)     The foregoing provisions of this Section 18 shall survive any termination of this Agreement.

Section 19.    Assignments.

So long as any Obligation is outstanding, the Member may not assign in whole or in part its limited liability company interest in the Company if such assignment would cause a Change in Control, unless such assignment is pursuant to the Pledge Agreement. If the Member is permitted to assign all or a portion of its limited liability company interest, subject to Section 21, the transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this Section 19, such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Transaction Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

Section 20.    Resignation.

So long as any Obligation is outstanding, the Member may not resign, except as permitted under the Transaction Documents or with the written consent of the Administrative Agent. If the Member is permitted to resign pursuant to this Section 20, an additional member of the Company shall be admitted to the Company, subject to Section 21, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 21.    Admission of Additional Members.

Without limiting the provisions of Sections 5(c) or 22(a), one or more additional members of the Company may be admitted to the Company with the written consent of the Member; provided however, that, notwithstanding the foregoing, so long as any Obligation remains outstanding, no additional members may be admitted if the addition of such a member would cause a Change in Control.

Section 22.    Dissolution.

(a)        Subject to Section 9(d), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) without limitation of the provisions of Section 5(c), the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. If, following the application of the provisions of Section 5(c), there shall, for any reason, nevertheless occur any event that causes

the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative (as defined in the Act) of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)     Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or the Special Member shall not cause the Member or the Special Member, respectively, to cease to be a member of the Company or cause the Company to be dissolved or its affairs to be wound up and upon the occurrence of such an event, the Company shall continue without dissolution. Except as otherwise required by law, notwithstanding any other provision of this Agreement, the dissolution or death of the Member or the Special Member shall not, by itself, cause the Company to be dissolved or its affairs to be wound up.

(c)     Notwithstanding any other provision of this Agreement, each of the Member and the Special Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or the Special Member or the occurrence of an event that causes the Member or the Special Member to cease to be a member of the Company.

(d)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)     The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 23.     Waiver of Partition; Nature of Interest.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member and the Special Member hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Section 15 hereof The interest of the Member in the Company is personal property.

Section 24.    Benefits of Agreement; No Third-Party Rights.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company (other than Covered Persons) or by any creditor of the Member or the Special Member, except the Administrative Agent (for so long as any Obligation is outstanding). Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons and the Administrative Agent) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons and except as provided in the following sentence and in Section 27). The Administrative Agent is an intended third party beneficiary of this Agreement and may enforce the Special Purpose Provisions.

Section 25.    Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 26.    Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 27.    Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member by the Independent Manager, in accordance with its terms. In addition, the Independent Manager shall be an intended beneficiary of this Agreement.

Section 28.    Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws. The Member hereby consents to (i) the non-exclusive jurisdiction of the courts of the State of Delaware, and (ii) service of process in accordance with Section 31.

Section 29.    Amendments.

Subject to Section 9(d), this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member. Notwithstanding anything to the contrary in this Agreement, so long as any Obligation is outstanding, this Agreement may not be modified, altered, supplemented or amended unless the Administrative Agent consents in writing.

Section 30.    Opt-in to Article 8.

(a)    Interests. A Member's interests in the Company shall be represented by the Interests issued to such Member by the Company. No more than one class of Interests shall be issued. All of a Member's Interests, in the aggregate, represent such Member's entire limited liability company interest in the Company. The Member hereby agrees that its Interests shall for all purposes be personal property. A Member has no interest in specific property of the Company.

(b)    Article 8 Opt-In. Each Interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Title 11, Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all such purposes, including, without limitation perfection of the security interest therein under Articles 8 and 9 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions). The Company shall maintain books for the purpose of registering the transfer of the Interests. Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del C. § 8-101, et seq.), (the "UCC"), such provision of Article 8 of the UCC shall control.

(c)    Interest Certificates.

(i)    Upon the issuance of Interests to any Member in accordance with the provisions of this Agreement, the Company shall issue one or more Interest Certificates (as defined herein) in the name of such Member. Each such Interest Certificate shall be denominated in terms of the percentage of Interests evidenced by such Interest Certificate and shall be signed by the Company. "Interest Certificate" means a certificate issued by the Company which evidences the ownership of one or more Interests. Each Interest Certificate shall bear, in effect, the following legend: "Each limited liability company interest in the Company represented by this certificate evidences an interest in the Company and shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all such purposes, including, without limitation perfection of the security interest

therein under Articles 8 and 9 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions)." This provision shall not be amended, and no such purported amendment to this provision shall be effective until all outstanding certificates have been surrendered for cancellation.

(ii)    The Company shall issue a new Interest Certificate in place of any Interest Certificate previously issued if the holder of the Interests represented by such Interest Certificate, as reflected on the books and records of the Company:

A.    makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Interest Certificate has been lost, stolen or destroyed.

B.    requests the issuance of a new Interest Certificate before the Company has notice that such previously issued Interest Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

C.    if requested by the Company, delivers to the Company a bond, in form and substance satisfactory to the Company, with such surety or sureties as the Company may direct, to indemnify the Company against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Interest Certificate; and

D.    satisfies any other reasonable requirements imposed by the Company.

(iii)    Subject to the restrictions set forth in the Transaction Documents, upon a Member's Transfer in accordance with the provisions of this Agreement of any or all Interests represented by an Interest Certificate, the Transferee of such Interests shall deliver such endorsed Interest Certificate to the Company for cancellation, and the Company shall thereupon issue a new Interest Certificate to such Transferee for the percentage of Interests being transferred and, if applicable, cause to be issued to such Transferor a new Interest Certificate for that percentage of Interests that were represented by the canceled Interest Certificate and that are not being Transferred. "Transferee" means an assignee or transferee. "Transferor" means an assignor or transferor.

Section 31.    <u>Counterparts.</u>

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 32.    Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 33.    Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the Effective Date.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the Effective Date.

MEMBER:

LAMINGTON ROAD LIMITED, *A Member*

By: _____

Name: **Rodney O'ROURKE**
Title: **Director**

INDEPENDENT MANAGER:

_____

Name: Michelle A Dreyer

*Signature Page for White Eagle General Partner, LLC Operating Agreement*

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the Effective Date.

MEMBER:

LAMINGTON ROAD LIMITED, *its Member*

By:_____
    Name:
    Title:

INDEPENDENT MANAGER:

Name:  Michelle A Dreyer

*Signature Page for White Eagle General Partner, LLC Operating Agreement*

## SCHEDULE A

## **DEFINITIONS**

A.    Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Administrative Agent" means the Person acting in its capacity as Administrative Agent under the Loan and Security Agreement, and its permitted successors and assigns.

"Affiliate" means, as to any Person, any other Person (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities/equities of such Person, or (iii) ten percent (10%) or more of the voting securities/equities of which is directly or indirectly beneficially owned or held by the Person in question. The term "control" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities/equities, by control, or otherwise.

"Aggregate Participation Interest" has the meaning assigned to that term in the Loan and Security Agreement.

"Agreement" means this Limited Liability Company Agreement of the Company, together with the Schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if sixty (60) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within sixty (60) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within sixty (60) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

A-1

"Certificate of Formation" means the initial Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on May 14, 2014, as amended or amended and restated from time to time.

"Change in Control" has the meaning assigned to that term in the Loan and Security Agreement.

"Company" means White Eagle General Partner LLC, a Delaware limited liability company.

"Contribution Agreement" means each of (i) that certain Contribution Agreement dated as of April 29, 2013, by and among Markley Asset Portfolio, LLC, a Delaware limited liability company, as transferor, and the Partnership, as transferee, and (ii) that certain Contribution Agreement intended to be entered into on or around May 16, 2014 by and among the Member, as transferor, and the Partnership, as the transferee, in each case, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the Transaction Documents.

"Covered Persons" has the meaning set forth in Section 18(a).

"Imperial" means Imperial Holdings Inc., a Florida corporation, and its successors.

"Independent Manager" means an individual who (i) is not a present or former director, manager, officer, employee, supplier, customer or five percent (5%) beneficial owner of the outstanding equity interests of the Company or any of its Affiliates and (ii) has at least three years of employment experience with one or more entities with a national reputation and presence that provide, in the ordinary course of their respective businesses, advisory, management or placement services to issuers of securitization or structured finance instruments, agreements or securities, and is currently employed by such an entity; provided, however, that an individual shall not be deemed to be ineligible to be an Independent Manager solely because such individual serves or has served in the capacity of an "independent director" or similar capacity for special purpose entities formed by the Company or any Affiliate of the Company or Imperial. Notwithstanding any other provision of this Agreement or the Act, an Independent Manager is not a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

"Loan and Security Agreement" means that certain Amended and Restated Loan and Security Agreement intended to be entered into on or around May 16, 2014 by and among the Partnership, as the borrower, the Administrative Agent and the other Persons parties thereto.

"Material Action" means to consolidate or merge the Company with or into any Person or sell all or substantially all of the assets of the Company, or institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the

4812-5988-4570.10

Company's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

"Member" means Lamington Road Limited, an Irish 110 Company, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Member.

"Obligations" shall mean the indebtedness, liabilities and obligations of the Partnership under or in connection with the Transaction Documents or any related document as in effect as of any date of determination, including, without limitation, the Aggregate Participation Interest.

"Partnership" has the meaning set forth in Section 7(a)(i).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited partnership, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Pledge Agreement" means that certain Partnership Interest Pledge Agreement intended to be entered into on or around May 16, 2014 by and among the Member and the Company, each as a pledgor, and CLMG Corp., as the secured party.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), the person acting as the Independent Manager, in such person's capacity as a member of the Company. The Special Member shall only have the rights and duties expressly set forth in this Agreement.

"Transaction Documents" has the meaning assigned to that term in the Loan and Security Agreement.

"Transferred Assets" has the meaning assigned to that term in each of the Contribution Agreements.

B.    Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation," and words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

A-3

**SCHEDULE B**

**MEMBER**

| Name | Mailing Address | Agreed Value of Capital Contribution | Limited Liability Company Interest |
|---|---|---|---|
| Lamington Road Designated Activity Company | Grand Canal House 2nd Floor Palmerston House Fenian Street Dublin 2 Ireland | $1,000.00 | 100% |

B-1

## Exhibit 3

**Articles of Association of Lamington
Road Designated Activity Company**

AMERICAS 98111360

9121062/1

**Number   541559**

**DUPLICATE FOR THE FILE**



**1555692**

# Certificate of Incorporation

I hereby certify that

**LAMINGTON ROAD LIMITED**

is this day incorporated under
the Companies Acts 1963 to 2013,
and that the company is limited.

Given under my hand at Dublin, this
**Thursday, the 27th day of March, 2014**

for Registrar of Companies

*Certificate handed to/posted to\*:*          *Arthur Cox*
                                              *Earlsfort Centre*
                                              *Earlsfort Terrace*
                                              *Dublin 2*

*Signed:* _____     *Date:* _28/3/2014_

*\*Delete as appropriate*

Uimhir    541559
**Number**    541559

*DEIMHNIÚ CORPRAITHE UM CHOMHSHÓ GO CUIDEACHTA GHNÍOMHAÍOCHTA AINMNITHE*

# Certificate of Incorporation
# On Conversion To A
# Designated Activity Company

*Deimhním leis seo go bhfuil an chuideachta*
**I hereby certify that**

**LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY**

a bhí cláraithe roimhe seo mar Chuideachta Teoranta, tar éis a comhshó inniu faoi Acht na gCuideachtaí 2014 ina Cuideachta Ghníomhaíochta Ainmnithe.

**formerly registered as a Limited Company has this day been converted under the Companies Act 2014 to a Designated Activity Company.**

*Arna thabhairt faoi mo láimh,*

**Given under my hand,**

*Déardaoin, an 16ú lá de Meitheamh, 2016*

**Thursday, the 16th day of June, 2016**

*thar ceann Chláraitheoir na gCuideac.*

**for Registrar of Companies**

CRO No:

4708342

**Companies Act 2014**

**DESIGNATED ACTIVITY COMPANY
LIMITED BY SHARES**

**CONSTITUTION**

**OF**

**LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY**

**MEMORANDUM OF ASSOCIATION**

1.  The name of the Company is Lamington Road Designated Activity Company.

2.  The company is a designated activity company limited by shares, that is to say a private company limited by shares registered under Part 16 of the Companies Act 2014 (the "**Act**").

3.  The objects for which the Company is established are:

    3.1  To carry on the business of financing and re-financing of any assets whatsoever and in any currency, with or without security, including, without limitation, by way of debentures, loan participation notes, credit and derivative-linked securities, securitisation and collateralised debt obligations.

    3.2  To carry on the business of financing and re-financing whether asset backed or not (including, without limitation, financing and re-financing of financial assets), with or without security in whatever currency including, without limitation, financing or re-financing by way of loan, acceptance credits, bonds, commercial paper, euro medium term notes, eurobonds, loan participation notes, credit and derivative-linked securities, securitisation, synthetic securitisation, collateralised debt and/or loan obligations, synthetic collateralised debt and/or loan obligations, limited recourse secured note issuance, bank placements, profit participation debentures, leasing, hire purchase, credit sale, conditional sale, factoring, discounting, note issue facilities and programmes (including credit and derivative-linked), project financing, bond issuances, participation and syndications, assignment, novation, sub-participation or other appropriate methods of finance and to discount mortgage receivables, loan receivables, and lease rentals for persons wherever situated in any currency whatsoever, and to acquire or enter into by purchase, lease, hire or otherwise and to sell or hire or otherwise deal in financial assets or instruments (including, without limitation, loans, debentures, debenture stock, bonds, notes, eurobonds, credit default, interest rate, currency or any other type of swaps and hedges (including, without limitation, credit, equity, currency, commodity and interest rate derivatives)) and to do all of the foregoing as principal, agent or broker.

3.3    To carry on the business of purchasing, acquiring, holding, collecting, discounting, entering into, negotiating, managing, selling, disposing of, financing and otherwise trading or dealing directly or indirectly in any form of assets of whatsoever nature (including, without limitation, real or personal property, mortgages, loans, swaps, securities, instruments or obligations of any nature whatsoever, and financial assets of any nature whatsoever and trade accounts, receivables and book debts of any nature whatsoever) and any proceeds arising therefrom or in relation thereto and any participation or interest (whether legal or equitable) therein and any certificates of participation or interest (whether legal or equitable) therein and any agreements in connection therewith.

3.4    To carry on a treasury business including the procurement of short, medium or long term finance or finance of unlimited duration and the provision of financial and investment services and facilities, financial and investment management, advice, assistance, information and agency services in any currency whatsoever and to carry out financing and lending of every description to such persons or companies upon such terms as may seem expedient.

3.5    To purchase, acquire by any means, hold and create, enter into any arrangement relating to, deal and participate in, underwrite and sell or dispose of by any means, securities, financial and swap instruments and rights of all kinds including, without limitation, foreign currencies, shares, stocks, gilts, equities, debentures, debenture stock, bonds, notes, commercial paper, risk management instruments, money market deposits, money market instruments, investment instruments, loans, credit default swaps or hedges, interest rate swaps or hedges, foreign currency swaps or hedges, caps, collars, floors, options and such other financial and swap instruments and rights and securities as are similar to, or are derivates of, any of the foregoing.

3.6    To carry on business and to act as merchants, financiers, investors (in assets or securities), traders, agents, brokers, commission agents, capitalists, concessionaires and to carry on any other businesses incidental thereto in Ireland or in any other part of the world and whether alone or jointly with others.

3.7    To raise or borrow money on such terms and in such manner as the directors of the Company think fit including, without limitation, by the creation and issue of listed or unlisted notes, bonds, eurobonds, debentures, debt instruments, shares or other securities irrespective of whether the repayment of which or the payment of interest or dividends thereon is referenced or linked to a portfolio of assets, property or revenues in which the Company has a legal or beneficial interest therein and to secure on such terms and in such manner as the directors of the Company think fit, any such indebtedness or obligation of the Company, by mortgage, charge, lien, pledge, assignment, trust or any other means involving the creation of security over all or any part of the undertaking, assets, property and revenues of the Company of whatever kind both present and future.

3.8    To appoint and act through any agents, administrators, contractors or delegates in any part of the world in connection with the undertaking and business of the Company (including, without limitation, in connection with the management, monitoring, servicing, administration, processing and enforcement of the

2

Company's assets and/or any related security) on such terms and subject to such conditions as the directors of the Company think fit.

3.9     As an object of the Company and as a pursuit in itself or otherwise, and whether for the purpose of making a profit or avoiding a loss or for any other purpose whatsoever, to engage in currency and interest rate transactions, commodity transactions, credit default swaps, hedges or other financial or other transactions of whatever nature (including, without limitation, any transaction for the purpose of, or capable of being for the purposes of, avoiding, reducing, minimising, hedging against or otherwise managing the risk of any loss, cost, expense or liability arising or which may arise, directly or indirectly, from a change or changes in any interest rate or currency exchange rate or in the price or value of any property, asset, commodity, index or liability or the credit standing of any person or entity or from any other risk or factor affecting the Company's undertaking and business), including, but not limited to, dealings, whether involving purchases, sales, investments or otherwise, in any credit-default contracts, currency, spot and/or forward exchange rate contracts, forward rate agreements, caps, collars and floors, futures, options, warrants, swaps, and any other credit default, commodity, currency, interest rate or other derivative arrangements and such other instruments as are similar to, or derivatives of, any of the foregoing.

3.10     To act as an investment holding company and to co-ordinate the business of any companies in which the Company is for the time being interested and to acquire (whether by original subscription, tender, purchase, exchange or otherwise) the whole of or any part of the stock, shares, debentures, debenture stocks, obligations, bills of exchange bonds and other securities issued or guaranteed by a body corporate, unincorporated association or partnership constituted or carrying on business in any part of the world or by any government, sovereign ruler, commissioners, public body or authority or superannuation organisation and to hold the same as investments and to sell, deal in, vary, exchange, carry and dispose of the same.

3.11     To exercise and enforce all rights and powers conferred by or incidental to the ownership, holding or performance of any of the foregoing or of any legal or equitable interest therein including, without limitation, the enforcement of any security interest in relation thereto.

3.12     To make such offers or invitations to subscribe for debentures as a designated activity company can make in accordance with section 68 of the Act, as modified in its application to a DAC by section 981 of the Act.

3.13     To carry on all or any of the businesses as aforesaid either as a separate business or as the principal business of the Company.

3.14     To invest and deal with the property of the Company in such manner as may from time to time be determined by the Company's board of directors and to dispose of or vary such investments and dealings.

3.15     To borrow or raise money or capital in such manner and on such terms and conditions as the Company's board of directors shall think fit, whether with or

3

without the giving of security, and without prejudice to the generality of the foregoing, whether by the issue of debentures or debenture stock, perpetual or otherwise, charged upon all or any of the Company's property, both present and future, and to purchase, redeem or pay off any such securities and to accept capital contributions.

3.16  To lend money or other property to any company or person either with or without security and upon such terms as may seem expedient to the Company's board of directors and in particular to customers and others having dealings with the Company and to guarantee and give indemnities in respect of and otherwise secure the performance of contracts by any such person or company.

3.17  To guarantee, support or secure, whether by personal covenant (including any indemnity) or by mortgaging or charging all or any property (both present and future) of the Company, or by indemnity or undertaking, or by any one or more of such methods, the performance of the obligations of, and the repayment or payment of the principal amounts of and premiums, interest and dividends on any securities of, indebtedness or obligation of any person or company including (without prejudice to the generality of the foregoing) any company which is for the time being the Company's holding company or subsidiary as defined by the Act or another subsidiary of the Company's holding company or otherwise associated with the Company in business.

3.18  To grant, convey, assign, transfer, exchange or otherwise alienate or dispose of any property of the Company of whatever nature or tenure for such price, consideration, sum or other return whether equal to or less than the market value thereof or for shares, debentures or securities and whether by way of gift or otherwise as the Company's board of directors shall deem fit and where the property consists of real property to grant any fee farm grant or lease or to enter into any agreement for letting or hire of any such property for a rent or return equal to or less than the market or rack rent therefor or at no rent and subject to or free from covenants and restrictions as the Company's board of directors shall deem appropriate.

3.19  To purchase, take on, lease, exchange, rent, hire or otherwise acquire any property and to acquire and undertake the whole or any part of the business and property of any company or person.

3.20  To develop and turn to account any land acquired by the Company or in which it is interested and in particular by laying out and preparing the same for building purposes, constructing, altering, pulling down, decorating, maintaining, fitting out and improving buildings and conveniences and by planting, paving, draining, farming, cultivating, letting and by entering into building leases or building agreements and by advancing money to and entering into contracts and arrangements of all kinds with builders, contractors, architects, surveyors, purchasers, vendors, tenants and any other person.

3.21  To construct, improve, maintain, develop, work, manage, carry out or control any property which may seem calculated directly or indirectly to advance the Company's interest and to contribute to, subsidise or otherwise assist or take

4

part in the construction, improvement, maintenance, working, management, carrying out or control thereof.

3.22    To draw, make, accept, endorse, discount, execute and issue promissory notes, bills of exchange, bills of lading, warrants, debentures and other negotiable or transferable instruments.

3.23    To engage in currency exchange and interest rate transactions including, but not limited to, dealings in foreign currency, spot and forward rate exchange contracts, futures, options, forward rate agreements, swaps, caps, floors, collars and any other foreign exchange or interest rate hedging arrangements and such other instruments as are similar to, or derived from, any of the foregoing whether for the purpose of making a profit or avoiding a loss or managing a currency or interest rate exposure or any other exposure or for any other purpose.

3.24    To apply for, establish, create, purchase or otherwise acquire, sell or otherwise dispose of and hold any patents, trade marks, copyrights, brevets d'invention, registered designs, licences, concessions and the like conferring any exclusive or non-exclusive or limited rights to use or any secret or other information and any invention and to use, exercise, develop or grant licences in respect of or otherwise turn to account or exploit the property, rights or information so held.

3.25    To enter into any arrangements with any governments or authorities, national, local or otherwise and to obtain from any such government or authority any rights, privileges and concessions and to carry out, exercise and comply with any such arrangements, rights, privileges and concessions.

3.26    To establish, form, register, incorporate or promote any company or companies or person, whether inside or outside of the State.

3.27    To procure that the Company be registered or recognised whether as a branch or otherwise in any country or place.

3.28    To enter into partnership or into any arrangement for sharing profits, union of interests, co-operation, joint venture, reciprocal concession or otherwise with any person or company carrying on or engaged in or about to carry on or engage in any business or transaction.

3.29    To amalgamate with any other company or person.

3.30    To promote freedom of contract, and to resist, insure against, counteract and discourage interference therewith, to join any lawful federation, union or association, or do any other lawful act or thing with a view to preventing or resisting directly or indirectly any interruption of or interference with the Company's or any other trade or business or providing or safeguarding against the same, or resisting or opposing any strike, movement or organisation which may be thought detrimental to the interests of the Company or its employees and to subscribe to any association or fund for any such purposes.

3.31    To make gifts to any person or company including, without prejudice to the generality of the foregoing, capital contributions and to grant bonuses to the

5

directors or any other persons or companies who are or have been in the employment of the Company including substitute and alternate directors and any other officer or employee.

3.32    To establish and support or aid in the establishment and support of associations, institutions, funds, trusts and conveniences calculated to benefit directors, ex-directors, employees or ex-employees of the Company or the dependants or connections of such persons, and to grant pensions and allowances upon such terms and in such manner as the Company's board of directors think fit, and to make payments towards insurance and to subscribe or guarantee money for charitable or benevolent objects or for any exhibition or for any public, general or useful object, or any other object whatsoever which the Company's board of directors may think advisable.

3.33    To establish and contribute to any scheme for the purchase of shares or subscription for shares in the Company or its holding company, to be held for the benefit of the employees or former employees of the Company or any subsidiary of the Company including any person who is or was a director holding a salaried employment or office in the Company or any subsidiary of the Company and to lend or otherwise provide money to the trustees of such schemes or the employees or former employees of the Company or any subsidiary of the Company to enable them to purchase shares of the Company or its holding company and to formulate and carry into effect any scheme for sharing the profits of the Company or its holding company with its employees and/or the employees of any of its subsidiaries.

3.34    To remunerate any person or company for services rendered or to be rendered in placing or assisting to place or guaranteeing the placing of any of the shares of the Company's capital or any debentures, debenture stock or other securities of the Company or in or about the formation or promotion of the Company or the conduct of its business.

3.35    To obtain any Act of the Oireachtas or provisional order for enabling the Company to carry any of its objects into effect or for effecting any modification of the Company's constitution or for any other purpose which may seem expedient and to oppose any proceedings or applications which may seem calculated directly or indirectly to prejudice the Company's interests.

3.36    To adopt such means of making known the products of the Company as may seem expedient and in particular by advertising in the press, by circulars, by purchase and exhibition of works of art or interest, by publication of books and periodicals and by granting prizes, rewards and donations.

3.37    To undertake and execute the office of trustee and nominee for the purpose of holding and dealing with any property of any kind for or on behalf of any person or company; to act as trustee, nominee, agent, executor, administrator, registrar, secretary, committee or attorney generally for any purpose and either solely or with others for any person or company; to vest any property in any person or company with or without any declared trust in favour of the Company.

3.38      To pay all costs, charges, fees and expenses incurred or sustained in or about the promotion, establishment, formation and registration of the Company.

3.39      To do all or any of the above things in any part of the world, and as principals, agents, contractors, trustees or otherwise and by or through trustees, agents or otherwise and either alone or in conjunction with any person or company.

3.40      To distribute the property of the Company in specie among the members or, if there is only one, to the sole member of the Company.

3.41      To do all such other things as the Company's board of directors may think incidental or conducive to the attainment of the above objects or any of them.

NOTE: it is hereby declared that in this memorandum of association:

(a)      the word "company", except where used in reference to this Company, shall be deemed to include a body corporate, whether a company (wherever formed, registered or incorporated), a corporation aggregate, a corporation sole and a national or local government or other legal entity; and

(b)      the word "person", shall be deemed to include where the context permits an unincorporated body of persons, a partnership, a club or other association as well as an individual; and

(c)      the word "property", shall be deemed to include, where the context permits, real property, personal property including choses or things in action and all other intangible property and money and all estates, rights, titles and interests therein and includes the Company's uncalled capital and future calls and all and every other undertaking and asset; and

(d)      words denoting the singular number only shall include the plural number and vice versa; and

(e)      it is intended that the objects specified in each paragraph in this clause shall, except where otherwise expressed in such paragraph, be separate and distinct objects of the Company and shall not be in any way limited or restricted by reference to or inference from the terms of any other paragraph or the order in which the paragraphs of this clause occur or the name of the Company.

4.      The liability of the members is limited.

5.      The share capital of the Company is US$1.00 divided into 1 ordinary share of US$1.00 each.

## ARTICLES OF ASSOCIATION

**Interpretation and general**

1. Sections 83 and 84 of the Act shall apply to the Company but, subject to that, the provisions set out in these articles of association shall constitute the whole of the regulations applicable to the Company and no other "optional provisions" as defined by section 968(2) of the Act shall apply to the Company.

2. The Company is a designated activity company that has the status of a private company limited by shares registered under Part 16 of the Act and the number of members of the Company (exclusive of persons who are in the employment of the Company and of persons who, having been formerly in the employment of the Company, were while in such employment and have continued after the termination of such employment to be members of the Company) is limited to one hundred and forty nine (149) (or such greater number as may be prescribed by the Act as being the maximum permitted number of members in a company of this type) so, however, that where two or more persons hold one or more shares in the Company jointly, they shall for the purpose of this Regulation be treated as a single member.

3. In these articles of association:

   3.1    the "Act" means the Companies Act 2014 and every statutory modification and re-enactment thereof for the time being in force;

   3.2    the "directors" means the directors for the time being of the Company or the directors present at a meeting of the board of directors and includes any person occupying the position of director by whatever name called and shall include an alternate director;

   3.3    "the independent director" means Rodney O'Rourke or his replacement from time to time. Any replacement independent director (including any alternate appointed under these articles of association) shall be an individual who (i) is not a present or former director, manager, officer, employee, supplier, customer or five percent (5%) beneficial owner of the outstanding equity interests of WHITE EAGLE ASSET PORTFOLIO, LP, a Delaware limited partnership (the "**Borrower**"), the Company and White Eagle General Partner, LLC, a Delaware limited liability company (the "**Parent Pledgors**"), EMERGENT FINANCE & TRADING, LLC, a Florida limited liability company (the "**Guarantor**"), Emergent Holdings Inc., a Florida corporation, and its successors ("**Emergent**") or any affiliate of any of them and (ii) has at least three years of employment experience with one or more entities with a national reputation and presence that provide, in the ordinary course of their respective businesses, advisory, management or placement services to issuers of securitization or structured finance instruments, agreements or securities, and is currently employed by such entity; provided, however, that an individual shall not be deemed to be ineligible to be an independent director solely because such individual serves or has served in the capacity of an "independent director" or similar capacity for special purpose entities formed by any affiliate of the Borrower or Emergent;

   3.4    a "secretary" shall include any joint, assistant or deputy secretary;

8

3.5 a "member" shall include a member's personal representatives in consequence of his or her death or bankruptcy;

3.6 a word or expression used in these articles of association which is not otherwise defined and which is also used in the Act shall have the same meaning here, as it has in the Act;

3.7 any phrase introduced by the terms "including, "include" and "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

3.8 a "person" includes any individual, firm, body corporate, association or partnership, government or state or agency of a state, local authority or government body or any joint venture association or partnership (whether or not having a separate legal personality) and that person's personal representatives, successors or permitted assigns;

3.9 a "company", other than the Company, shall be construed so as to include any company, corporation or body corporate, wherever and however incorporated or established; and

3.10 the singular shall include the plural and vice versa and references to one gender includes all genders.

**Allotment and acquisition of shares**

4. The following provisions apply to the allotment of shares (and 'allotment of shares' shall include issue of shares):

4.1 for the purposes of section 69(1) of the Act, the allotment of shares (including redeemable shares) is authorised generally;

4.2 for the purposes of section 69(3) of the Act, the general authorisation for the allotment of shares in the Company is not subject to any stipulation as to a period during which the allotment may occur; and

4.3 for the purposes of section 69(12)(a)(i) of the Act, section 69(6) of the Act shall not apply, generally, to any allotment of shares in the Company.

5. The Company:

5.1 may give financial assistance for the purpose of an acquisition of its shares or, where the Company is a subsidiary, its holding company, and

5.2 is authorised, for the purposes of section 105(4)(a) of the Act, to acquire its own shares.

6. The Directors (and for the purposes of section 69(4)(a) of the Act, any committee of the Directors so authorised by the Directors and any person so authorised by the Directors or such committee) may without prejudice to Regulation 120:

6.1 allot, issue, grant options over and otherwise dispose of shares in the Company;

6.2    exercise the Company's powers under Regulation 5,

on such terms and subject to such conditions as they think fit, subject only to the provisions of the Act.

**Variation of Class Rights**

7.    Where the shares in the Company are divided into different classes, the rights attaching to a class of shares may only be varied or abrogated if (a) the holders of 75% in nominal value of the issued shares of that class consent in writing to the variation, or (b) a special resolution, passed at a separate general meeting of the holders of that class, sanctions the variation. The quorum at any such separate general meeting, other than an adjourned meeting, shall be two persons holding or representing by proxy at least one-third in nominal value of the issued shares of the class in question and the quorum at an adjourned meeting shall be one person holding shares of the class in question or that person's proxy. The rights conferred upon the holders of any class of shares issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by a purchase or redemption by the Company of its own shares or by the creation or issue of further shares ranking pari passu therewith or subordinate thereto

**Calls on shares**

8.    The Directors may from time to time make calls upon the members in respect of any consideration unpaid on their shares in the Company (whether on account of the nominal value of the shares or by way of premium), provided that in the case where the conditions of allotment or issuance of shares provide for the payment of consideration in respect of such shares at fixed times, the Directors shall only make calls in accordance with such conditions.

9.    Each member shall (subject to receiving at least 30 days' notice specifying the time or times and place of payment, or such lesser or greater period of notice provided in the conditions of allotment or issuance of the shares) pay to the Company, at the time or times and place so specified, the amount called on the shares.

10.    A call may be revoked or postponed, as the Directors may determine.

11.    Subject to the conditions of allotment or issuance of the shares, a call shall be deemed to have been made at the time when the resolution of the Directors authorising the call was passed and may be required to be paid by instalments if specified in the call.

12.    The joint holders of a share shall be jointly and severally liable to pay all calls in respect of it.

13.    If the consideration called in respect of a share or in respect of a particular instalment is not paid in full before or on the day appointed for payment of it, the person from whom the sum is due shall pay interest in cash on the unpaid value from the day appointed for payment of it to the time of actual payment of such rate, not exceeding five per cent per annum or such other rate as may be specified by an order under section 2(7) of the Act, as the Directors may determine, but the Directors may waive payment of such interest wholly or in part.

10

14. Any consideration which, by the terms of issue of a share, becomes payable on allotment or issuance or at any fixed date (whether on account of the nominal value of the share or by way of premium) shall, for the purposes of these articles of association, be deemed to be a call duly made and payable on the date on which, by the terms of issue, that consideration becomes payable, and in the case of non-payment of such a consideration, all the relevant provisions of these articles of association as to payment of interest and expenses, forfeiture or otherwise, shall apply as if such consideration had become payable by virtue of a call duly made and notified.

15. The Directors may, on the issue of shares, differentiate between the holders of different classes as to the amount of calls to be paid and the times of payment.

16. The Directors may, if they think fit:

    (a)    receive from any member willing to advance such consideration, all or any part of the consideration uncalled and unpaid upon any shares held by him or her; and/or

    (b)    pay, upon all or any of the consideration so advanced (until the amount concerned would, but for such advance, become payable) interest at such rate (not exceeding, unless the Company in a general meeting otherwise directs, five per cent per annum or such other rate as may be specified by an order under Section 2(7) of the Act) as may be agreed upon between the Directors and the member paying such consideration in advance.

17. The Company may:

    (a)    acting by its Directors, make arrangements on the issue of shares for a difference between the shareholders in the amounts and times of payment of calls on their shares;

    (b)    acting by its Directors, accept from any member the whole or a part of the amount remaining unpaid on any shares held by him or her, although no part of that amount has been called up;

    (c)    acting by its Directors and subject to the Acts, pay a dividend in proportion to the amount paid up on each share where a larger amount is paid up on some shares than on others; and

    (d)    by special resolution determine that any portion of its share capital which has not been already called up shall not be capable of being called up except in the event and for the purposes of the Company being wound up; upon the Company doing so, that portion of its share capital shall not be capable of being called up except in that event and for those purposes.

**Lien**

18. Subject to the second sentence of Regulation 24, the Company shall have a first and paramount lien on every share (not being a fully paid share) for all consideration (whether immediately payable or not) called, or payable at a fixed time, in respect of that share.

19. The Directors may at any time declare any share in the Company to be wholly or in part exempt from Regulation 18.

20. The Company's lien on a share shall extend to all dividends payable on it. The Company's lien shall not apply where any such shares have been mortgaged or charged by way of security in which event such lien shall rank behind any such security.

21. The Company may sell, in such manner as the Directors think fit, any shares on which the Company has a lien, but no sale shall be made unless - (i) a sum in respect of which the lien exists is immediately payable; and (ii) the following conditions are satisfied:

    21.1 a notice in writing, stating and demanding payment of such part of the amount in respect of which the lien exists as is immediately payable, has been given to the registered holder for the time being of the share, or the person entitled thereto by reason of his or her death or bankruptcy; and

    21.2 a period of 14 days after the date of giving of that notice has expired.

22. The following provisions apply in relation to a sale referred to in Regulation 21:

    22.1 to give effect to any such sale, the Directors may authorise some person to transfer the shares sold to the purchaser of them;

    22.2 the purchaser shall be registered as the holder of the shares comprised in any such transfer;

    22.3 the purchaser shall not be bound to see to the application of the purchase consideration, nor shall his or her title to the shares be affected by any irregularity or invalidity in the proceedings in reference to the sale; and

    22.4 the proceeds of the sale shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is immediately payable, and the residue, if any, shall (subject to a like lien for sums not immediately payable as existed upon the shares before the sale) be paid to the person entitled to the shares at the date of the sale.

**Forfeiture**

23. If a member of the Company fails to pay any call or instalment of a call on the day appointed for payment of it, the Directors may, at any time thereafter during such time as any part of the call or instalment remains unpaid, serve a notice on the member requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

24. The notice referred to in Regulation 23 shall:

    24.1 specify a further day (not earlier than the expiration of 14 days after the date of service of the notice) on or before which the payment required by the notice is to be made; and

    24.2 state that, if the amount concerned is not paid by the day so specified, the shares in respect of which the call was made will be liable to be forfeited.

25. If the requirements of the notice referred to in Regulation 23 are not complied with, any share in respect of which the notice has been served may at any time after the day so specified (but before, should it occur, the payment required by the notice has been made) be forfeited by a resolution of the Directors to that effect.

26. A forfeited share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

27. A person whose shares have been forfeited shall cease to be a member of the Company in respect of the forfeited shares, but shall, notwithstanding, remain liable to pay to the Company all consideration which, at the date of forfeiture, were payable by him or her to the Company in respect of the shares, but his or her liability shall cease if and when the Company shall have received payment in full of all such consideration in respect of the shares.

28. A statement in writing that the maker of the statement is a Director or the secretary of the Company, and that a share in the Company has been duly forfeited on a date stated in the statement, shall be conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the share.

29. The following provisions apply in relation to a sale or other disposition of a share referred to in Regulation 26:

   29.1 the Company may receive the consideration, if any, given for the share on the sale or other disposition of it and may execute a transfer of the share in favour of the person to whom the share is sold or otherwise disposed of (the "disponee");

   29.2 upon such execution, the disponee shall be registered as the holder of the share; and

   29.3 the disponee shall not be bound to see to the application of the purchase consideration, if any, nor shall his or her title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the share.

**Variation of company capital**

30. The Company may, by ordinary resolution and in accordance with section 83 of the Act, do any one or more of the following, from time to time:

   30.1 consolidate and divide all or any of its shares into shares of a larger nominal value than its existing shares;

   30.2 subdivide its shares, or any of them, into shares of a smaller nominal value, so however, that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in the case of the share from which the reduced share is derived;

   30.3 increase the nominal value of any of its shares by the addition to them of any undenominated capital;

30.4    reduce the nominal value of any of its shares by the deduction from them of any part of that value, subject to the crediting of the amount of the deduction to undenominated capital, other than the share premium account;

30.5    without prejudice or limitation to Regulations 60 to 64 and the powers conferred on the Directors thereby convert any undenominated capital into shares for allotment as bonus shares to holders of existing shares;

30.6    increase its share capital by new shares of such amount as it thinks expedient; or

30.7    cancel shares of its share capital which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person, and diminish the amount of its share capital by the amount of the shares so cancelled.

31.    The Company may, by special resolution, and subject to the provisions of the Act governing the variation of rights attached to classes of shares and the amendment of a company's constitution, convert any of its shares into redeemable shares.

32.    The rights conferred upon the holders of the shares of any class issued by the Company with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

**Reduction of company capital**

33.    The Company may, in accordance with the provisions of sections 84 to 87 of the Act, reduce its company capital in any way it thinks expedient and, without prejudice to the generality of the foregoing, may thereby:

33.1    extinguish or reduce the liability on any of its shares in respect of share capital not paid up;

33.2    either with or without extinguishing or reducing liability on any of its shares, cancel any paid up company capital which is lost or unrepresented by available assets; or

33.3    either with or without extinguishing or reducing liability on any of its shares, pay off any paid up company capital which is in excess of the wants of the Company.

Unless the special resolution provides otherwise, a reserve arising from the reduction of company capital is to be treated for all purposes as a realised profit.

**Transfer and transmission of shares**

34.    The Directors may in their absolute discretion and without assigning any reason for doing so, decline to register the transfer of any share. The Directors' power to decline to register a transfer of shares shall not cease to be exercisable on the expiry of two months after the date of delivery to the Company of the instrument of transfer of the share.

35.   Notwithstanding anything contained in these articles of association, the Directors shall promptly register any transfer of shares and shall not suspend registration thereof where such transfer:

(i)     is to any bank, institution or other entity to whom such shares have been charged by way of security or to any nominee or any transferee of such bank, institution or other entity (a "**Secured Party**"); or

(ii)    is delivered to the Company for registration by a Secured Party or its nominee in order to register the Secured Party as legal owner of the shares; or

(iii)   is executed by a Secured Party or its nominee pursuant to the power of sale or other power under such security,

and furthermore, notwithstanding anything to the contrary contained in these articles of association or in any other agreement between the shareholders or any of them, no transferor of any shares in the Company or proposed transferor of such shares to a Secured Party or its nominee, and no Secured Party or its nominee, shall be required to offer the shares which are or are to be the subject of any transfer as aforesaid to the shareholders for the time being of the Company or any of them and no such shareholder shall have any right under the articles of association or otherwise howsoever to require such shares to be transferred to them whether for consideration or not. No resolution shall be proposed or passed the effect of which would be to delete or amend this regulation unless not less than 21 days' written notice thereof shall have been given to any such Secured Party by the Company.

36.   In the case of the death of a member, the survivor or survivors where the deceased was a joint holder, and the personal representatives of the deceased where he or she was a sole holder, shall be the only persons recognised by the Company as having any title to his or her interest in the shares.

37.   Nothing in Regulation 36 shall release the estate of a deceased joint holder from any liability in respect of any share which had been jointly held by him or her with other persons.

38.   Any person becoming entitled to a share in consequence of the death or bankruptcy of a member may, upon such evidence being produced as may from time to time properly be required by the Directors and subject to Regulation 39, elect either – (a) to be registered himself or herself as holder of the share; or (b) to have some person nominated by him or her (being a person who consents to being so registered) registered as the transferee thereof.

39.   The Directors shall, in either of those cases, have the same right to decline or suspend registration as they would have had in the case of a transfer of the share by that member before his or her death or bankruptcy, as the case may be.

40.   If the person becoming entitled as mentioned in Regulation 38 – (a) elects to be registered himself or herself, the person shall furnish to the Company a notice in writing signed by him or her stating that he or she so elects; or (b) elects to have another person registered, the person shall testify his or her election by executing to that other person a transfer of the share.

41.  All the limitations, restrictions and provisions of Regulations 34 to 40 shall be applicable to a notice or transfer referred to in Regulation 44 as if the death or bankruptcy of the member concerned had not occurred and the notice or transfer were a transfer signed by that member.

42.  Subject to Regulations 43 and 44, a person becoming entitled to a share by reason of the death or bankruptcy of the holder shall be entitled to the same dividends and other advantages to which he or she would be entitled if he or she were the registered holder of the share.

43.  A person referred to in Regulation 42 shall not, before being registered as a member in respect of the share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

44.  The Directors may at any time serve a notice on any such person requiring the person to make the election provided for by Regulation 38 and, if the person does not make that election (and proceed to do, consequent on that election, whichever of the things mentioned in Regulation 40 is appropriate) within 90 days after the date of service of the notice, the Directors may thereupon withhold payment of all dividends, bonuses or other moneys payable in respect of the share until the requirements of the notice have been complied with.

45.  The Company may charge a fee not exceeding €10.00 on the registration of every probate, letters of administration, certificate of death, power of attorney, notice as to stock or other instrument or order.

46.  The Directors may determine such procedures as they shall think fit in respect to the transmission of shares in the Company held by a body corporate that are transmitted by operation of law in consequence of a merger or division.

**Dividends**

47.  The Directors may from time to time:

47.1  pay to the members such dividends (whether as either interim dividends or final dividends) as appear to the Directors to be justified by the profits of the Company, subject to section 117 of the Act;

47.2  before declaring any dividend, set aside out of the profits of the Company such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors, be applicable for any purpose to which the profits of the Company may be properly applied, and pending such application may, at the like discretion either be employed in the business of the Company or be invested in such investments as the Directors may lawfully determine; and

47.3  without placing the profits of the Company to reserve, carry forward any profits which they may think prudent not to distribute.

48.  Unless otherwise specified by the Directors at the time of declaring a dividend, the dividend shall be a final dividend.

49. Where the Directors specify that a dividend is an interim dividend at the time it is declared, such interim dividend shall not constitute a debt recoverable against the Company and the declaration may be revoked by the Directors at any time prior to its payment provided that the holders of the same class of share are treated equally on any revocation.

50. Subject to the rights of persons, if any, entitled to shares with special rights as to dividend (and to the rights of the Company under Regulations 18 to 22 and Regulation 52) all dividends shall be declared and paid such that shares of the same class shall rank equally irrespective of the premium credited as paid up on such shares.

51. If any share is issued on terms providing that it shall rank for a dividend as from a particular date, such share shall rank for dividend accordingly.

52. The Directors may deduct from any dividend payable to any member, all sums of money (if any) immediately payable by him or her to the Company on account of calls or otherwise in relation to the shares of the Company.

53. The Directors when declaring a dividend or bonus may direct payment of such dividend or bonus wholly or partly by the distribution of specific assets and, in particular, paid up shares, debentures or debenture stock of any other company or in any one or more of such ways.

54. Where any difficulty arises in regard to a distribution, the Directors may settle the matter as they think expedient and, in particular, may:

   54.1   issue fractional certificates and fix the value for distribution of such specific assets or any part of them;

   54.2   determine that cash payments shall be made to any members upon the footing of the value so fixed, in order to adjust the rights of all the parties; and

   54.3   vest any such specific assets in trustees as may seem expedient to the Directors.

55. Any dividend, interest or other moneys payable in cash in respect of any shares may be paid –

   55.1   by cheque or negotiable instrument sent by post directed to or otherwise delivered to the registered address of the holder, or where there are joint holders, to the registered address of that one of the joint holders who is first named on the register or to such person and to such address as the holder or the joint holders may in writing direct; or

   55.2   by transfer to a bank account nominated by the payee or where such an account has not been so nominated, to the account of a trustee nominated by the Company to hold such moneys

   provided that the debiting of the Company's account in respect of the relevant amount shall be evidence of good discharge of the Company's obligations in respect of any payment made by any such methods.

56. Any such cheque or negotiable instrument referred to in Regulation 55 shall be made payable to the order of the person to whom it is sent.

57. Any one of two or more joint holders may give valid receipts for any dividends, bonuses or other moneys payable in respect of the shares held by them as joint holders, whether paid by cheque or negotiable instrument or direct transfer.

58. No dividend shall bear interest against the Company.

59. If the Directors so resolve, any dividend or distribution which has remained unclaimed for twelve years from the date of its declaration shall be forfeited and cease to remain owing by the Company. The payment by the Directors of any unclaimed dividend, distribution or other moneys payable in respect of a share into a separate account shall not constitute the Company a trustee in respect thereof.

**Bonus issue of shares**

60. The Directors may resolve to capitalise any part of a relevant sum (within the meaning of Regulation 61) by applying such sum in paying up in full unissued shares of a nominal value or nominal value and premium, equal to the sum capitalised, to be allotted and issued as fully paid bonus shares, to those members of the Company who would have been entitled to that sum if it were distributed by way of dividend (and in the same proportions).

61. For the purposes of Regulation 60, "relevant sum" means– (a) any sum for the time being standing to the credit of the Company's undenominated capital; (b) any of the Company's profits available for distribution; or (c) any sum representing unrealised revaluation reserves.

62. The Directors may in giving effect to any resolution under Regulation 60 make – (a) all appropriations and applications of the undivided profits resolved to be capitalised by the resolution; and (b) all allotments and issues of fully paid shares, if any, and generally shall do all acts and things required to give effect to the resolution.

63. Without limiting Regulation 62, the Directors may:

  63.1 make such provision as they think fit for the case of shares becoming distributable in fractions (and, again, without limiting the foregoing, may sell the shares represented by such fractions and distribute the net proceeds of such sale amongst the members otherwise entitled to such fractions in due proportions);

  63.2 authorise any person to enter, on behalf of all the members concerned, into an agreement with the Company providing for the allotment to them, respectively credited as fully paid up, of any further shares to which they may become entitled on the capitalisation concerned or, as the case may require, for the payment by the application thereto of their respective proportions of the profits resolved to be capitalised of the amounts remaining unpaid on their existing shares,

and any agreement made under such authority shall be effective and binding on all the members concerned.

64. Where the Directors have resolved to approve a bona fide revaluation of all the fixed assets of the Company, the net capital surplus in excess of the previous book value of

the assets arising from such revaluation may be – (a) credited by the Directors to undenominated capital, other than the share premium account; or (b) used in paying up unissued shares of the Company to be issued to members as fully paid bonus shares.

**General Meetings – General**

65.   Subject to Regulation 66 and, for the avoidance of doubt, section 175(3) of the Act, the Company shall in each year hold a general meeting as its annual general meeting in addition to any other meeting in that year, and shall specify the meeting as such in the notices calling it; and not more than 15 months shall elapse between the date of one annual general meeting of the Company and that of the next.

66.   So long as the Company holds its first annual general meeting within 18 months of its incorporation, it need not hold it in the year of its incorporation or in the year following.

67.   The annual general meeting shall be held at such time and place as the Directors shall appoint provided that all general meetings of the Company shall be held within the State.

68.   All general meetings of the Company other than annual general meetings shall be called extraordinary general meetings.

69.   The Directors may, whenever they think fit, convene an extraordinary general meeting and extraordinary general meetings shall also be convened on such requisition, or in default, may be convened by such requisitionists, as provided by section 178(3) to (7) of the Act. If at any time the number of Directors is less than the minimum number of Directors, any Director or any member may convene an extraordinary general meeting in the same manner as nearly as possible as that in which meetings may be convened by the Directors.

70.   An annual general meeting or extraordinary general meeting of the Company may be held outside the State provided that, unless all of the members entitled to attend and vote at such meeting consent in writing to its being held outside of the State the Company shall make, at its expense, all necessary arrangements to ensure that members can by technological means participate in any such meeting without leaving the State.

71.   A general meeting of the Company may be held in two or more venues (whether inside or outside of the State) at the same time using any technology that provides members, as a whole, with a reasonable opportunity to participate.

**Notice of general meetings**

72.   The only persons entitled to notice of general meetings of the Company are:

72.1   the members;

72.2   the personal representatives of a deceased member, which member would but for his death be entitled to vote;

72.3   the assignee in bankruptcy of a bankrupt member of the Company (being a bankrupt member who is entitled to vote at the meeting);

72.4   the Directors and secretary of the Company; and

72.5   unless the Company is entitled to and has availed itself of the audit exemption under the Act, the statutory auditors (who shall also be entitled to receive other communications relating to any general meeting which a member is entitled to receive).

73.   A meeting of the Company, other than an adjourned meeting, shall be called:

73.1   in the case of the annual general meeting or an extraordinary general meeting for the passing of a special resolution, by not less than 21 days' notice;

73.2   in the case of any other extraordinary general meeting, by not less than seven days' notice; or

73.3   in either case, on such shorter notice as all of the members and, unless the Company has availed of the audit exemption under section 360 or 365 of the Act (and, where relevant, section 399 of the Act has been complied with in that regard), the statutory auditors of the Company agree.

74.   In determining the correct period of notice for a general meeting, neither the day on which the notice is served nor the day of the meeting for which it is given shall be counted.

75.   The accidental omission to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice shall not invalidate the proceedings at the meeting.

**Unanimous written resolutions**

76.   In accordance with section 193(1) of the Act (as modified in its application to a DAC by section 989 of the Act), notwithstanding any provision to the contrary in the Act:

76.1   a resolution in writing signed by all the members of the Company for the time being entitled to attend and vote on such resolution at a general meeting (or being bodies corporate by their duly appointed representatives) shall be as valid and effective for all purposes as if the resolution had been passed at a general meeting of the Company duly convened and held (a "unanimous written resolution");

76.2   if described as a special resolution a unanimous written resolution shall be deemed to be a special resolution within the meaning of the Act, and

76.3   a unanimous written resolution may consist of several documents in like form each signed by one or more members.

77.   A unanimous written resolution shall be deemed to have been passed at a meeting held on the date on which it was signed by the last member to sign, and, where the resolution states a date as being the date of his or her signature thereof by any member, it shall be taken that it was signed by him or her on that date.

78.   Where a unanimous written resolution is not contemporaneously signed, the Company shall notify the members, within 21 days after the date of delivery to it of the document or documents constituting the unanimous written resolution of the fact that the resolution has been passed.

79. The signatories of unanimous written resolution shall, within 14 days after the date of its passing, procure delivery to the Company of the documents constituting the unanimous written resolution and without prejudice to the use of the other means of delivery generally permitted by the Act, such delivery may be effected by electronic mail or the use of a facsimile machine and the Company shall retain those documents as if they constituted the minutes of a general meeting of the Company.

80. A unanimous written resolution within the meaning of Regulation 76 shall be ineffective to remove a Director or a statutory auditor (or so as not to continue the statutory auditor in office).

**Majority written resolutions**

81. An ordinary resolution and special resolution may be passed as majority written resolutions in accordance with sections 194 (as modified in its application to a DAC by section 990 of the Act) and 195 of the Act.

**Written decision of sole member**

82. At any time that the Company is a single-member company, its sole member may pass any resolution as a written decision in accordance with section 196 of the Act.

**Quorum for general meetings**

83. Two members of a Company present in person or by proxy at a general meeting of it shall be a quorum provided that at any time when the Company is a single-member company, one member of the Company present in person or by proxy at a general meeting of it shall be a quorum.

84. If within 15 minutes after the time appointed for a general meeting a quorum is not present, then:

    84.1 the meeting shall stand adjourned to the same day in the next week, at the same time and place or to such other day and at such other time and place as the Directors may determine; and

    84.2 if at the adjourned meeting a quorum is not present within half an hour after the time appointed for the meeting, the members present shall be a quorum.

**Proxies**

85. Every member of the Company entitled to attend and vote at a meeting of the Company shall be entitled to appoint another person (whether a member or not) as his or her proxy to attend and vote instead of him or her. A member shall not be entitled to appoint more than one proxy to attend on the same occasion. A proxy so appointed shall have the same right as the member to speak at the meeting and to vote on a show of hands and on a poll.

86. The instrument appointing a proxy (the "instrument of proxy") shall be in writing:

    86.1 under the hand of the appointer or of his or her attorney duly authorised in writing; or

21

86.2    if the appointer is a body corporate, either under seal of the body corporate or under the hand of an officer or attorney of it duly authorised in writing.

87.    The instrument of proxy and the power of attorney or other authority, if any, under which it is signed, or a notarially certified copy of that power or authority, shall be deposited at the registered office of the Company or at such other place within the State as is specified for that purpose in the notice convening the meeting, and shall be so deposited not later than:

87.1    the time appointed for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote; or

87.2    in the case of a poll, 48 hours before the time appointed for the taking of the poll.

88.    An instrument of proxy which is not in compliance with these Regulations shall not be valid.

89.    The depositing of the instrument of proxy may, rather than its being effected by sending or delivering the instrument, be effected by communicating the instrument to the Company by electronic means.

90.    A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the appointer or revocation of the proxy or of the authority under which the proxy was executed or the transfer of the share in respect of which the proxy is given provided however that it will not be valid if notice in writing of such death, insanity, revocation or transfer as is mentioned in that subsection is received by the Company at its registered office before the commencement of the meeting or adjourned meeting at which the proxy is used.

**Form of proxy**

91.    An instrument appointing a proxy shall be in the following form or a form as near to it as circumstances permit:

[name of company] ("the Company")

[name of member] ("the Member") of [address of member] being a member of the Company hereby appoint/s name and address of proxy) or failing him or her

[name and address of alternative proxy] as the proxy of the Member to attend, speak and vote for the Member on behalf of the Member at the (annual or extraordinary, as the case may be) general meeting of the Company to be held on the [date of meeting] and at any adjournment of the meeting.

22

The proxy is to vote as follows:

| Voting Instructions to Proxy (choice to be marked with an 'x') | | | |
|---|---|---|---|
| Number or description of resolution: | In Favour | Abstain | Against |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| Unless otherwise instructed the proxy will vote as he or she thinks fit. | | | |
| Signature of member:................................................................... | | | |
| Dated: [date]......................................................................... | | | |

**Representative of bodies corporate**

92.   Any body corporate which is a member of the Company may, by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the body corporate which he represents as that body corporate could exercise if it were an individual member of the Company. The chairperson of a meeting may require a person claiming to be an authorised person within the meaning of this Regulation to produce such evidence of the person's authority as such as the chairperson may reasonably specify and, if such evidence is not produced, the chairperson may exclude such person from the meeting.

**The business of general meetings**

93.   All business shall be deemed to be special business that is transacted at an extraordinary general meeting and that is transacted at an annual general meeting other than, in the case of an annual general meeting, the business specified in Regulation 94 which shall be ordinary business.

94.   The business of the annual general meeting shall include:

94.1   the consideration of the Company's statutory financial statements and the report of the directors and, unless the Company is entitled to and has availed itself of the audit exemption under section 360 or 365 of the Act, the report of the statutory auditors on those statements and that report;

94.2   the review by the members of the Company's affairs;

94.3   the authorisation of the directors to approve the remuneration of the statutory auditors (if any); and

94.4     save where the Company has availed itself of the audit exemption referred to in Regulation 94.1, the appointment or re-appointment of statutory auditors.

**Proceedings at general meetings**

95.     The chairperson, if any, of the board of Directors shall preside as chairperson at every general meeting of the Company, or if there is no such chairperson, or if he or she is not present at the time appointed for the holding of the meeting or is unwilling to act, the Directors present shall elect one of their number to be chairperson of the meeting.

96.     If at any meeting no Director is willing to act as chairperson or if no Director is present at the time appointed for holding the meeting, the members present shall choose one of their number to be chairperson of the meeting.

97.     The chairperson may, with the consent of any meeting at which a quorum is present, and shall if so directed by the meeting, adjourn the meeting from time to time and from place to place.

98.     No business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

99.     When a meeting is adjourned for 30 days or more, notice of the adjourned meeting shall be given as in the case of an original meeting but, subject to that, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

100.     Unless a poll is demanded in accordance with section 189 of the Act, at any general meeting:

    100.1     a resolution put to the vote of the meeting shall be decided on a show of hands; and

    100.2     a declaration by the chairperson that a resolution has, on a show of hands, been carried or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book containing the minutes of the proceedings of the Company shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

101.     Where there is an equality of votes, whether on a show of hands or on a poll, the chairperson of the meeting at which the show of hands takes place or at which the poll is demanded, shall not have a second or casting vote.

102.     Subject to any rights or restrictions for the time being attached to any class or classes of shares, where a matter is being decided:

    102.1     on a show of hands, every member present in person and every proxy shall have one vote, but so that no individual member shall have more than one vote; and

    102.2     on a poll, every member shall, whether present in person or by proxy, have one vote for each share of which he or she is the holder.

103.     Where there are joint holders of a share, the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the

other joint holder or holders; and for this purpose, seniority shall be determined by the order in which the names of the joint holders stand in the register of members.

104. Each of the following:

   104.1  a member of unsound mind;

   104.2  a member who has made an enduring power of attorney;

   104.3  a member in respect of whom an order has been made by any court having jurisdiction in cases of unsound mind,

   may vote, whether on a show of hands or on a poll, by his or her committee, donee of an enduring power of attorney, receiver, guardian or other person appointed by the foregoing court.

105. Any committee, donee of an enduring power of attorney, receiver, guardian, or other person referred to in Regulation 104 may speak and vote by proxy, whether on a show of hands or on a poll.

106. No member shall be entitled to vote at any general meeting of the Company unless all calls or other sums immediately payable by him or her in respect of shares in the Company have been paid.

107. No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered, and every vote not disallowed at such meeting shall be valid for all purposes. Any such objection made in due time shall be referred to the chairperson of the meeting, whose decision shall be final and conclusive.

**Class meetings**

108. The provisions of these articles of association relating to general meetings shall, as far as applicable, apply in relation to any meeting of any class of member of the Company.

**Appointment of directors**

109. The number of Directors, from time to time, shall be not less than two and not more than twelve. A majority of the Directors must be resident in the State for taxation purposes and if, for whatever reason, a Director ceases to be resident in the State for taxation purposes, he or she shall immediately notify the Company and the other Directors in writing.

110. Directors may be appointed by the members in general meeting, provided that no person other than a Director retiring at the meeting shall, save where recommended by the Directors, be eligible for election to the office of Director at any general meeting unless the requirements of Regulation 115 as to his or her eligibility for that purpose have been complied with.

111. The Directors may from time to time appoint any person to be a Director, either to fill a casual vacancy or as an addition to the existing Directors, but so that the total number

of Directors shall not at any time exceed the number as may be provided for in these articles of association.

112. A Director who is appointed pursuant to Regulation 111 shall not be required to retire at the next following annual general meeting.

113. The Company may from time to time, by ordinary resolution, increase or reduce the number of Directors provided that any resolution to appoint a director approved by the members that would result in the maximum number of Directors being exceeded shall be deemed to constitute an ordinary resolution increasing the number of Directors to the number in office following such a resolution of appointment.

114. The Company may, by ordinary resolution, appoint another person in place of a Director removed from office under section 146 of the Act and, without prejudice to the powers of the Directors under Regulation 111, the Company in general meeting may appoint any person to be a Director either to fill a casual vacancy or as an additional Director.

115. The following are the requirements mentioned in Regulation 110 for the eligibility of a person (the "person concerned") for election as a Director at a general meeting, namely, not less than three nor more than 21 days before the day appointed for the meeting there shall have been left at the Company's registered office:

115.1 notice in writing signed by a member of the Company duly qualified to attend and vote at the meeting for which such notice is given, of his or her intention to propose the person concerned for such election; and

115.2 notice in writing signed by the person concerned of his or her willingness to be so elected.

**Vacation of office by Directors**

116. A Director may be appointed or removed by notice in writing served on the Company by the Company's holding company. Any such notice shall be effective from the date on which it is expressed to take effect.

117. In addition to the circumstances described in sections 146, 148(1) and 196(2) of the Act, the office of Director shall be vacated -

117.1 ipso facto, if that Director –

(a) resigns his or her office by notice in writing to the Company;

(b) becomes subject to a declaration of restriction under section 819 of the Act and the Directors, at any time during the currency of the declaration, resolve that his or her office be vacated;

(c) resigns his office by spoken declaration at any board meeting and such resignation is accepted by resolution of that meeting, in which case such resignation shall take effect at the conclusion of such meeting unless otherwise resolved;

26

(d)     is adjudicated insolvent or bankrupt or makes any arrangement or compromise with his creditors generally (in any jurisdiction);

(e)     is removed from office by notice in writing to the Company: where there is a sole member, by the sole member or where there is more than one member, by any member or members having the right to attend and vote at a general meeting of the Company on a resolution to remove a Director and holding for the time being not less than 90% in nominal value of the shares giving that right; and

117.2   by resolution of the board of directors where that Director -

(a)     can no longer be reasonably regarded as possessing an adequate decision making capacity by reason of his or her health;

(b)     is sentenced to a term of imprisonment (whether or not the term is suspended) following conviction of a criminal offence in any jurisdiction;

(c)     is for more than six months absent, without the permission of the Directors, from meetings of the Directors held during that period;

(d)     is in full-time employment of the Company or the Company's holding company or a subsidiary of the Company's holding company, upon the termination of such employment;

and a Director so removed shall have no right to prior notice or to raise any objection to his or her removal from office but any removal (other than one initiated by the Director) shall be without prejudice to any claim for compensation or damages payable as a result of the removal also terminating any contract of service.

**Directors' remuneration and expenses**

118.   The remuneration of the Directors shall be such as is determined, from time to time, by the board of Directors and such remuneration shall be deemed to accrue from day to day.

119.   The Directors may also be paid all travelling, hotel and other expenses properly incurred by them - (a) in attending and returning from – (i) meetings of the Directors or any committee; or (ii) general meetings of the Company, or (b) otherwise in connection with the business of the Company.

**General power of management and delegation**

120.   The business of the Company shall be managed by its Directors within the State and the Directors shall endeavour to ensure that the Company remains resident in the State for taxation purposes. The Directors may pay all expenses incurred in promoting and registering the Company and may exercise all such powers of the Company as are not, by the Act or by this Constitution, required to be exercised by the Company in general meeting, but subject to:

120.1   any regulations contained in these articles of association;

120.2   the provisions of the Act; and

120.3   such directions, not being inconsistent with the foregoing regulations or provisions, as the Company in general meeting may (by special resolution) give.

121.   No direction given by the Company in general meeting under Regulation 120.3 shall invalidate any prior act of the Directors which would have been valid if that direction had not been given.

122.   Without prejudice to the generality of Regulation 120, Regulation 120 operates to enable, subject to a limitation (if any) arising under any of paragraphs 120.1 to 120.3 of it, the Directors exercise all powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital, or any part thereof.

123.   Without prejudice to section 40 of the Act, the Directors may delegate any of their powers (including any power referred to in these articles of association) to such person or persons as they think fit, including committees; any such person or committee shall, in the exercise of the powers so delegated, conform to any regulations that may be imposed on it by the Directors.

124.   The reference in Regulation 120 to a power of the Company required to be exercised by the Company in general meeting includes a reference to a power of the Company that, but for the power of the members to pass a written resolution to effect the first-mentioned power's exercise, would be required to be exercised by the Company in general meeting.

125.   The acts of the board of Directors or of any committee established by the board of Directors or any delegee of the board or any such committee shall be valid notwithstanding any defect which may afterwards be discovered in the appointment or qualification of any Director, committee member or delegee.

126.   The Directors may appoint an assistant company secretary and a deputy company secretary for such term, at such remuneration and upon such conditions as they may think fit; and any such person so appointed may be removed by them.

**Chief Executive Officer**

127.   The Directors may from time to time appoint one or more of themselves (who is resident in the State for taxation purposes) to the office of Chief Executive Officer (by whatever name called including managing director) for such period and on such terms as to remuneration and otherwise as they see fit, and, subject to the terms of any agreement entered into in any particular case, may revoke such appointment.

128.   Without prejudice to any claim the person so appointed under Regulation 127 may have for damages for breach of any contract of service between the person and the Company, the person's appointment shall cease upon his or her ceasing, from any cause, to be a Director of the Company.

129.   A Chief Executive Officer of the Company shall receive such remuneration whether by way of salary, commission or participation in the profits, or partly in one way and partly in another, as the Directors may determine.

130.    Without prejudice to section 40 of the Act, the Directors may confer upon a Chief Executive Officer any of the powers exercisable by them upon such terms and conditions and with such restrictions as they may think fit and in conferring any such powers, the Directors may specify that the conferral is to operate either - (a) so that the powers concerned may be exercised concurrently by them and the Chief Executive Officer; or (b) to the exclusion of their own such powers.

131.    The Directors may (a) revoke any conferral of powers under Regulation 130 or (b) amend any such conferral (whether as to the powers conferred or the terms, conditions or restrictions subject to which the conferral is made).

**Meetings of Directors and committees**

132.    The Directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they think fit provided that all meetings of the Directors must take place within the State. Questions arising at any such meeting shall be decided by a majority of votes and where there is an equality of votes, the chairperson shall not have a second or casting vote. A Director may, and the secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

133.    All Directors shall be entitled to reasonable notice of any meeting of the Directors.

134.    Nothing in Regulation 133 or any other provision of the Act enables a person, other than a Director, to object to the notice given for any meeting of the Directors.

135.    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two but, where the Company has a sole Director, the quorum shall be one.

136.    The continuing Directors may act notwithstanding any vacancy in their number but, if and so long as their number is reduced below the number fixed in accordance with these articles of association as the necessary quorum of Directors, the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number or of summoning a general meeting of the Company but for no other purpose.

**Chairperson**

137.    The Directors may elect a chairperson of their meetings and determine the period for which he or she is to hold office, but if no such chairperson is elected, or, if at any meeting the chairperson is not present within 15 minutes after the time appointed for holding it, the Directors present may choose one of their number to be chairperson of the meeting.

**Committees**

138.    The Directors may establish one or more committees consisting in whole or in part of members of the board of Directors.

139.    A committee established under Regulation 138 (a "committee") may elect a chairperson of its meetings; if no such chairperson is elected, or if at any meeting the chairperson is not present within 15 minutes after the time appointed for holding it, the members of the committee present may choose one of their number to be chairperson of the meeting.

140.   A committee may meet and adjourn as it thinks proper. Questions arising at any meeting of a committee shall be determined by a majority of votes of the members of the committee present, and where there is an equality of votes, the chairperson of the committee shall have a second or casting vote.

141.   Where any committee is established by the Directors:

    141.1   the meetings and proceedings of such committee shall be governed by the provisions of these articles of association regulating the meetings and proceedings of the Directors so far as the same are applicable and are not superseded by any regulations imposed upon such committee by the Directors; and

    141.2   the Directors may authorise, or may authorise such committee to authorise, any person who is not a Director to attend all or any meetings of any such committee on such terms as the Directors or the committee think fit, provided that any such person shall not be entitled to vote at meetings of the committee.

**Written resolutions and telephonic meetings of Directors**

142.   A resolution in writing signed by all the Directors, or by all the members of a committee of them, and who are for the time being entitled to receive notice of a meeting of the Directors or, as the case may be, of such a committee, shall be as valid as if it had been passed at a meeting of the Directors or such a committee duly convened and held.

143.   Subject to Regulation 144, where one or more of the Directors (other than a majority of them) would not, by reason of:

    143.1   the Act or any other enactment;

    143.2   these articles of association; or

    143.3   a rule of law,

be permitted to vote on a resolution such as is referred to in Regulation 142, if it were sought to pass the resolution at a meeting of the Directors duly convened and held, then such a resolution, notwithstanding anything in Regulation 142, shall be valid for the purposes of that subsection if the resolution is signed by those of the Directors who would have been permitted to vote on it had it been sought to pass it at such a meeting.

144.   In a case falling within Regulation 143, the resolution shall state the name of each Director who did not sign it and the basis on which he or she did not sign it.

145.   For the avoidance of doubt, nothing in Regulations 142 to 144 dealing with a resolution that is signed by other than all of the Directors shall be read as making available, in the case of an equality of votes, a second or casting vote to the one of their number who would, or might have been, if a meeting had been held to transact the business concerned, chairperson of that meeting.

146.   The resolution referred to in Regulation 142 may consist of several documents in like form each signed by one or more Directors and for all purposes shall take effect from the time that it is signed by the last Director.

147.   A meeting of the Directors or of a committee referred to in Regulation 138 may consist of a conference between some or all of the Directors or, as the case may be, members of the committee who are not all in one place, but each of whom is able (directly or by means of telephonic, video or other electronic communication) to speak to each of the others and to be heard by each of the others provided always that all Directors participating in the meeting are for the duration of the meeting physically present within the State and:

   147.1   a Director or member of the committee taking part in such a conference shall be deemed to be present in person at the meeting and shall be entitled to vote and be counted in a quorum accordingly; and

   147.2   such a meeting shall be deemed to take place:

      (a)   where the largest group of those participating in the conference is assembled;

      (b)   if there is no such group, where the chairperson of the meeting then is; or

      (c)   if neither subparagraph (a) or (b) applies, in such location as the meeting itself decides.

**Directors' duties, conflicts of interest, etc.**

148.   The Directors may have regard to the interests of the Company's holding company and to other companies in a group of which it is a member to the full extent permitted by the Act.

149.   Subject to the provisions of the Act, a Director may vote in respect of any contract, appointment or arrangement in which he or she is interested and he or she shall be counted in the quorum present at the meeting.

150.   A Director is expressly permitted (for the purposes of section 228(1)(d) of the Act) to use vehicles, telephones, computers, accommodation and any other Company property where such use is approved by the board of Directors or by a person so authorised by the board of Directors or where such use is in accordance with a Director's terms of employment, letter of appointment or other contract or in the course of the discharge of the Director's duties or responsibilities or in the course of the discharge of a Directors employment.

151.   Nothing in section 228(1)(e) of the Act shall restrict a director from entering into any commitment which has been approved by the Board or has been approved pursuant to such authority as may be delegated by the Board in accordance with these articles of association. It shall be the duty of each Director to obtain the prior approval of the Board, before entering into any commitment permitted by sections 228(1)(e)(ii) and 228(2) of the Act.

152.   A Director may vote in respect of any contract, appointment or arrangement in which he or she is interested and shall be counted in the quorum present at the meeting and is hereby released from his or her duty set out in section 228(1)(f) of the Act and a Director may vote on his or her own appointment or arrangement and the terms of it.

153. The Directors may exercise the voting powers conferred by the shares of any other company held or owned by the Company in such manner in all respects as they think fit and, in particular, they may exercise the voting powers in favour of any resolution -- (a) appointing the Directors or any of them as Directors or officers of such other company; or (b) providing for the payment of remuneration or pensions to the Directors or officers of such other company.

154. Any Director may vote in favour of the exercise of such voting rights notwithstanding that he or she may be or may be about to become a Director or officer of the other company referred to in Regulation 153 and as such or in any other way is or may be interested in the exercise of such voting rights in the foregoing manner.

155. A Director may hold any other office or place of profit under the Company (other than the office of statutory auditor) in conjunction with his or her office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

156. No Director or intending such Director shall be disqualified by his or her office from contracting with the Company either with regard to his or her tenure of any such other office or place of profit or as vendor, purchaser or otherwise.

157. In particular, neither shall:

   157.1 any contract with respect to any of the matters referred to in Regulation 151, nor any contract or arrangement entered into by or on behalf of the Company in which a Director is in any way interested, be liable to be avoided; nor

   157.2 a Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement,

   by reason of such Director holding that office or of the fiduciary relation thereby established.

158. A Director, notwithstanding his or her interest, may be counted in the quorum present at any meeting at which:

   158.1 that Director or any other Director is appointed to hold any such office or place of profit under the Company as is mentioned in Regulation 155; or

   158.2 the terms of any such appointment are arranged,

   and he or she may vote on any such appointment or arrangement.

159. Without prejudice to the provisions of section 228 of the Act, a Director may be or become a Director or other officer of, or otherwise interested in, any company promoted by the Company or in which the Company may be interested as shareholder or otherwise.

160. A Director may act by himself or herself, or his or her firm, in a professional capacity for the Company; and any Director, in such a case, or his or her firm, shall be entitled to remuneration for professional services as if he or she were not a Director, but nothing in this Regulation authorises a Director, or his or her firm, to act as statutory auditor of the Company.

**Alternate Directors**

161. Any Director (the "appointer") may from time to time appoint any person, resident in the State for taxation purposes, to be an alternate director (the "appointee") as respects him or her.

162. One or more persons may stand appointed at a particular time to be an alternate director as respects a particular Director, although only one alternate in respect of each Director may attend an individual meeting.

163. The appointee, while he or she holds office as an alternate director, shall be entitled –

163.1  to notice of meetings of the Directors;

163.2  to attend at such meetings as a Director; and

163.3  in place of the appointer, to vote at such meetings as a Director,

but shall not be entitled to be remunerated otherwise than out of the remuneration of the appointer.

164. Any appointment under Regulation 161 shall be effected by notice in writing given by the appointer to the Company.

165. Any appointment so made may be revoked at any time by the appointer or by an ordinary resolution of the members and Regulations 116 and 117 shall apply to each alternate director.

166. Revocation of such an appointment by the appointer shall be effected by notice in writing given by the appointer to the Company.

167. An appointee shall cease to be an alternate director ipso facto upon his or her appointer ceasing to be a Director.

168. The appointer and each appointee of that appointer shall be deemed to constitute but one and the same Director for the purposes of counting the number of Directors for all purposes under these articles of association or the Act, including for the purposes of determining the maximum number of directors, the quorum for a meeting of the Directors or a majority of the directors for the purposes of determining the approval of a resolution of the Directors or all the Directors for the purposes of a resolution in writing of the Directors.

**The common seal and official seal**

169. The Company's seal shall be used only by the authority of the Directors, a committee authorised by the Directors to exercise such authority or by any one or more persons severally or jointly so authorised by the Directors or such a committee, and the use of the seal shall be deemed to be authorised for these purposes where the matter or transaction pursuant to which the seal is to be used has been so authorised. Unless otherwise specified by the Directors, or otherwise required by law, there shall be no requirement to seal debentures issued by the company.

170. Any instrument to which a Company's seal shall be affixed shall be signed by any one of:

    170.1   a Director;

    170.2   the secretary; or

    170.3   any other person authorised to sign by (i) the Directors or (ii) a committee or a person with the authority to use the seal under Regulation 169,

and the signature or countersignature of a second such person shall not be required.

171. The Company may have an official seal for use abroad.

172. The Company may have one or more duplicate common seals or official seals for use in different locations.

**Service of notices on members and the Company**

173. A notice required or authorised to be served on or given to a member of the Company pursuant to a provision of the Act or these articles of association shall, save where the means of serving or giving it specified in Regulation 173.4 is used, be in writing and may be served on or given to the member in one of the following ways:

    173.1   by delivering it to the member;

    173.2   by leaving it at the registered address of the member;

    173.3   by sending it by post in a prepaid letter to the registered address of the member; or

    173.4   by electronic means; and

each of the members of the Company hereby consents to the use of electronic means in the form of email to serve or give notices in relation to them and further agrees to provide the Company with an email address to which notices may be served or given.

174. Any notice served or given in accordance with Regulation 173 shall be deemed, in the absence of any agreement to the contrary between the Company (or, as the case may be, the officer of it) and the member, to have been served or given:

    174.1   in the case of its being delivered, at the time of delivery (or, if delivery is refused, when tendered);

    174.2   in the case of its being left, at the time that it is left;

    174.3   in the case of its being posted (to an address in the State) on any day other than a Friday, Saturday or Sunday, 24 hours after despatch and in the case of its being posted (to such an address)—

        (a)   on a Friday — 72 hours after despatch; or

        (b)   on a Saturday or Sunday — 48 hours after despatch;

34

174.4   in the case of electronic means being used in relation to it, twelve hours after despatch,

but this Regulation is without prejudice to section 181(3) of the Act.

175.   In addition to the means of service of documents set out in section 51 of the Act, a notice or other document may be served on the Company by an officer or member of the Company by email provided, however, that the Directors have designated an email address for that purpose and notified that email address to its members and officers for the express purpose of serving notices on the Company.

**Sending statutory financial statements to members**

176.   Each of the members hereby agree and consent that copies of the documents referred to in section 338(2) of the Act, are to be treated, for the purposes of section 338 of the Act, as sent to a person where:

176.1   the Company and that person have agreed to his or her having access to the documents on a website (instead of their being sent to him or her);

176.2   the documents are documents to which that agreement applies; and

176.3   that person is notified, in a manner for the time being agreed for the purpose between him or her and the Company, of –

(a)   the publication of the documents on a website,

(b)   the address of that website, and

(c)   the place on that website where the documents may be accessed, and how they may be accessed.

177.   Documents treated in accordance with Regulation 176 as sent to any person are to be treated as sent to him or her not less than 21 days before the date of a meeting if, and only if:

177.1   the documents are published on the website throughout a period beginning at least 21 days before the date of the meeting and ending with the conclusion of the meeting; and

177.2   the notification given for the purposes of paragraph (c) of Regulation 176.3 is given not less than 21 days before the date of the meeting.

178.   Any obligation by virtue of section 339(1) or (2) of the Act to furnish a person with a document may, unless these articles of association provides otherwise, be complied with by using electronic communications for sending that document to such address as may for the time being be notified to the Company by that person for that purpose.

**Winding up**

179.   Subject to the provisions of the Act as to preferential payments, the property of the Company on its winding up shall, subject to such application, be distributed among the members according to their rights and interests in the Company.

180. Unless the conditions of issue of the shares in question provide otherwise, dividends declared by the Company more than six years preceding the commencement date of a winding up of the Company, being dividends which have not been claimed within that period of six years, shall not be a claim admissible to proof against the Company for the purposes of the winding up.

**Indemnification**

181. Subject to the provisions of and so far as may be permitted by section 235(3) of the Act every Director, secretary and other officer (excluding statutory auditors) of the Company shall be entitled to be indemnified by the Company against all costs, charges, losses, expenses and liabilities incurred by him in the execution and discharge of his duties or in relation thereto including any liability incurred by him in defending any proceedings, civil or criminal, which relate to anything done or omitted or alleged to have been done or omitted by him as an officer or employee of the Company and in which judgment is given in his favour (or the proceedings are otherwise disposed of without any finding or admission of any material breach of duty on his part) or in which he is acquitted or in connection with any application under any statute for relief from liability in respect of any such act or omission in which relief is granted to him by the Court.

I, the person whose name, address and description are subscribed, wish to be formed into a Company in pursuance of this constitution, and I agree to take the number of shares in the capital of the Company set opposite my name.

| Name, address and description of subscriber | Number of shares taken by subscriber |
| --- | --- |
| For and on behalf of<br>Markley Asset Portfolio, LLC<br>701 Park of Commerce Blvd,<br>Suite 301, Baco Raton,<br>FL 33487<br>USA<br>Dublin 4 | |
| Corporate Body | One Ordinary Share |

Dated the 24 day of March 2014

Witness to the above signature:

Chris Stillman
701 Park of Commerce Blvd, Suite 301
Boca Raton, FL 33487

37

FIONA WALSH
DIRECTOR
Certified as a True Copy
of the Original

---

Name, address and description of subscriber

---

For and on behalf of
Markley Asset Portfolio, LLC
701 Park of Commerce Blvd.
Suite 301
Boca Raton, FL  33487
USA

Corporate Body

---

Dated the 24 day of   March 2014

Witness to the above signatures:

Chris Stillman
701 Park of Commerce Blvd., Suite 301
Boca Raton, FL 33487

CRO/Capital Markets4/TBC/04-2012

35