IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | Case No. 18-12808 (KG) |
| Debtors. | Jointly Administered |
| | **Related Docket No. 95** |

**DEBTORS' (A) OBJECTION TO MOTION
OF CLMG CORP. AND LNV CORPORATION FOR
ENTRY OF AN ORDER DIRECTING DISCOVERY FROM
THE DEBTORS PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE AND (B) REQUEST TO ADJOURN MOTION**

The above-captioned debtors and debtors in possession (the "Debtors") hereby:

(a) object to the *Motion of CLMG Corp. and LNV Corporation for Entry of an Order Directing Discovery From the Debtors Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* [Docket No. 95] (the "Motion")[2] and (b) request that the Court continue the hearing on the Motion to March 12, 2018 to coincide with the initial status conference in the related Adversary Proceeding (as defined below) against LNV Corporation ("LNV") and others. LNV and its administrative and collateral agent, CLMG Corp. ("CLMG"), filed the Motion and are referenced herein as the "Lender Parties." The Debtors submit that a short continuance of the Motion to the initial status conference in the Adversary Proceeding would provide the Court with an opportunity to address all discovery-related issues between the parties at a single hearing. In support of this objection and request for continuance, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738). The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

1.      The Lender Parties filed the Motion only five (5) days after the Debtors commenced the Adversary Proceeding, and that is no coincidence.  The Motion is nothing more than a retaliatory filing.  The Lender Parties are on the defensive after LNV and its cohorts were sued for a wide variety of wrongs, including, among other things: (a) artificially inflating the loan-to-value ratio under the Loan Agreement, (b) preventing the Debtors from participating in the payment waterfall under the Loan Agreement from proceeds of their own valuable life insurance portfolio, which is the Debtors' only source of income, and (c) ultimately, forcing the Debtors to commence these chapter 11 cases.  In response, the Lender Parties now seek to "investigate" a variety of issues arising out of the Loan Agreement and the circumstances surrounding the Debtors' decision to commence the Adversary Proceeding, notwithstanding that the proper forum for discovery as part of the Lender Parties' defense is through the Adversary Proceeding itself, not Rule 2004.

2.      Under the "pending proceeding" rule, once an adversary proceeding or contested matter has commenced, a party may not use a Rule 2004 examination to obtain information related to such pending proceeding.  Instead, the party must use the discovery mechanisms provided by the Federal Rules of Civil Procedure.  LNV is the lender under the Loan Agreement and one of the defendants named in the Adversary Proceeding.  The other Lender Party is CLMG, the administrative and collateral agent for LNV.  Given the pendency of the Adversary Proceeding, the Lender Parties cannot use a Rule 2004 examination to obtain information related to that pending proceeding.  Although the Lender Parties disingenuously assert that the Adversary Proceeding is unrelated to the Requested Discovery, both involve overlapping alleged wrongs committed by the other party in connection with the Loan

2

Agreement and the life insurance portfolio securing the Debtors' obligations thereunder. *See*, *e.g.*, Document Request No. 28 ("All Documents that form the basis for the Debtors' allegation [in the Adversary Proceeding] that LNV has improperly exercised its discretion by undervaluing the insurance portfolio."). The Lender Parties even reference the commencement of the Adversary Proceeding in the Motion as evidence of a conflict of interest and a basis to conduct Rule 2004 discovery in the first place. *See* Motion at ¶ 21. The Lender Parties also admit in the Motion that they seek information as to how the Debtors determined that bringing the Adversary Proceeding was in their best interests. *Id.* at ¶ 26. This Court should not permit the Lender Parties to circumvent the procedural safeguards of the Federal Rules by allowing the Lender Parties to conduct Rule 2004 examinations that will necessarily elicit information relevant to, and overlapping with, the Adversary Proceeding. For this reason alone, the Motion should be denied in its entirety or, at a minimum, continued to the initial status conference in the Adversary Proceeding on March 12, 2019.

3.      To the extent that the Court determines that any of the Requested Discovery is permissible notwithstanding the "pending proceeding" rule, such Requested Discovery should be denied on the basis that it is burdensome, overbroad, unnecessary, and being elicited for the sole purpose of harassing the Debtors. First, there is nothing to investigate outside of the Adversary Proceeding because the Debtors have not done or proposed to do anything yet in these cases, other than preserving their assets through various customary forms of first day relief and retaining professionals to assist with this process. Further, there is no dispute that the Lender Parties are substantially oversecured based on the value of the Debtors' life insurance portfolio. The Lender Parties will be paid in full in these cases, to the extent of their ultimately allowed claims. The only question is when and how. The Debtors are working on the

answers to those questions right now, while also pursuing litigation against the Lender Parties to determine the extent, validity, and amount of their allowed claims.  Under these circumstances, there is no reason for the Lender Parties to engage in a broad-ranging fishing expedition through Rule 2004 discovery.[3]

4.    <u>Second</u>, there is no need for discovery separate from the Adversary Proceeding unless and until the Lender Parties actually file a motion seeking substantive relief and thereby commence a contested matter.  The Lender Parties have threatened for nearly two months now to file a motion to appoint a trustee or to dismiss these cases, but they have not done so.  Yet, they continue to argue in the pending Motion that there are conflicts of interest between the Debtors, Emergent Capital, Inc. ("<u>Emergent</u>") (the ultimate non-debtor parent), and Imperial Finance & Trading, LLC ("<u>Imperial Finance</u>") (a non-debtor sister company), and a lack of independent decision making amongst the Debtors, notwithstanding the fact that the Debtors' organizational structure was created as part of the original financing with the Lender Parties.  Perhaps the Lender Parties have not sought substantive relief because they realize that there is nothing unusual with a parent or other affiliates providing services to a subsidiary or sister company and receiving reimbursement for such services – this is a common corporate practice.  The Lender Parties also know that all material actions taken by Debtor White Eagle Asset Portfolio, LP ("<u>WEAP</u>"), the entity that holds the valuable life insurance portfolio at issue, are approved by an independent manager as required by the Loan Agreement itself.  Notably, the independent manager authorized the commencement of WEAP's bankruptcy case.  ***So, why have***

---

[3]  The Lender Parties challenge the basis for the Debtors' bankruptcy filings, but ignore the very real risk that the Debtors were facing prepetition in the event that the Lender Parties exercised their discretion to declare an event of default and exercise remedies, as they were permitted to do under the Loan Agreement.  Without any advance notice to the Debtors, the Lender Parties could have taken the position that a material adverse change had occurred to the value of the Debtors' life insurance portfolio based on extended life expectancies for applicable insureds.

***the Lender Parties chosen to seek almost limitless discovery under Rule 2004 when they
already believe that they have a basis to file a substantive motion?*** Given the timing, the true
reason must be to retaliate against the Debtors for filing the Adversary Proceeding and to harass
the Debtors with endless discovery, while taking the focus away from what is actually important
in these cases – determining the allowed amount of LNV's claim and consummating a plan.

5.      <u>Third</u>, the Lender Parties already know everything material that there is to
know about the Debtors' governance structure and operations. This governance structure was
implemented at inception of the original credit transaction with the Lender Parties and is
supposed to remain in place so long as any obligations remain outstanding to the Lender Parties.
The Debtors also have been completely transparent regarding the payment of administrative
obligations owing to Imperial Finance, which is the principal operating entity within Emergent's
organizational structure. As an example, the approved budget and final cash collateral order
entered in these cases just last month, both of which were in a form approved by the Lender
Parties, expressly authorized the Debtors to reimburse Imperial Finance for certain services
rendered to the Debtors during these chapter 11 cases.[4] These reimbursements to Imperial
Finance do not unfairly extract value from the Lender Parties (as the Lender Parties ominously
suggest), but rather merely satisfy (in part) the ongoing administrative overhead costs associated
with these cases – costs that the Lender Parties improperly refused to allow the Debtors to pay
prepetition. In fact, the Lender Parties have already conducted discovery into the Debtors'
intercompany relationships as part of the Lender Parties' cash collateral objection before the

---

[4] The Lender Parties suggest that the Debtors are conflicted because they initially sought to reimburse Imperial
Finance for more than what was ultimately settled upon as a consensual resolution. That is not evidence of a
conflict, but rather reflects the reality that the Debtors have no employees and rely on Imperial Finance to administer
these estates. In an effort to avoid needless and costly litigation, the Debtors agreed to reimburse Imperial Finance
for less than the amounts that are actually being incurred on the Debtors' behalf.

DOCS_SF:99381.4

parties agreed to resolve the issue with a consensual form of budget. There is nothing about the Debtors' relationship with their non-debtor affiliates that should come as a surprise to the Lender Parties. They are already intimately familiar with the Debtors' operations and corporate structure because they either consented to it or otherwise imposed it as part of the Loan Agreement, and they have already investigated it postpetition in the context of a cash collateral dispute.

6.      If the Lender Parties truly believe that conflicts and inadequate management are the reasons why the Lender Parties find themselves in these bankruptcy cases, then they can file a motion and seek the relief that they have been threatening now for nearly two months. The Debtors at least would then have the benefit of knowing the Lender Parties' allegations and the specific relief that they seek, and the parties could engage in targeted discovery as part of a specific contested matter. Under the circumstances here, however, a Rule 2004 examination is simply a waste of time and resources.[5]

## RELEVANT BACKGROUND

### A.      The Debtors' Bankruptcy Cases

7.      On November 14, 2018, Debtors White Eagle GP and Lamington Road Designated Activity Company commenced their chapter 11 cases in this Court. On December 14, 2018, Debtor WEAP commenced a chapter 11 case of its own. The Debtors' cases are jointly administered.

### B.      The Debtors' Organizational Structure

8.      The Debtors' organizational structure was created and implemented in order to effectuate the original financing with the Lender Parties. WEAP, Imperial Finance, and

---

[5]  The Motion seeks the production of documents within 15 days following the entry of an order approving the Motion. The Debtors object to such request on the basis that it provides insufficient time to respond.

the Lender Parties are each party to the Loan Agreement. WEAP is the sole borrower and obligor under the Loan Agreement. The remaining Debtors are pledgors of their equity interests in WEAP in favor of the Lender Parties, but are not liable in connection with any obligations under the Loan Agreement.

9.     Pursuant to the Loan Agreement and as a condition to the advances thereunder, the Lender Parties were required to receive the Debtors' various organizational documents *in form and substance acceptable* to the Lender Parties. Loan Agreement at § 7.1. The Loan Agreement further required WEAP to maintain its separate legal identity, which it has done. *Id*. at § 9.1(f). Emergent's involvement with WEAP was well known to the Lender Parties at the time. In fact, the Loan Agreement contains a covenant and associated event of default with respect to a "Cash Interest Coverage Ratio" that needed to be satisfied not by WEAP, but by Emergent. *Id*. at §§ 9.1(mm), 10.1(x).

C.     **WEAP Has an Independent Manager for Material Actions**

10.     As part of the organizational structure imposed on the Debtors by the Lender Parties through the Loan Agreement, Michelle A. Dreyer was appointed as the independent manager (the "Independent Manager") of White Eagle General Partner, LLC ("White Eagle GP"). Pursuant to WEAP's *Agreement of Limited Partnership* dated as of May 16, 2014 (the "WEAP Partnership Agreement"), neither WEAP nor White Eagle GP may take any material actions, including selling substantially all of WEAP's assets or commencing insolvency proceedings, without the prior unanimous written consent of White Eagle GP and the Independent Manager so long as WEAP's obligations under the Loan Agreement are outstanding. WEAP Partnership Agreement at § 5(a).

11.     The WEAP Partnership Agreement also required WEAP to "conduct its business and operations separate and apart from that of any other Person" while WEAP's obligations under the Loan Agreement are outstanding.  For example, section 5(b) of the WEAP Partnership Agreement requires WEAP to: (a) maintain separate accounts and financial statements and to "ensure all audited financial statements of any Person that uses consolidated financial statements to include [WEAP] contain notes clearly stating that (1) all of [WEAP's] assets are owned by [WEAP] and (2) [WEAP] is a separate entity"; (b) avoid commingling or pooling of its funds or assets with those of any other entity; (c) hold its assets in its own name; (d) conduct business in its own name; and (e) "maintain an arm's length relationship with its Affiliates."

12.     In November and December 2018, after substantial consultation and diligence, and based upon the advice of her own counsel, the Independent Manager authorized the bankruptcy filings of White Eagle GP and WEAP.

**D.     The Cash Collateral Dispute and Subsequent Order**

13.     On December 13, 2018, the Debtors filed their *Motion for Entry of Interim and Final Orders (a) Authorizing the Use of Cash Collateral, (b) Providing Adequate Protection, (c) Modifying the Automatic Stay, and (d) Scheduling a Final Hearing* [Docket No. 7] (the "Cash Collateral Motion").  This Court entered an interim order approving the Cash Collateral Motion on December 17, 2018 [Docket No. 37].

14.     On January 11, 2019, the Lender Parties filed a preliminary objection [Docket No. 61] to entry of a final order approving the Cash Collateral Motion.  The Lender Parties argued many of the same issues raised in the pending Motion, including that: (a) these

cases were filed to serve Emergent's interests; (b) the Debtors have no independent management; and (c) the payments to Imperial Finance are for Emergent's benefit.

15.     In connection with the foregoing objection, the Lender Parties served extensive discovery on the Debtors, including 23 document requests seeking, among other items, audit reports, tax returns, service agreements between WEAP and Imperial Finance, office leases, vendor agreements and invoices, professional retention agreements and invoices, employment agreements, wage and salary information, health insurance and 401(k) expenses, all other benefit costs incurred by Imperial Finance and charged to White Eagle, and all relevant budgets and draft budgets for WEAP.  The discovery was so broad that the Lender Parties basically sought all of the Debtors' books and records.

16.     In response to these document requests, the Debtors objected to the scope of the Lender Parties' requests, but ultimately produced over 800 pages of responsive documents, including audit reports, vendor invoices, attorney engagement letters, and related attorney invoices.

17.     On January 15, 2019 – *only three weeks ago* – the Court entered its *Final Order (a) Authorizing the Use of Cash Collateral, (b) Providing Adequate Protection, and (c) Modifying the Automatic Stay* [Docket No. 81] (the "Cash Collateral Order").  Pursuant to the Cash Collateral Order, which was approved by the Lender Parties as part of a consensual resolution, the Debtors were authorized to pay the overhead and operating costs of Imperial Finance in accordance with an agreed budget.  As part of the resolution with the Lender Parties, the Debtors agreed to reimburse substantially less to Imperial Finance than the amounts that are actually being incurred on the Debtors' behalf.  The projected disbursements to Imperial Finance are reflected in a separate line item in the budget and, as part of the compromise with the Lender

Parties, the Debtors are not permitted any variance with respect to the aggregate weekly budgeted amounts payable to Imperial Finance. *See* Cash Collateral Order at ¶ 6.

**E.     The Adversary Proceeding**

18.     On January 25, 2019, the Debtors and Emergent filed a complaint (the "Complaint") in this Court against, among others, LNV, thereby commencing an adversary proceeding (Case No. 19-50096, the "Adversary Proceeding").

19.     As set forth in the Complaint, the Debtors assert, among other things, that: (a) LNV undervalued WEAP's policy portfolio by improperly reducing the loan-to-value ratio under the Loan Agreement and preventing WEAP from receiving any proceeds generated from its own assets; (b) LNV imposed usurious fees on WEAP under the Loan Agreement for unnecessary portfolio services at inflated prices; (c) LNV maintained significant control over WEAP under the Loan Agreement, resulting in a *de facto* joint venture, and LNV breached its fiduciary duty when it siphoned cash from the joint venture for its own benefit and to the detriment of WEAP; and (d) the portion of LNV's claim against WEAP for an original issue discount should be disallowed.

20.     Accordingly, much like the Requested Discovery in the Motion, the Adversary Proceeding involves the circumstances surrounding the Loan Agreement, valuation, ownership and control of the Debtors, and the transfer of funds to non-debtors.

## OBJECTION

**A.     Discovery is Not Permitted Under the "Pending Proceeding" Rule**

21.     The well-established "pending proceeding" rule provides that "once an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004." *In re Enron Corp.*, 281 B.R. 836, 840

(Bankr. S.D.N.Y. 2002) (collecting cases); *see also In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996) ("The well-recognized rule is that once an adversary proceeding or contested matter has been commenced, discovery is made pursuant to [Rule 7026] rather than by [Rule 2004] examination"); *In re Comdisco, Inc.*, 2006 WL 2375458, at *6–7 (N.D. Ill. Aug. 14, 2006) ("Rule 2004 is a pre-litigation discovery device for bankruptcy proceedings, and when an adversary proceeding or contested matter has commenced, discovery must be made pursuant to the Federal Rules."); *In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("The cases are in agreement that once an adversary proceeding is in progress a creditor/party does not have a right to a 2004 examination.").

22.     Examinations conducted pursuant to Rule 2004 provide fewer procedural protections than the civil discovery process and have been likened to "fishing expeditions" and "inquisitions."    *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 516 (Bankr. E.D.NY 1991). Accordingly, the "pending proceeding" rule acknowledges the diminished nature of a Rule 2004 examinee's rights and reflects a "concern that a party to litigation could circumvent his adversary's rights by using Rule 2004 rather than civil discovery to obtain documents or information relevant to the lawsuit." *Enron Corp.,* 281 B.R. at 841; *In re Washington Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009) (parties may not use Rule 2004 examinations "to circumvent the safeguards and protections of the Federal Rules of Civil Procedure.").

23.     While the existence of a pending proceeding does not place a blanket prohibition on Rule 2004 examinations, courts universally acknowledge that such examinations should not be used in connection with entities affected by, or issues pending in, a proceeding subject to the Federal Rules of Civil Procedure. *In re L.L. Murphrey Co.*, 2012 WL 4855355, at *2 (Bankr. E.D.N.C. Oct. 11, 2012); *see also In re 2435 Plainfield Ave.*, *Inc.*, 223 B.R. 440, 456

(Bankr. D.N.J. 1998) ("[T]his court holds that where a party seeks to depose another party or a witness on an issue which is the subject of a pending adversary proceeding, the examination cannot be conducted pursuant to Rule 2004, but must be conducted pursuant to the Federal Rules of Civil Procedure.").

24.     This Court has explained that where "a party requests a Rule 2004 examination and an adversary proceeding . . . is pending between the parties, the relevant inquiry is whether the Rule 2004 examination will lead to discovery of evidence related to the pending proceeding or whether the requested examination seeks to discover evidence unrelated to the pending proceeding." *Washington Mut.,* 408 B.R. at 51.

25.     In other words, a Rule 2004 examination may not be used to obtain discovery of evidence related to other pending litigation.  However, that is exactly what the Lender Parties seek to accomplish through the pending Motion.  The Requested Discovery attempts to elicit information relevant to the Loan Agreement that is the focus of the Adversary Proceeding.  Both the Requested Discovery and the allegations in the Adversary Proceeding revolve around the same thing:  what wrongful acts may have been committed by the other party in connection with the Loan Agreement.

26.     The Requested Discovery seeks, among other things: (a) documents relating to the Debtors' sale and refinancing efforts to repay the obligations under the Loan Agreement, (b) documents relating to the value of the Debtors' assets underlying the Loan Agreement, (c) documents evidencing the transfer of funds among affiliates to the extent prohibited by the Loan Agreement, (d) documents identifying directors, officers, managers, and employees of the Debtors, (e) documents relating to the decision to commence these chapter 11 cases, and (f) documents that form the basis for the Debtors' decision to commence the

Adversary Proceeding and the various allegations contained in the Complaint itself. *See*, *e.g.*, Document Request Nos. 4, 6, 7, 8, 10, 11, 12, 23, 24, 27, 28, 29, 30, and 31.

27. Along similar lines, as discussed above, the Debtors assert in the Complaint that LNV: (a) undervalued WEAP's policy portfolio by improperly reducing the loan-to-value ratio under the Loan Agreement and preventing WEAP from receiving any proceeds generated by its own assets; (b) imposed usurious fees on WEAP under the Loan Agreement for unnecessary portfolio services at inflated prices; and (c) maintained significant control over WEAP through the Loan Agreement, resulting in a *de facto* joint venture, and breached LNV's fiduciary duty when it siphoned cash from the joint venture for its own benefit and to the detriment of WEAP. *See* Complaint at ¶¶ 2, 3, 4, 6, 30, 33, 37, 39, 40, and 41. Accordingly, the Motion is a poorly veiled attempt by the Lender Parties to improperly invoke Rule 2004 to obtain information that might support a defense against, or otherwise undermine, the claims asserted in the Adversary Proceeding.

28. If there is a material risk that a requested Rule 2004 examination will delve into issues relating to other pending litigation, then the court should deny such request, even where the requesting party has assured the court that it will avoid issues related to the pending proceeding. For example, in *Bennett Funding,* the trustee who filed a motion requesting a Rule 2004 examination represented to the court that "he does not seek discovery on matters pled in the Adversary Complaint." 203 B.R. at 29. However, the court denied the request because "it is difficult at this point, if not impossible, to determine whether and to what extent information gleaned from [the requested Rule 2004 examination] . . . will not be related to the parties and subject matter covered by the Amended Complaint" and "even a carefully crafted examination . . . by the Trustee could not avoid delving into issues regarding the other

13

defendants and subject matter covered in the extensive Amended Complaint." *Id.* at 28. The court concluded:

> It appears then that [the entity sought to be examined] and the parties and subject matter of the Amended Complaint are not easily separable because of the complex relationship between them, and the Court recognizes that use of a Fed. R. Bankr. P. 2004 examination would unavoidably and unintentionally create a back door through which the Trustee could circumvent the limitations of Fed. R. Bankr. P. 7026 *et seq*., which are properly applied in this instance.

29.    Here, it is a certainty that the breadth of information and testimony solicited from the Debtors by the Lender Parties pursuant to the Rule 2004 will delve into issues concerning the Adversary Proceeding. Accordingly, pursuant to the "pending proceeding" rule, a Rule 2004 examination on these topics is impermissible and the Motion should be denied in its entirety on this basis alone.

**B.    The Requested Discovery is Burdensome, Unnecessary, Retaliatory, and Designed to Harass the Debtors**

30.    Even if the Court were to determine that the "pending proceeding" rule does not apply to some of the Requested Discovery, it is well established that parties do not have an absolute right to a Rule 2004 examination and such examination is subject to the discretion of the court. *See*, *e.g.*, *Bennett Funding*, 203 B.R. at 28. In exercising this discretion, courts must balance "the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *Drexel Burnham*, 123 B.R. at 712. Although the scope of an examination under Bankruptcy Rule 2004 may be broad, it is not without limits. An examination under Rule 2004 must be both relevant and reasonable and should not encompass matters that will be unduly burdensome to the examinee. *In re Symington*, 209 B.R. 678, 684 (D. Md. 1997). Further, a Rule 2004 examination may not be used for the purpose of abuse or harassment. *Wash. Mut.*, 408 B.R. at 50.

14

31.     The Requested Discovery is burdensome, containing 35 document requests and seeking to depose three of the Debtors' representatives on substantially similar topics.  The Document Requests are overbroad and would lead to the production of thousands of trivial documents, including substantially all of the Debtors' books and records.  For example, Document Request No. 8 asks for "[a]ll Documents related to or otherwise evidencing the Debtors' operating expenses."  The Debtors would need to produce every vendor invoice and related correspondence for the past two years to respond to this Document Request.

32.     The Requested Discovery is also unnecessary.  It is targeted to elicit information regarding the corporate and contractual relationships between the Debtors and their non-debtor affiliates.  However, documents relevant to this inquiry have already been produced to the Lender Parties in connection with the litigation concerning the Cash Collateral Motion, which the parties then proceeded to resolve.  The Lender Parties now ask for more discovery on topic areas that substantially overlap with the cash collateral dispute and right after the Adversary Proceeding was filed.  That makes no sense and is completely unnecessary.

33.     As discussed above, the Lender Parties are substantially oversecured and will be paid in full in these cases, to the extent of their ultimately allowed claims.  The Debtors are currently focused on effectuating a reorganization that will satisfy the Lender Parties' claims while, at the same time, maintaining the Debtors' valuable life insurance portfolio for the benefit of all constituents.  There is no reasonable basis for the Lender Parties to engage in a fishing expedition through discovery at this stage of these cases.

34.     The Lender Parties already know how the Debtors are operated – in fact, the Debtors' organizational structure was implemented as part of the consummation of the original loan transaction with the Lender Parties.  In this regard, there is nothing unusual in a

15

parent (Emergent) or other affiliates (Imperial Finance) providing services to a subsidiary or sister company and receiving reimbursement for such services.  The debtors are also independently managed when it comes to the taking of material actions.  In fact, the Independent Manager holds her position with White Eagle GP and WEAP because the Lender Parties required her to be in place so long as obligations under the Loan Agreement remain outstanding.  The Independent Manager did her job by diligently evaluating, with the assistance of her own counsel, whether White Eagle GP's and WEAP's bankruptcy filings were in the best interests of creditors and other parties in interest.  She ultimately decided that they were.

35.    The Lenders are also well-versed in the Debtors' financial situation.  Both prepetition and during the course of these cases, the Debtors have been completely transparent with the Lender Parties regarding the use of cash collateral and the transfer of any funds to Imperial Finance, which is the principal operating entity within Emergent's organizational structure.  As an example, the approved budget and final cash collateral order entered in these cases just last month, and approved by the Lender Parties, expressly authorized the Debtors to reimburse Imperial Finance for certain services rendered for the benefit of the Debtors during these cases.  These reimbursements to Imperial Finance satisfy (in part) the administrative overhead associated with these cases, and the Lender Parties have already conducted discovery into such matters in the context of their cash collateral objection.

36.    Under these circumstances, it would be an unnecessary distraction and a waste of estate resources to allow the requested Rule 2004 examinations to go forward because there would not be any appreciative benefit to the Lender Parties and only significant cost, delay, and distraction incurred by the Debtors.  As explained by one court, the "examination should not

16

be so broad as to be more disruptive and costly to the party to be examined than beneficial to the party seeking discovery." *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989).

37.     Finally, the timing of the Requested Discovery is not coincidental.  The Motion was filed only five (5) days after the Debtors commenced the Adversary Proceeding against LNV and others.  The Motion is nothing more than a thinly veiled retaliatory filing designed to harass the Debtors.  As noted above, all pertinent documents and facts are already in the possession of the Lender Parties, and certainly the Lender Parties have sufficient facts to file their threatened substantive motion if that is the way that they choose to go (which motion the Debtors would of course contest, but at least there would be a discrete contested matter to fight about).

38.     For the foregoing reasons, the Debtors respectfully request that the Motion be denied to prevent the Lender Parties from unduly harassing them with unnecessary and burdensome discovery.

**C.     The Debtors' Bankruptcy Cases Were Commenced in Good Faith**

39.     The Lender Parties allege that these cases were filed "solely to pursue a two-party dispute without any legitimate reorganization rationale."  However, there is a clear reorganization rationale here – the Debtors seek to preserve and maximize the value of their life insurance portfolio for all constituents and not just for the benefit of the Lender Parties.

40.     The Lender Parties assert that there is an inherent conflict between the interests of the Debtors and their non-debtor parent, Emergent, even though the Lender Parties were well aware of Emergent's involvement since the inception of the parties' credit relationship.  The Loan Agreement even contains a "Cash Interest Coverage Ratio" that needed to be satisfied not by WEAP, but by Emergent.  Loan Agreement at §§ 9.1(mm), 10.1(x). Pursuant to the Motion, the Lender Parties seek, among other topics, discovery regarding the

17

decision to commence these cases. ***But what is the conflict in all parties wanting to maximize value in the context of a solvent estate?*** Indeed, where a solvent debtor files bankruptcy to maximize the value of the enterprise, a bankruptcy filing is not in bad faith. *In re Liberate Techs.*, 314 B.R. 206, 212 (Bankr. N.D. Cal. 2004) (citing *In re Johns-Manville Corp.*, 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984)). Moreover, Delaware law requires that directors of a solvent corporation consider the interests of the shareholders in exercising their fiduciary duties. *In re General Growth Properties*, 409 B.R. 43, 64 (Bankr. S.D.N.Y. 2009) ("Delaware law in turn provides that the directors of a solvent corporation are authorized -- indeed, required -- to consider the interests of the shareholders in exercising their fiduciary duties.").

41.     In *General Growth Properties*, the independent managers of special purpose entities – similar to the structure here – authorized the filing of bankruptcy cases of solvent subsidiaries. Although the applicable operating agreements directed the independent managers to consider only the interests of the entity, including its creditors, the court found that Delaware law did not permit the independent managers to consider only the interests of the secured creditor or that there would be a breach of fiduciary duty on the part of any of the managers by voting to file based on the interests of equity. *Id.*

42.     Here, the Debtors commenced these cases to prevent the Lender Parties from stripping the Debtors of their interests in a valuable portfolio of life insurance policies by declaring a default under the Loan Agreement. The Debtors were justifiably concerned given the Lender Parties' bad faith actions in the past, such as chronically undervaluing the Debtors' assets in calculating the loan-to-value ratio under the Loan Agreement, which is an issue raised in the Adversary Proceeding. The mere filing of these cases is no basis for the Lender Parties to engage in limitless discovery.

43.    To the extent that the Lender Parties truly believe that conflicts, inadequate management, or any other reasons are the basis for particular substantive relief, then they can file such motion, the Debtors will respond to it, and the parties can engage in targeted discovery on the disputes at issue.  Until that happens, however, a Rule 2004 examination is simply a waste of time and money.

## D.    The Motion Should Be Continued to the Initial Status Conference

44.    The initial status conference in the Adversary Proceeding is currently scheduled for March 12, 2019.  The Debtors intend to serve discovery on LNV and the other parties to the Adversary Proceeding pursuant to Rule 26 of the Federal Rules of Civil Procedure. In the event that this Court is not inclined to deny the Motion outright, the Debtors request that the Court continue the hearing on the Motion to March 12, 2019, so that all discovery issues amongst the parties may be addressed at once.

## CONCLUSION

45.    Based on the foregoing, the Debtors urge the Court to deny the Motion and the Requested Discovery or, at a minimum, continue the Motion to the initial status conference in the Adversary Proceeding.

DOCS_SF:99381.4

Dated: February 7, 2019                PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*

Richard M. Pachulski (CA Bar No. 62337)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box. 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
E-mail:          rpachulski@pszjlaw.com
                 ikharasch@pszjlaw.com
                 mlitvak@pszjlaw.com
                 crobinson@pszjlaw.com

*Proposed Counsel to the Debtors*