## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | Case No. 18-12808 (KG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 53** |

### OBJECTION OF CLMG CORP. AND LNV CORPORATION TO DEBTORS' APPLICATION PURSUANT TO SECTION 327(e) OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF KASOWITZ BENSON TORRES LLP, AS SPECIAL LITIGATION COUNSEL TO THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE

CLMG Corp. ("CLMG") and LNV Corporation ("LNV" and, together with CLMG, the "Lender Parties"), as administrative agent and sole lender, respectively, under the Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), submit this objection (the "Objection") to the *Debtors' Application Pursuant to Section 327(e) of the Bankruptcy Code for an Order Authorizing the Retention and Employment of Kasowitz Benson Torres LLP, as Special Litigation Counsel to the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 53] (the "Application") and respectfully state as follows:

### PRELIMINARY STATEMENT

1.     Debtor White Eagle Asset Portfolio LP ("White Eagle") has an overwhelming conflict of interest with its ultimate parent, non-Debtor Emergent Capital, Inc.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, where applicable, include:  White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738).  The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

("Emergent").  Emergent is in danger of default on its own independent debt obligations and wants to access cash at White Eagle to satisfy those obligations and avoid a bankruptcy case of its own.  White Eagle, on the other hand, should have a strong incentive to use its funds to pay down debt under the Loan Agreement and thereby create additional borrowing capacity for its business.  This incentive should be particularly compelling because White Eagle derives its income from life settlement assets with cash flows that are uneven, are difficult to predict, and can easily result in liquidity issues if such cash flows are insufficient to cover operating expenses.[2]  However, White Eagle paying down its debt reduces the amount of cash that would otherwise be available to potentially distribute to Emergent.  On the other hand, cash transferred by White Eagle to Emergent and used to pay expenses that exclusively benefit Emergent (such as Emergent's independent debt obligations or the costs of maintaining Emergent's status as a public company) is value lost at White Eagle with nothing in return.  In sum, what is good for Emergent often is not good for White Eagle and what is good for White Eagle often is not good for Emergent.

2.      This conflict is central to the filing of these chapter 11 cases (the "Chapter 11 Cases"), which have no legitimate rehabilitative purpose, and were filed because of Emergent's inability to extract cash from White Eagle without causing a default under the Loan Agreement.[3] Emergent is now using the Debtors as its conduit to pursue what is effectively a two-party dispute between Emergent and the Lender Parties in the Chapter 11 Cases in an attempt to rewrite the terms of the Loan Agreement (to which Emergent is not even a party).  Emergent is

---

[2]     *See Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration"), ¶ 7.

[3]     It defies credulity to suggest, as the Debtors have, that these Chapter 11 Cases were filed for fear that the Lender Parties would declare an event of default under the Loan Agreement that the Debtors have never identified and that the Lender Parties never asserted.

thereby taking advantage of these unnecessary Chapter 11 Cases, which Emergent has kept itself out of, and foisting the costs and risks thereof upon the Debtors' estates. And, as if that were not offensive enough, by the Application, Emergent is now forcing the Debtors to seek to pay for half of the professional expenses associated with that litigation.

3.    White Eagle, for its part, has no ability to push back on Emergent's demands as it has no employees or decision-making ability of its own. That dynamic is exemplified by the filing of these Chapter 11 Cases, given that White Eagle always paid its debts as they came due prepetition and never purported to have any liquidity issues.[4] Indeed, the Debtors' and Emergent's filings state that White Eagle is solvent.[5] And the Lender Parties never asserted a default under the Loan Agreement – it was Emergent that caused an unquestionable default under the Loan Agreement by pushing White Eagle's limited partner and general partner into bankruptcy. Even after the occurrence of that default, the Lender Parties agreed to provide a protective advance to White Eagle prepetition, demonstrating the Lender Parties' commitment to ensuring that their collateral is properly preserved. Nevertheless, the Debtors filed these Chapter 11 Cases, thus cutting off White Eagle's ability to borrow under the Loan Agreement and jeopardizing its own liquidity and economic stability (which was never an issue prepetition). The disparity between what is beneficial for White Eagle and the actions it has taken to date at Emergent's behest further demonstrates the conflict of interest that exists between White Eagle and Emergent.

---

[4]    *See Complaint* [Docket No. 90] (the "Adversary Complaint"), ¶ 67 ("Plaintiffs have performed and are ready, willing, and able to continue to perform their obligations under the Loan Agreement.").

[5]    *See, e.g.,* Adversary Complaint, ¶ 5.

4.    The Application, in which the Debtors seek to retain Kasowitz Benson Torres LLP ("Kasowitz"), as special litigation counsel to represent both the Debtors and Emergent in litigation against the Lender Parties pursuant to the Adversary Complaint filed on January 25, 2019, exemplifies this conflict.   The Debtors anticipate that this litigation will address the material issues in the Chapter 11 Cases.[6]   Accordingly, now that the Adversary Complaint has been filed, it is anticipated that the related litigation will become the primary event in these Chapter 11 Cases and is the Debtors' sole objective in these Chapter 11 Cases.   The role proposed to be played by Kasowitz in representing both the Debtors and Emergent in the litigation is, therefore, fundamental to the conduct of these Chapter 11 Cases and Kasowitz's proposed retention as special counsel under section 327(e) of the Bankruptcy Code is improper. Instead, the Application should be considered under section 327(a) of the Bankruptcy Code, which requires that a professional be disinterested and not hold or represent an interest that is adverse to the debtor's estate.

5.    Kasowitz's proposed retention as counsel to the Debtors and Emergent is fraught with conflicts that warrant denial of the Application, whether considered under section 327(a) or 327(e) of the Bankruptcy Code.   First, the conflict between Emergent and White Eagle taints the Application.   Emergent, desperate to solve its own liquidity problems and service its independent debt obligations, will be incentivized to pursue litigation strategies (including those with a low probability of success) that, if successful, would result in Emergent being able to move cash out of White Eagle's estate.   On the other hand, because it has no decision-making abilities of its

---

[6]    *See* First Day Declaration, ¶¶ 16, 21; Dec. 17, 2018 Hr'g Tr. [Docket No. 50] (the "First Day Hr'g Tr.") at 18:17-21 ("What's going to happen in this case if we can't get it resolved is we are going to propose a plan that will pay off the LNV in full, based on whatever claim Your Honor determines is going to be the case after a determination of the complaint.").

4

own, White Eagle will be forced by Emergent to pursue claims that are without merit and that may provide no benefit to White Eagle but which would benefit Emergent (e.g., seeking to equitably subordinate the claims of the Lender Parties). Second, there is a conflict in connection with any settlement discussions related to the litigation, as Emergent will likely be unwilling to support a resolution that would result in White Eagle being able to emerge and continue to maintain its portfolio of life insurance policies outside of bankruptcy but that does not result in cash being diverted to Emergent in a manner that resolves Emergent's independent issues. Third, Emergent has paid Kasowiz's retainer, which further suggests that Kasowitz has an incentive to pursue Emergent's interests, rather than White Eagle's. Given these actual and potential conflicts of interest, Kasowitz cannot represent both Emergent and the Debtors (including White Eagle) in connection with the litigation asserted in the Adversary Complaint and, as such, the Application should be denied.

6.    Finally, there are other infirmities with respect to the Application that warrant denial. The Application proposes that Emergent advance professional fees for Kasowitz and that the Debtors ultimately pay a 50% share of such fees. The Application argues that this will not result in the use of cash collateral but, so long as the Loan Agreement remains outstanding, cash collateral is the only available source of funding for the sizeable administrative claims Kasowitz would accrue during the Chapter 11 Cases. Ultimately, this arrangement constitutes either an additional use of cash collateral under section 363 of the Bankruptcy Code or postpetition financing under section 364 – in either case, the Debtors have not made the requisite showing required for approval. The Application also fails to disclose the Kasowitz engagement letter and whether Kasowitz has any compensation arrangements with Emergent other than as set forth in the Application and, therefore, the Application fails to satisfy the requirement of Federal Rule of

Bankruptcy Procedure 2014(a), which requires "any proposed arrangement for compensation" to be disclosed in a retention application.  Additionally, the proposed order attached as an exhibit to the Application would approve the retention by the Debtors of Kasowitz under section 327(e) and section 328(a).  This is entirely improper, as no showing with respect to section 328(a) was made in the Application, nor is it appropriate for section 328(a) to be incorporated in an order granting the Application as it wrongly implies that the payment of Kasowitz's fees by the Debtors are approved in advance.  For each of these reasons alone, the Application should be denied.

## BACKGROUND

7.    White Eagle is a special purpose entity formed by its indirect parent, Emergent, to acquire and hold life insurance policies.  White Eagle obtained the funds necessary to purchase and maintain these policies with the approximately $367.9 million loaned by LNV under the Loan Agreement.  As security for the obligations under the Loan Agreement, the Lender Parties were granted first priority liens and security interests on, among other things, substantially all of White Eagle's assets, including White Eagle's interests in its life insurance policies and the proceeds therefrom, and all other cash held by White Eagle.[7]  The Loan Agreement also provides LNV with an Aggregate Participation Interest (as defined in the Loan Agreement) equal to 45% of the revenue generated by White Eagle's life insurance portfolio (after interest, expenses, and required amortization has been paid).  As is typical for special purpose entities, the Loan

---

[7]    *See* First Day Declaration, ¶12.

Agreement is the only permitted debt at White Eagle and White Eagle has no other secured debt and minimal other purported unsecured claims.[8]

8.      White Eagle has no employees of its own.[9]  White Eagle's only purported officer is Miriam Martinez, who is also the chief financial officer of Emergent.[10]  The other two Debtors are White Eagle's limited partner and general partner, which are holding companies with no operations of their own and were primarily put in place for Emergent's tax benefit.

9.      Emergent, formerly known as Imperial Holdings, Inc., is a public corporation.[11] Emergent's only material source of revenue is currently from its indirect equity interests in White Eagle.[12]  Emergent has its own independent debt obligations consisting of over $114 million of notes.[13]  Emergent is currently experiencing a liquidity crisis and is in danger of defaulting on its obligations under its notes.[14]  As a result, in December 2018, Emergent entered into a supplemental indenture for certain of its outstanding notes that provides an election for the holders of such notes to receive interest in kind (i.e., applied to principal) to prevent what would otherwise be a payment default under such notes.[15]

---

[8]     See White Eagle's *Summary of Assets and Liabilities* [Docket No. 62] (scheduling $701,920.36 in unsecured claims belonging to creditors that are neither an insider nor one of the Lender Parties).  The Lender Parties reserve all rights with respect to such purported claims, including as to their amount and as to their status as a claim and recharacterization to equity.

[9]     First Day Declaration, ¶ 9.

[10]    *Id.* ¶ 1.

[11]    See Emergent Capital, Inc., Annual Report (Form 10-K) (Mar. 14, 2018), at 1, 13, 15.

[12]    See Adversary Complaint, ¶ 23 ("Emergent's primary business is to act as a holding company for its indirect interests in White Eagle and White Eagle's portfolio of life insurance policies.").

[13]    See Emergent Capital, Inc., Current Report (Form 8-K) (Aug., 1, 2017); Emergent Capital, Inc., Current Report (Form 8-K) (Feb. 5, 2019).

[14]    See Emergent Capital, Inc., Quarterly Report (Form 10-Q) (Nov. 16, 2018), at 9-10 (Emergent's cash balance "create[s] a substantial doubt of the Company's ability to meet [its] financial needs").

[15]    See Emergent Capital, Inc., Current Report (Form 8-K) (Dec. 14, 2018).

10.     In July 2017, PJC Investments, LLC, Emergent's current largest shareholder, and certain other parties acquired Emergent.[16]   Shortly thereafter, a representative of Emergent approached the Lender Parties with a series of requests for amendments to the Loan Agreement, allegedly to provide White Eagle with the necessary flexibility to continue as a going concern and service its portfolio of insurance policies.   As these negotiations progressed, it became clear that the proposed amendments were not for the benefit of White Eagle, which did not need the proposed amendments in order to continue its business.   Rather, the proposed amendments were intended to benefit Emergent by, among other things, reducing the Participation Interest and allowing cash at White Eagle to be upstreamed to Emergent.

11.     Kasowitz was, according to the Application, initially retained by Emergent and the Debtors on October 18, 2018 to prosecute a lawsuit against LNV and unaffiliated defendants.[17]   Prosecuting that lawsuit is the Debtors' intended plan for running these Chapter 11 Cases.[18]   The Debtors filed that complaint on January 25, 2019.   In the Adversary Complaint, the Debtors assert causes of action against LNV for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, civil conspiracy, recharacterization of debt as equity, seeking a declaratory judgment that the Participation Interest

---

[16]   *See* Emergent Capital, Inc., Current Report (Form 8-K) (July 28, 2017).

[17]   Kasowitz's engagement letter was not filed with its Application, nor was a copy of it produced in connection with ongoing discovery related to the Debtors' use of cash collateral, despite the engagement letters of numerous other firms to be retained by the Debtors being produced.   The Lender Parties reserve all rights to further object to the Application if it becomes apparent that Kasowitz did not, in fact, represent the Debtors prepetition and, thus, cannot be retained under section 327(e) as a result.   *See* 11 U.S.C. § 327(e) (requiring that any counsel to be retained thereunder to be, among other things "an attorney that has represented the debtor"); *Meespierson Inc. v. Strategic Telecom*, 202 B.R. 845 (D. Del. 1996) (refusing to retain proposed counsel under section 327(e) because such counsel did not previously represent the debtor); *Pa. Water Works Supply Co. v. Bucks Cty. Bank & Tr. Co.*, No. 91-2814, 1991 U.S. Dist. LEXIS 11610, at *5 n. 2 (E.D. Pa. Aug. 19, 1991) (refusing to apply section 327(e) where attorney did not represent the debtor before bankruptcy).

[18]   First Day Declaration, ¶¶ 16, 21; First Day Hr'g Tr. at 13:10-12, 18:17-21.

under the Loan Agreement either resulted in unmatured original issue discount or constitutes

contingent interest, and equitable subordination.[19]

12.     Before filing the Adversary Complaint, the Debtors filed the Application seeking

authorization to retain Kasowitz as "special litigation counsel" pursuant to section 327(e) of the

Bankruptcy Code to prosecute the related litigation.  The Debtors propose that their estates pay

half of Kasowitz's fees and expenses and Emergent pay the other half, with Emergent advancing

the Debtors' share during the Chapter 11 Cases, and that the Debtors would not be liable for

services provided solely on behalf of Emergent.[20]  The Debtors imply that this arrangement will

not require the use of the Lender Parties' cash collateral.[21]

## OBJECTION

### I.     The Application Should Be Reviewed Under Section 327(a)

13.     Section 327(a) of the Bankruptcy Code allows a debtor "with the court's

approval" to employ attorneys "that do not hold or represent an interest adverse to the estate, and

that are disinterested persons."  11 U.S.C. § 327(a).  The term "disinterested person" includes a

person that "(A) is not a creditor, an equity holder, or an insider . . . and (C) does not have an

interest materially adverse to the interest of the estate or of any class of creditors or equity

security holders, by reason of any direct or indirect relationship to, connection with, or interest

in, the debtor, or for any other reason."  11 U.S.C. §101(14).  Section 327(a) sets forth a higher

standard than section 327(e) of the Bankruptcy Code, which allows a debtor to employ special

counsel under certain circumstances.  Indeed, section 327(e) of the Bankruptcy Code provides

---

[19]     Adversary Complaint, ¶¶ 65-86, 93-122.

[20]     Application, ¶¶ 26-27.

[21]     *Id.* ¶ 27.

9

that it can be utilized only, among other things, if the proposed counsel is to be retained "other than to represent the trustee in conducting the case."

14.     There is no accepted definition of the phrase "conducting the case." *Stapleton v. Woodworkers Warehouse, Inc. (In re Woodworkers Warehouse, Inc.)*, 323 B.R. 403, 406 (D. Del. 2005).   In assessing this standard, the court in *Woodworkers Warehouse* analyzed the qualitative (*i.e.*, importance to the case) and quantitative (*i.e.*, time devoted to the specialized task) aspects of the work to be performed compared to the debtor's primary counsel. *Id.* at 407-08.

15.     The Application is similar to the one analyzed in *In re Argus Group 1700*, where the court held that counsel sought to be retained as special litigation counsel had to meet the section 327(a) standard.   199 B.R. 525, 531 (Bankr. E.D. Pa. 1996).   The debtor and its co-debtor general partner sought to retain a law firm under section 327(e) that had, prior to the bankruptcy filing, represented the debtors, their sole stockholder and the father of the stockholder (who served as financial consultant to the debtors) in connection with lawsuits asserted by and against such parties in federal and state court versus a limited partner of the main debtor. *Id.* at 527. The debtors' purported rationale for filing for bankruptcy was the costs of that litigation. *Id.* The counterparty to the lawsuit objected to the application to retain the law firm, arguing that the scope of the proposed representation was so broad as to require applying the standards of section 327(a). *Id.* at 530.   Addressing cases where the scope of proposed counsel was deemed broad enough to require satisfaction of section 327(a), the court stated as follows:

> At first blush, it would appear that the contemplated role of the [law firm] does not fall within the proscriptions of the foregoing cases.   The [law firm] is simply needed, according to the Debtors, to pursue the [litigation], and § 327(e) was expressly enacted to allow existing counsel to continue pending litigation post-bankruptcy notwithstanding its lack of disinterest. ***The problem with this***

10

> ***analysis is that the [litigation] is the bankruptcy case. There are no other
> creditor problems. . . . If there is any point to this bankruptcy proceeding, we
> fail to discern what it is. To the extent there is any bankruptcy purpose for this
> case . . . it seems, by Debtors' counsel's own statement to revolve around the
> [litigation]. Given that the role of litigation is preeminent in these cases,
> litigation counsel, not bankruptcy counsel, is the primary legal adviser.*** Indeed
> we see a very little role for bankruptcy counsel if the [law firm] is employed.
> ***Accordingly, we believe the more rigorous standards of § 327(a) should be
> applied.***

*Id.* at 530-31 (emphasis added).

16.    Here, just as in *In re Argus Group 1700*, the Debtors are seeking to retain
Kasowitz to represent them in litigation, the pursuit of which the Debtors have stated is the
planned course of action in these Chapter 11 Cases. And, similarly, there are no other issues
present in these Chapter 11 Cases other than the two-party dispute between Emergent and the
Lender Parties. There are no other material creditors in these Chapter 11 Cases given that there
are no secured creditors other than the Lender Parties and the Debtors allege only approximately
$702,000 of non-insider unsecured claims. With the Adversary Complaint now filed, the
Debtors' and Emergent's lawsuit is the central event in the Chapter 11 Cases. Kasowitz would
effectively be conducting the Chapter 11 Cases, both qualitatively and quantitatively. The
Application, therefore, must satisfy the requirements of section 327(a) of the Bankruptcy Code.

## II.    The Application Should Be Denied Under Section 327(a)

17.    Properly reviewed under section 327(a) of the Bankruptcy Code, the Application
does not, and cannot, meet the requirements for retention because Kasowitz's representation of
Emergent is materially adverse to the interests of the Debtors' estates due to the conflicts
described herein and because Kasowitz may not be disinterested. Courts have found an "interest
adverse to the estate" under section 327(a) when the proposed counsel has "a competing
economic interest tending to diminish estate values or to create a potential or actual dispute in

which the estate is a rival claimant." *U.S. Tr. v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 509 (3d Cir. 1999) (quoting *In re Caldor, Inc.*, 193 B.R. 165, 171 (Bankr. S.D.N.Y. 1996)). "The phrase 'interest adverse to the estate,' or term 'adverse interest' is not defined in the Bankruptcy Code, but courts have interpreted it to mean 'to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant,' or 'to possess a predisposition under circumstances that render such a bias against the estate.'" *In re 22 Acquisition Corp.*, No. 03-3059, 2004 U.S. Dist. LEXIS 6435, at *11 (E.D. Pa. Mar. 23, 2004) (quoting *In re Gelsinger*, No. 99-3264, 2000 U.S. Dist. LEXIS 1026, at *4-5 (E.D. Pa. Feb. 7, 2000)). In sum, if "***it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate.***" *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (emphasis added).

18.     Emergent clearly has an "interest adverse to the estate" of White Eagle. White Eagle, as a special purpose entity, exists solely to own its life insurance policies and, thus, should ensure that it can continue to maintain and preserve those policies. To that end, White Eagle has an interest in using its revenues either to pay its expenses directly or to pay down its debt under the Loan Agreement so as to free up borrowing availability to help sustain its business. However, any such use of revenues would prevent White Eagle from transferring such cash to Emergent. Emergent, on the other hand, has significant debt obligations of its own and is in danger of running out of the cash necessary to service those obligations. Therefore, Emergent relies almost exclusively on White Eagle to provide it with the cash necessary to service its debt. This exemplifies the material conflict of interest between White Eagle and Emergent.

19.    White Eagle has no decision-making abilities of its own and is controlled entirely by Emergent.  White Eagle bears the costs of these Chapter 11 Cases while Emergent has, so far, remained out of bankruptcy.  And Emergent is attempting to use the Debtors' Chapter 11 Cases as a platform to pursue claims and causes of action (some of which could *only* be pursued in a bankruptcy case), that are all geared towards Emergent being able to extract additional cash from White Eagle to avoid a bankruptcy case of its own.  The detriments of these conflicts of interests on White Eagle's estate are myriad, most recently exemplified by White Eagle's attempt to use cash collateral to fund 100% of expenses of the entire Emergent enterprise including services that, in whole or in part, benefitted Emergent.

20.    The Application is another example of the mischief that this conflict of interest can cause, as it contemplates White Eagle amassing significant administrative claims owed to Kasowitz.  This may ultimately result in White Eagle expending substantial amounts of cash to pay Kasowitz for its services in connection with a lawsuit from which White Eagle derives little benefit compared to the alternative of exiting bankruptcy and continuing to service its portfolio of life insurance policies and satisfy its obligations (a course of action which White Eagle will not pursue so long as it is controlled by Emergent).  Emergent's divergent interest in pursuing "hail mary" strategies in the hopes of saving its own business, combined with its absolute control over White Eagle, create pervasive conflicts of interest that make it impossible for Kasowitz to adequately represent both White Eagle and Emergent.  This conflict is exacerbated by the fact that Kasowitz received its retainer from Emergent.[22]  These facts, along with the other payments that Emergent will be making to Kasowitz, increases the likelihood that Kasowitz will act for

---

[22]    *See* Application, Ex. B, ¶ 2 (disclosing that Emergent paid Kasowitz $275,000 prepetition, including a $50,000 retainer "in connection with its representation of the Debtors and [Emergent].").

Emergent's benefit and not the Debtors' (including White Eagle). These facts also suggest that Kasowitz is not disinterested, as required by section 327(a) of the Bankruptcy Code. Therefore, the Application fails to satisfy the section 327(a) standard and should not be approved.

## III.    Even if Reviewed Under Section 327(e), the Application Should Be Denied

21.    If the Court is not inclined to assess the Application under section 327(a) of the Bankruptcy Code, the Application still does not pass muster under section 327(e). Section 327(e) of the Bankruptcy Code allows a debtor to employ an attorney for a specified special purpose other than to represent the debtor in conducting the case only if that attorney "does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e). Where employment is sought for a specified special purpose, section 327(e) mandates "a factual evaluation of actual or potential conflicts only as related to the particular matters for which the representation is sought." *In re Statewide Pools, Inc.*, 79 B.R. 312, 314 (Bankr. S.D. Ohio 1987); *see also In re Leslie Fay Cos.*, 175 B.R. at 533 (holding that "if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate.").

22.    In the context of section 327(e), "[a]n actual conflict of interest will disqualify counsel, per se; a potential conflict may be disqualifying in the court's discretion; but the appearance of conflict alone is not disqualifying." *In re Zais Inv. Grade Ltd. VII*, No. 11-20243 (RTL), 2011 Bankr. LEXIS 3859, at *5 (D.N.J. Sept. 26, 2011) (citing *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998)). "Simultaneous representation of a debtor corporation and the controlling shareholders, although not a disqualifying conflict *per se*, becomes a basis to disqualify counsel when adverse interests either exist *or are likely* to develop." *In re Jade Mgmt.*

14

*Servs.*, 386 Fed. Appx. 145, 149 (3d Cir. 2010) (quoting *In re Plaza Hotel Corp.*, 111 B.R. 882, 890 (Bankr. E.D. Cal. 1990) (emphasis added; citations omitted)).[23]

23.    In *In re Argus Group 1700*, after the court ruled that the law firm's retention application had to be determined under section 327(a) (which could not be met), the court noted that the application also would be denied under the requirements of section 327(e) because the law firm, in representing both the debtors and certain related parties, represented a materially adverse interest to the interests of the Debtors in the litigation.  199 B.R. at 531.  The court stated that "[a]lthough all of the [parties] share the same goal as the Debtors in repudiating the claims of [the litigation counterparty], they do not share the same interests."  *Id.*  The court noted a securities fraud allegation that the Debtors were not accused of and, thus, would have no interest in defending and a mismanagement related cause of action where the Debtors and the other parties were adverse.  Quoting *In re Mican Homes, Inc.*, 179 B.R. 886, 888 (Bankr. E.D. Mo. 1995), the court stated that "[u]nder the Bankruptcy Code, the interests of the Debtor are intertwined with the interests of the estate which includes the interests of creditors. Simultaneous representation of a Chapter 11 Debtor and the Debtor's principals gives rise to at least a potential conflict of interest."  *In re Argus Group 1700*, 199 B.R. at 531.  The court held that the conflict in the case at hand was "more than hypothetical" because the law firm was unable to "serve both masters (*i.e.*, debtors and related parties)" and under the proposed application, the debtors would pay all expenses of the law firm resulting in administrative claims against the estate, including expenses incurred in pursuing litigation that would benefit only the

---

[23]    The Debtors' citation to *In re Gawker Media LLC*, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y. Sept. 23, 2016) [Docket No. 287] is inapposite.  That case only indicated that there are certain situations where counsel can be authorized under section 327(e) to represent both a debtor and a non-debtor affiliate.  However, *Gawker Media* does not stand for the proposition that counsel can represent a debtor and its non-debtor affiliate that lack a unity of interests with respect to the representation in question or that have conflicting interests.

related parties. *Id.* at 532.

24.    Here, there are multiple actual and potential conflicts of interests between the Debtors and their ultimate equity owner, Emergent, related to the litigation asserted in the Adversary Complaint.  <u>First</u>, White Eagle has only a vague and tenuous interest in the success of the anticipated litigation, which would primarily benefit Emergent.  Most of the causes of action in the Adversary Complaint seek to eliminate the Lender Parties' Participation Interest.  But even if the Participation Interest were entirely eliminated, the benefit to White Eagle is illusory as the Participation Interest is essentially only contemplated to be paid if all of the necessary expenses of preserving White Eagle's collateral are paid first out of the payment waterfall in the Loan Agreement.  Therefore, once White Eagle receives profits at the end of the waterfall, whether that share is 55% or 100%, the expected use of that cash is for White Eagle to dividend it to Emergent.  Emergent is therefore the primary (and perhaps only) beneficiary of modifications of the Participation Interest.  Therefore, like the securities fraud claims in *In re Argus Group 1700* that only named related parties of the debtors, causes of action in the Adversary Proceeding related to the Participation Interest create a conflict that renders Kasowitz unable to meet the section 327(e) standard.

25.    <u>Second</u>, the litigation is simply an attempt by Emergent to solve its own liquidity problems (which are largely caused by its own independent debt obligations) by eliminating the Participation Interest and, thus, being able to extract additional cash from White Eagle.  Emergent seeks to impose half the cost of prosecuting the litigation onto the Debtors' estates and, thus, subsidize suits that would be brought largely for its own benefit.  Therefore, like litigation that the debtors sought to pursue solely for the benefit of related parties in *In re Argus Group 1700*, this conflict is contrary to the section 327(e) standard.

16

Case 18-12808-KG    Doc 103    Filed 02/07/19    Page 17 of 21

26.    <u>Third</u>, it is likely that Kasowitz's representation of Emergent will cause it to act differently than if it only represented White Eagle, particularly given the retainer that it has received from Emergent.  Emergent, relying on the success of the litigation to solve its liquidity problems, has every incentive to pursue "scorched earth" strategies and fight for a bigger share of White Eagle's profits.  For example, if the litigation results in a recharacterization of the Participation Interest as equity, the ownership share of White Eagle is altered, which should be of no concern to White Eagle (and, notably, would not cause a change in the majority ownership of White Eagle).  For Emergent to benefit from such recharacterization, the litigation must accomplish the extra step of subordinating LNV's newly-recharacterized equity interest in White Eagle to the indirect equity interest of Emergent.[24]  That potential subordination is Emergent's concern alone and White Eagle, therefore, could be willing to withdraw that related cause of action in connection with a settlement if it were truly independent.  Instead, in all likelihood, because Kasowitz would take direction from both White Eagle and Emergent, it may advise its clients to pursue that subordination action regardless of the potential benefit to White Eagle. Virtually any scenario that pits White Eagle's interest in emerging from bankruptcy and resuming operations in the ordinary course (which is an interest any unconflicted debtor will have) against Emergent's desire to extract cash from White Eagle creates a conflict.  Such scenarios abound in these Chapter 11 Cases and in connection with the Adversary Proceeding. Therefore, the Court should use its discretion to determine that this potential conflict of interest does not satisfy section 327(e).[25]

---

[24]    *See* Adversary Complaint, ¶¶ 115-22 (asserting equitable subordination cause of action).

[25]    Importantly, White Eagle is not obligated to bend to the desires of Emergent in pursuing or settling estate causes of action.  Rather, as a fiduciary for all parties in interest, it maintains flexibility to settle estate claims and action without Emergent's support.  This principle is articulated in *In re Chemtura Corp.*, a solvent debtor case,

## IV.    The Proposed 50/50 Split of Fees in the Application is Procedurally Improper

27.    The Court should not authorize the Debtors to use the Lender Parties' cash collateral without consent for these purposes.  The Debtors seek to end-run the requirement of secured lender consent or court authorization for the use of cash collateral by seeking authorization, through a plain retention application, for Emergent to "advance" the Debtors' share of Kasowitz's fees and expenses, subject to eventual repayment of 50% of such fees and expenses by the Debtors.[26]  This will result in substantial administrative claims for the Debtors, which will ultimately need to be paid from the Lender Parties' cash collateral so long as the Loan Agreement remains in effect.  Notably, the final cash collateral budget approved by the Court contains no approved amounts with respect to Kasowitz's payment.[27]  The Debtors not only seek to use the Lender Parties' cash collateral for this purpose without consent, but also effectively seek approval of a postpetition loan from an insider without making any of the requisite showings under section 364 of the Bankruptcy Code.  The request is procedurally deficient.  *See* Del. Bankr. L.R. 4001-2 ("[A]ll cash collateral and financing requests under 11 U.S.C. §§ 363

---

where the bankruptcy confirmed a plan premised on a global settlement regarding, among other things, the debtors' total enterprise value and bondholders' "make whole" claims.  439 B.R. 561, 614 (Bankr. S.D.N.Y. 2010).  The official committee of equity security holders appointed in the case objected to the plan, arguing that the settlement undervalued the debtors and that the bondholder settlement was unreasonable.  *Id.* at 567.  In determining that the settlements were within the range of reasonableness, the court considered, among other facts, which parties supported and opposed the settlement.  *Id.* at 607.  As the court stated, "[i]t is no more logical to place material reliance on the Equity Committee's opposition than it would be to rely on the Creditors' Committee's and Bondholders' Committee's support—or vice versa.  This factor has no material bearing on the reasonableness of the Settlement here."  *Id.* at 608.  White Eagle does not need to prosecute litigation to Emergent's satisfaction, particularly where White Eagle bears the cost of doing so.  It must be able to resolve estate claims in the best interest of its estate, and to the potential detriment of Emergent, which it cannot do if represented by the same counsel.

26    The Lender Parties question the Debtors' logic in the Application that the 50/50 split is fair because Emergent is only one of four plaintiffs.  *See* Application, ¶ 26.  If that is the basis by which Kasowitz's fees and expenses should be allocated, White Eagle should only be responsible for 25% (if each of the four plaintiffs pays an equal share) or 16.7% (if each Debtor pays its share of the 50% proposed Debtor allocation) of such costs.  Of course, White Eagle should not be paying any amounts for the asserted litigation, which primarily benefits Emergent.

27    *See* Exhibit 1 to the *Final Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 81].

and 364 shall be heard by motion filed under Fed. R. Bankr. P. 2002, 4001 and 9014 . . .   All

Financing Motions shall . . . provide a summary of the essential terms of the proposed use of

cash collateral and/or financing (*e.g.*, the maximum borrowing available on a final basis, the

interim borrowing limit, borrowing conditions, interest rate, maturity, events of default, use of

funds limitations and protections afforded under 11 U.S.C. §§ 363 and 364)") *see also In re City*

*Loft Hotel, LLC*, 465 B.R. 428, 436 (Bankr. D.S.C. 2012) (denying fee application for debtors'

counsel despite finding fees to be reasonable because no cash collateral order authorized

payment of that expense from cash collateral).   On this basis alone, the Application should be

denied.

## V.     The Application Does Not Satisfy Bankruptcy Rule 2014

28.     To be approved, a retention application under section 327 of the Bankruptcy Code

must comply with Federal Rule of Bankruptcy Procedure 2014, which provides that such an

application must disclose, among other things, "any proposed arrangement for compensation."[28]

The Application does not include, and the Debtors have to date refused to produce, a copy of

Kasowitz's engagement letter.  This raises legitimate concerns, particularly in light of the

proposed 50/50 split of Kasowitz's fees and expenses between the Debtors and Emergent and the

fact that Emergent paid Kasowitz's retainer.  Further, given Emergent's perilous liquidity,

Emergent's ability to pay for Kasowitz's fees and expenses pending reimbursement by White

Eagle is suspect.  The Debtors should be required to produce Kasowitz's engagement letter and

disclose all terms of their engagement, including any separate fee arrangements with Emergent.

Until such time, the Application does not satisfy Rule 2014 and should not be approved.  Further,

---

[28]     *See* Application, ¶2 (stating that the statutory bases for the relief sought therein include, among others, Bankruptcy Rule 2014(a)).

the Lender Parties reserve all rights if Kasowitz in fact has any separate payment arrangement with Emergent.

## VI.    The Reference to Section 328(a) in the Proposed Order Is Inappropriate

29.    Finally, the Application should be denied because the proposed form of order seeks to authorize the retention and employment of Kasowitz under sections 327(e) and 328(a) of the Bankruptcy Code.   However, the Application makes no reference to section 328 of the Bankruptcy Code.   Under section 328(a) of the Bankruptcy Code, once fees are approved, they are payable unless the approved terms and conditions "prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."   11 U.S.C. § 328(a).   The reference to this standard effectively forces the Court to judge the reasonableness of the cost of the litigation, including the estates' share of such costs, in advance, without any meaningful ability to revisit that judgment except in the narrow circumstances contemplated by the statute.   Because the litigation is for the primary benefit of Emergent, yet the Debtors would bear half the cost under the Debtors' proposed order, the Court should fully preserve the ability to determine the estates' responsibility for related fees and expenses at the conclusion of the litigation.   Therefore, the reference to section 328(a) in the proposed order is highly inappropriate and is grounds for denial of the Application.

## CONCLUSION

WHEREFORE, the Lender Parties respectfully request that the Court (a) deny the Application, and (b) grant the Lender Parties such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 7, 2019                    Respectfully submitted,
       Wilmington, Delaware

/s/ Courtney A. Emerson
Jeffrey M. Schlerf (No. 3047)              Thomas E Lauria (admitted *pro hac vice*)
Carl D. Neff (No. 4895)                    Jesse L. Green (admitted *pro hac vice*)
Courtney A. Emerson (No. 6229)             **WHITE & CASE LLP**
**FOX ROTHSCHILD LLP**                     Southeast Financial Center
919 North Market St., Suite 300            200 S. Biscayne Boulevard, Suite 4900
Wilmington, DE 19801                       Miami, FL 33131
Telephone:  (302) 654-7444                 Telephone: (305) 371-2700
Facsimile:  (302) 463-4971                 Facsimile: (305) 358-5744
jschlerf@foxrothschild.com                 tlauria@whitecase.com
cneff@foxrothschild.com                    jgreen@whitecase.com
cemerson@foxrothschild.com
                                             –and–

                                           David M. Turetsky (admitted *pro hac vice*)
                                           Andrew T. Zatz (admitted *pro hac vice*)
                                           Kimberly A. Haviv (admitted *pro hac vice*)
                                           **WHITE & CASE LLP**
                                           1221 Avenue of the Americas
                                           New York, NY  10020-1095
                                           Telephone: (212) 819-8200
                                           Facsimile: (212) 354-8113
                                           dturetsky@whitecase.com
                                           azatz@whitecase.com
                                           khaviv@whitecase.com

                                             –and–

                                           Jason N. Zakia (admitted *pro hac vice*)
                                           **WHITE & CASE LLP**
                                           227 West Monroe Street, Suite 3900
                                           Chicago, IL 60606-5055
                                           Telephone: (312) 881-5400
                                           Facsimile: (312) 881-5450
                                           jzakia@whitecase.com

                                           *Attorneys for CLMG Corp.*
                                           *and LNV Corporation*