IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) ) | Chapter 11 |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | ) ) ) | Case No. 18-12808 (KG) |
| Debtors. | ) ) ) | Jointly Administered |

**Objection Deadline: April 25, 2019 at 4:00 p.m. (ET)**
**Hearing Date: May 15, 2019 at 10:00 a.m. (ET)**

## MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 502(c) AND 105(a) TO ESTIMATE SECURED CLAIMS OF LNV CORPORATION AND CLMG CORP. FOR DISTRIBUTION PURPOSES

White Eagle Asset Portfolio, LP ("White Eagle") and its affiliate debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby submit this motion (this "Motion") pursuant to sections 502(c) and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order, substantially in the form attached to this Motion as **Exhibit A**, estimating the allowed amounts of the Prepetition Lender Secured Claims (as defined in the Debtors' proposed plan as discussed further below) of LNV Corporation, as lender ("LNV" or the "Prepetition Lender"), and CLMG Corp., as administrative agent ("CLMG"), including, without limitation, the putative "Participation Interest" claims of LNV as of the Plan Effective Date (defined below).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738). The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

Pursuant to this Motion, the Debtors submit that LNV's claim arising from the "Participation Interest" (as that term is defined in LNV's loan documents): (a) is and should be treated as a claim for interest, and (b) that any portion of such claim which has not accrued and become fixed as of the Plan Effective Date should be disallowed as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code.[2]

Further, as discussed herein, this Court's estimation of the Prepetition Lender Secured Claims should account for the $4 million in cash retained by LNV as the "Up-Front Fee" upon the closing of the loan transaction. This Up-Front Fee (retained by LNV out of the initial advance) constituted original issue discount ("OID"). As a result of LNV's retention of the Up-Front Fee, LNV's loan balance has been $4 million in excess of the amount of the proceeds actually received by White Eagle from LNV. Pursuant to sections 502(b)(2) and 506 of the Bankruptcy Code, the portion of the $4 million Up-Front Fee that remains unamortized as of the Plan Effective Date represents unmatured interest that should be disallowed.

Specifically, the Debtors request this Court to estimate the allowed amount of the Prepetition Lender Secured Claims for purposes of distribution under the Debtors' reorganization plan in an aggregate amount not to exceed:

> (i)    the aggregate principal amount of $367.9 million, which reflects the face amount of the funds advanced by the Prepetition Lender to White Eagle, less

---

[2] In the Pending Action (defined below), the Debtors contend additionally and alternatively that the Participation Interest constitutes either "original issue discount" or an equity participation in the Debtors. This Motion is brought without prejudice to any alternative positions alleged in the Pending Action, and the Debtors reserve any and all rights with respect thereto.

(ii)    the OID represented by that portion of the $4 million Up-Front Fee not amortized as of the Plan Effective Date, plus

(iii)    accrued (both before and after the petition date) and unpaid interest and fees payable under the Prepetition Loan Agreement (as defined below) as of the Plan Effective Date, including any payments to which LNV is entitled on account of the Participation Interest as of the Plan Effective Date (the "Pre-Effective Date Interest/Costs Claim"), based on actual recoveries from the proceeds of White Eagle's insurance policies realized as of such date,

provided that the allowed amount of the Participation Interest and any other charges and costs provided for under the Prepetition Loan Agreement not accrued and due and payable as of the Plan Effective Date (*i.e.*, such claims, charges and costs that may otherwise purportedly accrue or become due and payable after the Plan Effective Date) (the "Post-Effective Date Claim") shall be estimated at zero dollars ($0), and provided further that the Prepetition Lender Secured Claims shall remain subject to any valid claims, defenses, and setoffs of the Debtors (the "Estate Setoffs"), including those asserted in the Pending Action (defined below).

## Preliminary Statement

1.    LNV and CLMG assert certain putative secured claims arising under the Prepetition Loan Agreement with the Debtors, including putative claims that may become payable on account of a 45% "Participation Interest" provided to LNV under the Prepetition Loan Agreement (which, as described below, is a form of contingent interest). The Debtors seek estimation of the allowed amounts of (i) the asserted principal claim, which the Debtors believe

is approximately $367.9 million, less the unamortized portion of the OID represented by the

prior Up-Front Fee; (ii) the Pre-Effective Date Interest/Costs Claim, which should be decreased

based on all valid Estate Setoffs; and (iii) any Post-Effective Date Claim, including any other

fees, charges, expenses and claims provided for under the loan documents that have not accrued

and become  fixed, due and payable as of the Plan Effective Date, which the Debtors assert

should be estimated at $0.00.

2.      In particular, the Participation Interest should be treated as a claim for interest on

monies advanced by LNV and should be disallowed to the extent that it has not accrued and

become fixed and due as of the effective date of the Debtors' proposed plan (the "Plan Effective

Date") (which provides for the payment in full of LNV's allowed secured claims and which itself

does not trigger any accrual of a Participation Interest claim).  Section 502(b) of the Bankruptcy

Code provides for the disallowance of all claims for unmatured interest as of the petition date.

An exception to this rule is set forth in section 506(b) of the Bankruptcy Code, which provides

that to the extent an allowed secured claim is oversecured, a court shall allow postpetition

interest (and any other reasonable fees, costs or charges) accrued during the pendency of the

bankruptcy as part of the allowed secured claim.  Importantly, as more fully discussed below,

section 506(b) does not include the allowance of interest that remains unmatured as of the

effective date of a plan of reorganization.  Consistent with the foregoing, to the extent the

Participation Interest has not accrued and become due as of the Plan Effective Date, it should be

disallowed in full and estimated at zero under Bankruptcy Code sections 502(c) and 105(a).

3.      It is necessary to have the maximum allowed amount of the Prepetition Lender

Secured Claims estimated for distribution purposes in order to expeditiously and effectively

proceed with the administration of these chapter 11 cases and the Debtors' reorganization efforts,

including obtaining new exit financing, for the benefit of all stakeholders in these cases.

Accordingly, the Debtors submit that ample basis exists to grant this Motion.

### Jurisdiction

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).  The Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of

a final order by the Court in connection with this Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory predicates for the relief requested herein are sections 105(a) and

502(c) of the Bankruptcy Code.

### Background

A.      **Filing of the Chapter 11 Cases**

7.      On November 14, 2018, Debtors White Eagle General Partner, LLC ("WEGP")

and Lamington Road Designated Activity Company ("LRDA") commenced their cases by filing

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      On December 13, 2018, Debtor White Eagle filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

9.      No statutory committee has been appointed in the Debtors' cases by the Office of the U.S. Trustee.

10.     The Debtors are operating their business and managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.     Debtors' Business and Prepetition Capital Structure**

11.     The Debtors are indirect subsidiaries of Emergent Capital, Inc. ("Emergent"), a publicly traded company. Emergent is a global leader in the life settlements industry.

12.     As of the Petition Date, Debtor White Eagle owned a portfolio of approximately 586 life insurance policies – also known as life settlements – with an aggregate death benefit of approximately $2.8 billion. The partnership interests in White Eagle are owned by Debtors WEGP and LRDA. WEGP is the general partner of White Eagle, manages White Eagle, and holds 0.10% of the interests therein. LRDA is the limited partner of White Eagle and holds 99.90% of the interests therein.[3]

13.     White Eagle, as borrower, LNV, as lender, and CLMG, as administrative agent, are parties to that certain *Second Amended and Restated Loan and Security Agreement*, dated as of January 31, 2017 (as subsequently amended and/or restated, the "Prepetition Loan Agreement"). LNV and CLMG are affiliates of Beal Financial Corporation. Additional parties

---

[3] A more detailed description of the Debtors' business and operations and the events leading to the commencement of these chapter 11 cases is provided in the *Declaration of Miriam Martinez, Chief Financial Officer, in Support of First Day Motions* [Docket No. 3] and incorporated herein by reference.

to the Prepetition Loan Agreement are certain non-debtor affiliates of Emergent. The Prepetition

Loan Agreement is governed by New York law.

14.    Under the Prepetition Loan Agreement, the total aggregate lending commitment

of LNV was $370 million. As of the date hereof, principal in the face amount of approximately

$367.9 million is ostensibly due and owing to LNV. However, that is not the amount actually

received by White Eagle; LNV retained a $4 million "Up-Front Fee" out of the initial loan

advance, upon the closing of the loan transaction. *See* Prepetition Loan Agreement, Section

7.1(b)(viii) (a condition precedent to advances being made includes evidence of payment of all

"Fees"); Prepetition Loan Agreement Annex I, p. I-14 (definition of "Fees" includes the Up-

Front Fee), p. I-15 (definition of "Initial Advance" includes the Up-Front Fee), p. I-30 ("Up-

Front Fee" defined as $4 million). Thus, $4 million of the initial advance appears to have been

retained by LNV, with the result that, at all times, the stated principal amount of LNV's loan has

exceeded the amount of the proceeds actually received by White Eagle by $4 million. As

discussed further herein, this differential constituted OID and, pursuant to sections 502(b)(2) and

506 of the Bankruptcy Code, that portion of the OID that is unamortized as of the Plan Effective

Date is subject to disallowance as unmatured interest.

15.    Moreover, in addition to the stated interest and charges, the Prepetition Loan

Agreement entitles LNV to receive periodic cash payments on account of the so-called

"Participation Interest" that are based on a "waterfall" for the allocation of the "Available

Amount" of certain cash determined for each quarterly "Distribution Date." In essence, the

Participation Interest is a form of additional contingent interest that accrues and comes due, if at

all, on a quarterly basis based on certain metrics.  It is similar to contingent interest calculated on

the basis of a company's profits.  Specifically, from and after December 28, 2016, the

Participation Interest entitles LNV to receive, on a quarterly basis from funds in the Collection

Account (*i.e.*, an account into which all life insurance policy proceeds are to be deposited), a

forty-five percent (45%) share of available cash remaining after payment of interest, certain

expenses and required amortization, before any available cash can be distributed to the Debtors.

The Prepetition Loan Agreement is explicit that none of these "Participation Interest" payments

are to be credited against either the outstanding principal balance or any stated accrued interest

due on the loan.  In sum, the right of LNV to receive these quarterly distributions is based upon

the amount of cash in the Collection Account as of the applicable date certain and the application

of a distribution priority waterfall, specified in sections 5.2(b) and (c) of the Prepetition Loan

Agreement.[4]

16.    The obligations under the Prepetition Loan Agreement are secured by purported

liens in favor of CLMG on substantially all of the assets of White Eagle, including its interests in

life insurance policies and the proceeds therefrom.  CLMG also purportedly has control of White

Eagle's funds and collections from insurance policies through a custodial arrangement with

Wilmington Trust, N.A.

17.    The Debtors believe and have asserted that LNV is substantially oversecured.

LNV's own valuation firm has concluded that the fair value of the insurance portfolio is $552

---

[4]  An alternative distribution waterfall is set forth in section 5.2(e) of the Prepetition Loan Agreement, but this
provision only becomes effective after the Partial Repayment Date (defined as the date on which all of the loan
obligations have been paid in full other than certain obligations not then due and payable, which include any portion
of the Participation Interest not yet payable, any administrative fees not yet due and payable and any protective
advances made after such date).

million as of October 31, 2018, an equity cushion of approximately $184 million, subject to a reservation of rights to assert a downward adjustment based on revised life expectancy models.[5]

18.     The Debtors' bankruptcy filings constituted an Event of Default under the Prepetition Loan Agreement. Under the general default provision of the Prepetition Loan Agreement, those filings resulted in the automatic acceleration of the "Obligations." Prepetition Loan Agreement, ¶¶ 10.1(f); 10.2(b). However, under Section 5.2(c) of the Prepetition Loan Agreement, the Participation Interest continues to accrue on a quarterly basis substantially as before, subject to some changes in the metrics that govern the calculation of the amount that becomes due thereon for any quarter. Thus, as more fully described below, the acceleration of the "Obligations" under the Prepetition Loan Agreement does not change the fact that the obligations regarding the Participation Interest do not accrue and become due until and unless, at the applicable quarterly Distribution Date, there is available cash – referred to as the "Available Amount" in the Prepetition Loan Agreement – remaining following the payment of higher priority items in the waterfall. In other words, by its terms, the accrual of the Participation Interest has not been accelerated by the chapter 11 filings.

**C.     Commencement of Adversary Proceeding Against Prepetition Lender and Others**

19.     As set forth in the *Amended Complaint* [Adv. Proc. 19-50096, Docket No. 48], the Debtors believe that LNV abused the discretion that it was granted under the terms of the Prepetition Loan Agreement and committed other wrongful actions that substantially damaged

---

[5]  The Debtors also filed these cases with an aggregate cash balance of approximately $33 million, and such funds have been used and continue to be used postpetition by the Debtors in accordance with the Court's cash collateral orders, subject to the adequate protection provided to LNV and CLMG as set forth therein.

the Debtors.  In connection therewith, on January 25, 2019, the Debtors and Emergent

commenced an adversary proceeding (the "Pending Action") against LNV and its co-

conspirators for breaches of contract, breaches of fiduciary duty, and other claims.  In the

Pending Action, the Debtors have also asserted various challenges relating to the Participation

Interest, alleging that (i) the obligations with respect to the Participation Interest must be treated

as additional interest on the loan, a portion of which must be disallowed as unmatured interest;

(ii) alternatively, an amount of the principal amount of the loan which equals the value of the

Participation Interest when granted constitutes "original issue discount" that is subject to partial

disallowance as unmatured interest; and (iii) also alternatively to item (i), the Participation

Interest does not constitute an allowed claim because it represents an equity interest or

participation in the Debtors.  This Motion is based on the first of these contentions, with the

Debtors reserving their rights as to items (ii) and (iii).

**D.      Debtors' Filing of the Proposed Plan and Disclosure Statement**

20.      On March 13, 2019, the Debtors filed the *Debtors' Joint Chapter 11 Plan of*

*Reorganization* (as may be amended from time to time, the "Plan") [Docket No. 165] and

*Disclosure Statement for Debtors' Joint Chapter 11 Plan of Reorganization* (as may be amended

from time to time, the "Disclosure Statement") [Docket No. 166].

21.      The proposed Plan provides for the expeditious reorganization of the Debtors,

pursuant to which the allowed Prepetition Lender Secured Claims of LNV and CLMG arising

under the Prepetition Loan Agreement will be fully paid off through and replaced by a new exit

financing facility (the "New Exit Facility").  The Plan will allow the Debtors to maximize the

value of the life settlements portfolio with the benefit of attractive financing terms offered as part

of the New Exit Facility.  As set forth in the Plan, the Prepetition Lender Secured Claims will not

be impaired under the Plan, as the allowed amount thereof will be paid in full, including interest

that is matured as of the plan effective date; and, consequently, the holders of the Prepetition

Lender Secured Claims (*i.e.*, LNV and CLMG) will be presumed to have accepted the Plan.

      22.     The Debtors' proposed Plan (in Article IX) relatedly provides as a condition

precedent to the occurrence of the effective date of the Plan (the "Plan Effective Date") that:

> The Bankruptcy Court shall have determined that the Debtors are
> indebted and liable to the Holders of the Prepetition Secured
> Lender Claims in an amount not to exceed:  (i) the aggregate
> principal amount of $367.9 million (all of which reflects funds
> advanced by the Prepetition Lender to White Eagle), plus (ii)
> accrued (both before and after the Petition Date) and unpaid
> interest and fees payable under the Prepetition Loan Agreement
> and related documentation as of the Effective Date, including any
> distributions to which the Prepetition Lender is entitled on account
> of the Participation Interest as of the Effective Date, based on
> actual recoveries from the proceeds of White Eagle's insurance
> policies realized as of such date.

## Relief Requested

      23.     By this Motion, the Debtors request this Court to estimate the allowed amount of

the Prepetition Lender Secured Claims for purposes of distributions under the Plan in an

aggregate amount not to exceed (a) the principal claim, which the Debtors believe is in the face

amount of approximately $367.9 million, less (b) the OID represented by the $4 million Up-

Front Fee, to the extent not amortized as of the Plan Effective Date, plus (c) accrued and unpaid

Pre-Effective Date Interest/Costs Claim, including any accrued amounts to which LNV is

entitled on account of the Participation Interest prior to the Plan Effective Date, based on actual

recoveries from the proceeds of White Eagle's insurance policies realized as of such date, subject

11

to deductions for valid Estate Setoffs; provided that the allowed Post-Effective Date Claim shall

be estimated at zero dollars ($0), and provided further that the Prepetition Lender Secured

Claims shall remain subject to any valid Estate Setoffs, including those asserted in the Pending

Action.

## Basis for Relief

**A.    Applicable Standards**

24.    Section 502(c) of the Bankruptcy Code mandates the estimation for purposes of

allowance of all contingent or unliquidated claims which, unless fixed or liquidated, would

unduly delay the administration of a debtor's case, and provides, in pertinent part, as follows:

> There shall be estimated for purpose of allowance under this
> section –
>
> (1) any contingent or unliquidated claim, the fixing or liquidation
> of which, as the case may be, would unduly delay the
> administration of the case . . . .

11 U.S.C. § 502(c).  "[B]y its very nature, estimation under section 502(c) results in allowing a

claim for purposes of the entire case, and is no different than a claim allowed under section

502(a) or (b)."  *In re Pacific Sunwear of Cal., Inc.*, 2016 Bankr. LEXIS 2976, *8-*9 (Bankr. D.

Del. Aug. 8, 2016).

25.    The claims estimation process envisioned by section 502(c) provides a means for

a bankruptcy court "[t]o achieve reorganization, and/or distributions on claims, without awaiting

the results of legal proceedings" that could become protracted.  *In re Chavez*, 381 B.R. 582, 587

(Bankr. E.D. N.Y. 2008) (internal quotation marks and citation omitted).  By its terms, section

502(c) of the Bankruptcy Code requires a bankruptcy court to estimate a claim where liquidation

of that claim would otherwise unduly delay the reorganization process.  *A.H. Robins Co. v.*

*Piccinin*, 788 F.2d 994, 1011-12 (4th Cir. 1986) (noting that the duty to estimate contingent or

unliquidated claims is "a mandatory obligation of the bankruptcy court" where otherwise the claim would cause undue delay).

26.    Indeed, the clearly stated purpose for mandating the estimation of claims is to "avoid undue delay in the administration of bankruptcy proceedings." *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993); *see In re Stone & Webster, Inc.*, 279 B.R. 748, 810 (Bankr. D. Del. 2002) ("The purpose of an estimation proceeding is to avoid delays that may arise from waiting to fix the value of contingent claims. An estimation proceeding expedites the bankruptcy process so that key steps in a reorganization that depend on the fixing of value may proceed. In essence, an estimation proceeding is a procedural device that is to be used when adjudication and liquidation of a claim would take an unreasonably long time to allow courts to quickly and flexibly estimate the amount of an as yet to be liquidated claim.") (citation omitted); 4 COLLIER ON BANKRUPTCY ¶ 502.04(1) (15th ed.) ("[S]ection 502(c) provides a mechanism for estimating the amount of a contingent or unliquidated claim for the purpose of its allowance where the actual liquidation of the claim as determined by the court would unduly delay the administration of the case."); *see also In re Roman Catholic Archbishop of Portland, Oregon*, 339 B.R. 215, 219 (Bankr. D. Or. 2006) ("When actual liquidation of claims would unduly delay administration of the bankruptcy estate, estimation is mandatory."); *In re N.Y. Med. Group, P.C.*, 265 B.R. 408, 415 (Bankr. S.D.N.Y. 2001) ("Under 11 U.S.C. § 502(c), a claim may be estimated for purposes of allowance if it is unliquidated and liquidation would unduly delay the administration of the case.").

27.    Defining "undue delay" under section 502(c) of the Code is "a problem whose solution ultimately rests on the exercise of judicial discretion in light of the circumstances of the case, particularly the probable duration of the liquidation process as compared with the future

uncertainty due to the contingency in question." *Roman Catholic Archbishop*, 339 B.R. at 222

(internal quotation marks omitted). This analysis implicates both (1) "how long it will take

before . . . [a] claim will be liquidated and determined" by an alternative forum and (2) whether a

"plan of reorganization can be confirmed so long as [the relevant] claim remains unliquidated

and not estimated." *In re Lane*, 68 B.R. 609, 611 (Bankr. D. Haw. 1986).

28.     Section 502(c) does not prescribe the method for estimating a claim, and courts

therefore have discretion to utilize any valuation method that best suits the circumstances of the

case at hand. *See, e.g.*, *Maxwell v. Seaman Furniture Co. (In re Seaman Furniture Co.)*, 160

B.R. 40, 42 (S.D.N.Y. 1993) (stating that "a bankruptcy court may use whatever method is best

suited to the circumstances"). "[W]hen estimating claims, bankruptcy courts may use whatever

method is best suited to the contingencies of the case, so long as the procedure is consistent with

the fundamental policy of Chapter 11 that a reorganization must be accomplished quickly and

efficiently." *In re Adelphia Communications Corp.*, 368 B.R. 140, 278 (S.D.N.Y. 2007) (citation

and internal quotations omitted).

29.     A claim is contingent when "the debtor will be called upon to pay only upon the

occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the

alleged creditor." *In re Fostvedt*, 823 F.2d 305, 306 (9th Cir. 1987) (citing *Brockenbrough v.*

*Commissioner*, 61 B.R. 685, 686 (W.D. Va. 1986)). A claim is unliquidated if it is not subject to

"ready determination and precision in computation of the amount due." *Fostvedt*, 823 F.2d at

306 (quoting *Sylvester v. Dow Jones & Co., Inc. (In re Sylvester)*, 19 B.R. 671, 673 (D.N.J.

1975)).

30.     In addition, section 105(a) of the Bankruptcy Code affords courts wide latitude in

effectuating the provisions of section 502(c), and provides that a court "may issue any order,

14

process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11

U.S.C. § 105(a). Section 105(a) allows courts to "craft flexible remedies that, while not

expressly authorized by the [Bankruptcy] Code, effect the result the [Bankruptcy] Code was

designed to obtain." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235-36 (3d Cir. 2004) (citing

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.*

*Chinery*, 330 F.3d 548, 568 (3d Cir. 2003)).

**B.**     **The Critical Need for Estimation of LNV's Claims in These Cases**

31.     The Debtors urge the Court to estimate the contingent and unliquidated

Prepetition Lender Secured Claims of LNV. These claims are contingent and unliquidated, at

least in part, because quarterly accruals of the Participation Interest depend on the amount and

timing of future recoveries on the applicable insurance policies and various associated costs.

Absent estimation by this Court, the administration of these cases will be unduly hampered and

delayed. Specifically, the Debtors need the allowed amount of the Prepetition Lender Secured

Claims to be estimated for distribution purposes in order to be able to expeditiously and

appropriately refinance the Prepetition Lender Secured Claims with new exit financing.

32.     Stated another way, the Debtors need a fixed "pay-off" amount for the Prepetition

Lender Secured Claims in order to obtain exit financing. Thus, estimation of the Prepetition

Lender Secured Claims by the Court is necessary and appropriate.

**C.**     **The Participation Interest Must Be Treated as Unmatured Interest**

33.     White Eagle agreed to pay the Aggregate Participation Interest to LNV on the

terms and conditions set forth in the Prepetition Loan Agreement "in consideration for the

Lenders providing such financing." (Prepetition Loan Agreement, p. 1, third recital.) Thus, the

parties agreed that payments made on account of the Participation Interest constitute part of the

consideration for the LNV loan (in addition to, *inter alia,* interest due and payable pursuant to

15

sections 3.1 through 3.3 of the Prepetition Loan Agreement and the $4 million Up-Front Fee).

As noted above, payments on account of the Participation Interest accrue and become due on a

quarterly basis only to the extent of an amount equal to 45% of the amount (if any) remaining

after deducting various senior payments (including interest, fees, and amortization) that must be

made.

      **1.**    **Any Payments That Become Due and Payable to LNV On Account of the Participation Interest Constitute Interest on the Loan**

      34.    The Prepetition Loan Agreement is governed by New York law.  Under New

York law, it has long been established that a contingent right to potential future profits, future

transaction proceeds, or other types of bonuses not expressly labeled as "interest" can be

properly viewed and considered as interest. *See, e.g., Diehl v. Becker*, 227 N.Y. 318, 325-326,

125 N.E. 533 (N.Y. 1919) (loan repayment terms provided that a bonus was due beyond

principal and legal interest if borrower made any sale or license of his patents/inventions; lender

acquired such contingent right as part compensation for the loan and no act of borrower could

have deprived him of it; because lender could have received more than usurious interest rate in

case of the bonus, loan transaction was usurious); *Moore v. Plaza Commercial Corp.,* 9 A.D. 2d

223, 225, 192 N.Y.S. 2d 770 (N.Y. App. Div. 1959) ("it is clear that the letter agreement

provides that in the event [the collateral's value later increases beyond a certain price, the

collateral must be sold and if] the collateral were sold for more than $1 per share the parties

would divide the profits evenly.  Where a borrower surrenders contingent rights to profits in

addition to a promise to pay principal and lawful interest, the transaction is usurious."); *Cusick v.*

*Ifshin,* 70 Misc.2d 564, 567-68, 334 N.Y.S. 2d 106 (Civ. Ct. 1972) (loan agreement provided for

bonus payment only if certain property were sold within a certain period, and such bonus could

be taken into account to determine if effective interest was usurious; "[A] loan is usurious where

the lender is entitled to the return of the principal and the full legal rate of interest plus a bonus to be paid upon a contingency over which the borrower has no control. This contingent right to a bonus is something of value and this value added to the maximum interest results in total interest in excess of the legal rate.") (citations omitted).[6]

35.    Further, courts have had no difficulty in logically extending section 502's prohibition against "unmatured interest" to other charges and costs, even if not expressly labeled as "interest," that are tantamount to interest such as a charge for the lender agreeing to provide financing to the debtor. *See, e.g., In re Ultra Petroleum Corp.*, 913 F.3d 533, 547 (5th Cir. 2019) (in defining "unmatured interest," the court is to "look[] to economic realities, not trivial formalities"; "Section 502(b)(2) … disallows any claim that is the economic equivalent of unmatured interest"; make-whole premium was tantamount to interest and thus disallowed under section 502(b)(2)); *Official Committee of Unsecured Creditors v. UMB Bank, N.A. (In re Capital, LLC)*, 495 B.R. 250, 263 (Bankr. S.D. N.Y. 2013) ("unamortized [original issue discount] constitutes 'unmatured interest' under section 502(b)(2) and must be disallowed"); *In re Pengo Indus., Inc.*, 962 F.2d 543, 546 (5th Cir. 1992) ("The term 'unmatured interest,' which is not defined by the Bankruptcy Code, encompasses OID. The economic reality of original issue discounting bolsters this conclusion.").

36.    The Prepetition Loan Agreement itself provides that "***in consideration for the Lenders providing [the applicable] financing***, the Borrower hereby agrees to pay, among other things, the Aggregate Participation Interest to the Lenders on the terms and conditions set forth

---

[6] Under New York law, the economic substance and not the form controls what should be considered "interest" – the lender cannot preclude a judicial determination that a certain charge constitutes, in effect, interest by tying the charge to a measure other than the loan principal amount. *See, e.g., Cusick v. Ifshin*, 70 Misc.2d at 568 ("[i]t is substance rather than form which determines" if a bonus or other charge provision is tantamount to interest or reflects a joint venture or other arrangement).

herein." Prepetition Loan Agreement, p. 1, third recital (emphasis added). Further, consistent with the foregoing acknowledgement, counsel for LNV and CLMG has acknowledged that the Participation Interest "is an enhanced recovery *as a consequence of agreeing to make the loan*" Transcript of Court Hearing on February 14, 2019 (p. 18, line 24 to page 19, line 1) (emphasis added).

37.    Additionally, the provisions in the Prepetition Loan Agreement relating to the Debtors' obligation to pay the Participation Interest (Section 3.4) are categorized under "Article III – Interest; Interest Periods; Fees, Etc.," and there is no commonplace provision in the Prepetition Loan Agreement that the agreement's headings are not intended to be a part of or to affect the interpretation of the agreement. *See also In re General Amer. Communications Corp.*, 63 B.R. 534, 545 (Bankr. S.D. N.Y. 1986), *rev'd on other grounds*, 73 B.R. 887 (S.D.N.Y. 1987) (under usury analysis, "[i]nterest is the compensation fixed by the parties for the use of money"; "Although not denominated as interest, the Fees were plainly charges for the use of money and are by definition interest."); *Mims v. Fid. Funding*, 307 B.R. 849, 856 (N.D. Tex. 2002) (purported initial and annual "fees" were tantamount to interest in context of usury analysis, where there was "no distinctly separate and additional consideration" from the lender for the fees; interest was "disguised as an additional fee"); *Green v. Boling (In re Boling)*, 2008 Bankr. LEXIS 2116, *13-*15 (Bankr. M.D. Fla. July 24, 2008) (lender's right under loan agreement with debtors to so-called "return on investment" quarterly payments (which lender also referred to as a "bonus") was "in actuality a subterfuge to disguise usurious interest"); *In re Rosner*, 48 B.R. 538, 549 (Bankr. E.D. N.Y. 1985) ("The advisory fee was additional interest because it was the compensation fixed by the parties for the use of money," or in other words, the fee "was part of the cost of borrowing money" from the lender).

    **2.**      **Acceleration of the Loan Did Not Transform Any Contingent Right to Payment that Might Accrue and Become Due and Payable in the Future On Account of the Participation Interest Into a Matured and Fixed Obligation**

38.    To the extent that any payment obligation to LNV on account of the Participation Interest did not accrue and become due and payable prior to the Plan Effective Date, the additional interest represented by the Participation Interest is "unmatured" for purposes of sections 502 and 506 of the Bankruptcy Code, irrespective of any putative immediate acceleration of the Debtors' "Obligations" under the Prepetition Loan Agreement.  Under the plain terms of the provision of the Prepetition Loan Agreement that specifically governs the accrual of any obligation to make a payment on account of the Participation Interest where an Event of Default exists (Section 5.2(c)), there was not a single penny that was not otherwise then due and owing, accrued, or became due on account of the Participation Interest at that time. Interest is "unmatured" when it is not yet due and payable. *In re X-Cel, Inc.*, 75 B.R. 781, 788-89 (N.D. Ill. 1987).  The legislative history of Section 502(b)(2) confirms as much:

> Paragraph (2) requires disallowance to the extent that the claim is for unmatured interest as of the date of the petition…. Interest disallowed under this paragraph includes postpetition interest that is **not yet due and payable** . . . .

*See* S. Rep. No. 989, 95th Cong., 2d Sess. 62 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 352 (1977) (emphasis added).  Here, there can be no dispute that the payments on account of the Participation Interest accrue and become due and payable only as and to the extent that the "Available Amount" on any quarterly Distribution Date under the Prepetition Loan Agreement is in excess of the amount of all items that come ahead of the Participation Interest in the applicable waterfall, as discussed above. *See* Prepetition Loan Agreement, 5.2.

39.    LNV has sought to avoid the conclusion that results from a plain reading of Section 5.2 of the Prepetition Loan Agreement by asserting that the bankruptcy filings

constituted a default and consequently resulted in an automatic acceleration of all "Obligations"

under the Prepetition Loan Agreement, which defines the "Obligations" to include the

Participation Interest and, thus, purportedly, the Participation Interest has "matured." However,

notwithstanding the general contractual language accelerating the "Obligations," any such

acceleration does not and cannot alter the fact that any future Participation Interest payments

remain contingent and conjectural, and do not accrue or become due and payable, and thus do

not "mature" *except to the extent* the Available Amount on any future quarterly Distribution

Date exceeds items with priority in the waterfall.

40.    Specifically, the "Obligations" are defined to include, among other things, the

"Aggregate Participation Interests," which are defined as "the aggregate of all of the

Participation Interests for all of the Pledged Policies." The "Participation Interest," in turn, is

defined as:

> … the right of the Lenders to receive the Participation Interest
> Percentage of the portion of Collections (including Available
> Amounts), prior to the deduction of any Amortization Shortfall
> Amounts and Participation Interest Shortfall Amounts,
> distributable pursuant to (i) clause "Eighth" of Section 5.2(b) of
> the Loan Agreement, (ii) clause "Tenth" of Section 5.2(b) of the
> Loan Agreement, (iii) clause "Eleventh" of Section 5.2(b) of the
> Loan Agreement, (iv) clause "Eleventh" of Section 5.2(c) of the
> Loan Agreement, (v) clause "Fourteenth" of Section 5.2(c) of the
> Loan Agreement, (vi) clause "Fifteenth" of Section 5.2(c) of the
> Loan Agreement, (vii) Clause "Ninth" of Section 5.2(e) of the
> Loan Agreement, (viii) Clause "Tenth" of Section 5.2(e) of the
> Loan Agreement and/or (ix) Section 10.2(c) of the Loan
> Agreement, as applicable.

Annex I to Prepetition Loan Agreement, pp. I-21-22.[7] Thus, the right to the Participation Interest

is basically the right to receive payments, if any, in accordance with the various subsections of

---

[7] The "Participation Interest Percentage" is, on and after December 28. 2016, 45%, subject to certain reductions and conditions as set forth on p. I-22 of Annex I.

Section 5.2, each of which makes any payment obligation accrue and become due and payable only when and to the extent there is an Available Amount sufficient to proceed all the way down to the applicable level of the waterfall, ranging from "Eighth" to "Fifteenth."

41.    Importantly, the provision of Section 5.2 that specifically governs the accrual of the Participation Interest obligation following an Event of Default (including that resulting from the chapter 11 filings) is Section 5.2(c), under which provision the Participation Interest occupies and is payable pursuant to clauses "Eleventh," "Fourteenth" and "Fifteenth" of the waterfall applicable to the Available Amount (if any) on each quarterly Distribution Date.

42.    The general "acceleration" language in the general default section of the Prepetition Loan Agreement does not alter any of the foregoing waterfall. The provision of the Prepetition Loan Agreement that specifically governs the accrual of any payment obligation respecting the Participation Interest following an Event of Default (Section 5.2(c)) prevails over any more general language governing the effect of an Event of Default on "Obligations" generally. *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 133 N.E.2d 688, 150 N.Y.S.2d 171 (1956) (under New York law, where there are general and specific provisions relating to the same matter, the specific provision controls); *DiPizio Constr. Co., Inc. v. Erie Canal Harbor Dev. Corp.*, 120 A.D.3d 905, 907, 991 N.Y.S.2d 683 (N.Y.App.Div. 2014) (same).

43.    Moreover, just as the acceleration, upon bankruptcy, of a note cannot turn unmatured interest into matured interest (*see, e.g., In re Solutia Inc.*, 379 B.R. 473, 486-87 (Bankr. S.D.N.Y. 2007) (notes were accelerated and deemed matured upon bankruptcy filing, but such acceleration did not transform OID that had not yet accrued into a matured, due and payable claim)), the acceleration of the LNV loan did not turn unmatured interest -- in the form of the contingent Participation Interest payments that had not yet accrued and become due and payable

21

under Section 5.2 -- into amounts that became immediately due and payable outside the

operation of the "Available Amount" waterfall provisions. *See also Ultra Petroleum Corp. v. Ad*

*Hoc. Comm. of Unsecured Creditors of Ultra Res., Inc. (In re Ultra Petroleum Corp.)*, 913 F.3d

533 (5th Cir. 2019) ("The Note Agreement's acceleration clause doesn't change things because it

operates as an *ipso facto* clause by keying acceleration to, among other things, the debtor's

decision to file a bankruptcy petition…. And the parties agree that an *ipso facto* clause is

unenforceable. '[W]hether interest is considered to be matured or unmatured for the purpose

of [§ 502(b)(2)] is to be determined without reference to any *ipso facto* bankruptcy clause in the

agreement creating the claim.' [quoting *Collier on Bankruptcy* and citing H.R. Rep. No. 95-595,

at 352-53 (1977)] …. [*I*]*pso facto* clauses count for nothing when deciding maturity under §

502(b)(2)."); *Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 296 (2d Cir. 2009)

("The normal consequence of acceleration is that interest payments that would have been due in

the future are no longer due, because, after acceleration, the entire principal is immediately due

and owing; in other words, future interest payments are 'unearned' because the creditor is no

longer loaning the debtor the principal."); *In re Nair*, 320 B.R. 119, 126 (Bankr. S.D. Tex. 2004)

("Section 502(b) requires claims to be determined 'as of the date of the filing of the petition.'

The prohibition against claims for 'unmatured interest' is designed to avoid an acceleration of

future interest to create a claim against the estate.").

     44.     In short, the acceleration of the LNV loan cannot make obligations respecting the

Participation Interest immediately due and payable when, by the plain terms that govern the

Participation Interest—including when there is an Event of Default—such payment obligations

accrue only as and when the "Available Amount" (if any) for any given quarter exceeds certain

deductions. Indeed, how could the Participation Interest payments became "due and payable"

upon acceleration of the LNV loan when no one can possibly quantify how much, if any amount,
supposedly became due and payable? LNV itself admits that "the Participation Interest depends
entirely on the revenue stream from White Eagle's portfolio of life insurance policies, and is only
payable when there is sufficient cash to flow through the applicable payment waterfall" (LNV's
Motion to Dismiss Adversary Complaint ("Motion to Dismiss") [Adv. Proc. No. 19-50096 (KG),
Adv. Docket No. 29], p. 41 (emphasis added). Thus, necessarily, the Participation Interest
obligations cannot have matured and presently be due and payable – whether and when any
amounts will accrue and become due and payable on account of the Participation Interest is
uncertain and completely dependent upon conditions being satisfied in the future. *See also
Brockenbrough v. Commissioner, IRS*, 61 B.R. 685, 686 (W.D. Va. 1986) (a contingent claim is
"one which the debtor will be called upon to pay only upon the occurrence or happening of an
extrinsic event which will trigger the liability of the debtor to the alleged creditor" (internal
quotation marks and citation omitted)).

**D.     The Unamortized Portion of the OID Represented By the $4 Million Up-Front Fee is
        Unmatured Interest Subject to Disallowance**

        45.     As discussed above, the Up-Front Fee —retained by LNV out of the initial
advance— constituted original issue discount or OID. By virtue of the Up-Front Fee, LNV's
loan has always been $4 million in excess of the amount of the proceeds actually received by
White Eagle from LNV.

        46.     It is axiomatic that where the principal face amount of a loan is in excess of the
loan proceeds received by the borrower, the difference constitutes OID, subject to amortization
over the life of the loan.[8] LNV itself has acknowledged: "OID exists when a lender does not

---

[8] As observed by courts including some in the Third Circuit, OID should be calculated by the "straight line"
method, by which the amount of the discount is spread equally over the duration of the term of the note, so that the
same amount of interest accrues during each day of such term. *See, e.g., In re Allegheny Int'l, Inc.*, 100 B.R. 247,

advance the funds stated in the face amount of the debt instrument, and the unamortized delta may be treated as interest in bankruptcy." (Motion to Dismiss, p. 35.)  This is precisely what occurred with respect to LNV's retention of $4 million out of the purported initial advance. Calling the $4 million an "Up-Front Fee" does not change the substance of what happened— White Eagle received $4 million less than the stated principal amount of the debt.  For the same or similar reasons set forth above in Section C relating to the Participation Interest, the OID represented by the $4 million Up-Front Fee (to the extent unamortized as of the Plan Effective Date) constitutes unmatured interest that should be disallowed.

47.    Section 502's legislative history states that "[i]nterest disallowed under this paragraph includes postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents *original discounting* of the claim." H. Rep. No. 95-595, 352–53 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6308-10 (emphasis added); S. Rep. No. 95-989, 62-63 (1978), 1978 U.S.C.C.A.N. 5787, 5848-49 (emphasis added).  Based on the legislative history's explicit reference to "original discounting," courts have held that OID that is unamortized as of the petition date constitutes "unmatured interest" under section 502(b)(2) and is not allowable in a bankruptcy case. *See, e.g., In re Capital, LLC*, 495 B.R. at 263 ("unamortized [original issue discount] constitutes 'unmatured interest' under section 502(b)(2) and must be disallowed"); *In re Pengo Indus., Inc.*, 962 F.2d at 546 ("The term 'unmatured interest,' which is not defined by the Bankruptcy Code, encompasses OID.  The economic reality of original issue discounting bolsters this conclusion."); *In re Solutia*, 379 B.R. 473, 486 (Bankr.

---

254 (Bankr. W.D. Pa. 1989) ("based on the plain language of the legislative history [of section 502(b)(2), which provides that unmatured interest should be "pro-rated" and disallowed to the extent it was for interest after the petition date], the original issue discount should be determined on a straight-line basis").

S.D.N.Y. 2007) ("The legislative history of this section is clear that this provision was intended to apply to notes issued at a discount").

48.     Importantly, fees like the Up-Front Fee – without any separate consideration and justification – are commonly understood by courts, as well as lenders and borrowers, as a synonym for OID. *See, e.g., General American Communications Corp.*, 63 B.R. at 545 ("[i]nterest is the compensation fixed by the parties for the use of money"; "Although not denominated as interest, the Fees [upfront payment of 10% of principal amount of each of the financing transactions] were plainly charges for the use of money and are by definition interest."); *Mims*, 307 B.R. at 856 (purported initial and annual "facility fees" were tantamount to interest in context of usury analysis, where there was "no distinctly separate and additional consideration" from the lender for the fees (since lender had already agreed to make the agreed amount of principal available to borrower); interest was "disguised as an additional fee"); Steven Miller, "Syndicated Loans" in *Handbook of Finance, Financial Markets and Instruments*, p. 334 (Frank Fabrozzi, ed. 2008) ("An up-front fee, which is the same as an original-issue discount in the bond market, is a fee paid by the issuer."). *See also Agile Opportunity Fund, LLC v. Vectormax Corp.,* 2011 N.Y. Misc. LEXIS 6617, *2-*5, *8-*11 (N.Y.S.Ct. Dec. 29, 2011) ("Where the lender provides for a legal rate of interest in the notes, but charges *additional fees* as protection against the risk of loss, it may well be that these charges are indirect charges of interest, however denominated, and may render the agreements in violation of the usury statutes." (emphasis added)); *Capital One Fin. Corp. v. Comm'r*, 130 T.C. 147, 153, 2008 U.S. Tax Ct. LEXIS 11 (2008) ("Respondent has conceded that cash advance fees generally increase OID under [Internal Revenue Code provisions/procedures]. When a cardholder repays the loan (the amount of cash advanced), the cardholder will also pay the cash advance fee. Thus, the

SRPM [stated redemption price at maturity] is the amount of the loan plus the fee. As the SRPM

is greater than the issue price (the amount of the loan), there is OID on the transaction.").

49.    Accordingly, pursuant to sections 502(b)(2) and 506, that portion of the OID

represented by the $4 million Up-Front Fee that is unamortized as of the Plan Effective Date

must be deducted from the allowed amount of LNV's claim.[9]

**E.    The Allowed Amount of the Separate Components of the Prepetition Lender Secured Claims Should Be Appropriately Estimated**

50.    The Debtors submit that the basic claim-analysis process that the Bankruptcy

Court for the Southern District of New York utilized in *In re Solutia Inc.*, 379 B.R. 473 (Bankr.

S.D. N.Y. 2007), is highly instructive.  In that case, the debtor issued secured notes in the face

amount of $223 million, but it received only $182 million in exchange for the notes.[10]  As the

*Solutia* court noted, the approximately $41 million difference between the face amount of the

notes and the value actually received by the debtor for the notes constituted "original issue

discount" or "OID," which courts have uniformly treated as a claim for unmatured interest which

must be amortized (generally at a constant rate) over the life of the loan. *Id.* at 486.  In

determining the allowed amount of the secured noteholder's claim, the court noted that the

applicable indenture agreement provided for the automatic acceleration of the notes upon the

filing of a bankruptcy petition and that, accordingly, the notes' maturity may have been

automatically accelerated to the date of the bankruptcy petition.  While determining that the

allowed claim should comprise a prepetition claim (including all prepetition accruals) and post-

petition interest and charges (allowable under Bankruptcy Code § 506(b)), as more fully

---

[9]  As noted above, the OID should be calculated by the straight line method for purposes of sections 502(b)(2) and 506 of the Bankruptcy Code.

[10]  Specifically, in exchange for notes in the face amount of $223 million, the noteholders funded approximately $200.7 million in cash and received warrants to purchase shares of the debtor's common stock at a certain exercise price, which were determined to have a value of approximately $19 million. Accordingly, in exchange for issuance of the notes, the debtor received net consideration of approximately $181.7 million.

discussed below, the court held that OID that had not accrued or amortized as of the effective date of the debtor's plan of reorganization was "unmatured interest" which had to be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code and was not allowed by virtue of section 506.

### 1.    Prepetition Portion

51.    With regard to the prepetition portion, the *Solutia* court focused on "the base amount of the ... Noteholders' claim" as "the amount actually advanced on the Notes plus the OID [original issue discount, which the court analyzed as interest subject to section 502(b)(2)] accrued to the petition date." 379 B.R. at 486.  As discussed above, in this case, the Debtors believe that the ostensible principal claim unpaid and owing as of the petition date is approximately $367.9 million; provided, however, that the OID represented by the $4 million Up-Front Fee (unamortized as of the Plan Effective Date) must be taken into account and deducted from the face amount of the secured claim as was done in the *Solutia* case.

52.    Subject to the Debtors' claims asserted in the Pending Action, other accrued and unpaid interest and costs payable by the Debtors under the Prepetition Loan Agreement as of the petition date should also be included as part of the Prepetition Lender Secured Claims.

### 2.    Postpetition Portion

53.    The *Solutia* court then proceeded to take into account the oversecured noteholders' postpetition interest claim:

> During the pendency of the Chapter 11 cases, the ... Noteholders have been entitled to pendency interest. Pendency interest must be paid on secured claims [under section 506(b)] .... [B]oth the Debtors and the Creditors' Committee are prepared to allow OID [interest] that accrued during the pendency of these cases to be paid as pendency interest on the Plan's effective date.  This amount, the second piece of the ... Noteholders' allowable claim, needs to be added to the base amount of the ... Noteholders' claim.

27

379 B.R. at 486. This conclusion is based on the interplay between Bankruptcy Code sections 502(b)(2) and 506(b). Specifically, section 502(b)(2) states the general rule that there is a suspension of the accrual of interest on claims as of the date of the filing of the bankruptcy petition; this statute provides that a claim is disallowed to the extent that "such claim is for unmatured interest." 11 U.S.C. § 502(b)(2). A narrow exception to this general rule is set forth in section 506(b), pursuant to which an oversecured creditor will be allowed postpetition interest *to the extent* that such unmatured interest accrues and becomes due and owing during the bankruptcy case *prior to plan confirmation*. *See, e.g., Rake v. Wade*, 508 U.S. 464, 468 (1993), *superseded by statute on other grounds* ("It is generally recognized that the interest allowed by § 506(b) will accrue until payment of the secured claim or until the effective date of the plan.").[11] *See also Key Bank N.A. v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir. 1998) ("Even if Key Bank were entitled to pendency interest at 9.5%, that rate would apply only to the period bounded by the petition on one side and on the other by confirmation of the plan, because pendency interest does not continue to run post-confirmation [citations omitted].")

54.    Consistent with the foregoing, based on the fact that the Prepetition Lender Secured Claims are substantially oversecured, the Prepetition Lender Secured Claims should include unpaid interest and costs and fees payable under the Prepetition Loan Agreement accruing from the petition date until the Plan Effective Date (discussed further below). The Debtors further acknowledge that this claim portion should include any payments to which LNV may become entitled on account of the Participation Interest under the Prepetition Loan Agreement during this timeframe, based on actual recoveries from the proceeds of White Eagle's

---

[11] As noted above, under the Debtors' Plan, the Prepetition Lender Secured Claims are treated as unimpaired and will be paid in full with proceeds from a New Exit Facility.

insurance policies realized as of such date, determined in accordance with the applicable

waterfall provision under Section 5.2 of the Loan Agreement.

**3.     Post-Confirmation Portion**

55.     Finally, the *Solutia* court analyzed the post-plan-effective-date timeframe and

concluded that even though the noteholders were oversecured, they were not entitled to recover

as part of their allowed claim the OID (interest) that had not accrued as of the plan effective date:

> Under New York law, the mortgagee upon acceleration may not
> retain or recovery any unearned portion of the interest charged
> even if the collateral is sufficient. *See Birman v. Schwartz*, 59
> Misc.2d 184, 186, 298 N.Y.S.2d 185 (Sup.Ct. Special Term, NY
> Co. 1968); *Atlas Financial Corp. v. Ezrine*, 42 A.D.2d 256, 345
> N.Y.S.2d 36 (1st Dept. 1973); *Bostwick-Westbury Corp. v.
> Commercial Trading Co.*, 94 Misc.2d 401, 404 N.Y.S.2d 968
> (N.Y. City Civ. Ct. 1978) and *Aardwoolf Corp. v. Nelson Capital
> Corp.*, 861 F.2d 46 (2d Cir. 1988).
>
> This court discerns no reason to reach a different result under the
> Code. No principal was advanced to Solutia for the amount of the
> OID. The underlying fact that the obligation is secured does not
> change this fact. There are no apparent bankruptcy policy reasons
> to be found in the legislative history, Code §§ 502 and 506 and the
> relevant case law to warrant different treatment for unsecured and
> secured OID. And the unfairness that Congress was concerned
> with is just as real with a secured claim as an unsecured one - that
> a discounted note paid off early in its life span would therefore
> have a higher claim value than one paid off later, if unmatured
> interest was not disallowed. Importantly, this result is totally
> consistent with New York Law.

379 B.R. at 486-87. Consistent with the foregoing, the Debtors submit that, as of the Plan

Effective Date, the Prepetition Lender Secured Claims should be fixed, and the Participation

Interest claims, as well as any other charges and costs provided for under the Prepetition Loan

Agreement, that may otherwise purportedly accrue or become due and payable after the Plan

Effective Date should be estimated at zero dollars ($0).

56.    LNV is not entitled to any postpetition Participation Interest claim that has not accrued and become payable as of the Plan Effective Date.  This result is mandated by section 502(b), which generally prohibits the allowance of unmatured interest as of the petition date, and section 506, which only allows postpetition interest for an oversecured creditor until plan confirmation.

57.    Accordingly, based on the foregoing, the Prepetition Lender Secured Claims should be estimated as set forth in the Motion under Bankruptcy Code sections 502(c) and 105(a).

### Notice

58.    Notice of this Motion has been provided to the following parties, or their counsel, if known:  (a) the Office of the United States Trustee, (b) counsel for LNV and CLMG; and (c) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

59.    No prior request for the particular relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court: (a) enter an order, substantially in the form annexed as **Exhibit A** hereto, granting the Motion, and (b) grant such other and further relief as may be just and appropriate.

Dated:  April 11, 2019                              PACHULSKI STANG ZIEHL & JONES LLP

                                                    */s/ Colin R. Robinson*
                                                    Richard M. Pachulski (CA Bar No. 90073)
                                                    Ira D. Kharasch (CA Bar No. 109084)
                                                    Maxim B. Litvak (CA Bar No. 215852)
                                                    Colin R. Robinson (DE Bar No. 5524)
                                                    919 North Market Street, 17th Floor
                                                    P. O. Box 8705
                                                    Wilmington, Delaware 19899 (Courier 19801)
                                                    Telephone: (302) 652-4100
                                                    Facsimile:  (302) 652-4400
                                                    E-mail:  rpachulski@pszjlaw.com
                                                             ikharasch@pszjlaw.com
                                                             mlitvak@pszjlaw.com
                                                             crobinson@pszjlaw.com

                                                    Counsel to Debtors and Debtors in Possession