**EXHIBIT A**

**Debtors' Second Amended Joint Chapter 11 Plan of Reorganization**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| WHITE EAGLE ASSET PORTFOLIO, LP, *et al.*,[1] | ) | Case No. 18-12808 (KG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

---

Dated: June 18, 2019

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (CA Bar No. 90073)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  302/652-4100
Facsimile:  302/652-4400
E-mail:    rpachulski@pszjlaw.com
           ikharasch@pszjlaw.com
           mlitvak@pszjlaw.com
           crobinson@pszjlaw.com

Counsel for the Debtors and Debtors-in-Possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  White Eagle Asset Portfolio, LP (0691); White Eagle General Partner, LLC (8312); and Lamington Road Designated Activity Company (7738).  The location of the Debtors' service address in these chapter 11 cases is 5355 Town Center Road, Suite 701, Boca Raton, FL 33486.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME,
        GOVERNING LAW AND DEFINED TERMS ............................................. 1

    A.    Rules of Interpretation, Computation of Time and Governing Law ..................... 1

    B.    Defined Terms ................................................................................................. 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ................ 12

    A.    Administrative Expense Claims ..................................................................... 12

    C.    Professional Fee Claims ................................................................................. 13

    D.    Priority Tax Claims ....................................................................................... 13

ARTICLE III. CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
        AND EQUITY INTERESTS ......................................................................... 14

    A.    Summary ....................................................................................................... 14

    B.    Elimination of Vacant Classes ...................................................................... 14

    C.    Unimpairment of Claims and Equity Interests; No Solicitation or
        Voting ........................................................................................................... 14

    D.    Cramdown ..................................................................................................... 15

    E.    Classification and Treatment of Claims and Equity Interests .......................... 15

    F.    Special Provision Governing Unimpaired Claims ............................................ 18

    G.    Subordinated Claims ..................................................................................... 18

ARTICLE IV. DEEMED ACCEPTANCE OF THIS PLAN ..................................................... 19

    A.    Presumed Acceptance of Plan ....................................................................... 19

    B.    No Presumed Rejection of Plan ..................................................................... 19

    C.    No Voting Classes ......................................................................................... 19

ARTICLE V. MEANS FOR IMPLEMENTATION OF THIS PLAN ....................................... 19

    A.    Prepetition Lender Settlement and General Settlement of Claims ..................... 19

    B.    Corporate Existence ...................................................................................... 19

    C.    Vesting of Assets in the Debtors .................................................................... 21

**Page**

D.      Authorized Financing / Sale Process ................................................21

E.      Treatment of Vacant Classes .........................................................23

F.      No Substantive Consolidation.........................................................23

G.      Release of Liens, Claims and Equity Interests...................................23

H.      Certificate of Incorporation and Bylaws............................................24

I.       Management of Debtors..................................................................24

J.      Company Action ............................................................................24

K.      Cancellation of Notes, Certificates and Instruments............................25

L.      Cancellation of Existing Instruments Governing Security Interests...................25

M.      Restructuring Transactions .............................................................26

N.      Plan Documents ............................................................................26

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS ..............................................26

A.      Assumption of Executory Contracts ...................................................26

B.      Assignment of Executory Contracts ..................................................27

C.      Cure of Defaults for Assumed Executory Contracts.............................27

D.      Assumption of Insurance Policies.....................................................28

E.      Indemnification Provisions ..............................................................28

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS............................................28

A.      Dates of Distributions ....................................................................28

B.      Distribution Agent .........................................................................29

C.      Disputed Claims Reserve ................................................................29

D.      Cash Distributions.........................................................................30

E.      Rounding of Payments ...................................................................30

F.      *De Minimis* Distribution ..................................................................30

**Page**

G.      Distributions on Account of Claims Allowed After the Effective Date ............ 30

H.      General Distribution Procedures ......................................................................... 31

I.      Address for Delivery of Distributions ................................................................ 31

J.      Undeliverable Distributions and Unclaimed Property ....................................... 31

K.      Withholding Taxes ............................................................................................. 31

L.      Setoffs ................................................................................................................ 31

M.      Surrender of Cancelled Instruments or Securities ............................................. 32

N.      Lost, Stolen, Mutilated or Destroyed Securities ............................................... 32

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,
                UNLIQUIDATED AND DISPUTED CLAIMS ............................................ 32

A.      Filing of Proofs of Claim .................................................................................. 32

B.      Disputed Claims ................................................................................................ 33

C.      Procedures Regarding Disputed Claims ............................................................ 33

D.      Allowance of Claims and Equity Interests ........................................................ 33

ARTICLE IX. EFFECTIVENESS OF THIS PLAN .................................................................. 34

A.      Conditions Precedent to the Effective Date ...................................................... 34

B.      Waiver of Conditions ........................................................................................ 36

C.      Effect of Non-Occurrence of Conditions to Effectiveness ................................ 36

D.      Consummation of this Plan ................................................................................ 36

ARTICLE X. RELEASE, INJUNCTION AND RELATED PROVISIONS ............................. 37

A.      General ............................................................................................................... 37

B.      Release by Debtors ............................................................................................ 37

C.      Release by Holders of Claims and Equity Interests .......................................... 38

D.      Discharge of Claims .......................................................................................... 39

E.      Exculpation ........................................................................................................ 39

**Page**

    F.      Preservation of Rights of Action ........................................................... 40

    G.     Injunction ............................................................................................... 40

ARTICLE XI. BINDING NATURE OF PLAN ............................................................... 41

ARTICLE XII. RETENTION OF JURISDICTION .................................................... 41

ARTICLE XIII. MISCELLANEOUS PROVISIONS ....................................................... 43

    A.     Payment of Statutory Fees and Filing of Reports ................................. 43

    B.     Modification of Plan ............................................................................. 43

    C.     Revocation of Plan ............................................................................... 43

    D.     Entire Agreement ................................................................................. 44

    E.     Closing of Chapter 11 Cases ............................................................... 44

    F.      Successors and Assigns ........................................................................ 44

    G.     Reservation of Rights ........................................................................... 44

    H.     Further Assurances ............................................................................... 45

    I.       Severability .......................................................................................... 45

    J.      Service of Documents .......................................................................... 45

    K.     Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code ........................................................................... 46

    L.     Governing Law .................................................................................... 46

    M.    Tax Reporting and Compliance ........................................................... 46

    N.     Exhibits and Schedules ........................................................................ 46

    O.     No Strict Construction ......................................................................... 46

    P.     Controlling Document .......................................................................... 47

**Exhibit A - Prepetition Lender Settlement Agreement**

## DEBTORS' SECOND AMENDED JOINT CHAPTER 11
## PLAN OF REORGANIZATION

WHITE EAGLE ASSET PORTFOLIO, LP and its debtor affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), propose the following *second amended* joint chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. This Plan is consistent with, and incorporates the terms of, the Prepetition Lender Settlement Agreement and the Prepetition Lender Settlement Order.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to and consistent with the terms of the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order (including any and all rights of the Lender Parties thereunder), the DIP Financing Documents, and the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date subject to the consent of the Lender Parties.

If this Plan cannot be confirmed as to some or all of the Debtors, then subject to the terms set forth herein, (a) this Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke this Plan as to any Debtor and confirm this Plan as to the remaining Debtors to the extent required, in each case subject to the consent of the Lender Parties.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to

an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    *"Accrued Professional Compensation"* means, with respect to a particular Professional, compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

2.    *"Administrative Expense Claim"* means any Claim other than an Intercompany Claim or Professional Fee Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed pursuant to sections 365, 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the business of the Debtors; and (b) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtors during the Chapter 11 Cases.

3.    *"Administrative Expense Claims Bar Date"* means (i) with respect to any Administrative Expense Claim (other than a Professional Fee Claim or an Administrative Expense Claim as specified in subparagraph (B) or (C) of section 503(b)(1) of the Bankruptcy Code held by a Governmental Unit) becoming due on or prior to May 31, 2019, on June 28, 2019 at 5:00 p.m. (prevailing Eastern time), and (ii) with respect to any Administrative Expense Claim (other than a Professional Fee Claim or an Administrative Expense Claim as specified in subparagraph (B) or (C) of section 503(b)(1) of the Bankruptcy Code held by a Governmental Unit) becoming due between June 1, 2019 and the Effective Date, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

4.    *"Administrative Expense Claims Objection Deadline"* means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) thirty (30) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim.

5.    *"Adversary Dismissal Order"* means the *Order Granting Voluntary Dismissal of Adversary Proceeding* [Adv. Docket No. 70].

6.    *"Adversary Proceeding"* means the adversary proceeding commenced by the Debtors and Emergent Capital, Inc. in the Bankruptcy Court against LNV Corporation, Silver Point Capital L.P., and GWG Holdings, Inc., Adv. Proc. No. 19-50096 (KG).

7.    *"Affiliate"* means an "affiliate" as defined in section 101(2) of the Bankruptcy Code and also includes any other Entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity. For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct

2

or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

8.      "*Allowed*" means any Claim or Equity Interest (a) that is a Scheduled Claim that has not been superseded by a Filed Proof of Claim or objected to or subject to a request to estimate by the Scheduled Claims Objection Deadline, or as to which any objection has been determined by a Final Order to be in favor of the Holder thereof or such request for estimation resolved by a Final Order in the amount set forth in such Final Order, (b) that is expressly allowed under this Plan (including the DIP Financing Claims and the Prepetition Lender Secured Claim), (c) that is not Disputed (including for which a Proof of Claim has been timely Filed in a liquidated and noncontingent amount that has not been objected to by the Unscheduled Claims Objection Deadline or as to which any such objection has been overruled by Final Order), (d) that is either allowed or determined by Final Order, or (e) that is agreed to by the Debtor or Reorganized Debtor, as applicable, and the Holder of such Claim or Equity Interest.

9.      "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

10.      "*Amended Constituent Documents*" means the limited partnership agreement of White Eagle executed as part of the Prepetition Lender Settlement Agreement, the limited liability company agreement of WEGP executed as part of the Prepetition Lender Settlement Agreement, and the power of attorney executed as part of the Prepetition Lender Settlement Agreement, in each case as amended from time to time in accordance with the Prepetition Lender Settlement Agreement and the Prepetition Lender Settlement Order.

11.      "*Assets*" means all of the right, title, and interest of a Debtor in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

12.      "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

13.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

14.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

15.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

16.      "*Bar Date*" means the deadline set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtors as set forth in the Bar Date Order.

17.      "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 315].

18.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

3

19.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

20.    "*Cash Collateral*" means "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) in which the Lender Parties have an interest.

21.    "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

22.    "*Chapter 11 Cases*" means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code as of December 17, 2018, and styled *In re White Eagle Asset Portfolio, LP, et al.*, Case No. 18-12808 (KG).

23.    "*Claim*" means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

24.    "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

25.    "*Collateral*" means all of the Assets and property of the Debtors as set forth in the Prepetition Loan Agreement and the other Transaction Documents (as defined in the Prepetition Loan Agreement), including (i) White Eagle's portfolio of life insurance policies, (ii) all rights, claims, and causes of action related to or arising from such policies (including potential or pending actions to recover and receive proceeds of such policies), (iii) general intangibles (including accounts receivable) and (iv) the equity interests in White Eagle.

26.    "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

27.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

28.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

29.    "*Consummation Date*" means the date on which the Prepetition Lender Secured Claim has been satisfied in full consistent with the terms of this Plan, the Prepetition Lender Settlement Agreement, and the Prepetition Lender Settlement Order, either by (i)

4

payment in full of the Early Payoff Amount or the Payoff Amount, as applicable, to the Prepetition Agent, which must occur no later than the Outside Closing Date, or (ii) the transfer of any unsold Collateral to the Lender Parties after the Outside Closing Date.

30.    "*Debtor(s)*" means, individually, White Eagle Asset Portfolio, LP, Lamington Road Designated Activity Company, and White Eagle General Partner, LLC, in each case, in their capacities as debtors in the Chapter 11 Cases.

31.    "*Debtor(s) in Possession*" means, individually, each Debtor, as debtor in possession in their Chapter 11 Cases as of the Petition Date and, collectively, all Debtors, as debtors in possession in the Chapter 11 Cases.

32.    "*DIP Financing Claim*" means any Claim asserted against the Debtors arising under the DIP Financing Documents.

33.    "*DIP Financing Documents*" means any order, loan agreement, security or pledge agreement, or other ancillary documents, each as amended, modified, or supplemented in accordance with the terms thereof, pursuant to which debtor-in-possession financing is extended to the Debtors, including by the Lender Parties or any Affiliate of the Lender Parties. The DIP Financing Documents shall have a maturity date that is no later than the Outside Closing Date.

34.    "*DIP Liens*" means the liens and security interests securing the DIP Financing Claim under the DIP Financing Documents.

35.    "*Disallowed*" means, as to any Claim (or portion thereof) or Equity Interest, a Claim or Equity Interest against any Debtor that (i) has been disallowed by a Final Order, (ii) is an Unscheduled Claim as to which no Proof of Claim has been Filed by the Bar Date or deemed timely Filed pursuant to any Final Order, or (iii) has been agreed to by the holder of such Claim and the applicable Debtor to be equal to $0 or to be expunged.

36.    "*Disclosure Statement*" means that certain *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

37.    "*Disputed*" means, as to any Claim (or portion thereof) or Equity Interest against the Debtors that has not been Allowed or Disallowed, (i) if no Proof of Claim has been Filed by the Bar Date, the Administrative Expense Claims Bar Date or the Professional Fee Claims Bar Date, as applicable, a Scheduled Claim which is the subject of an objection or motion for estimation Filed by the Scheduled Claims Objection Deadline in accordance with the Bar Date Order, this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, which has not been withdrawn or determined by a Final Order; (ii) if a Proof of Claim for any Unscheduled Claim other than an Administrative Expense Claim or Professional Fee Claim has been Filed by the Bar Date and has been objected to or subject to a motion to estimate Filed by the Unscheduled Claims Objection Deadline, which has not been withdrawn or determined by a Final Order; and (iii) if a request for payment of an Administrative Expense Claim or Professional Fee Claim has been Filed by the Administrative Expense Claims Bar Date or Professional Fee Claims Bar Date, respectively, any such Administrative Expense Claim or Professional Fee Claim that has been objected to or subject to a motion to estimate Filed by the Administrative Expense Claims Objection Deadline or the Professional Fee Claims Objection Deadline, respectively, which has not been withdrawn or determined by a Final Order; *provided* that the Prepetition Lender Secured Claim and the DIP Financing Claims are not Disputed.

38.    "*Disputed Claims Reserve*" has the meaning set forth in Section VII.C.

5

39.    "*Distribution Agent*" means the Debtors or the Reorganized Debtors, as applicable, or any party designated by the Debtors or the Reorganized Debtors, as applicable, to serve as distribution agent under this Plan.

40.    "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Confirmation Date.

41.    "*Early Payoff Amount*" has the meaning set forth in the Prepetition Lender Settlement Agreement.

42.    "*Effective Date*" means the Business Day that this Plan becomes effective as provided in Article IX hereof.

43.    "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

44.    "*Equity Interest*" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares of stock or limited company interests, *provided that* the term "Equity Interest" does not include any "Participation Interest" (as defined in the Prepetition Loan Agreement) or any other interest that may be asserted by the Prepetition Agent or the Prepetition Lender in connection with the Prepetition Loan Agreement. Any interests asserted by the Prepetition Agent and the Prepetition Lender with respect to the Debtors are addressed and resolved pursuant to the terms of the Prepetition Lender Settlement Agreement and the Prepetition Lender Settlement Order.

45.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

46.    "*Estates*" means the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

47.    "*Estimation Motion*" means the *Motion of Debtors Pursuant to 11 U.S.C. §§ 502(c) and 105(a) to Estimate Secured Claims of LNV Corporation and CLMG Corp. for Distribution Purposes* [Docket No. 200].

48.    "*Exculpated Parties*" means, collectively, the Debtors, the Reorganized Debtors, the Debtors' directors, officers, and managers who served in such capacity during the Chapter 11 Cases, and the Debtors' professionals retained in these Chapter 11 Cases.

49.    "*Executory Contract*" means a contract to which any Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

50.    "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

51.    "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

52.    "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or

6

as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

53.  "*General Unsecured Claim*" means any prepetition Claim against any Debtor that is not a/an: (a) Administrative Expense Claim; (b) Priority Tax Claim; (c) DIP Financing Claim; (d) Professional Fee Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Prepetition Lender Secured Claim; (h) Intercompany Claim; or (i) Equity Interest.

54.  "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

55.  "*Holder*" means an Entity holding a Claim against, or Equity Interest in, any Debtor.

56.  "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

57.  "*Initial Distribution Date*" means, subject to the "Treatment" sections in Article III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

58.  "*Insolvency or Liquidation Proceeding*" means any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

59.  "*Insurance Policies*" means all insurance policies maintained by the Debtors as of the Petition Date, including all life insurance policies or life settlements in respect of which any of the Debtors is a direct or indirect owner or is beneficiary.

60.  "*Intercompany Claims*" means any Claims (whether for subordination, contribution, reimbursement, or otherwise) of a Debtor or an Affiliate thereof against any other Debtor, including (i) the purported $5,385,975.90 Claim held by Imperial Finance and Trading, LLC against White Eagle, (ii) the intercompany notes between Markley Asset Portfolio LLP and Lamington Road Designated Activity Company, and (iii) any Claims of a non-Debtor Affiliate of a Debtor on account of payment by such non-Debtor Affiliate of any Scheduled Claims.

61.  "*Lender Parties*" means, together, LNV Corporation, a Nevada corporation, and CLMG Corp., a Texas corporation.

62.  "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge,

charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

63.      *"Liquidation Agent"* means Joseph J. Farnan, Jr. or any replacement pursuant to (and in accordance with) the Amended Constituent Documents (including any and all rights of the Lender Parties thereunder).

64.      *"Litigation Claims"* means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Entity, including, without limitation, the Causes of Action of the Debtors.

65.      *"Local Rules"* means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

66.      *"Maple"* means, together, Maple Life Analytics, LLC and Brean Capital, LLC, as due diligence and marketing agent to the Debtors pursuant to the Prepetition Lender Settlement Agreement and the Prepetition Lender Settlement Order.

67.      *"Non-Debtor Affiliates"* means Emergent Capital, Inc., Imperial Finance and Trading, LLC, Lamington Road Bermuda, LTD; OLIPP IV, LLC and Markley Asset Portfolio, LLC.

68.      *"Ordinary Course Professionals Order"* means the *Order Authorizing Debtors to Retain, Employ, and Compensate Certain Professionals Utilized By Debtors in the Ordinary Course of Business* [Docket No. 80].

69.      *"Other Priority Claim"* means any Claim other than an Intercompany Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

70.      *"Other Secured Claim"* means any Secured Claim other than a Prepetition Lender Secured Claim or an Intercompany Claim.

71.      *"Outside Closing Date"* means December 30, 2019 at 12:00 noon (New York time).

72.      *"Payoff Amount"* has the meaning set forth in the Prepetition Lender Settlement Agreement.

73.      *"Person"* means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

74.      *"Petition Date"* means the date on which each Debtor commenced its respective Chapter 11 Case (i.e., November 14, 2018 with respect to Lamington Road Designated Activity Company and White Eagle General Partner, LLC and December 13, 2018 with respect to White Eagle).

75.      *"Plan"* means this *Debtors' Second Amended Joint Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

76.    "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

77.    "*Plan Documents*" means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof.

78.    "*Plan Schedule*" means a schedule annexed as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time with the consent of the Lender Parties).

79.    "*Prepetition Agent*" means CLMG Corp. in its capacity as administrative agent and collateral agent under the Prepetition Loan Agreement, and its successors and assigns.

80.    "*Prepetition Lender*" means LNV Corporation, in its capacity as lender under the Prepetition Loan Agreement, and any successors and assigns thereof.

81.    "*Prepetition Lender Lien*" means the valid first priority lien on and security interest in all Collateral securing the Prepetition Lender Secured Claim.

82.    "*Prepetition Lender Secured Claim*" means any Claim arising under the Prepetition Loan Agreement and the documents ancillary thereto.

83.    "*Prepetition Lender Settlement Agreement*" means the Settlement Agreement dated as of May 24, 2019 by and between: (i) the Debtors, (ii) the Non-Debtor Affiliates, and (iii) the Prepetition Agent and the Prepetition Lender (including the exhibits thereto), a copy of which is annexed hereto as **Exhibit A**.

84.    "*Prepetition Lender Settlement Documents*" means, collectively, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, and the Amended Constituent Documents, the terms of each of which are incorporated in this Plan in their entirety.

85.    "*Prepetition Lender Settlement Order*" means the *Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement Between Debtors, Certain Non-Debtor Affiliates, and Lender Parties* [Docket No. 316].

86.    "*Prepetition Loan Agreement*" means the Second Amended and Restated Loan and Security Agreement dated as of January 31, 2017 by and among White Eagle, as borrower, the Prepetition Agent, Imperial Finance & Trading, LLC, as initial servicer, initial portfolio manager, and as guarantor, Lamington Road Bermuda Ltd., as portfolio manager, the Prepetition Lender, as sole lender, and the Prepetition Agent, as administrative agent (as amended, waived, supplemented, or as otherwise modified from time to time).

87.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

88.    "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class, unless this Plan provides otherwise.

9

89.    "*Professional*" means (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

90.    "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

91.    "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

92.    "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, the later of (a) ninety (90) days after the Effective Date and (b) thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

93.    "*Proof of Claim*" means a proof of Claim or Equity Interest Filed against any Debtor in the Chapter 11 Cases.

94.    "*Reinstated*" means, with respect to any Claim, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, contractual rights to which such Claim entitles the Holder of such Claim.

95.    "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns and Affiliates (whether by operation of law or otherwise), and each of their respective present and former officers, directors, employees, managers, managing members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, members, employees, subsidiaries, divisions, management companies, and other representatives, in each case acting in such capacity.

96.    "*Released Parties*" means, collectively, each in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Non-Debtor Affiliates; (d) the Lender Parties; and (e) the Related Persons of each of (a) through (d) of the foregoing.

97.    "*Releasing Debtor Parties*" means each of the Debtors and each of the Reorganized Debtors, each in their individual capacities and as debtors-in-possession, and each of their respective Related Persons.

10

98.    "*Releasing Parties*" means, collectively, each in its capacity as such, Holders of Claims, including the Prepetition Agent and the Prepetition Lender, and the Holders of Equity Interests, including the Non-Debtor Affiliates, that are Unimpaired under this Plan and the Related Persons thereof.

99.    "*Reorganized Debtors*" means each of the Debtors, as reorganized pursuant to this Plan on or after the Consummation Date.

100.    "*Restructuring*" means the financial restructuring of the Debtors, the principal terms of which are set forth in this Plan, the Disclosure Statement, and the Prepetition Lender Settlement Documents.

101.    "*Restructuring Transactions*" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter (except as otherwise specified herein) that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including (a) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and the Plan Documents; and (c) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with this Plan and the Plan Documents.

102.    "*Sale Deadlines*" has the meaning set forth in the Prepetition Lender Settlement Agreement.

103.    "*Sale Process*" has the meaning set forth in the Prepetition Lender Settlement Agreement.

104.    "*Sale Trigger Event*" has the meaning set forth in the Prepetition Lender Settlement Agreement.

105.    "*Scheduled Claim*" means a Claim that appears on the Schedules and is not listed at $0 or marked as unliquidated, contingent, or disputed.

106.    "*Scheduled Claims Objection Deadline*" means the deadline for the Debtors, the Lender Parties, or any other party in interest to object to any Scheduled Claims as set forth in the Bar Date Order.

107.    "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtors with the Bankruptcy Court.

108.    "*Secured Claim*" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

109.    "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

110.    *"Stamp or Similar Tax"* means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

111.    *"Statutory Fees"* means fees payable pursuant to 28 U.S.C. § 1930.

112.    *"Unexpired Lease"* means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

113.    *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

114.    *"Unscheduled Claim"* means any Claim that does not appear on the Schedules or that appears on the Schedules and is listed at $0 or marked as unliquidated, contingent, or disputed for which a Proof of Claim is filed by the Holder of such Claim on or before the Bar Date.

115.    *"Unscheduled Claims Objection Deadline"* means the deadline for the Debtors, the Lender Parties, or any other party in interest to object to any Unscheduled Claims as set forth in the Bar Date Order.

116.    *"White Eagle"* means Debtor White Eagle Asset Portfolio, LP.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

A.    **Administrative Expense Claims**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors, as applicable, in accordance with such applicable terms and conditions relating thereto and the DIP Financing Documents without further notice to or order of the Bankruptcy Court. All Statutory Fees shall be paid as such fees become due.

In the event that an Administrative Expense Claim is not paid by the Debtors in the ordinary course, the Holder of such Administrative Expense Claim (other than an Administrative Expense Claim as specified in subparagraph (B) or (C) of section 503(b)(1) of the Bankruptcy Code held by a Governmental Unit) must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtors or the Reorganized Debtors, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party by the Administrative Expense Claims Objection Deadline. Each Holder of an Allowed Administrative Expense Claim will be paid by the Debtors or the Reorganized Debtors, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Administrative Expense Claim.

**B.    DIP Financing Claims**

The DIP Financing Claims are hereby deemed Allowed in an amount pursuant to the DIP Financing Documents. The DIP Financing Claims shall be satisfied by the Debtors in accordance with the terms of the DIP Financing Documents, and the Prepetition Lender Settlement Documents.

**C.    Professional Fee Claims**

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtors or the Reorganized Debtors, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim and, upon entry of an order of the Bankruptcy Court granting such fee application, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order; *provided* that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order and the DIP Financing Documents.

Objections to any Professional Fee Claim must be Filed and served on the Debtors or the Reorganized Debtors, as applicable, and the requesting party by the Professional Fee Claim Objection Deadline except as otherwise provided in the Ordinary Course Professionals Order. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtors or the Reorganized Debtors, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim. The Debtors or the Reorganized Debtors, as applicable, will pay Professionals in the ordinary course of business, for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation, effectiveness, and consummation of this Plan, in each case without further application or notice to or order of the Bankruptcy Court in full, in Cash, subject to the DIP Financing Documents; *provided,* that any Professional seeking payment for work performed after the Effective Date through the Consummation Date must serve, on or before the Business Day that is sixty (60) days after the Consummation Date on the Debtors or the Reorganized Debtors, as applicable, and the Lender Parties a request for payment (which may be by e-mail transmission), including the relevant invoices, subject to a review by the Lender Parties for reasonableness upon ten (10) Business Days' notice; *provided, further*, that any payment to a Professional subject to an objection asserted by the Lender Parties during such review period shall not be paid until such objection is resolved consensually with the Lender Parties or, if necessary, by the Bankruptcy Court.

**D.    Priority Tax Claims**

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an

13

Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**    **Summary**

All Claims and Equity Interests, except Administrative Expense Claims, DIP Financing Claims, Professional Fee Claims, and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. This Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtors or any other Entity) prior to the Effective Date.

### Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Prepetition Lender Secured Claim | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 5 | Intercompany Claims | Unimpaired | Deemed to Accept |
| 6 | Equity Interests in Debtors | Unimpaired | Deemed to Accept |

**B.**    **Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**C.**    **Unimpairment of Claims and Equity Interests; No Solicitation or Voting**

All Holders of Allowed Claims and Equity Interests are Unimpaired, are not entitled to vote on this Plan, and are deemed to accept this Plan.

14

**D.**     **Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or is determined to be entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**E.**     **Classification and Treatment of Claims and Equity Interests**

　　　　1.     Class 1 – Other Priority Claims

- *Classification*: Class 1 consists of the Other Priority Claims.

- *Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired.

  Any Allowed Class 1 Claims becoming due after the Effective Date through the Consummation Date will be paid in full in Cash in the ordinary course.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

　　　　2.     Class 2 – Other Secured Claims

- *Classification*: Class 2 consists of the Other Secured Claims.

- *Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) return of such portion of the collateral securing such

Allowed Class 2 Claim with a value sufficient to fully satisfy such Claim; or (D) such other treatment rendering such Claim Unimpaired. Except with respect to Claims that are treated in accordance with the preceding clause (C), each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Unimpaired, and the Holders of Class 2 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

3.    Class 3 – Prepetition Lender Secured Claim

- *Classification*: Class 3 consists of the Prepetition Lender Secured Claim.

- *Allowance and Treatment*: The Holders of the Prepetition Lender Secured Claim have an Allowed Claim against White Eagle in an amount equal to the sum of (i) $382,703,913 (i.e., one hundred four percent (104%) of the principal amount owed under the Prepetition Loan Agreement, plus (ii) the amounts of all accrued and unpaid interest at the contractual non-default rate under the Prepetition Loan Agreement until November 14, 2018 and at the contractual default rate under the Prepetition Loan Agreement (i.e., 200 basis points over the contractual non-default rate) from and after November 14, 2018 (which shall continue to accrue until the Consummation Date), plus (iii) the amounts of all accrued and unpaid fees, costs, and expenses, including professional fees (which shall continue to accrue until the Consummation Date).

  The Prepetition Lender Secured Claim is secured by the Prepetition Lender Lien.

  The Prepetition Lender Secured Claim and the Prepetition Lender Lien are not subject to any defense, counterclaim, offset, charge, or reduction of any kind, whether at law or in equity.

  Immediately upon the Effective Date, the Holders of the Prepetition Lender Secured Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, the Prepetition Lender Secured Claim, all rights and distributions to which such Holder is entitled under the terms of the Prepetition Lender Settlement Documents, and the DIP Financing Documents (including adequate protection payments as set forth therein through the Consummation Date).

  Solely as set forth in the Prepetition Lender Settlement Documents, the Prepetition Lender Secured Claim and the Prepetition Lender Lien will be fully released, terminated, extinguished and discharged (i) upon the payment in full in Cash of the Early Payoff

16

Amount or the Payoff Amount, as applicable, or (ii) upon the transfer of all unsold Collateral to the Prepetition Agent or its designee.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4.    Class 4 – General Unsecured Claims

- *Classification*: Class 4 consists of the General Unsecured Claims.

- *Treatment*: Each Holder of an Allowed Class 4 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive Cash in an amount equal to such Allowed Class 4 Claim on the later of: (a) the Effective Date, or as soon as practicable thereafter; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Class 4 Claim.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by order of the Bankruptcy Court.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5.    Class 5 – Intercompany Claims

- *Classification*: Class 5 consists of the Intercompany Claims.

- *Treatment*: As agreed to by the Debtors and the Non-Debtor Affiliates, pursuant to the terms of the Prepetition Lender Settlement Documents, (i) each Holder of an Allowed Class 5 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive its Pro Rata share of Cash remaining, if any, upon the Consummation Date after the payment in full in Cash of all other Allowed Claims, including DIP Financing Claims, the Prepetition Lender Secured Claim in Class 3 and Allowed General Unsecured Claims in Class 4 and (ii) if unsold Collateral is transferred to the Agent (or its designee) as set forth in the Prepetition Lender Settlement Documents, Holders of Allowed Class 5 Claims shall not receive any distribution hereunder.

17

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6.      Class 6 – Equity Interests in the Debtors

- *Classification*:  Class 6 consists of the Equity Interests in the Debtors.

- *Treatment*:  Pursuant to the Prepetition Lender Settlement Documents, the Holders of the Equity Interests in each of the Debtors as of the Petition Date have agreed that such Equity Interests may be sold or transferred as set forth in the Prepetition Lender Settlement Documents and, if such Equity Interests have not been sold or transferred upon the Consummation Date, such Holders shall retain such Equity Interests in each of the Reorganized Debtors.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Equity Interests in the Debtors will be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 6 Equity Interests in the Debtors are not entitled to vote to accept or reject this Plan and will not be solicited.

## F.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in this Plan and subject to and consistent with the terms of the Prepetition Lender Settlement Documents, nothing under this Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under this Plan.

## G.    Subordinated Claims

The allowance, classification, and treatment of all Claims under this Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Under section 510 of the Bankruptcy Code, upon written notice, the Debtors and the Reorganized Debtors reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under this Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

18

## ARTICLE IV.
## DEEMED ACCEPTANCE OF THIS PLAN

**A.**     **Presumed Acceptance of Plan**

All Classes of Claims and Equity Interests are Unimpaired under this Plan, and are, therefore, presumed to have accepted this Plan pursuant to section 1126 of the Bankruptcy Code.

**B.**     **No Presumed Rejection of Plan**

No Class of Claims or Equity Interests is deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.**     **No Voting Classes**

No Class of Claims or Equity Interests will be entitled to vote to accept or reject this Plan.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

**A.**     **Prepetition Lender Settlement and General Settlement of Claims**

This Plan hereby expressly incorporates all of the terms of the Prepetition Lender Settlement Documents as if fully set forth herein. The Prepetition Lender Settlement Agreement became binding on all parties thereto and all parties in interest in the Chapter 11 Cases upon entry of the Prepetition Lender Settlement Order, which shall continue to be enforceable and binding in all respects on and after the Effective Date. The Prepetition Lender Settlement Documents are essential and integral to this Plan. As set forth in the Prepetition Lender Settlement Documents, no Entity may seek to reject the Prepetition Lender Settlement Agreement, any other Prepetition Lender Settlement Document, or this Plan under section 365 of the Bankruptcy Code (or otherwise) in the Chapter 11 Cases or any other Insolvency or Liquidation Proceeding.

Further, pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to this Plan, subject to and consistent with the terms of the Prepetition Lender Settlement Documents. Except with respect to the DIP Financing Claims, the DIP Liens, the Prepetition Lender Secured Claim, the Prepetition Lender Lien, and any other Claim or Lien expressly Allowed under this Plan, nothing in this Plan or the other Plan Documents constitutes an admission by the Debtors as to the existence, merits, or amount of the Debtors' actual present or future liability on account of any Claim or Lien in accordance with the Confirmation Order effective as of the Effective Date.

**B.**     **Corporate Existence**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Debtors will continue to exist after the Effective Date as separate legal entities, with all of the powers of corporations, limited liability companies, and partnerships pursuant to the applicable law in their states or country of incorporation or organization pursuant to the Amended Constituent Documents.

19

As set forth in the Prepetition Lender Settlement Documents, the Liquidation Agent has been appointed at each Debtor to do the following:

(i)      prior to the occurrence of a Sale Trigger Event, take such actions as the Liquidation Agent determines in his sole and absolute discretion to be necessary or appropriate (including consulting with, directing, and overseeing Maple) for White Eagle to be prepared to launch and implement the Sale Process upon the occurrence of a Sale Trigger Event; *provided* that, prior to the occurrence of a Sale Trigger Event, the Liquidation Agent shall not take any action to commence the marketing of the Collateral to third parties or to otherwise contact potential buyers about the Collateral; and

(ii)     if the Debtors do not pay the Early Payoff Amount in full in Cash to the Prepetition Agent prior to the occurrence of a Sale Trigger Event, the Liquidation Agent shall, automatically on the next Business Day after the occurrence of such Sale Trigger Event and without further order or corporate or other action by the Debtor Parties, the Lender Parties, or any other Person, have the sole authority and the express mandate to (a) conduct the Sale Process, (b) select winning bids for the Collateral, (c) close sale transactions on behalf of the Debtors with respect to the Collateral; *provided* that the Liquidation Agent may not cause the Debtors to transfer any Collateral to a purchaser without first (or simultaneously) receiving the proceeds of such sale (with any credit bid by the Lender Parties being deemed simultaneous receipt of proceeds), (d) prohibit the Debtors from making any expenditure not specified in the DIP Budget (as defined in the Prepetition Lender Settlement Agreement) unless such expenditure is approved in writing by the Lender Parties, (e) obtain DIP Financing (as defined in the Prepetition Lender Settlement Agreement) in accordance with the Prepetition Lender Settlement Agreement, (f) take all other actions as he determines in his sole and absolute discretion are necessary and appropriate to promptly implement and complete the Sale Process and preserve and protect the Collateral (including the commencement, defense and settlement of litigation, if necessary), and (g) exercise veto rights over any action to be taken by the Debtors that is inconsistent with, or that would interfere with or delay timely completion of, the Sale Process.

Subject to the foregoing exclusive authority and mandate granted to the Liquidation Agent, the existing management of the Debtors shall retain all of their other respective management and decision-making powers on behalf of the Debtors. The Liquidation Agent shall exercise the exclusive powers granted under the Prepetition Lender Settlement Agreement in the role of Bankruptcy Court-appointed independent liquidation agent and he shall not be an officer, employee, manager, or director of any of the Debtors.

The Liquidation Agent shall maximize the proceeds from the sale of the Collateral in the manner that he determines to be appropriate in his sole and absolute discretion and, in any event, consistent with traditional fiduciary duties owed by directors and officers of corporations under Delaware law to constituents of bankruptcy estates subject to complying with the Sale Process in all respects as set forth in the Prepetition Lender Settlement Documents; *provided* that the Liquidation Agent may not, in exercising his rights and duties, contest the Sale Process (including the Sale Deadlines), in any way or seek any relief from the Bankruptcy Court to modify the Sale Process (including the Sale Deadlines), or take any other action inconsistent with the terms of the Prepetition Lender Settlement Documents.

On the Effective Date or as soon thereafter as is reasonably practicable, subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Debtors (including, as appropriate as set forth in the Prepetition Lender Settlement Agreement, at the

20

direction of the Liquidation Agent) may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, without limitation: (i) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (ii) the filing of appropriate certificates or articles of incorporation and amendments thereto; and (iii) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

On or after the Consummation Date, subject to the Prepetition Lender Settlement Documents, and without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may take such action not inconsistent with this Plan and as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Consummation Date or any time thereafter, in each case subject to and consistent with the terms of the Prepetition Lender Settlement Documents.

## C.    Vesting of Assets in the Debtors

Except as otherwise provided in this Plan or the Confirmation Order and subject to and consistent with the terms of the Prepetition Lender Settlement Documents, on or after the Effective Date, all property and Assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or this Plan, Avoidance Actions) will vest in the Debtors, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date (including the Prepetition Lender Secured Claim, the Prepetition Lender Lien, the DIP Financing Claim, and the DIP Liens). Notwithstanding the vesting of such property and Assets in the Debtors on the Effective Date, (i) the Debtors shall remain obligated to sell or transfer the Collateral in accordance with the Prepetition Lender Settlement Documents and (ii) the Debtors and the Reorganized Debtors, as applicable, shall remain obligated to provide Holders of Allowed Claims and Equity Interests with the treatment set forth in Articles II and III.

Except as may be otherwise provided in this Plan or the Confirmation Order and subject to and consistent with the terms of the Prepetition Lender Settlement Documents, on and after the Consummation Date, the Reorganized Debtors may operate their business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Consummation Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

## D.    Authorized Financing / Sale Process

As set forth in the Prepetition Lender Settlement Documents, until the occurrence of a Sale Trigger Event, the Liquidation Agent's duties and authorities shall be limited to taking such actions as he determines in his sole and absolute discretion to be necessary or appropriate

(including consulting with, directing, and overseeing Maple) for White Eagle to be prepared to launch and implement the Sale Process. Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, if the Debtors fail to pay the Early Payoff Amount to the Prepetition Agent on or before the occurrence of a Sale Trigger Event, on the next Business Day, the Liquidation Agent shall have sole power to act on behalf of the Debtors as provided in Article V.B(ii) automatically and without further order or corporate action and shall take all actions as he determines in his sole and absolute discretion as necessary or appropriate to exercise his rights and perform his duties in accordance with the terms set forth in the Prepetition Lender Settlement Documents.

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, from and after the Effective Date through the occurrence of a Sale Trigger Event, the Debtors may not sell or transfer any Collateral without approval of the Bankruptcy Court; *provided* that, if the Debtors attempt to sell any Collateral prior to the occurrence of a Sale Trigger Event for an amount which is less than the Early Payoff Amount, the proceeds therefrom (after the payment of any fees owed to Maple as a result of such sale, as applicable) shall be paid to the Prepetition Agent to reduce the Allowed Prepetition Lender Claim dollar for dollar (first in satisfaction of accrued and unpaid interest, fees, costs, and expenses and, then, in satisfaction of principal); *provided, further*, that the Lender Parties' credit bid and objection rights are fully preserved with respect to any such proposed sale or transfer. If any such sale or transfer is approved by the Bankruptcy Court after notice and a hearing, the Debtors are authorized, pursuant to section 1123(a) of the Bankruptcy Code and notwithstanding any otherwise applicable nonbankruptcy law, to enter into and consummate such transaction.

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, after the occurrence of a Sale Trigger Event and notwithstanding any applicable nonbankruptcy law, the Debtors, at the direction of the Liquidation Agent based on the advice of Maple, may sell any or all of their Assets or property (including the equity interests in White Eagle) without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The Lender Parties and Emergent shall each have the right to object to any proposed sale of some or all of the Collateral pursuant to the Sale Process by filing an objection to such sale with the Bankruptcy Court. So long as the Lender Parties and Emergent receive at least seven (7) days' notice of the proposed sale of some or all of the Collateral pursuant to the Sale Process, the filing of such an objection shall not stay any proposed sale. The burden shall be on the objecting party to obtain expedited consideration of such objection (to which any opposing party shall not unreasonably object). At the hearing before the Bankruptcy Court to consider any such objection, the burden shall be on the objecting party to prove that the sale does not satisfy the requirements of section 363 of the Bankruptcy Code; *provided* that such objection shall not challenge the adequacy of the Sale Process as contemplated by the Prepetition Lender Settlement Documents. None of the filing, the pendency, nor the determination of any such objection shall prevent or stay the Collateral from being transferred to the Lender Parties on or promptly after the Outside Closing Date pursuant to the Prepetition Lender Settlement Documents.

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, from and after the Effective Date and notwithstanding any applicable nonbankruptcy law, the Debtors and the Liquidation Agent, as applicable, shall be and are authorized to execute and deliver any loan, financing, and ancillary documents, and shall be and are authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, security agreements, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity; *provided* that, as set forth in the Prepetition Lender Settlement Documents, the Debtors may not incur any additional funded indebtedness after the Effective

Date and through the Consummation Date except to the extent the proceeds of which shall be used simultaneously to pay the DIP Financing Claims and the Prepetition Lender Secured Claim in full in Cash. Any holder of a lien or security interest whose Claim is satisfied under this Plan, shall be required to file terminations of any perfection instruments.

Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Debtors and the Reorganized Debtors to make payments required pursuant to this Plan will be obtained pursuant to the DIP Financing Documents and the Debtors and the Reorganized Debtors' Cash balances, including Cash from the receipt of Insurance Policy proceeds; *provided* that, notwithstanding anything to the contrary herein, the Debtors shall remain subject to the DIP Financing Documents for the use of Cash Collateral (including proceeds of DIP Financing) through the Consummation Date, including the budget and permitted variances and requirement to make adequate protection payments included in the DIP Financing Documents through the Consummation Date. Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable.

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, from and after the Consummation Date and notwithstanding any applicable nonbankruptcy law, the Reorganized Debtors, at the direction of management, shall be and are authorized to execute and deliver any sale and ancillary documents with respect to the Reorganized Debtors' assets, and shall be and are authorized to execute, deliver, file, record and issue any other purchase agreements, bills of sale, assignment and transfer documents, amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, subject to the limitations set forth herein.

## E.     Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.B of this Plan shall receive no Plan Distribution.

## F.     No Substantive Consolidation

This Plan does not provide for substantive consolidation of the Debtors. Each of the Estates of the Debtors shall remain separate and distinct for all purposes under this Plan, including for purposes of classifying and treating Claims under this Plan.

## G.     Release of Liens, Claims and Equity Interests

Except as otherwise provided in this Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan and subject to and consistent with the terms of the Prepetition Lender Settlement Documents, from and after the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates (other than the Prepetition Lender Secured Claim, the Prepetition Lender Lien, the DIP Financing Claims and the DIP Liens) will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtors or the Reorganized Debtors, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

Solely as set forth in the Prepetition Lender Settlement Documents, the Prepetition Lender Secured Claim, the Prepetition Lender Lien, the DIP Financing Claims and the DIP Liens will be fully released, terminated, extinguished and discharged, in each case (i) upon the payment in full in Cash of the Early Payoff Amount or the Payoff Amount, as applicable, to the Prepetition Agent or (ii) upon the transfer of all unsold Collateral to the Prepetition Agent or its designee.

## H.    Certificate of Incorporation and Bylaws

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Debtors shall have executed the Amended Constituent Documents (including the granting of duties and powers to the Liquidation Agent as set forth in the Prepetition Lender Settlement Agreement).

After the Consummation Date, the Reorganized Debtors shall amend or restate the Amended Constituent Documents to satisfy the provisions of this Plan and the Bankruptcy Code and the Prepetition Lender Settlement Documents, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate this Plan (including the Prepetition Lender Settlement Agreement) and the transactions contemplated herein.

## I.    Management of Debtors

As of the Effective Date, subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the initial officers, directors, and managers of the Debtors (except the Independent Manager as defined in the Prepetition Loan Agreement who was removed pursuant to the Prepetition Lender Settlement Order) will be the officers, directors, and managers of the Debtors existing immediately prior to the Effective Date, subject to and consistent with the terms of the Prepetition Lender Settlement Documents and will be compensated on the same basis as existed immediately prior to the Effective Date.  Each such director, officer, and manager will serve from and after the Effective Date pursuant to applicable law and the terms of the Amended Constituent Documents and the other constituent and organizational documents of the Debtors.

## J.    Company Action

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, each of the Debtors, the Reorganized Debtors and the Liquidation Agent, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan or the Prepetition Lender Settlement Documents, as applicable, in the name of and on behalf of the Debtors or the Reorganized Debtors, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors, as applicable, or by any other Person (except for those expressly required pursuant to this Plan or the Prepetition Lender Settlement Documents).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, directors, managers or members of any Debtor or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as

appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or members of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, all matters provided for in this Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtor, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtor, as applicable, or by any other Person. Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, on the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtor, as applicable, as well as the Liquidation Agent, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and each Reorganized Debtor, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

## K.    Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan (including the provisions regarding assumption of Executory Contracts and the continued effectiveness of the DIP Financing Documents) and subject to and consistent with the terms of the Prepetition Lender Settlement Documents, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. Notwithstanding such cancellation and discharge, the Prepetition Loan Agreement shall continue in effect to the extent necessary to: (1) allow the Prepetition Lender and the Prepetition Agent to receive Plan Distributions on account of the Allowed Prepetition Lender Secured Claim and (2) allow the Debtors and the Reorganized Debtors to make distributions pursuant to this Plan and in accordance with the Prepetition Lender Settlement Documents.

## L.    Cancellation of Existing Instruments Governing Security Interests

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, upon payment or other satisfaction of an Allowed Other Secured Claim or Allowed Prepetition Lender Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim or Allowed Prepetition Lender Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests

with respect to its Allowed Other Secured Claim or Allowed Prepetition Lender Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**M.**    **Restructuring Transactions**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

**N.**    **Plan Documents**

The documents, if any, to be Filed as part of the Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein.

## ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACTS

**A.**    **Assumption of Executory Contracts**

On the Effective Date, all Executory Contracts of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) that:

- have previously expired or terminated pursuant to their own terms or by agreement of the parties thereto; or

- have been rejected by order of the Bankruptcy Court.

The Debtors do not have any Unexpired Leases. Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtors' assumption of such Executory Contract, then such provision will be deemed modified such that the transactions contemplated by this Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto. Each Executory Contract assumed pursuant to this Article of this Plan will revest in and be fully enforceable by the Debtors and the Reorganized Debtors in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

None of the Prepetition Lender Settlement Documents may be rejected by the Debtors or the Non-Debtor Affiliates in the Chapter 11 Cases or any other Insolvency or Liquidation Proceeding.

**B.**   **Assignment of Executory Contracts**

Executory Contracts may only be assigned by the Debtors prior to the Consummation Date with the prior written consent of the Lender Parties.  In the event of an assignment of an Executory Contract, at least ten (10) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts a notice of the proposed assumption and assignment that will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will File with the Bankruptcy Court a list of such Executory Contracts to be assigned and the proposed cure amounts.  Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts may otherwise agree.

Any objection by a counterparty to an Executory Contract to a proposed assignment or any related cure amount must be Filed, served and actually received by the Debtors at least three (3) Business Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  The Debtors, in their sole option, reserve the right to reject such Executory Contract at any time in lieu of assuming and assigning it.

**C.**   **Cure of Defaults for Assumed Executory Contracts**

Any monetary amounts by which any Executory Contract to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree.  Any Claims arising under Executory Contracts between the Debtors and their Affiliates shall be treated as Intercompany Claims under this Plan. The Debtors may serve a notice on parties to Executory Contracts to be assumed reflecting the Debtors' intention to assume the Executory Contract in connection with this Plan and setting forth the proposed cure amount (if any).

In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtors, the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  The Debtors or Reorganized Debtors, as applicable, in their sole option, reserve the right to reject such Executory Contract at any time in lieu of assuming it.

**D.    Assumption of Insurance Policies**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, upon the Effective Date, the Debtors will assume all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code and all such Insurance Policies shall vest in the Debtors. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Insurance Policies and all such Insurance Policies shall continue in full force and effect thereafter in accordance with their respective terms. Notwithstanding anything to the contrary contained in this Plan, confirmation of this Plan will not impair or otherwise modify any rights of the Debtors or the Reorganized Debtors under the Insurance Policies.

**E.    Indemnification Provisions**

All indemnification provisions currently in place (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the directors, officers and managers of the Debtors who served in such capacity as of the Petition Date with respect to or based upon any act or omission taken or omitted in such capacities, for or on behalf of the Debtors, will be Reinstated (or assumed, as the case may be), and will survive effectiveness of this Plan. The Liquidation Agent shall be the beneficiary of any such indemnity provisions or, to the extent such indemnity provisions are not applicable, a separate indemnity agreement to be agreed by the Debtors and the Liquidation Agent. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying contract or document as applicable.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.    Dates of Distributions**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, and except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtors shall receive the full amount of the distributions that this Plan or the Prepetition Lender Settlement Documents, as applicable, provides for Allowed Claims or Equity Interests in the applicable Class and in the manner provided herein. In the event that any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan or the Prepetition Lender Settlement Documents, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtors shall be deemed fixed and adjusted pursuant to this Plan and the Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, all payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the

28

Debtors and the Reorganized Debtors.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtors and the Equity Interests in the Debtors shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtors, the Reorganized Debtors, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtors or Equity Interests in the Debtors occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

## B.    **Distribution Agent**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, and except as provided herein, all distributions under this Plan shall be made by the Debtors or the Reorganized Debtors, as applicable, as Distribution Agent, or by such other Entity designated by the Debtors or the Reorganized Debtors, as applicable, as a Distribution Agent on the Effective Date or thereafter. The Debtors or the Reorganized Debtors, as applicable, or such other Entity designated by the Debtors or the Reorganized Debtors, as applicable, to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

None of the Debtors, the Reorganized Debtors, or any Distribution Agent shall have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

## C.    **Disputed Claims Reserve**

Prior to, or concurrently with, the occurrence of the Consummation Date, if the Debtors have paid in full the Early Payoff Amount or the Payoff Amount to the Prepetition Agent, the Debtors shall establish, fund, and maintain a reserve in an amount determined by the Debtors in good faith to be sufficient to pay all Disputed Claims and accrued and unpaid Administrative Expense Claims and Professional Fee Claims (the "Disputed Claims Reserve"). Any payments to be made under this Plan after the Consummation Date shall be paid from the Disputed Claims Reserve. Upon the resolution of all Disputed Claims, Administrative Expense Claims Filed by the applicable Administrative Expense Claims Bar Date, and Professional Fee Claims Filed by the Professional Fee Claims Bar Date, funds remaining in the Disputed Claims Reserve shall be remitted to the Reorganized Debtors.

If unsold Collateral is transferred to the Prepetition Agent (or its designee) pursuant to the terms of the Prepetition Lender Settlement Documents, (i) the Debtors and the Lender Parties shall determine in good faith an amount sufficient to pay all Disputed Claims and accrued and unpaid Administrative Expense Claims and Professional Fee Claims (and if no such agreement

can be reached, the Bankruptcy Court shall determine the appropriate amount) and such amount shall not be transferred to the Prepetition Agent (or its designee) but, rather, shall be deposited in the Disputed Claims Reserve, (ii) the Disputed Claims Reserve shall be under the control of, and managed by, an independent third party mutually agreeable to the Debtors and the Lender Parties or, if no such agreement can be reached, selected by the Bankruptcy Court, (iii) the Lender Parties shall be granted a Lien over the Disputed Claims Reserve (which Lien shall be subordinate to the interests of the holders of Disputed Claims and accrued and unpaid Administrative Expense Claims and Professional Fee Claims until such Claims are paid in full or Disallowed), and (iv) upon the resolution of all Disputed Claims, Administrative Expense Claims Filed by the Administrative Expense Claims Bar Date, and Professional Fee Claims Filed by the Professional Fee Claims Bar Date, funds remaining in the Disputed Claims Reserve shall be remitted to the Prepetition Agent (or its designee).

Upon the funding of the Disputed Claims Reserve, the Debtors shall notify the United States Trustee of the amount funded.

**D.** **Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**E.** **Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**F.** ***De Minimis* Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtors, the Reorganized Debtors, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article XIII.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Debtors or the Reorganized Debtors, as applicable. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**G.** **Distributions on Account of Claims Allowed After the Effective Date**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**H.    General Distribution Procedures**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Debtors or the Reorganized Debtors, as applicable, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtors or the Reorganized Debtors, as applicable, for distribution under this Plan shall not be subject to any claim by any Person, except as provided under this Plan, the DIP Financing Documents, and the Prepetition Lender Settlement Documents.

**I.    Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, or (3) at the addresses in the Debtors' books and records.

**J.    Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Debtors or the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Debtors and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Debtors or the Reorganized Debtors are notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within one (1) year from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Debtors or the Reorganized Debtors.

**K.    Withholding Taxes**

In connection with this Plan, to the extent applicable, the Debtors and the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Debtors and the Reorganized Debtors shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Debtors and the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Debtors or the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

**L.    Setoffs**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Debtors and the Reorganized Debtors may, to the extent permitted under applicable law, set off against any Allowed Claim (other than the Prepetition Lender Secured Claim or the DIP Financing Claims) and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtors or the

31

Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, rights and causes of action that the Debtors or the Reorganized Debtors possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

**M.     Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article V of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Debtors or the Reorganized Debtors, as applicable, or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

**N.     Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Debtors or the Reorganized Debtors, as applicable, and other applicable Distribution Agent: (x) evidence reasonably satisfactory to the Debtors or the Reorganized Debtors, as applicable, and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Debtors or the Reorganized Debtors, as applicable, and other applicable Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim. Upon compliance with Article VII.M of this Plan as determined by the Debtors or Reorganized Debtors, as applicable, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Debtors or the Reorganized Debtors, as applicable, and other applicable Distribution Agent.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

**A.     Filing of Proofs of Claim**

Each Holder of a Claim shall be required to File a Proof of Claim on or prior to the applicable Bar Date, unless such Claim appears in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid. Unless disputed by the Holder of a Claim (including by filing a Proof of Claim in a higher amount or different classification or priority than as set forth in the Schedules), the amount set forth in the Schedules, subject to any limitations on allowance imposed by section 502 of the Bankruptcy Code, shall constitute the Allowed amount of such Holder's Claim. The Prepetition Lenders have an Allowed Claim as set forth in the Prepetition Lender Settlement Documents and this Plan and, therefore, do not need to File a Proof of Claim.

**B.**     **Disputed Claims**

The Debtors shall not seek to resolve or settle any Disputed Claim with respect to any of White Eagle's life insurance policies for an amount that represents a reduction greater than the lesser of (i) $2 million of the face amount of such policy or (ii) 20% of the face amount of such policy without the prior written consent of the Lender Parties (not to be unreasonably withheld).

Other than as set forth in the preceding paragraph, following the Effective Date, (i) each of the Debtors or the Reorganized Debtors, as applicable, and the Lender Parties may, in their discretion, File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or any other appropriate motion or adversary proceeding with respect thereto. All such objections shall be litigated to Final Order, *provided, however,* that the Debtors or the Reorganized Debtors, as applicable, may compromise, settle, withdraw or resolve any objections to Claims without further order of the Bankruptcy Court but, with respect to asserted Claims in excess of $1,000,000, only with the prior written consent of the Lender Parties and (ii) unless otherwise provided in the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim following the Effective Date without further notice to creditors (other than the creditor holding such Disputed Claim) or authorization of the Bankruptcy Court but, with respect to asserted Claims in excess of $1,000,000, only with the prior written consent of the Lender Parties, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of this Plan.

Under no circumstances will any distributions be made on account of any Claim that is not an Allowed Claim.

**C.**     **Procedures Regarding Disputed Claims**

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by order of the Bankruptcy Court or by stipulation between the Debtors and the Holder of the Claim.

**D.**     **Allowance of Claims and Equity Interests**

Following the date on which a Disputed Claim becomes an Allowed Claim after the Distribution Date, the Debtors or the Reorganized Debtors, as applicable, shall pay directly to the Holder of such Allowed Claim the amount provided for under this Plan, as applicable, and in accordance therewith.

The Equity Interests in the Debtors existing as of the Petition Date are deemed Allowed.

1.     Allowance of Claims

After the Consummation Date and subject to the other provisions of this Plan and the Prepetition Lender Settlement Documents, the Reorganized Debtors will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtors had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim. As set forth in Section III.E.3 hereof and the Prepetition Lender Settlement Documents, the Prepetition Lender Secured Claim is Allowed.

2.      Estimation

Subject to the other provisions of this Plan and the Prepetition Lender Settlement Documents, the Debtors, prior to the Consummation Date, and the Reorganized Debtors, after the Consummation Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding. The Prepetition Lender Secured Claim and the DIP Financing Claim are Allowed and not Disputed and, therefore, the Prepetition Lender Secured Claim and the DIP Financing Claim are not (and shall not be) subject to estimation (whether by the Debtors, the Reorganized Debtors, or any other Person).

## ARTICLE IX.
## EFFECTIVENESS OF THIS PLAN

A.      **Conditions Precedent to the Effective Date**

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtors and the Lender Parties pursuant to the provisions of Article IX.B of this Plan of the following:

- The Bankruptcy Court shall have approved the Prepetition Lender Settlement Agreement and shall have entered the Prepetition Lender Settlement Order, which shall be a Final Order.

- The Bankruptcy Court shall have entered an order in form and in substance satisfactory to the Debtors and the Lender Parties approving the Disclosure Statement with respect to this Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and confirming this Plan.

- This Plan and the Plan Documents and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance acceptable to the Debtors and the Lender Parties.

- The Confirmation Order shall have been entered, shall be a Final Order, and shall be in form and substance acceptable to the Debtors and the Lender Parties. The Confirmation Order shall provide that, among other things, (a) the Debtors, the Reorganized Debtors, or the Liquidation Agent, on behalf of the Debtors, as appropriate, are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan and the Restructuring Transactions, including, without limitation, (i) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan and the Prepetition Lender Settlement Documents, (ii) making all distributions and issuances as required under this Plan; and (iii) entering into any transactions as set

34

forth in the Plan Documents, including the Prepetition Lender Settlement Documents; (b) the provisions of the Confirmation Order, this Plan, and the Prepetition Lender Settlement Documents are nonseverable and mutually dependent; (c) the implementation of this Plan in accordance with its terms is authorized; (d) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; (e) the vesting of the Debtors' Assets and property in the Debtors as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date (including the Prepetition Lender Secured Claim, the Prepetition Lender Lien, the DIP Financing Claim, and the DIP Liens); (f) the Debtors and the Non-Debtor Affiliates shall comply with the Prepetition Lender Settlement Documents and shall not take any actions in contravention thereof; (g) from and after a Sale Trigger Event, any sale or transfer of the Debtors' Assets and property (including the equity interests in White Eagle) may be effectuated by the Debtors, at the direction of the Liquidation Agent (based on the advice of Maple) without any further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity, (h) the Debtors may not make any payments or other transfers of Cash that are not specifically identified in the budget included in the DIP Financing Documents, subject to permitted variances; (i) no Entity may seek to reject the Prepetition Lender Settlement Agreement or this Plan under section 365 of the Bankruptcy Code (or otherwise) in the Chapter 11 Cases or any other Insolvency or Liquidation Proceeding; (j) notwithstanding the occurrence of the Effective Date, until the Consummation Date, the DIP Financing Documents shall remain in full force and effect and the Debtors shall remain obligated to comply therewith; and (k) the Debtors may not file another case under the Bankruptcy Code or any other Insolvency or Liquidation Proceeding prior to the Consummation Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Prepetition Lender Settlement Documents, in each case in form and substance acceptable to the Debtors and the Prepetition Agent, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan or the Prepetition Lender Settlement Documents, including, without limitation, the Amended Constituent Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by

35

any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

**B.     Waiver of Conditions**

The conditions to effectiveness of this Plan set forth in this Article IX (other than that the Confirmation Order shall have been entered) may be waived by the mutual agreement of the Debtors and the Prepetition Agent without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtors, the Reorganized Debtors, or the Prepetition Agent regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtors, the Reorganized Debtors, or the Prepetition Agent to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

**C.     Effect of Non-Occurrence of Conditions to Effectiveness**

If the Effective Date of this Plan does not occur within ten (10) calendar days of entry of the Confirmation Order (unless extended by agreement of the Lender Parties), this Plan will be null and void in all respects and nothing contained in this Plan or the Disclosure Statement will: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, the Prepetition Agent, the Prepetition Lender, any other Holders or any other Entity; (c) constitute an Allowance of any Claim or Equity Interest; provided that the Prepetition Lender Secured Claim shall be an Allowed Claim as set forth in the Prepetition Lender Settlement Documents; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, the Prepetition Agent, the Prepetition Lender, any other Holders or any other Entity in any respect.

**D.     Consummation of this Plan**

Following the Effective Date, this Plan shall be "substantially consummated" pursuant to section 1101 of the Bankruptcy Code and the Consummation Date shall be deemed to occur, in each case solely on (and not before) the date on which the Prepetition Lender Secured Claim and the DIP Financing Claims have been satisfied in full consistent with the terms of this Plan and the Prepetition Lender Settlement Documents, either by (i) the payment in full in Cash of the Early Payoff Amount or the Payoff Amount, as applicable, or (ii) the transfer of all unsold Collateral to the Prepetition Agent on or after the Outside Closing Date in accordance with the Prepetition Lender Settlement Documents. Until the Consummation Date, the Debtors shall not be permitted to emerge from, or seek to close, the Chapter 11 Cases. Notwithstanding the occurrence of the Effective Date, until the Consummation Date, the DIP Financing Documents shall remain in full force and effect and the Debtors shall remain obligated to comply therewith (including with respect to any budget (subject to permitted variances) and adequate protection payments required thereunder), in each case subject to the terms of the DIP Financing Documents. The Prepetition Lender Settlement Documents shall remain in full force and effect regardless of the occurrence of the Effective Date or the Consummation Date. The Debtors may not file another case under the Bankruptcy Code or any other Insolvency or Liquidation Proceeding prior to the Consummation Date.

## ARTICLE X.
## RELEASE, INJUNCTION AND RELATED PROVISIONS

### A.    General

Notwithstanding anything contained in this Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under this Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

Subject to and consistent with the terms of the Prepetition Lender Settlement Agreement and the Prepetition Lender Settlement Order, and in accordance with the provisions of this Plan and pursuant to section 363 of the Bankruptcy Code, without any further notice to or action, order or approval of the Bankruptcy Court, after the Consummation Date (1) the Reorganized Debtors may compromise and settle Claims against them and (2) the Reorganized Debtors may compromise and settle Causes of Action against other Entities.

### B.    Release by Debtors

*Effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby acknowledged and confirmed, the Releasing Debtor Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to the Released Parties (and each such Released Party so released shall be deemed forever released, waived and discharged by the Releasing Debtor Parties) and their respective properties from any and all Claims, interests, Causes of Action, litigation claims and any other debts, accounts, offsets, liens, obligations, indemnities, guaranties, powers, privileges, licenses, franchise, demands, rights, defenses, suits, controversies, damages, actions, judgments, losses, remedies and liabilities whatsoever, including any derivative claims, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether absolute, inchoate, or contingent; whether determined or undetermined, proven or unproven; whether held individually, jointly, or jointly and severally; whether arising indirectly, derivatively, or by way of any legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets, or otherwise; whether for compensation, relief, protection, punishment, or any other remedy of result of any kind, character, or nature; whether based upon any intentional or negligent conduct, strict liability, or upon any other grounds or upon any other theory whatsoever; whether asserted or subject to assertion by complaint, cross-complaint, counterclaim, affirmative defense, or other pleadings, by motion, by notice, or otherwise; whether asserted or subject to assertion in any jurisdiction, in any court or other forum, or with any federal, state, county, municipal, or other governmental authority, agency, or official; whether arising at law, in equity, or otherwise, including the Adversary Proceeding (and the related complaint and amended complaint and LNV's motion to dismiss) and the Estimation Motion; whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to the Debtors, the Chapter 11 Cases, the Disclosure Statement or this Plan that such Releasing Debtor Parties or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of a Claim or Equity interest or other Entity would have been legally entitled to assert for or on behalf of the Debtors, their estates or the Reorganized Debtors (whether directly or derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this release shall not operate to waive or release (i) any Causes of Action expressly set forth in and preserved by this Plan, the Prepetition Lender Settlement*

*Agreement, the Prepetition Lender Settlement Order, or the Plan Documents; (ii) any Causes of Action arising from fraud, gross negligence, or willful misconduct as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (iii) the rights of such Releasing Debtor party to enforce this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iv) any post-Effective Date obligations of any party or Entity under this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, any of the restructuring transactions, or any document, instrument or agreement (including those set forth in the Plan Documents) executed to implement this Plan. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person. Notwithstanding the foregoing, the Debtors are not releasing the Debtors (but they are releasing the related persons to the Debtors pursuant to this paragraph).*

## C.    <u>Release by Holders of Claims and Equity Interests</u>

*Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring and the restructuring transactions, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all Claims, interests, Causes of Action, litigation claims and any other debts, accounts, offsets, liens, obligations, indemnities, guaranties, powers, privileges, licenses, franchise, demands, rights, defenses, suits, controversies, damages, actions, judgments, losses, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether absolute, inchoate, or contingent; whether determined or undetermined, proven or unproven; whether held individually, jointly, or jointly and severally; whether arising indirectly, derivatively, or by way of any legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets, or otherwise; whether for compensation, relief, protection, punishment, or any other remedy of result of any kind, character, or nature; whether based upon any intentional or negligent conduct, strict liability, or upon any other grounds or upon any other theory whatsoever; whether asserted or subject to assertion by complaint, cross-complaint, counterclaim, affirmative defense, or other pleadings, by motion, by notice, or otherwise; whether asserted or subject to assertion in any jurisdiction, in any court or other forum, or with any federal, state, county, municipal, or other governmental authority, agency, or official; whether arising at law, in equity, or otherwise, including the Adversary Proceeding (and the related complaint and amended complaint and LNV's motion to dismiss) and the Estimation Motion; whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in this Plan, the restructuring, the restructuring of any claim or equity interest before or during the Chapter 11 Cases, the restructuring transactions, the negotiation, formulation, or preparation of the Disclosure Statement, this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, and related agreements, instruments, and other documents (including the Plan Documents), or any other act or omission that such Releasing Debtor Parties or their Affiliates would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity interest or other Entity would have been legally entitled to assert for or on behalf of the Debtors, their estates or the Reorganized Debtors (whether directly or*

38

*derivatively) against any of the Released Parties; provided, however, that the foregoing provisions of this release shall not operate to waive or release (i) any causes of action arising from fraud, gross negligence, or willful misconduct as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; (ii) the rights of such Releasing Party to enforce this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court; and/or (iii) any post-Effective Date obligations of any party or Entity under this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, any of the Restructuring Transactions, or any document, instrument or agreement (including those set forth in the Plan Documents) executed to implement this Plan. The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person.*

### D.      Discharge of Claims

      To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### E.      Exculpation

      The Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising out of any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or affecting the effectiveness and Consummation of this Plan, the Disclosure Statement, the Prepetition Lender Settlement Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation, effectiveness, or Consummation of this Plan; *provided, however*, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; *provided, further,* that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; *provided, further,* however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by this Plan, the Prepetition Lender Settlement Documents, or the Plan Documents.

**F.    Preservation of Rights of Action**

        1.      Maintenance of Causes of Action

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, and except as otherwise provided in Article X or elsewhere in this Plan, the Adversary Dismissal Order, or the Confirmation Order, after the Effective Date, the Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases.

After the Consummation Date, the Reorganized Debtors, as the successors in interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.

        2.      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan, the Prepetition Lender Settlement Documents, or any Final Order (including, without limitation, the Confirmation Order and the Adversary Dismissal Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in this Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of this Plan) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**G.    Injunction**

Except as otherwise provided in Article X of this Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any suit, action or other proceeding, or creating, perfecting or enforcing any lien of any kind, on account of or respecting any claim, demand, liability, obligation, debt, right, Cause of Action, Equity Interest, or remedy released or to be released, exculpated or to be exculpated, or discharged or to be discharged pursuant to this Plan, the Prepetition Lender Settlement Documents, the Adversary Dismissal Order, or the Confirmation Order.  By accepting distributions pursuant to this Plan, each Holder of an Allowed Claim or Equity Interest will be deemed to have specifically consented to this injunction.  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the Consummation Date.

## ARTICLE XI.
## BINDING NATURE OF PLAN

On the Effective Date, and effective as of the Effective Date, this Plan will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtors and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under this Plan.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date or the Consummation Date, the Bankruptcy Court shall, after the Effective Date and after the Consummation Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Reorganized Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided, however,* that, from and after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, (a) those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts to the list of Executory Contracts to be assumed; and (b) any dispute regarding whether a contract or lease is or was executory or expired;

4.      authorize, approve, and allow, as may be requested by the Debtors, the Reorganized Debtors or the Liquidation Agent, as applicable, any sale, disposition, assignment or other transfer of the Debtors' assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof, subject to and consistent with the terms of the Prepetition Lender Settlement Documents;

5.      authorize, approve, and allow, as may be requested by the Debtors, the Reorganized Debtors or the Liquidation Agent, as applicable, any borrowing or the incurrence of indebtedness, whether secured or unsecured, subject to and consistent with the terms of the Prepetition Lender Settlement Documents;

6.      resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

41

7.      ensure that distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of this Plan;

8.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or the Consummation Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtors or the Reorganized Debtors whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or the Consummation Date or instituted by the Reorganized Debtors after the Consummation Date, *provided* that the Debtors and the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

9.      enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, the Disclosure Statement, the Prepetition Lender Settlement Agreement, or the Prepetition Lender Settlement Order;

10.      resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan; *provided, however*, that any dispute arising under or in connection with the Prepetition Lender Settlement Agreement or the Prepetition Lender Settlement Order shall be dealt with in accordance with the provisions thereof;

11.      hear and determine all Causes of Action that are pending as of the Effective Date or the Consummation Date or that may be commenced in the future;

12.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

13.      enforce the terms and conditions of this Plan and the Confirmation Order;

14.      resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

15.      hear and determine the Litigation Claims by or on behalf of the Debtors or the Reorganized Debtors;

16.      enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

17.      resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Prepetition Lender Settlement Agreement, the Prepetition Lender Settlement Order, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

42

18.    enforce the terms and conditions of the DIP Financing Documents; and

19.    enter an order concluding or closing the Chapter 11 Cases after the Consummation Date.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

**A.    Payment of Statutory Fees and Filing of Reports**

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable after the Effective Date shall be paid by the Debtors when due or as soon thereafter as practicable until the Chapter 11 Cases are closed, converted, or dismissed. After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Statutory Fees when due and payable. The Debtors shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the United States Trustee. After the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the United States Trustee. Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Statutory Fees to the Office of the United States Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

**B.    Modification of Plan**

Effective as of the date hereof and subject to the limitations and rights contained in this Plan and the Prepetition Lender Settlement Documents: (a) the Debtors reserve the right, with the prior written consent of the Prepetition Agent and the Prepetition Lender, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, with the prior written consent of the Prepetition Agent and the Prepetition Lender, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan. Any amendment or modification of the Amended Plan without the prior written consent of the Lender Parties shall be void *ab initio*.

**C.    Revocation of Plan**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan prior to the Confirmation Date, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption of Executory Contracts effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court, including the Prepetition Lender Settlement Order; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

43

**D.**     **Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan; *provided* that, the Prepetition Lender Settlement Documents shall govern the matters addressed thereby.

**E.**     **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, after the Consummation Date and promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**F.**     **Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**G.**     **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract is or is not an executory contract or that the Debtors or the Reorganized Debtors or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract.

If there is a dispute regarding whether a contract is or was executory at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**H.    Further Assurances**

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**I.    Severability**

Subject to and consistent with the terms of the Prepetition Lender Settlement Documents, if, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted; *provided, however*, that any such altered form must be consistent with the Prepetition Lender Settlement Documents.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  The Prepetition Lender Settlement Documents are nonseverable elements of this Plan.

**J.    Service of Documents**

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> White Eagle Asset Portfolio, LP, et al.
> 5355 Town Center Road, Suite 701
> Boca Raton, FL 33486
> Telephone: (561) 995-4200
> Facsimile:  (561) 566-5073
> Attention:  Miriam Martinez
>
> **with copies to:**
>
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market Street, 17th Floor
> Wilmington, DE  19899-8705 (Courier 19801)
> Attn:   Richard M. Pachulski, Esq., Ira D. Kharasch, Esq.,
>          Maxim B. Litvak, Esq., Colin R. Robinson, Esq.

**K.**    **Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code**

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, including the Prepetition Lender Settlement Documents; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan or the Prepetition Lender Settlement Documents.

**L.**    **Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction; *provided* that corporate governance matters relating to the Debtors or Reorganized Debtors, as applicable, shall be governed by the laws of the state of organization of the applicable Debtor or Reorganized Debtor, as applicable.

**M.**    **Tax Reporting and Compliance**

The Debtors are hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors are for all taxable periods ending after the Petition Date through, and including, the Consummation Date.

**N.**    **Exhibits and Schedules**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**O.**    **No Strict Construction**

This Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Prepetition Agent, and their respective professionals. Each of the foregoing was represented by counsel of its choice who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits and the Plan Documents, and the agreements and documents ancillary or related thereto. Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits and the Plan Documents, and the documents ancillary and related thereto.

**P.    Controlling Document**

Notwithstanding any other provision of this Plan (including any provision that purports to be preemptory), in the event of an inconsistency between this Plan, the Disclosure Statement, or any Plan Document, on the one hand, and the Prepetition Lender Settlement Documents, on the other hand, the terms of the Prepetition Lender Settlement Documents shall control.

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated:  June 18, 2019

**WHITE EAGLE ASSET PORTFOLIO, LP.**

By: */s/ Miriam Martinez*
     Name:  Miriam Martinez
     Title:    Chief Financial Officer

**LAMINGTON ROAD DESIGNATED
ACTIVITY COMPANY**

By: */s/ David Thompson*
     Name:  David Thompson
     Title:    Director

**WHITE EAGLE GENERAL PARTNER, LLC**

By: */s/ Miriam Martinez*
     Name:  Miriam Martinez
     Title:    Chief Financial Officer

**FILED BY:**

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Colin R. Robinson*
Richard M. Pachulski (CA Bar No. 62337)
Ira D. Kharasch (CA Bar No. 109084)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:      rpachulski@pszjlaw.com
         ikharasch@pszjlaw.com
         mlitvak@pszjlaw.com
         crobinson@pszjlaw.com

Counsel for the Debtors and Debtors-in-Possession

# **EXHIBIT A**

## EXHIBIT A

**Prepetition Lender Settlement Agreement**

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "**Agreement**") dated as of May 24, 2019, is entered into by and among LNV Corporation, a Nevada corporation ("**LNV**"), and CLMG Corp., a Texas corporation ("**CLMG**," and, together with LNV, the "**Lender Parties**"), on the one hand, and White Eagle Asset Portfolio, LP, a Delaware limited partnership ("**White Eagle**"), Lamington Road Designated Activity Company, an Irish designated activity company ("**LRDA**"), White Eagle General Partner, LLC, a Delaware limited liability company ("**WEGP**," and collectively with White Eagle and LRDA, the "**Debtors**"), Emergent Capital, Inc., a Florida corporation ("**Emergent**"), Imperial Finance and Trading, LLC, a Florida limited liability company ("**Imperial**"), Lamington Road Bermuda, LTD, a Bermuda company ("**Lamington Road**"), OLIPP IV, LLC, a Delaware limited liability company ("**OLIPP**"), and Markley Asset Portfolio LLC, a Delaware limited liability company ("**Markley**," and collectively with the Debtors, Emergent, Imperial, Lamington Road and OLIPP, the "**Debtor Parties**," and the Debtor Parties together with the Lender Parties, the "**Parties**"), on the other.

## RECITALS

WHEREAS, LNV is the sole lender under that certain Second Amended and Restated Loan and Security Agreement, dated as of January 31, 2017 (as amended, restated, supplemented, or otherwise modified, the "**Loan Agreement**") by and among White Eagle, as Borrower, Imperial, as Initial Servicer, Initial Portfolio Manager, and Guarantor, Lamington Road, as Portfolio Manager, LNV, as Initial Lender, and CLMG, as Administrative Agent (in such capacity, the "**Agent**");

WHEREAS, to secure White Eagle's obligations under the Loan Agreement, the Debtors granted to the Agent a lien and security interest in substantially all of the Debtors' assets, including (i) the Pledged Policies and the proceeds thereof, (ii) general intangibles (including accounts receivable), (iii) all rights, claims, and causes of action related to or arising from the Pledged Policies (including potential or pending actions to recover and receive proceeds of Pledged Policies), and (iv) the equity interests in White Eagle (collectively with all other assets and property pledged under the Loan Agreement and the other Transaction Documents, the "**Collateral**");

WHEREAS, WEGP and LRDA are pledgors under that certain Partnership Interest Pledge Agreement, dated as of May 16, 2014 (as amended, restated, supplemented, or otherwise modified, the "**Pledge Agreement**"), pursuant to which WEGP and LRDA pledged their equity interests in White Eagle to the Agent to secure White Eagle's obligations under the Loan Agreement;

WHEREAS, on November 14, 2018, LRDA and WEGP each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), thereby commencing their chapter 11 cases and causing an Event of Default under (and as defined in) the Loan Agreement;

1

WHEREAS, on December 13, 2018, White Eagle filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, which is being jointly administered with the chapter 11 cases filed by LRDA and WEGP as *In re White Eagle Asset Portfolio, LP, et al.*, Case No. 18-12808 (KG) (the "**Chapter 11 Cases**");

WHEREAS, on January 25, 2019, the Debtors and Emergent commenced an adversary proceeding in the Bankruptcy Court against LNV, Silver Point Capital L.P., and GWG Holdings, Inc. (collectively, the "**Defendants**"), Adv. Proc. No. 19-50096 (KG) (the "**Adversary Proceeding**"), alleging breaches of contract, breaches of fiduciary duty, and other claims, including challenging LNV's rights to the Participation Interest referenced in the Loan Agreement by filing a complaint (the "**Original Complaint**") in the Bankruptcy Court;

WHEREAS, on March 8, 2019, Defendants filed motions to dismiss each of the claims asserted in the Adversary Proceeding in the Bankruptcy Court;

WHEREAS, on March 27, 2019, the Debtors and Emergent filed an amended complaint in the Adversary Proceeding in the Bankruptcy Court (the "**Amended Complaint**"), and on April 17, 2019, the Defendants filed motions in the Bankruptcy Court to dismiss each of the claims asserted in the Amended Complaint (collectively, the "**Motions to Dismiss**");

WHEREAS, on March 13, 2019, the Debtors filed with the Bankruptcy Court a proposed chapter 11 plan of reorganization [Docket No. 165] (the "**Plan**") and accompanying Disclosure Statement [Docket No. 166] (the "**Disclosure Statement**");

WHEREAS, on April 11, 2019, the Debtors filed a *Motion of Debtors Pursuant to 11 U.S.C. §§ 502(c) and 105(a) to Estimate Secured Claims of LNV Corporation and CLMG Corp. for Distribution Purposes* [Docket No. 200] (the "**Estimation Motion**");

WHEREAS, on May 7, 2019, the Parties agreed on the terms of a settlement of all matters between them involving the Debtors, the Loan Agreement, the Chapter 11 Cases, the Adversary Proceeding, the Estimation Motion, and the Plan (the "**Settlement**") as set forth in a term sheet summarized on the record at a hearing held on May 7, 2019 by counsel for the Lender Parties and counsel for the Debtors and as filed with the Bankruptcy Court in that *Notice of Settlement Term Sheet* [Docket No. 242];

WHEREAS, time is of the essence for the implementation of the Settlement to be effectuated and completed, in its entirety, by December 30, 2019;

WHEREAS, in connection with the Settlement, the Lender Parties withdrew their objection to the *Motion of the Debtors for Entry of an Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Pursuant to Section 1121 of the Bankruptcy Code* [Docket No. 167];

WHEREAS, the Parties hereto desire to formally document and effectuate the terms of the Settlement as set forth herein;

WHEREAS, the Parties have agreed to adjourn the Estimation Motion *sine die*;

WHEREAS, on May 15, 2019, the Debtors filed the *Motion of the Debtors Pursuant to*

2

*Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Order Approving Settlement Between Debtors, Certain Non-Debtor Affiliates, and Lender Parties* [Docket No. 253] (the "**Settlement Motion**") seeking approval by the Bankruptcy Court of the Settlement as set forth in this Agreement; and

WHEREAS, on May 22, 2019, the Bankruptcy Court entered a stipulation adjourning the Motions to Dismiss *sine die*.

NOW THEREFORE, for good and valuable consideration, the receipt of which is duly acknowledged, the Parties agree as follows:

## AGREEMENT

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1     Definitions.  When used in this Agreement, the following terms shall have the meanings ascribed to them below or elsewhere in this Agreement as indicated below.  Defined terms in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

"**Affiliate**" of a Person has the meaning set forth in section 101(2) of the Bankruptcy Code and also includes any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Adversary Proceeding**" has the meaning set forth in the Recitals.

"**Agent**" has the meaning set forth in the Recitals.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allowed Claim**" has the meaning set forth in Section 2.3(a).

"**Allowed Lien**" has the meaning set forth in Section 2.3(a).

"**Amended Complaint**" has the meaning set forth in the Recitals.

"**Amended Disclosure Statement**" has the meaning set forth in Section 2.1(b).

"**Amended Plan**" has the meaning set forth in Section 2.1(a).

"**Asset Transfer Documents**" has the meaning set forth in Section 2.3(f).

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

3

"**Breach Order**" has the meaning set forth in Section 8.1(a).

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks in New York, New York are authorized to close.

"**Cash Collateral**" means "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) in which the Lender Parties have an interest.

"**Cash Collateral Order**" means the *Final Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 81].

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Claims**" has the meaning set forth in section 101(5) of the Bankruptcy Code and also includes actions, claims, demands, causes of action, suits, controversies, liens, indemnities, guaranties, obligations, liabilities, remedies, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchise, and rights of every kind, nature, or character; whether absolute, inchoate, or contingent; whether determined or undetermined, proven or unproven; whether held individually, jointly, or jointly and severally; whether arising directly, indirectly, derivatively, or by way of any legal or equitable right of subrogation, contribution, indemnity, estoppel, marshalling of assets, or otherwise; whether for compensation, relief, protection, punishment, or any other remedy or result of any kind, character, or nature; whether based upon any intentional or negligent conduct, strict liability, any tort of any kind, upon any breach of any contract or upon any other grounds or upon any other theory whatsoever; whether asserted or subject to assertion by complaint, cross-complaint, counterclaim, affirmative defense, or other pleading, by motion, by notice, or otherwise; whether asserted or subject to assertion in any jurisdiction, in any court or other forum, or with any federal, state, county, municipal, or other governmental authority, agency, or official; and whether arising at law, in equity, or otherwise, including the Adversary Proceeding (and the related Original Complaint and Amended Complaint and LNV's Motion to Dismiss) and the Estimation Motion.

"**CLMG**" has the meaning set forth in the Preamble.

"**Collateral**" has the meaning set forth in the Recitals.

"**Confirmation Order**" has the meaning set forth in Section 3.1(x).

"**Constituent Documents**" means, collectively, the POA, the LLC Agreement, and the LP Agreement.

"**Debtor Parties**" has the meaning set forth in the Preamble.

"**Debtors**" has the meaning set forth in the Preamble.

"**Defendants**" has the meaning set forth in the Recitals.

"**DIP Budget**" means any budget approved in connection with any DIP Financing (as may be amended with the prior written consent of the Lender Parties) and/or the Debtors' use of

Cash Collateral; *provided* that, subject to Section 3.2(e), the DIP Budget shall be consistent with, and an extension of, the existing Budget (as defined in the Cash Collateral Order).

"**DIP Claims**" means Claims arising under any DIP Financing.

"**DIP Credit Agreement**" means any agreement providing for DIP Financing as approved by a DIP Order.

"**DIP Financing**" has the meaning set forth in Section 2.8(c).

"**DIP Order**" means any order entered by the Bankruptcy Court authorizing DIP Financing and the Debtors' use of Cash Collateral.

"**Disclosure Statement**" has the meaning set forth in the Recitals.

"**Disclosure Statement Order**" has the meaning set forth in Section 2.2(c).

"**Dismissal Order**" has the meaning set forth in Section 2.2(b).

"**Early Payoff Amount**" has the meaning set forth in Section 2.3(b).

"**Effective Date**" has the meaning set forth in Section 6.1.

"**Emergent**" has the meaning set forth in the Preamble.

"**Estimation Motion**" has the meaning set forth in the Recitals.

"**Farnan**" means Joseph J. Farnan, Jr. or his replacement pursuant to Section 2.4(d) and the Constituent Documents.

"**Governmental Unit**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, regional, county, municipal or local, and any agency, authority, instrumentality, regulatory body, ministry, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Imperial**" has the meaning set forth in the Preamble.

"**Initial DIP Financing**" has the meaning set forth in Section 2.8(a).

"**Initial Orders**" has the meaning set forth in Section 2.2(d).

"**Insolvency or Liquidation Proceeding**" means any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Intercompany Claims**" means any "claims" (as defined in section 101(5) of the

Bankruptcy Code) of a Debtor or an Affiliate thereof against any other Debtor.

"**Lamington Road**" has the meaning set forth in the Preamble.

"**Lender Parties**" has the meaning set forth in the Preamble.

"**Lender Release Party**" has the meaning set forth in Section 7.1(a).

"**LexServ**" means MLF LexServ, L.P.

"**Lincoln Benefit Settlement Agreement**" means that certain Settlement Agreement and Release between Lincoln Benefit Life Company, White Eagle, Emergent and Wilmington Trust, N.A.

"**LLC Agreement**" means the limited liability company agreement of WEGP, as amended from time to time.

"**LNV**" has the meaning set forth in the Preamble.

"**Loan Agreement**" has the meaning set forth in the Recitals.  For ease of reference, a true and correct copy of the Loan Agreement has been filed in the Chapter 11 Cases as Exhibit 1 to Docket No. 24.

"**LP Agreement**" means the limited partnership agreement of White Eagle, as amended from time to time.

"**LRDA**" has the meaning set forth in the Preamble.

"**Maple**" means, together, Maple Life Analytics, LLC and Brean Capital, LLC.

"**Maple Retention Application**" has the meaning set forth in Section 2.1(g).

"**Maple Retention Order**" has the meaning set forth in [2.2(e)].

"**Markley**" has the meaning set forth in the Preamble.

"**Motions to Dismiss**" has the meaning set forth in the Recitals.

"**OLIPP**" has the meaning set forth in the Preamble.

"**Original Complaint**" has the meaning set forth in the Recitals.

"**Outside Closing Date**" has the meaning set forth in Section 2.6(b).

"**Participation Interest**" has the meaning set forth in the Loan Agreement.

"**Parties**" has the meaning set forth in the Preamble.

"**Payoff Amount**" has the meaning set forth in Section 2.3(b).

6

"**Person**" means (i) any person, individual, corporation, company, partnership, joint venture, firm, limited liability company, joint stock company, joint venture, estate, trust, business trust, unincorporated organization, trust or association, (ii) the United States Trustee, (iii) any Governmental Unit or any political subdivision thereof, or (iv) any other entity.

"**Plan**" has the meaning set forth in the Recitals.

"**Pledge Agreement**" has the meaning set forth in the Recitals.

"**Pledged Policy**" has the meaning set forth in the Loan Agreement.

"**POA**" has the meaning set forth in Section 2.4.

"**Premium**" means, with respect to any Pledged Policy, any past due premium with respect thereto, or any scheduled premium.

"**Sale Deadlines**" means, together, the Sale Trigger Outside Date and the Outside Closing Date.

"**Sale Process**" means a sale of the Collateral on the terms set forth in this Agreement.

"**Sale Trigger Event**" means the earlier to occur of (i) the entry of a Breach Order or (ii) the Sale Trigger Outside Date.

"**Sale Trigger Outside Date**" means September 17, 2019 at 11:59 p.m. (New York time).

"**Settlement**" has the meaning set forth in the Recitals.

"**Settlement Motion**" has the meaning set forth in the Recitals.

"**Settlement Order**" has the meaning set forth in Section 2.2(a).

"**Transaction Documents**" has the meaning set forth in the Loan Agreement.

"**Transfer Date**" has the meaning set forth in Section 2.6(c).

"**Transfer Documents**" has the meaning set forth in Section 2.3(f).

"**WEGP**" has the meaning set forth in the Preamble.

"**White Eagle**" has the meaning set forth in the Preamble.

1.2    Interpretation.  When a reference is made in this Agreement to a Section or Article, such reference shall be to a Section or Article of this Agreement unless otherwise indicated.    Whenever the words "included," "includes," or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  Unless otherwise indicated, all references to dollars refer to United States dollars.  Unless otherwise indicated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Agreement in its entirety rather than to a particular portion of this Agreement.  Any other rules of construction

with respect to this Agreement shall be governed by section 102 of the Bankruptcy Code.

## ARTICLE II
## SETTLEMENT TERMS

2.1    <u>Actions in Anticipation of Approval of Settlement</u>.  On or before May 24, 2019, the Debtors shall file with the Bankruptcy Court the following:

(a)    an amended version of the Plan (the "**Amended Plan**"), which shall (i) be consistent with, and reflect the effectiveness of, the terms of this Agreement (including the implementation of the Sale Process and the setting of the Sale Deadlines), (ii) provide treatment of the Allowed Claim consistent with this Agreement, (iii) provide releases by and among the Parties and (iv) otherwise be acceptable to the Parties;

(b)    an amended version of the Disclosure Statement (the "**Amended Disclosure Statement**"), which shall be consistent with the terms of the Amended Plan and shall otherwise be acceptable to the Parties;

(c)    the Settlement Motion;

(d)    this Agreement;

(e)    a proposed Dismissal Order;

(f)    a motion seeking to shorten notice or such other pleadings as are necessary for (i) consideration by the Bankruptcy Court of approval of the Amended Disclosure Statement, entry of the Settlement Order, and entry of the Dismissal Order by June 7, 2019 and (ii) confirmation of the Amended Plan by June 21, 2019; and

(g)    an application seeking approval of the Debtors' retention of Maple as the due diligence and marketing agent for the Debtors on the terms set forth in this Agreement and otherwise acceptable to the Parties (the "**Maple Retention Application**").

2.2    <u>Initial Orders</u>.  Each of the Parties shall use their respective best efforts to seek and obtain entry by the Bankruptcy Court, on or before June 7, 2019, of the following:

(a)    The proposed order approving this Agreement in the form attached as Exhibit A to the Settlement Motion, as shall be modified by the agreement of all of the Parties by May 24, 2019 to conform such order to the terms of this Agreement (the "**Settlement Order**") and as may be further modified by agreement of all of the Parties;

(b)    An order mutually agreeable to the Debtor Parties and the Lender Parties dismissing the Adversary Proceeding (the "**Dismissal Order**"), which dismissal shall be (i) without prejudice upon entry by the Bankruptcy Court of the Dismissal Order and (ii) with prejudice upon entry by the Bankruptcy Court of (x) a Breach Order or (y) the Confirmation Order;

(c)    An order mutually agreeable to the Debtor Parties and the Lender Parties

8

(i) approving the Amended Disclosure Statement, which shall be in form acceptable to the Parties (the "**Disclosure Statement Order**"), and (ii) setting a hearing on confirmation of the Amended Plan on or before June 21, 2019; and

       (d)    An order mutually agreeable to the Debtor Parties and the Lender Parties approving the Maple Retention Application (the "**Maple Retention Order**" and, collectively with the Settlement Order, the Dismissal Order, and the Disclosure Statement Order, the "**Initial Orders**").

      2.3    <u>Allowed Claim and Allowed Lien; Satisfaction and Discharge</u>.

       (a)    Upon the Effective Date, the Lender Parties shall hold, and have full right and title to, an allowed claim (pursuant to sections 502 and 506 of the Bankruptcy Code) against White Eagle in an amount equal to the sum of (i) $382,703,913 (<u>i.e.</u>, one hundred four percent (104%) of the principal amount owed under the Loan Agreement), <u>plus</u> (ii) the amounts of all accrued and unpaid interest at the contractual non-default rate under the Loan Agreement until November 14, 2018 and at the contractual default rate under the Loan Agreement (<u>i.e.</u>, 200 basis points over the contractual non-default rate) from and after November 14, 2018, <u>plus</u> (iii) the amounts of all of the Lender Parties' accrued and unpaid fees, costs and expenses, including professional fees (collectively, the "**Allowed Claim**"). The Allowed Claim shall include the amounts of all fees, costs, expenses, and interest that accrue following entry of the Initial Orders through the date of full payment of the Allowed Claim. The Allowed Claim (including all principal, fees, costs, expenses, and interest) shall be secured by a valid first priority lien on and security interest in all Collateral as set forth in the Loan Agreement and the other Transaction Documents, including the Pledged Policies and the equity interests in White Eagle (the "**Allowed Lien**"). The Allowed Claim and Allowed Lien shall not be subject to any defense, counterclaim, offset, charge, or reduction, whether at law or in equity. The Allowed Claim shall be reduced by payments made by White Eagle to the Lender Parties after the date hereof as permitted under this Agreement.

       (b)    Subject to Section 2.3(c) hereof, the Debtor Parties may, at any time from the Effective Date through the Outside Closing Date, discharge and satisfy the Allowed Claim and the DIP Claims and obtain the release of the Allowed Lien and all liens securing DIP Financing by making a payment in cash to the Agent in an amount equal to: (i) if payment in full is made prior to the occurrence of a Sale Trigger Event, the sum of (A) $375,344,223 (<u>i.e.</u>, one hundred two percent (102%) of the principal amount owed under the Loan Agreement), <u>plus</u> (B) the amounts of all accrued and unpaid interest at the contractual non-default rate under the Loan Agreement until November 14, 2018 and at the contractual default rate under the Loan Agreement (<u>i.e.</u>, 200 basis points over the contractual non-default rate) from and after November 14, 2018 through the date of payment, <u>plus</u> (C) all of the Lender Parties' accrued and unpaid fees, costs and expenses including professional fees through the date of payment, <u>plus</u> (D) the amounts of any and all unpaid obligations under any DIP Financing (the sum of (i)(A)-(D), the "**Early Payoff Amount**") or (ii) if payment in full is made upon or after the occurrence of a Sale Trigger Event, the sum of (A) the amount of the Allowed Claim, <u>plus</u> (B) the amounts of any and all unpaid obligations under any DIP Financing or other financing provided by the Lender Parties (the sum of (ii)(A) and (ii)(B), the "**Payoff Amount**"). Prior to the occurrence of a Sale Trigger Event, the Debtors shall have the right to continue to use the proceeds from the maturities of any life insurance policy or resolution of any life insurance policy-related claims to pay operating

expenses consistent with the DIP Budget and to reduce the Allowed Claim (first in satisfaction of accrued and unpaid interest, fees, costs, and expenses and, then, in satisfaction of principal) by payment to the Lender Parties.

       (c)     Prior to the Outside Closing Date, upon the receipt by the Agent of the payment in cash in full of the Payoff Amount or, to the extent applicable, the Early Payoff Amount, the Allowed Claim and the DIP Claims shall be satisfied and the Allowed Lien and all liens securing DIP Financing shall be discharged and released.

       (d)     Until the Payoff Amount is paid in cash in full to the Agent, and except as permitted pursuant to Section 2.3(b), promptly upon the closing and funding of the sale of any portion of the Collateral as contemplated hereunder, the proceeds therefrom (after the payment of any fees owed to Maple as a result of such sale, as applicable) shall be paid to the Agent to reduce the Allowed Claim dollar for dollar (first in satisfaction of accrued and unpaid interest, fees, costs, and expenses and, then, in satisfaction of principal).

       (e)     At the time that the Early Payoff Amount or the Payoff Amount, as applicable, has been paid in full, the Debtors may, at their discretion, (i) terminate and abandon the Sale Process, (ii) amend and restate the Constituent Documents in any manner (including removing Farnan from any position to which he was appointed pursuant to this Agreement), *provided* that the LP Agreement may not be amended or otherwise modified if the equity of White Eagle is transferred pursuant to the Sale Process or otherwise, (iii) terminate the engagement of Maple, and (iv) retain any Collateral not sold or subject to a binding purchase agreement.

       (f)     Upon the Effective Date, the Debtor Parties shall execute (i) the transfer documents in the form mutually agreeable to the Debtor Parties and the Lender Parties to be attached hereto as **Exhibit A** (the "**Asset Transfer Documents**") effectuating the transfer of all Pledged Policies and all other Collateral (other than the equity interests in White Eagle) to the Agent (or its designee) in the circumstances provided in Section 2.6(c), which Asset Transfer Documents shall identify all outstanding Pledged Policies, all Pledged Policies as to which a maturity event has occurred, and all pending claims and causes of action relating to, or arising from, the Pledged Policies and (ii) a transfer document in the form mutually agreeable to the Debtor Parties and the Lender Parties to be attached hereto as **Exhibit B** (collectively with the Asset Transfer Documents, the "**Transfer Documents**") effectuating the transfer of all equity interests in White Eagle to the Agent (or its designee) in the circumstances provided in Section 2.6(c) and shall deliver the fully executed Transfer Documents to White & Case LLP to be held in escrow pending release pursuant to Section 2.6(c). The Asset Transfer Documents shall be amended by the Lender Parties and White Eagle from time to time to reflect (i) any omitted Pledged Policies, (ii) maturity events that occur with respect to the Pledged Policies, (iii) payments that are made in respect thereof, (iv) pending actions with respect thereto that are resolved, (v) any new claims or causes of action that arise related to the Pledged Policies, (vi) the designee or designees of the Agent that will become party to the Transfer Documents, and (vii) the date of the Transfer Documents, as determined by the following sentence. The Transfer Documents shall not be released from escrow by White & Case LLP and no delivery of such Transfer Documents to the Lender Parties may occur until the later to occur of (A) the Outside Closing Date, and (B) such later date and time expressly approved in writing by the Lender Parties in their sole discretion. Upon confirmation from the Agent to White & Case LLP that it

has received the Early Payoff Amount or the Payoff Amount, as applicable (which shall be sent promptly upon the Agent's receipt of the Early Payoff Amount or the Payoff Amount), the Transfer Documents shall cease to have any force or effect and White & Case LLP shall return the Transfer Documents to the Debtor Parties.

2.4    Appointment of Farnan. Upon the Effective Date, (x) the LP Agreement shall be amended and restated in the form mutually agreeable to the Debtor Parties and the Lender Parties to be attached as **Exhibit C** hereto and the signatures delivered by the parties thereto shall be deemed to be automatically released at such time (which signature pages have been delivered to White & Case LLP in escrow on or before the Effective Date), (y) the LLC Agreement shall be amended and restated in the form mutually agreeable to the Debtor Parties and the Lender Parties to be attached as **Exhibit D** hereto and the signatures delivered by the parties thereto shall be deemed to be automatically released at such time (which signature pages have been delivered to White & Case LLP in escrow on or before the Effective Date), and (z) Farnan, LRDA and CLMG shall enter into a power of attorney (the "**POA**") in the form mutually agreeable to the Debtor Parties and the Lender Parties to be attached as **Exhibit E** hereto to reflect, among other things, the following:

(a)    Pursuant to a written agreement entered into between Farnan and the Debtors, Farnan shall be appointed as (x) the liquidation agent of WEGP, (y) the liquidation agent of LRDA, and (z) the liquidation agent of White Eagle;

(b)    The Independent Manager (as defined in the Loan Agreement) shall be removed from all positions at WEGP and White Eagle simultaneously with Farnan's appointment as the liquidation agent of WEGP and White Eagle;

(c)    Farnan may not be removed or replaced from the positions to which he is appointed pursuant to Section 2.4(a) without the mutual written consent of the Debtor Parties and the Lender Parties;

(d)    If Farnan is removed pursuant to Section 2.4(c), dies, resigns, or otherwise ceases to act in his capacity as liquidation agent, the Debtor Parties and the Lender Parties shall mutually agree on his replacement and, if no such agreement can be reached within thirty (30) days, the Parties shall seek a determination by the Bankruptcy Court of the identity of an appropriate replacement liquidation agent. Upon such mutual agreement or determination by the Bankruptcy Court, Farnan's successor shall automatically become the replacement liquidation agent and the replacement liquidation agent and the applicable Debtor Parties and Lender Parties shall enter into all necessary agreements (including, in the case of LRDA, a power of attorney in substantially the same form as the POA attached as Exhibit E hereto) to effect the appointment of the replacement liquidation agent.

(e)    If the Debtors do not pay the Early Payoff Amount in full in cash to the Agent prior to the occurrence of a Sale Trigger Event, Farnan shall, automatically on the next Business Day after the occurrence of such Sale Trigger Event and without further order or corporate or other action by the Debtor Parties, the Lender Parties, or any other Person, have the sole authority and the express mandate to:

(i)    conduct the Sale Process,

11

(ii)     select winning bids for the Collateral,

(iii)     close sale transactions on behalf of the Debtors with respect to the Collateral; *provided* that Farnan may not cause the Debtors to transfer any Collateral to a purchaser without first (or simultaneously) receiving the proceeds of such sale (with any credit bid by the Lender Parties being deemed simultaneous receipt of proceeds),

(iv)     prohibit the Debtors from making any expenditure not specified in any such DIP Budget unless such expenditure is approved in writing by the Lender Parties,

(v)     obtain DIP Financing in accordance with Section 2.8(c),

(vi)     take all other actions as he determines in his sole and absolute discretion are necessary and appropriate to promptly implement and complete the Sale Process and preserve and protect the Collateral (including the commencement, defense and settlement of litigation, if necessary), and

(vii)     exercise veto rights over any action to be taken by the Debtors that is inconsistent with, or that would interfere with or delay timely completion of, the Sale Process.

Subject to the foregoing exclusive authority and mandate granted to Farnan, the existing management of the Debtors shall retain all of their other respective management and decision-making powers on behalf of the Debtors. Farnan shall exercise the exclusive powers granted hereunder in the role of Bankruptcy Court-appointed independent liquidation agent, and he shall not be an officer, employee, manager, or director of any of the Debtors.

(f)     Farnan shall maximize the proceeds from the sale of the Collateral in the manner that he determines to be appropriate in his sole and absolute discretion and, in any event, consistent with traditional fiduciary duties owed by directors and officers of corporations under Delaware law to constituents of bankruptcy estates subject to complying with the Sale Process in all respects as set forth in this Agreement; *provided* that Farnan may not, in exercising his rights and duties, contest the Sale Process (including the Sale Deadlines), in any way or seek any relief from the Bankruptcy Court to modify the Sale Process (including the Sale Deadlines), or take any other action inconsistent with the terms of this Agreement; and

(g)     Prior to the occurrence of a Sale Trigger Event, Farnan's duties and authorities shall be limited to taking such actions as he determines in his sole and absolute discretion to be necessary or appropriate (including consulting with, directing, and overseeing Maple) for the Debtors to be prepared to launch and implement the Sale Process upon the occurrence of a Sale Trigger Event; *provided* that, prior to the Sale Trigger Event, Farnan shall not take any action to commence the marketing of the Collateral to third parties or to otherwise contact potential buyers about the Collateral.

2.5     Engagement of Maple.

(a)     Upon the Effective Date, Maple shall be engaged as the due diligence and

12

marketing agent by the Debtors to conduct the Sale Process pursuant to an engagement agreement mutually agreeable to the Debtor Parties and the Lender Parties; *provided* that Maple shall receive guidance and direction solely from Farnan in connection with such engagement.

(b)    Under the terms of such engagement, (i) until the occurrence of a Sale Trigger Event, Maple shall only take such actions as it shall determine, in consultation with Farnan, are necessary or appropriate to be able to launch and implement the Sale Process upon the occurrence of a Sale Trigger Event; *provided* that, prior to the Sale Trigger Event, Maple shall not take any action to commence the marketing of the Collateral to third parties or to otherwise contact potential buyers about the Collateral and (ii) upon the occurrence of a Sale Trigger Event, Maple shall, subject to Farnan's discretion and in consultation with the Parties, promptly launch and conduct the Sale Process as it determines to be appropriate.

2.6    Sale Process.    Upon the occurrence of a Sale Trigger Event, a sale of the Collateral shall be conducted by the Debtors, at the direction of Farnan based on the advice of Maple, as follows:

(a)    The Collateral shall be marketed in one or more packages as determined by Farnan in his sole and absolute discretion based on the advice of Maple;

(b)    The closing of the sale of any of the Collateral shall occur, and the proceeds of such sale shall be received by the Agent, on or before December 30, 2019 at 12:00 noon (New York time) (the "**Outside Closing Date**");

(c)    If the Agent has not confirmed receipt of the Payoff Amount to White & Case LLP by December 30, 2019 at 2:00 p.m. (New York time) or such later date and time as expressly approved in writing by the Lender Parties in their sole and absolute discretion (such applicable date and time, the "**Transfer Date**"), White & Case LLP shall promptly deliver to the Agent all of the executed Transfer Documents (dated as of the Transfer Date) to which the Agent (or any one or more of its designees) has provided to White & Case LLP executed counterparties and, upon such delivery, all rights, title, and interests of the Debtors in and to the Collateral covered by the applicable Transfer Documents shall, as of the Transfer Date, be transferred to and vest in the transferee in full satisfaction of the remaining unpaid portion of the Allowed Claim and any outstanding obligations owed under DIP Financing;

(d)    The following deadlines shall be set by the Debtors, as directed by Farnan based on the advice of Maple, and communicated to all potential bidders (including the Lender Parties), so as to ensure that all sales are completed by the Outside Closing Date:  (i) the execution of nondisclosure agreements by interested parties, (ii) the submission of nonbinding expressions of interest, (iii) the conducting and completion of diligence, (iv) the submission of binding bids, including binding stalking horse bids (if appropriate), and (v) the conducting of an auction, if appropriate, all as determined by Farnan in his sole and absolute discretion based on the advice of Maple; *provided* that the Parties hereby recognize that, in order to close one or more sale transactions with respect to the Collateral by the Outside Closing Date, such deadlines must be set in a manner that addresses all requirements a potential purchaser must satisfy in order to effectuate the transfer of the applicable Collateral;

(e)    The Agent may submit one or more credit bids of all or any portion of the

Allowed Claim and/or the DIP Claims for all of the Collateral or any package thereof; *provided* that the Agent may not credit bid for packages of Collateral solely in the event that (i) third party bids for such packages of Collateral in the aggregate exceed the full amount of the Payoff Amount and (ii) the sales with respect to such packages of Collateral are actually consummated simultaneously with each other. If the Agent's credit bid is the high bid with respect to the sale of any package of Collateral, the amount of such credit bid shall, upon closing, reduce the Allowed Claim and, if the Allowed Claim has been paid in full, the DIP Claims; and

(f)     The Lender Parties and Emergent shall each have the right to object to any proposed sale of some or all of the Collateral pursuant to the Sale Process by filing an objection to such sale with the Bankruptcy Court. So long as the Lender Parties and Emergent receive at least seven (7) days' notice of the proposed sale of some or all of the Collateral pursuant to the Sale Process, the filing of such an objection shall not stay any proposed sale. The burden shall be on the objecting party to obtain expedited consideration of such objection (to which any opposing party shall not unreasonably object). At the hearing before the Bankruptcy Court to consider any such objection, the burden shall be on the objecting party to prove that the sale does not satisfy the requirements of section 363 of the Bankruptcy Code; *provided* that such objection shall not challenge the adequacy of the Sale Process as contemplated by this Agreement. None of the filing, the pendency, nor the determination of any such objection shall prevent or stay the Collateral from being transferred pursuant to Section 2.6(c).

2.7     Time is of the Essence. The Parties expressly acknowledge and agree that (i) time is of the essence with respect to the Sale Deadlines, (ii) strict adherence to the Sale Deadlines is a material term of this Agreement, (iii) the Sale Deadlines may not be extended or modified by Farnan or any of the Debtor Parties in any way for any reason whatsoever including (A) Farnan's exercise of his duties as set forth in Section 2.4(e), (B) the status of any potential or pending sale of Collateral, (C) any pending objection to a sale of Collateral pursuant to Section 2.6(f) that is not yet resolved by the Bankruptcy Court, or (D) any other extenuating circumstances that may exist as of the applicable Sale Deadline, and (iv) any decision by the Lender Parties to extend or not extend the Sale Deadlines shall be in the Lender Parties' sole and absolute discretion.

2.8     DIP Financing.

(a)     Subject to negotiation of terms and conditions mutually agreeable to the Debtor Parties and the Lender Parties, the Lender shall provide the Debtors a revolving postpetition credit facility of up to $15 million (the "**Initial DIP Financing**"), with a maturity date of the Outside Closing Date, to address White Eagle's liquidity needs, after receipt of maturities of the Pledged Policies, subject to the DIP Budget, the DIP Credit Agreement, and the DIP Order authorizing such Initial DIP Financing.

(b)     If, prior to the Sale Trigger Event, White Eagle indicates that it anticipates having insufficient liquidity to pay its obligations under the DIP Budget notwithstanding having fully drawn the Initial DIP Financing, the Parties shall work together in good faith to try to agree on how such shortfall should be addressed.

(c)     If Farnan anticipates that White Eagle will not have sufficient liquidity to service its obligations after the occurrence of a Sale Trigger Event, Farnan, on behalf of the Debtors, shall have full authority to (i) negotiate and enter into all necessary documentation

14

regarding additional postpetition financing following the Sale Trigger Event on behalf of the Debtors (together with the Initial DIP Financing and any other financing provided by the Lender Parties or any of their Affiliates to any of the Debtor Parties after the Effective Date, "**DIP Financing**") and (ii) seek and obtain all necessary Bankruptcy Court approvals in connection therewith. Emergent shall have the right to contest or comment on any such proposed DIP Financing before the Bankruptcy Court.

**ARTICLE III**
**COVENANTS**

3.1    <u>Debtor Party Covenants</u>. Until (i) the payment of the Early Payoff Amount or the Payoff Amount, as applicable, or (ii) the transfer of Collateral to the Agent as set forth in Section 2.6(c), each of the Debtor Parties hereby covenants and agrees as follows:

(a)    Each Debtor Party shall comply with this Agreement and the Settlement Order and shall use its reasonable best efforts to take all actions reasonably necessary and desirable to implement the terms of this Agreement and shall not take any action inconsistent with this Agreement.

(b)    No Debtor Party shall take any action inconsistent with obtaining entry of any of the Initial Orders or the Confirmation Order, including objecting, causing, or encouraging any other Person to object, or supporting any other Person in making an objection to entry of any of the Initial Orders or the Confirmation Order.

(c)    The Debtors shall not alter, amend, or modify the Amended Plan (whether or not any such alteration, amendment, or modification would require resolicitation under the Bankruptcy Code) without the prior written consent of the Lender Parties. Any alteration, amendment, or modification of the Amended Plan without the prior written consent of the Lender Parties shall be void *ab initio*. The Debtors shall not seek to revoke or withdraw the Amended Plan without the prior written consent of the Lender Parties.

(d)    No Debtor Party shall seek to (i) vacate or otherwise impair the effectiveness of any Initial Order or the Confirmation Order that is entered by the Bankruptcy Court or (ii) alter, amend, or modify any Initial Order or the Confirmation Order in any manner (whether such alteration, modification, or amendment is *de minimis*, corrective, or otherwise) without the prior written consent of the Lender Parties. Any alteration, amendment, or modification of any Initial Order or the Confirmation Order without the prior written consent of the Lender Parties shall be void *ab initio*.

(e)    No Debtor Party may contest, object to, or otherwise challenge, directly or indirectly, (i) the Allowed Claim, (ii) the accrual of interest (at the contractual default rate), fees, costs, and expenses with respect to the Allowed Claim, or (iii) the Allowed Lien; *provided* that White Eagle reserves the right to contest the mathematical accuracy of the calculation of the Allowed Claim pursuant to the terms hereof.

(f)    No Debtor Party shall seek to reject this Agreement under section 365 of the Bankruptcy Code (or otherwise) in the Chapter 11 Cases or any other Insolvency or Liquidation Proceeding. If any Debtor Party that is not a Debtor as of the Effective Date files an

15

Insolvency or Liquidation Proceeding, it shall seek to assume this Agreement under section 365 of the Bankruptcy Code (or, in the case of an Insolvency or Liquidation Proceeding under any law other than the Bankruptcy Code, its equivalent) on the first day of such Insolvency or Liquidation Proceeding.

(g)    No Debtor Party shall amend or otherwise propose to amend any of the Constituent Documents or the constitution of LRDA except as expressly permitted hereby.

(h)    No Debtor Party shall issue, or authorize for issuance, sell, deliver, or agree to commit to issue, sell, or deliver (whether through the issuance of granting of options, warrants, commitments, subscriptions, right to purchase, or otherwise) any equity or voting interest in any of the Debtors or any securities convertible into or exchangeable for any equity or voting interest in any of the Debtors unless the proceeds of such issuance, sale, or delivery are sufficient to and are used to pay in full in cash the Early Payoff Amount or the Payoff Amount, as applicable.

(i)    The Debtor Parties shall provide the Lender Parties with reasonable access to information regarding any potential Claims against any of the Debtors (including administrative expenses and unsecured claims) and shall cooperate in good faith with the Lender Parties to minimize, to the fullest extent possible, such Claims (if any); *provided* that, subject to Section 3.2(f), the Lender Parties' right to object to any Claims asserted against, or scheduled by, the Debtors are fully preserved and the Debtor Parties shall not challenge the right of the Lender Parties to assert any such objection.

(j)    The Debtors shall not seek to sell any Collateral prior to the occurrence of a Sale Trigger Event without the approval of the Bankruptcy Court; *provided* that, if the Debtors attempt to sell any Collateral prior to the occurrence of a Sale Trigger Event for an amount which is less than the Early Payoff Amount, the Lender Parties shall have the right to (i) credit bid all or a portion of the Allowed Claim and/or the DIP Claims for such Collateral and/or (ii) object to any such sale.

(k)    The Debtor Parties shall (i) cooperate with and assist Farnan in performing his obligations and duties as contemplated under this Agreement, including with respect to preparing for the Sale Process and the implementation and consummation thereof and (ii) provide Farnan with reasonable access to information necessary or desirable to prepare for, implement, and consummate the Sale Process.

(l)    No Debtor Party may take any action, directly or indirectly, to remove or displace Farnan or to interfere with the performance of Farnan's duties as set forth in this Agreement or the Constituent Documents.

(m)    The Debtor Parties shall cooperate with and assist Maple in performing its obligations and duties under its engagement, including with respect to the preparation for the Sale Process and the consummation thereof.

(n)    None of the Debtors shall sell, license, sublicense, abandon, allow to lapse, transfer, or dispose of any Collateral except as expressly permitted hereby.

(o)    The Debtor Parties shall comply with the terms of any DIP Order and DIP

16

Credit Agreement (including the covenants set forth therein) and shall not take any action inconsistent with any DIP Order and DIP Credit Agreement.

(p)      Each of the Debtor Parties shall continue to operate its businesses in the ordinary course (subject to the terms of this Agreement and the Settlement Order) including (i) doing or causing to be done all things necessary to preserve and keep in full force and effect its existence and its material rights, franchises, licenses, permits, copyrights, trademarks and patents, (ii) maintaining and implementing administrative and operating procedures (including an ability to recreate the documents relating to the Collateral in the event of the destruction thereof) and keeping and maintaining all records and other information, reasonably necessary or reasonably advisable for the collection of proceeds of the Pledged Policies, (iii) maintaining its existing bank accounts and not closing any bank accounts or creating any new bank accounts without the consent of the Lender Parties, acting reasonably, (iv) not being acquired directly or indirectly, or becoming a party to any merger or consolidation unless any such transaction would result in the immediate payment in full of the Early Payoff Amount or the Payoff Amount, as applicable, (v) not creating any new direct or indirect subsidiary, (vi) not acquiring any new life insurance policies, (vii) not changing its accounting practices, policies, or treatment except to the extent required by applicable law, changes in GAAP or requirements of its independent accounts, (viii) not becoming an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, by virtue of an exemption other than pursuant to Section 3(c)(l) or Section 3(c)(7) thereof, (ix) not becoming a "covered fund" under Section 13 of the Bank Holding Company Act of 1956, as amended, (x) maintaining its insurance in existence on the date hereof with respect to the DIP Collateral, and (xi) complying in all material respects with all applicable laws, rules and regulations applicable to the Collateral and White Eagle's business.

(q)      None of the Debtor Parties may (i) seek relief from the Bankruptcy Court, or any other court, seeking a modification of the Sale Process (including the Sale Deadlines) or (ii) otherwise attempt to modify the Sale Process (including the Sale Deadlines). The Debtor Parties shall not seek any approval by the Bankruptcy Court (or any other court) or the entry by the Bankruptcy Court of any order in the Chapter 11 Cases that affects this Agreement or any DIP Financing without the prior written consent of the Lender Parties.

(r)      The Debtors may not incur or assume any funded indebtedness other than any DIP Financing or as set forth in the DIP Budget unless the proceeds of such indebtedness are used to pay in full in cash the Early Payoff Amount or the Payoff Amount, as applicable.

(s)      The Debtors may not grant liens on any of the Collateral to any party other than the Agent or the agent or lender under any DIP Financing except with respect to indebtedness the proceeds of which are used to pay in full in cash the Early Payoff Amount or the Payoff Amount, as applicable.

(t)      The Debtor Parties shall forbear from making, causing to be made, publishing, ratifying, or endorsing any and all disparaging remarks or derogatory statements or comments, whether written or oral, to any Person with respect to any of the Lender Parties and, in response to any related inquiry, shall state only that the Parties have resolved their dispute to their mutual satisfaction; *provided* that the Debtors Parties shall not be prohibited from responding publicly to incorrect public statements or from making truthful statements when

17

required by law, subpoena, or court order.

(u)    The Debtor Parties shall pay or cause to be paid all Premiums due on the Pledged Policies and keep all of the Pledged Policies in full force and effect and not in a state of grace or lapse unless otherwise agreed to by the Lender Parties in their sole and absolute discretion.

(v)    The Debtor Parties shall (i) continue to coordinate with LexServ to obtain, as soon as is reasonably practicable, (A) updated life expectancy reports from ITM TwentyFirst LLC for each insured life which has been previously underwritten by ITM TwentyFirst LLC, using the new underwriting methodology and mortality tables announced and adopted by ITM TwentyFirst LLC during October 2018 and (B) updated life expectancy reports from AVS Underwriting, LLC for each insured life which has been previously underwritten by AVS Underwriting, LLC, using the new underwriting methodology and mortality tables announced and adopted by AVS Underwriting, LLC during October and November 2018, and (ii) provide to the Lender Parties such reports on the Friday of each week.

(w)    The Debtor Parties shall keep the Lender Parties apprised on a timely basis of all material developments with respect to the business and affairs of the Debtors and the Collateral including the maturity of any Pledged Policy and any litigation or other dispute with respect to any Pledged Policy.

(x)    The Debtor Parties shall use their best efforts to seek and obtain entry by the Bankruptcy Court, on or before June 21, 2019, of an order consistent with the terms of this Agreement and otherwise acceptable to the Parties that shall, among other things, (i) confirm the Amended Plan, (ii) incorporate the terms of the Settlement Order in their entirety, (iii) prohibit the Debtor Parties from making any payments or other transfers of cash not specifically identified in the DIP Budget and (iv) to the greatest extent permitted under applicable law, vest the Collateral in the Debtors on the terms set forth in this Agreement on the effective date of the Amended Plan free and clear of liens and Claims  (other than liens and Claims specifically surviving the effective date under the terms of the Amended Plan, including the Allowed Claim and the Allowed Lien) (the "**Confirmation Order**").

(y)    The Debtors shall not seek to resolve or settle any disputed Claim with respect to any Pledged Policy for an amount that represents a reduction greater than the lesser of (i) $2 million of the face amount of such Pledged Policy or (ii) 20% of the face amount of such Pledged Policy without the prior written consent of the Lender Parties (not to be unreasonably withheld); *provided* that the Lender Parties' consent shall not be required with respect to the Lincoln Benefit Settlement Agreement (but that the Lender Parties shall work in good faith with the Debtor Parties to resolve any outstanding issues or concerns with respect to the Lincoln Benefit Settlement Agreement so as to provide their consent by May 29, 2019); *provided further* that the Lincoln Benefit Settlement Agreement shall not be binding on, or effective as to, White Eagle unless and until it is approved by the Bankruptcy Court after notice and a hearing, and the Lender Parties' right to object to such Bankruptcy Court approval of the Lincoln Benefit Settlement is fully preserved.

(z)    Each of the representations and warranties of each Debtor Party contained in Article IV shall be true and correct in all material respects on and as of the Effective Date.

(aa)    Without limiting the effect of Section 6.1(b), the Debtor Parties shall work in good faith with the Lender Parties to finalize and attach each of the Exhibits hereto by May 29, 2019.

3.2    <u>Lender Party Covenants</u>. Until (i) the payment of the Early Payoff Amount or the Payoff Amount, as applicable, or (ii) the transfer of Collateral to the Agent as set forth in Section 2.6(c), each of the Lender Parties hereby covenants and agrees as follows:

(a)    Each Lender Party shall comply with this Agreement and the Settlement Order and shall use its reasonable best efforts to take all actions reasonably necessary and desirable to implement the terms of this Agreement and shall not take any action inconsistent with this Agreement.

(b)    So long as the Initial Orders and the Confirmation Order are consistent with this Agreement and have been otherwise approved by the Lender Parties, no Lender Party shall take any action inconsistent with obtaining entry of any of the Initial Orders or the Confirmation Order, including objecting, causing, or encouraging any other Person to object, or supporting any other Person in making an objection, to entry of any of the Initial Orders or the Confirmation Order.

(c)    The Lender Parties shall (i) cooperate with and assist Farnan in performing his obligations and duties under this Agreement, including with respect to the preparation for the Sale Process and the consummation thereof and (ii) provide Farnan with reasonable access to information necessary or desirable to prepare for the Sale Process.

(d)    The Lender Parties shall cooperate with and assist Maple in performing its obligations and duties under its engagement, including with respect to the preparation for the Sale Process and the consummation thereof.

(e)    The Lender Parties shall work in good faith with the Debtor Parties to resolve any dispute in connection with the proper allocation of payments to professionals as between the Debtors, on the one hand, and their non-Debtor Affiliates, on the other hand, in connection with negotiating the DIP Budget.

(f)    Upon agreement on a DIP Budget, the Lender Parties shall not object to the Debtors' use of cash collateral to pay professionals or any other expenses consistent with such DIP Budget.

(g)    The Lender Parties shall comply with the terms of any DIP Order and shall not take any action inconsistent with any DIP Order.

(h)    The Lender Parties shall forbear from making, causing to be made, publishing, ratifying, or endorsing any and all disparaging remarks or derogatory statements or comments, whether written or oral, to any Person with respect to any of the Debtor Parties and, in response to any related inquiry, shall state only that the Parties have resolved their dispute to their mutual satisfaction; *provided* that the Lender Parties shall not be prohibited from responding publicly to incorrect public statements or from making truthful statements when required by law, subpoena, or court order.

(i)     The Lender Parties shall use their best efforts to seek and obtain entry by the Bankruptcy Court, on or before June 21, 2019, of the Confirmation Order.

(j)     Each of the representations and warranties of each Lender Party contained in Article V shall be true and correct in all material respects on and as of the Effective Date.

(k)     Without limiting the effect of Section 6.1(b), the Lender Parties shall work in good faith with the Debtor Parties to finalize and attach each of the Exhibits hereto by May 29, 2019.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF EACH DEBTOR PARTY

Each Debtor Party, severally and not jointly, hereby represents and warrants to the Lender Parties as follows:

4.1     Authority.  Each Debtor Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and perform its obligations under this Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be party, subject to entry by the Bankruptcy Court of the Settlement Order.  The execution, delivery, and performance by each Debtor Party under this Agreement and the other documents and instruments contemplated hereby to which such Debtor Party is contemplated to be a party have been duly authorized by all necessary action on its part, and no other actions or proceedings on its part are necessary to authorize it to enter in to this Agreement or the other documents or instruments contemplated hereby to which it is contemplated to be a party, subject to entry by the Bankruptcy Court of the Settlement Order.

4.2     Enforceability.  This Agreement and each other agreement and document executed and delivered by each Debtor Party in connection herewith have been duly executed and delivered by such Debtor Party and constitutes the binding obligation of such Debtor Party, enforceable in accordance with their respective terms upon entry by the Bankruptcy Court of the Settlement Order.

4.3     No Conflict.  The execution and delivery of this Agreement does not and will not (a) conflict with any provision of the organizational documents of any Debtor Party or (b) violate any contract, agreement, document, judgment, license, or order applicable to or binding upon such Debtor Party, subject to Bankruptcy Court approval of this Agreement.

4.4     Ownership.

(a)     Emergent is the sole legal and beneficial owner of all of the issued and outstanding stock or other equity interests of OLIPP and no one other than Emergent owns any other equity interests in OLIPP.

(b)     OLIPP is the sole legal and beneficial owner of all of the issued and outstanding stock or other equity interests of Markley and no one other than Emergent owns any

other equity interests in Markley.

      (c)    Markley is the sole legal and beneficial owner of all of the issued and outstanding stock or other equity interests of LRDA and no one other than Emergent owns any other equity interests in LRDA.

      (d)    LRDA is the legal and beneficial owner of 99.9% of the issued and outstanding stock or other equity interests of White Eagle and WEGP is the legal and beneficial owner of 0.1% of the issued and outstanding stock or other equity interests of White Eagle and no one other than LRDA or WEGP owns any other equity interests in White Eagle.

      (e)    White Eagle is the sole owner of the Pledged Policies, which are not subject to any liens or encumbrances other than the Allowed Lien and any liens securing DIP Financing.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE LENDER PARTIES

Each Lender Party, severally and not jointly, hereby represents and warrants to each Debtor Party as follows:

    5.1    Authority. Each Lender Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization and has all the requisite corporate, partnership, limited liability company, or other power and authority to execute and deliver this Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and perform its obligations under this Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be party. The execution, delivery, and performance by each Lender Party under this Agreement and the other documents and instruments contemplated hereby to which such Lender Party is contemplated to be a party have been duly authorized by all necessary action on its part, and no other actions or proceedings on its part are necessary to authorize it to enter in to this Agreement or the other documents or instruments contemplated hereby to which it is contemplated to be a party.

    5.2    Enforceability. This Agreement and each other agreement and document executed and delivered by each of the Lender Parties in connection herewith have been duly executed and delivered by such Lender Party and constitutes the binding obligation of each of the Lender Parties, enforceable in accordance with their respective terms.

    5.3    No Conflict. The execution and delivery of this Agreement does not and will not (a) conflict with any provision of the organizational documents of any Lender Party or (b) violate any contract, agreement, document, judgment, license, or order applicable to or binding upon such Lender Party.

    5.4    Ownership. The Lender Parties are the sole legal and beneficial holders and owners of the Allowed Claim and the Allowed Lien, and no such interests have been transferred or assigned to any other party.

## ARTICLE VI
## CONDITIONS TO EFFECTIVENESS

6.1    Effectiveness.  This Agreement shall become effective and fully binding on the Parties on the first Business Day (the "**Effective Date**") on which each of the conditions set forth below has been satisfied or waived by the appropriate Party or Parties:

(a)    each Party shall have executed and delivered to each other Party a signed counterpart to this Agreement;

(b)    each applicable Debtor Party shall have executed and delivered in escrow to White & Case LLP the documents contemplated by Sections 2.3(f) and 2.4; and

(c)    the Bankruptcy Court shall have entered the Settlement Order, and the Settlement Order shall be in full force and effect and not stayed, reversed, vacated, or amended.

6.2    Certain Obligations Effective Immediately.  Notwithstanding anything else in this Agreement, the Parties agree that their respective obligations under Sections 2.1 and 2.2 shall be effective immediately upon the execution of this Agreement by the Parties.

## ARTICLE VII
## RELEASES

7.1    Mutual Releases.

(a)    Release by Debtor Parties.  Except as otherwise set forth in Section 7.2 of this Agreement, upon the Effective Date, in consideration of the covenants, promises, and consideration set forth herein (the receipt and sufficiency of which is hereby acknowledged by the Debtor Parties), each Debtor Party, on behalf of itself, each of its Affiliates, and each Debtor Party's and its Affiliate's respective present and former attorneys, financial advisors, accountants, investment bankers, consultants, professionals, advisors, agents, officers, directors, shareholders, principals, partners, members, managers, employees, subsidiaries, divisions, predecessors, management companies, and other representatives (each, a "**Debtor Release Party**"), hereby forever releases and discharges each of the Lender Parties, each Affiliate thereof, and each Lender Party's and its Affiliate's respective present and former attorneys, financial advisors, accountants, investment bankers, consultants, professionals, advisors, agents, officers, directors, shareholders, principals, partners, members, managers, employees, subsidiaries, divisions, predecessors, management companies, and other representatives (each, a "**Lender Release Party**") from any and all Claims, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, that such Debtor Release Party (whether individual or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to the Debtor Parties, any of their respective Affiliates, the business and operations of the Debtor Parties, the Plan, the Collateral, the Loan Agreement, the Transaction Documents, the Adversary Proceeding, the Estimation Motion, the Chapter 11 Cases, or any act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing.

(b)    Release by the Lender Parties.  Except as otherwise set forth in Section 7.2 of this Agreement, upon the Effective Date, in consideration of the covenants, promises, and

22

consideration set forth herein (the receipt and sufficiency of which is hereby acknowledged by the Lender Parties), each Lender Release Party hereby forever releases and discharges each Debtor Release Party from any and all Claims, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, that such Lender Release Party (whether individual or collectively) ever had, now has, or hereafter can, shall, or may have, based on or relating to the Debtor Parties, any of their respective Affiliates, the business and operations of the Debtor Parties, the Plan, the Collateral, the Loan Agreement, the Transaction Documents, the Adversary Proceeding, the Estimation Motion, the Chapter 11 Cases or any act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing.

(c)    Debtor Parties' Covenant Not to Sue.    Subject to Section 7.2 of this Agreement, upon the Effective Date, each Debtor Party, on behalf of each Debtor Release Party, hereby agrees that it shall not institute or prosecute (or, except to the extent required by law, in any way aid, assist, or cooperate with the institution or prosecution of) any action, suit, hearing, or other proceeding of any kind, nature, or character at law or in equity, against any Lender Release Party in order to collect, enforce, declare, assert, establish, or defend against any Claim released pursuant to Section 7.1(a) above.  This Agreement shall provide each Lender Release Party with a complete defense to any such claims.

(d)    Lender Release Parties' Covenant Not to Sue.    Subject to Section 7.2 of this Agreement, upon the Effective Date, each Lender Party, on behalf of each Lender Release Party, hereby agrees that it shall not institute or prosecute (or, except to the extent required by law, in any way aid, assist, or cooperate with the institution or prosecution of) any action, suit, hearing, or other proceeding of any kind, nature, or character at law or in equity against any Debtor Release Party in order to collect, enforce, declare, assert, establish, or defend against any Claim released pursuant to Section 7.1(b) above.  This Agreement shall provide each Debtor Release Party with a complete defense to any such claims.

(e)    Subordination and Treatment of Intercompany Claims.    Subject to Section 7.2 of this Agreement, upon the Effective Date, in consideration of the covenants, promises, and consideration set forth herein, each Debtor Party hereby agrees to subordinate any Intercompany Claims including (i) the purported $5,385,975.90 Intercompany Claim held by Imperial against White Eagle listed in the schedules of assets and liabilities for White Eagle [Docket No. 62], (ii) the intercompany notes between Markley and LRDA and (iii) any reimbursement, contribution, subrogation, or any other Intercompany Claims held by Emergent, Imperial, or any other Debtor Party, whether arising before, on, or after the Effective Date, to the DIP Claims, the Allowed Claim, and any other third party Claims against the Debtors; *provided* that the Amended Plan shall provide that no distribution may be made on account of any Intercompany Claims unless and until the Early Payoff Amount or the Payoff Amount, as applicable, is paid in full and the Debtor Parties hereby agree that treatment consistent with the foregoing shall be acceptable to them in full satisfaction of any such Intercompany Claims.

(f)    Unknown Claims.    The Parties hereby understand and waive the effect of Section 1542 of the California Civil Code, which provides:

§1542.  A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of

23

executing the release, which if known by him must have materially affected his settlement with the debtor.

THE PARTIES AGREE TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THIS AGREEMENT AND THE PARTIES HEREBY WAIVE AND RELEASE ALL RIGHTS AND BENEFITS WHICH THEY MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE PARTIES WAIVE AND RELEASE ANY BENEFIT, RIGHT OR DEFENSE WHICH THEY MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS

7.2    Certain Preserved Obligations.  Notwithstanding Section 7.1 of this Agreement, nothing in this Agreement shall waive, release, or impair (i) any of the rights or obligations of the Parties under this Agreement, the Interim Orders, the Confirmation Order, the Amended Plan, the DIP Order, or any other related agreement or order, (ii) the right of any Party to obtain remedies with respect to the breach or violation thereof by any other Party, (iii) the Allowed Claim, the Early Payoff Amount, or the Payoff Amount, or (iv) any rights, claims, or defenses that any Party may have with respect to any Person that is not a Release Party and any Affiliate thereof.

**ARTICLE VIII**
**REMEDIES**

8.1    Breach by Debtor Parties.  If the Lender Parties determine that any of the Debtor Parties has materially breached this Agreement or the Settlement Order, the Lender Parties will provide notice of such breach to the Debtor Parties and shall be entitled to a hearing before the Bankruptcy Court on an expedited basis within three (3) Business Days' of delivery of such notice for entry of an order of the Bankruptcy Court determining that such a breach has occurred (a "**Breach Order**") and, if a Breach Order is entered, a Sale Trigger Event shall automatically and immediately occur and the Sale Process will commence in accordance with Section 2.6; *provided* that the Debtor Parties may not oppose such request for an expedited hearing for a Breach Order or the effects of obtaining a Breach Order as set forth in this Agreement; *provided, further,* that, prior to the Outside Closing Date, White & Case LLP shall not release any Transfer Documents to the Lender Parties.

8.2    Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement or the Settlement Order by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach on shortened notice, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any

24

Party to comply promptly with any of its obligations under this Agreement and the Settlement Order; *provided* that each Party agrees to waive any requirement for the security or posting of a bond in connection with such remedy; *provided, further*, that, consistent with the foregoing, any claim for breach of this Agreement would not be a dischargeable claim in the Chapter 11 Cases or any other Insolvency or Liquidation Proceeding.

8.3     Other Remedies.  Upon a breach of any of the terms of this Agreement by any Party, the non-breaching Party may, in addition to (or in lieu of) any other available remedies (including the right of the Lender Parties to seek entry of a Breach Order in accordance with Section 8.1), obtain specific performance as set forth in Section 8.2 or injunctive or equitable relief (such as a temporary restraining order pending a hearing on entry of a Breach Order), none of which shall be an exclusive remedy.

## ARTICLE IX
## MISCELLANEOUS

9.1     Binding Agreement.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No third party beneficiaries are intended in connection with this Agreement.  This Agreement or any rights hereunder may not be assigned by any Party without the prior written consent of the other Parties, and any attempted assignment in violation of this provision shall be null and void.

9.2     Counterparts.  This Agreement may be executed in any number of counterparts, each of which, when executed, will be deemed to be an original and all of which taken together will be deemed to be one and the same instrument.

9.3     Choice of Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

9.4     Jurisdiction.  The Bankruptcy Court shall retain jurisdiction with respect to all matters arising from or related to this Agreement, the implementation of this Agreement, and the Settlement Order.  Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in Delaware, (iii) waives any objection that the Bankruptcy Court is an inconvenient forum, does not have jurisdiction over any Party hereto, or lacks the authority to enter final orders in connection with such action or proceeding, and (iv) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any form of substantially similar mail), postage prepaid, to such Party at the address set forth for such Party in this Agreement; *provided, however*, that this Agreement and the releases set forth herein may be submitted in any court, arbitration, or other legal proceeding to enforce the terms of such releases.  Each Party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of, or relating to, this Agreement or the transactions contemplated hereby (whether based on contract, tort, or any other theory).

9.5    Headings. The headings used in this Agreement are for convenience only and shall be disregarded in interpreting the substantive provisions of this Agreement.

9.6    Fees, Costs, and Expenses. The Parties agree that the prevailing Party in any action to enforce this Agreement shall be entitled to fees, costs, and expenses, including attorneys' fees, costs, and expenses, incurred by such Party in connection with any such action.

9.7    Entire Agreement. THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT OF THE PARTIES HERETO WITH RESPECT TO THE MATTERS COVERED AND THE TRANSACTIONS CONTEMPLATED HEREBY AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

9.8    Drafting. The Parties acknowledge that all of the Parties hereto participated fully in the drafting of this Agreement and that, accordingly, any ambiguities in this Agreement shall not be construed against a Party on the grounds that such Party was the drafter of this Agreement.

9.9    Modifications/Amendments; Waiver. This Agreement may be modified or amended only by written agreement executed by each of the Parties in its sole and absolute discretion. The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) by the Party entitled to the benefits of such term, but such waiver shall be effective only if it is in a writing signed by the Party entitled to the benefits of such term and against which such waiver is to be asserted. Unless otherwise expressly provided in this Agreement, no delay or omission on the part of any Party in exercising any right or privilege under this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any Party of any right or privilege under this Agreement operate as a waiver of any other right or privilege under this Agreement, nor shall any single or partial exercise of any right or privilege preclude any other or further exercise thereof or the exercise of any other right or privilege under this Agreement.

9.10    Non-Severability. This Agreement is to be construed as a whole, and all provisions of it are to be read and construed together. Notwithstanding anything in this Agreement to the contrary, and in light of the integrated nature of the settlements and compromises embodied in this Agreement, in the event that (a) a court of competent jurisdiction enters a final order ruling that any of the provisions of this Agreement or the Settlement Order are void, invalid, illegal, or unenforceable in any material respect, or (b) any of the provisions of this Agreement or the Settlement Order are reversed, vacated, overturned, voided, or unwound in any material respect, then in each case, the entirety of this Agreement (including the releases set forth in Article VII) shall be void ab initio and of no force and effect and, during any subsequent proceeding, the Parties shall not assert claim preclusion, issue preclusion, estoppel, or any similar defense in respect of rights and claims of the Parties that were the subject of this Agreement prior to this Agreement being of no force or effect. Upon such a voiding of this Agreement or the Settlement Order, or any other termination of this Agreement or the Settlement Order, the Parties shall have no further obligations under this Agreement and the Lender Parties may assert a claim for all obligations under the Loan Agreement and the other Transaction Documents (including for the Participation Interest) and the Debtor Parties retain the right to

26

object to, or otherwise challenge, that claim.

9.11    Notice. All notices, demands, and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via electronic mail to the e-mail address set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight courier service, or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid. Notices, demands, and communications, in each case to the respective Parties, shall be sent to the applicable address set forth below, unless another address has been previously specified in writing:

(a)    If to the Lender Parties, to:

LNV Corporation
c/o CLMG Corp.
6000 Legacy Drive
Plano, TX 75204
Attention: James Erwin; Rob Ackermann
jerwin@clmgcorp.com; rackermann@clmgcorp.com

with a copy to:

Thomas E Lauria
White & Case LLP
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, FL 33131
tlauria@whitecase.com

-and-

David M. Turetsky
Andrew T. Zatz
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
dturetsky@whitecase.com
azatz@whitecase.com

(b)    If to the Debtor Parties, to:

White Eagle Asset Portfolio, LP
One Lane Hill, East Broadway
Hamilton HM19

Bermuda
whiteeagle@lamington.ie

with a copy to:

Emergent Capital, Inc.
5355 Town Center Rd #701
Boca Raton, FL 33486
Attention: Miriam Martinez
mmartinez@emergentcapital.com

-and-

Richard M. Pachulski
Maxim B. Litvak
Colin R. Robinson
Pachulski Stang Ziehl & Jones LLP
919 North Market Street
P.O. Box 8705
Wilmington, DE 19899-8705
rpachulski@pszjlaw.com
mlitvak@pszjlaw.com
crobinson@pszjlaw.com

9.12   Settlement.   This Agreement is a settlement of various disputes between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

9.13   No Warranties.   EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, NEITHER THE PARTIES HERETO NOR ANY OF THEIR RESPECTIVE AFFILIATES ARE MAKING ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, TO ANY OTHER PARTY AND ALL SUCH REPRESENTATIONS AND WARRANTIES ARE EXPRESSLY WAIVED TO THE FULLEST EXTENT PERMITTED BY LAW.

9.14   No Consequential Damages.   NO PARTY SHALL BE ENTITLED TO RECOVER UNDER THIS AGREEMENT FROM ANY OTHER PARTY OR ANY OF SUCH PARTY'S AFFILIATES ANY AMOUNT IN RESPECT OF EXEMPLARY, PUNITIVE, SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and delivered as of the day and year first above written.

Lender Parties:

LNV CORPORATION:

By: _____
Name:
Title:
    Jacob Cherner
    Executive Vice
    President

CLMG CORP.:

By: _____
Name:
Title:
    James Erwin
    President

Debtor Parties:

WHITE EAGLE ASSET PORTFOLIO, LP:

By: White Eagle General Partner, LLC, its General Partner

By: _____
Name:
Title:

LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY:

By: _____
Name:
Title:

WHITE EAGLE GENERAL PARTNER, LLC:

By: _____
Name:
Title:

EMERGENT CAPITAL, INC.:

By: _____
Name:
Title:

SETTLEMENT AGREEMENT BY AND AMONG LNV CORPORATION, CLMG CORP.,
WHITE EAGLE ASSET PORTFOLIO, LP, LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY,
WHITE EAGLE GENERAL PARTNER, LLC, EMERGENT CAPITAL, INC., ET AL.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and delivered as of the day and year first above written.

Lender Parties:

LNV CORPORATION:

Debtor Parties:

WHITE EAGLE ASSET PORTFOLIO, LP:

By: White Eagle General Partner, LLC, its General Partner

By: _____
Name:
Title:

By: _Miriam Mart_____
Name: MIRIAM MARTINEZ
Title: CFO

CLMG CORP.:

LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY:

By: _____
Name:
Title:

By: _____
Name:
Title:

WHITE EAGLE GENERAL PARTNER, LLC:

By: _Min Mart_____
Name: MIRIAM MARTINEZ
Title: CFO

EMERGENT CAPITAL, INC.:

By: _Min Mart_____
Name: MIRIAM MARTINEZ
Title: CFO

Debtor Parties:

IMPERIAL FINANCE AND TRADING, LLC:

By: _____
Name: MIRIAM MARTINEZ
Title: CFO


LAMINGTON ROAD BERMUDA, LTD:



By: _____
Name:
Title:


OLIPP IV, LLC:

By: _____
Name: MIRIAM MARTINEZ
Title: CFO


MARKLEY ASSET PORTFOLIO, LLC:

By: _____
Name: MIRIAM MARTINEZ
Title: CFO

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and delivered as of the day and year first above written.

Lender Parties:                                    Debtor Parties:

LNV CORPORATION:                                   WHITE EAGLE ASSET PORTFOLIO, LP:

                                                   By: White Eagle General Partner, LLC, its
                                                   General Partner

By: _____                        By: _____
Name:                                              Name:
Title:                                             Title:


CLMG CORP.:                                         LAMINGTON ROAD DESIGNATED
                                                   ACTIVITY COMPANY:

By: _____                        By: _____
Name:                                              Name: DAVID THOMPSON
Title:                                             Title: DIRECTOR


                                                   WHITE EAGLE GENERAL PARTNER, LLC:

                                                   By: _____
                                                   Name: DAVID THOMPSON
                                                   Title: VICE PRESIDENT


                                                   EMERGENT CAPITAL, INC.:

                                                   By: _____
                                                   Name:
                                                   Title:

Debtor Parties:

IMPERIAL FINANCE AND TRADING, LLC:

By: _____
Name:
Title:


LAMINGTON ROAD BERMUDA, LTD:

By: _____
Name:
Title:

DAVID THOMPSON
DIRECTOR


OLIPP IV, LLC:

By: _____
Name:
Title:


MARKLEY ASSET PORTFOLIO, LLC:

By: _____
Name:
Title:


SETTLEMENT AGREEMENT BY AND AMONG LNV CORPORATION, CLMG CORP.,
WHITE EAGLE ASSET PORTFOLIO, LP, LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY,
WHITE EAGLE GENERAL PARTNER, LLC, EMERGENT CAPITAL, INC., ET AL.

## EXHIBIT A

Asset Transfer Documents

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Bill of Sale") is dated as of [December 30, 2019] and entered into by and between White Eagle Asset Portfolio, LP, a Delaware limited partnership (the "Transferor"), and [CLMG Corp., a Texas corporation] (the "Transferee").

WHEREAS, the Transferor is a debtor and debtor-in-possession in a chapter 11 case, Case No. 18-12808 (KG) (the "Bankruptcy Case"), pending in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on May 24, 2019, the Transferee or one of its affiliates and the Transferor, among others, entered into a Settlement Agreement (the "Settlement Agreement"), dated as of May 24, 2019;

WHEREAS, the Settlement Agreement was approved by the Bankruptcy Court on June 5, 2019, and subsequently went into effect; and

WHEREAS, this Bill of Sale is being entered into to effect the transactions contemplated by the Settlement Agreement and in accordance with the terms thereof.

NOW, THEREFORE, in satisfaction of Transferor's obligations under Section 2.6(c) of the Settlement Agreement and subject to the terms thereof, the Transferor by these presents does hereby convey, transfer and assign to the Transferee, its successors and assigns forever, all of the Transferor's right, title and interest, legal and equitable, in and to each life insurance policy or policies of the Transferor, including but not limited to those described on the Policy Schedule attached as **Exhibit A** hereto, (collectively, the "Policies").

TO HAVE AND TO HOLD, unto the Transferee, its successors and assigns, from and after the passage of title as aforesaid, FOREVER.

The Transferor agrees that for purposes hereof, the Policies assigned and transferred include all of the following:

a.        (i) the related Collateral Packages (as defined below), including all pertinent files and documents actually obtained by the Transferor or any of its affiliates or service providers in connection with the original purchase or origination, as well as the ongoing management and administration, in connection with such Policies, (ii) the documents set forth on Exhibit M to that Second Amended and Restated Securities Account Control and Custodian Agreement, dated as of January 31, 2017, by and among the Transferor and CLMG Corp., among others, and (iii) all other files, documents or other agreements held by Wilmington Trust, National Association in connection with the Policies;

b.        all claims, actions, litigation, causes of action, defenses and rights of offset or counterclaim (at any time or in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) relating to any of the Policies, including those set forth in **Exhibit B** hereto;

c.        all death benefit payments, pay-outs and other payments payable by the applicable insurers under the Policies, including those set forth in **Exhibit C** hereto;

d.        all health or medical information, authorizations and releases and data and information on each insured, and all past and current tracking information on each insured under such Policies, to the extent such information currently exists and is in the Transferor's possession, custody or control; and

e.    all documentation on the past and future payment of premiums, all actuarial studies and appraisals of such Policies or any portion thereof, to the extent such information currently exists and is in the Transferor's possession, custody or control.

"Collateral Package" means with respect to a Policy, all documents and information in the possession or under the control of the Transferor, which are related to such Policy, including but not limited to, all Policy files related to the purchase or acquisition thereof by any affiliate of Emergent Capital, Inc. or Lamington Road Designated Activity Company and the transfer thereof to the Transferee (which shall include the most recent policy illustrations, life expectancy estimates, the physician competency statement and medical records available to the Transferor).

For the avoidance of doubt, the parties acknowledge, confirm and agree that, subject to the terms of the Settlement Agreement, upon the conveyance of the Policies hereunder, all risk of loss as to the Policies so conveyed (including in connection with the creditworthiness of the carrier issuing the Policies conveyed hereunder) shall pass from the Transferor to the Transferee.

Transferor and Transferee agree that, subject to the terms of the Settlement Agreement, Transferor shall have no right to rescind or otherwise retroactively affect the conveyance of such Policies.

Transferor and Transferee each acknowledge, confirm and agree that they: (i) intend that the Policies shall no longer be part of the bankruptcy estate of the Transferor in the pending Bankruptcy Case of the Transferor; (ii) intend that the Policies shall not be part of the bankruptcy estate of any affiliates of the Transferor in the event of the bankruptcy (or similar event) of any affiliate of the Transferor and (iii) do not intend that the conveyance made by the Transferor hereunder be deemed a pledge of the Policies to the Transferee to secure a debt or other obligation of the Transferor.

In case at any time after the date of this Bill of Sale, any further action is necessary or desirable to carry out the purposes of this Bill of Sale, the Transferor shall take such further action (including the execution and delivery of such further instruments and documents) as the Transferee reasonably may request, all at the sole cost and expense of the Transferee.

On the date hereof, the Transferor hereby acknowledges and agrees that the Policies shall be debited from the securities account held in the name of the Transferor at Wilmington Trust, National Association, as securities intermediary, and credited to one or more securities held in the name of the Transferee at Wilmington Trust, National Association, as securities intermediary.

This instrument shall be binding upon, inure to the benefit of, and be enforceable by the Transferee and the Transferor and their respective successors and assigns.

This Bill of Sale may be executed in counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law provisions thereof (other than Sections 5-1401 and 5-1402 of The General Obligations Law of the State of New York).

*[Signatures Follow]*

2

IN WITNESS WHEREOF, the undersigned parties have caused this Bill of Sale to be executed as of the date first set forth above.

TRANSFEROR:

WHITE EAGLE ASSET PORTFOLIO, LP

By: White Eagle General Partner, LLC, its General Partner

By: _____
Name: MIRIAM MARTINEZ
Title: CFO

TRANSFEREE:

[CLMG CORP.]

By: _____
Name
Title:

**EXECUTION VERSION**

ENTITLEMENT ORDER

December 30, 2019

> Wilmington Trust, N.A.
> 300 Park Street, Suite 390
> Birmingham, Michigan 48009
> Attention: Capital Markets Insurance Services
> Facsimile: (248) 723-5424
> Telephone: (248) 723-5422
> E-mail: SpecializedInsurance@wilmingtontrust.com

**Re:** **Transfer of Pledged Financial Assets**

Ladies and Gentlemen:

Reference is hereby made to the Second Amended and Restated Securities Account Control and Custodian Agreement, dated as of January 31, 2017 (as amended from time to time, the "Securities Account Control Agreement"), by and among CLMG Corp., as administrative agent (in such capacity, the "Administrative Agent"), White Eagle Asset Portfolio, LP, as the borrower (the "Borrower"), Wilmington Trust, National Association, a national banking association, as the securities intermediary (together with its successors, the "Securities Intermediary") and Wilmington Trust, National Association, a national banking association, as the custodian (together with its successors, the "Custodian"). Capitalized terms used, but not defined herein, shall have the meanings assigned to them in the Securities Account Control Agreement.

In consideration of the transfers and payments described below, the undersigned parties to this Entitlement Order (the "Entitlement Order") hereby agree as follows:

1.    The Administrative Agent and the Borrower hereby irrevocably direct the Securities Intermediary to debit the life insurance policies identified on Schedule I attached hereto and all proceeds thereof (the "Financial Assets") from the Policy Account established pursuant to Section 2.1(d) of the Securities Account Control Agreement.

2.    The Administrative Agent and the Borrower hereby direct the Securities Intermediary to transfer the Financial Assets from the Policy Account, as contemplated by paragraph 1 above, to a separate account in accordance with that certain additional entitlement order dated the date hereof to be delivered by the Administrative Agent or its designee.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the undersigned Administrative Agent and Borrower have caused this Entitlement Order to be executed by its duly authorized officer as of the date set forth above.

CLMG CORP., as Administrative Agent

By: _____  *AZ*

Name: **James Erwin**

Title: **President**

WHITE EAGLE ASSET PORTFOLIO, LP, as Borrower

By: White Eagle General Partner, LLC, a Delaware limited liability company

By: _____

Name:

Title:

Accepted and acknowledged by:

WILMINGTON TRUST, NATIONAL ASSOCIATION, not in its individual capacity but solely as Securities Intermediary

By: _____

Name:

Title:

IN WITNESS WHEREOF, the undersigned Administrative Agent and Borrower have caused this Entitlement Order to be executed by its duly authorized officer as of the date set forth above.

CLMG CORP., as Administrative Agent

By: _____
Name:
Title:

WHITE EAGLE ASSET PORTFOLIO, LP,
as Borrower

By: White Eagle General Partner, LLC, a Delaware
limited liability company

By: _____
Name: MIVIAM MAVTINEZ
Title: CFO

Accepted and acknowledged by:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
not in its individual capacity but solely as
Securities Intermediary

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned Administrative Agent and Borrower have caused this Entitlement Order to be executed by its duly authorized officer as of the date set forth above.

CLMG CORP., as Administrative Agent

By: _____
Name:
Title:


WHITE EAGLE ASSET PORTFOLIO, LP,
as Borrower

By: White Eagle General Partner, LLC, a Delaware
limited liability company


By: _____
Name:
Title:


Accepted and acknowledged by:

WILMINGTON TRUST, NATIONAL ASSOCIATION,
not in its individual capacity but solely as
Securities Intermediary

By: _____
Name:    Robert J. Donaldson
Title:    Vice President


ENTITLEMENT ORDER

**EXHIBIT B**

Equity Interests Transfer Document

## PARTNER INTEREST POWER

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a _____, 99.9% of the partner interests of White Eagle Asset Portfolio, LP, a Delaware limited partnership, standing in its name on the books of said limited partnership represented by Certificate No. 2 and does hereby irrevocably constitute and appoint CLMG Corp. as attorney to transfer said partnership interest on the books of said limited partnership with full power of substitution in the premises.

Dated:  June 5, 2019

LAMINGTON ROAD DESIGNATED ACTIVITY
COMPANY, an Irish designated activity company

By:
Name:
Title:          DAVID THOMSON
                DIRECTOR

In the presence of:

## PARTNER INTEREST POWER

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a _____, 0.10% of the partner interests of White Eagle Asset Portfolio, LP, a Delaware limited partnership, standing in its name on the books of said limited partnership represented by Certificate No. 1 and does hereby irrevocably constitute and appoint CLMG Corp. as attorney to transfer said partnership interest on the books of said limited partnership with full power of substitution in the premises.

Dated: June 5, 2019

WHITE EAGLE GENERAL PARTNER, LLC,
a Delaware limited liability company

By: _____
Name: DAVID THOMPSON
Title: DIRECTOR

In the presence of:

_____

_____

2

## EXHIBIT C

LP Agreement

**EXECUTION VERSION**

WHITE EAGLE ASSET PORTFOLIO, LP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

This Amended and Restated Agreement of Limited Partnership (together with the attached schedules, this "Agreement") effective as of June 5, 2019 (the "Effective Date"), is entered into between White Eagle General Partner, LLC, a Delaware limited liability company, as general partner, and Lamington Road Designated Activity Company, an Irish designated activity company, as limited partner.

PRELIMINARY STATEMENTS:

WHEREAS, White Eagle Asset Portfolio, LLC, a Delaware limited liability company (the "Company") was formed on March 27, 2013;

WHEREAS, effective May 16, 2014, the Company was converted from a Delaware limited liability company into a Delaware limited partnership pursuant to Section 17-217 of the Delaware Revised Uniform Limited Partnership Act (6 Del. C, § 17-101 et seq.), as amended from time to time (the "Act");

WHEREAS, a limited partnership agreement (as amended, the "Previous Partnership Agreement") of the Partnership was made and entered into as of May 16, 2014;

WHEREAS, on December 13, 2018, the Partnership commenced a chapter 11 case before the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on May 24, 2019, the Partnership and CLMG Corp., a Texas corporation ("CLMG"), among others, entered into that certain Settlement Agreement (the "Settlement Agreement"), pursuant to which, among other things, the Previous Partnership Agreement shall be amended in order to appoint the Liquidation Agent;

WHEREAS, the Settlement Agreement was approved by the Bankruptcy Court on June 5, 2019, and subsequently went into effect;

WHEREAS, consistent with the Settlement Agreement, the parties hereto wish to amend and restate the Previous Partnership Agreement in its entirety as set forth herein; and

WHEREAS, the parties hereto agree that the partnership in and management of the Partnership shall be governed by the terms set forth herein.

NOW, THEREFORE, the Partners hereby amend and restate the Previous Partnership Agreement in entirety and agree as follows:

AGREEMENT:

In consideration of the mutual agreements herein contained and other good and valuable consideration, receipt of which is acknowledged, the parties to this Agreement agree as follows:

Section 1.    Definitions.

When used in this Agreement, the following terms shall have the meanings set forth below:

"Act" has the meaning set forth for such term in the Preliminary Statements.

"Affiliate" means, as to any Person, any other Person (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities/equities of such Person, or (iii) ten percent (10%) or more of the voting securities/equities of

which is directly or indirectly beneficially owned or held by the Person in question, The term "control" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities/equities, by control, or otherwise.

"Agreement" means this Agreement of Limited Partnership as from time to time amended pursuant to Section 12.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if sixty (60) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within sixty (60) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within sixty (60) days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy," in conjunction with Section 9(f) of this Agreement, is intended to and shall supersede the events of withdrawal set forth in Sections 17-402(a)(4) & (5) of the Act.

"Bankruptcy Court" has the meaning assigned to such term above.

"Business Day" has the meaning assigned to such term in the Settlement Agreement.

"Capital Contribution" means, as to any Partner, the sum of (i) the Partners' initial capital contribution payments actually made to the Partnership and (ii) the Partner's additional capital contributions, if any, to the Partnership.

"Certificate of Limited Partnership" means the Certificate of Limited Partnership of the Partnership filed with the office of the Secretary of State of the State of Delaware on May 16, 2014.

"CLMG" has the meaning assigned to such term above.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable United States Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" has the meaning assigned to such term in the Settlement Agreement.

"DIP Budget" has the meaning assigned to such term in the Settlement Agreement.

"DIP Financing" has the meaning assigned to such term in the Settlement Agreement.

"DIP Order" has the meaning assigned to such term in the Settlement Agreement.

"Early Payoff Amount" has the meaning assigned to such term in the Settlement Agreement.

"General Partner" means White Eagle General Partner, LLC, a Delaware limited liability company, together with any other Person who becomes the or a general partner of the Partnership pursuant to this Agreement.

2

"General Partner Limited Liability Company Agreement" means that certain Amended and Restated Limited Liability Company Agreement of White Eagle General Partner, LLC, a Delaware limited liability company, effective as of the Effective Date, as the same may be amended, supplemented or otherwise modified from time to time.

"Limited Partner" means Lamington Road Designated Activity Company, an Irish designated activity company, together with any other Person who is admitted in accordance with the terms of Section 11(b) (but such additional Persons shall become Limited Partners only upon their having been formally admitted under the terms hereof). Such term shall also include those Persons who become a Substituted Limited Partner pursuant to this Agreement.

"Liquidation Agent" means an individual who is not a present or former director, manager, officer, employee, supplier, customer or five percent (5%) beneficial owner of the outstanding equity interests of the Partnership or any of its Affiliates; provided, however, that an individual shall not be deemed to be ineligible to be the Liquidation Agent solely because such individual serves or has served in the capacity of a "liquidation agent" or similar capacity for special purpose entities formed by the Partnership or any Affiliate of the Partnership.

"Liquidation Agent Termination Date" means the earliest to occur of (y) the Transfer Date, and (z) the date on which CLMG has confirmed to White & Case LLP, pursuant to the Settlement Agreement, that it has received the Early Payoff Amount or the Payoff Amount, as applicable and in accordance with the Settlement Agreement.

"Majority in Interest of the Partners" means Partners owning in the aggregate more than fifty percent (50%) of the Percentage Interests in the Partnership.

"Maple" has the meaning assigned to such term in the Settlement Agreement.

"Material Action" means to consolidate or merge the Partnership with or into any Person or sell all or substantially all of the assets of the Partnership, or institute proceedings to have the Partnership be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Partnership or file a petition seeking, or consent to, reorganization or relief with respect to the Partnership under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Partnership or a substantial part of its property, or make any assignment for the benefit of creditors of the Partnership, or admit in writing the Partnership's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Partnership.

"Partners" means, collectively, the General Partner and the Limited Partners who have executed this Agreement.

"Partnership" means the limited partnership formed pursuant to this Agreement.

"Payoff Amount" has the meaning assigned to such term in the Settlement Agreement.

"Percentage Interest" has the meaning set forth for such term in Section 6(b).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Policies" has the meaning assigned to that term in Section 4(a).

3

"Sale Deadlines" has the meaning assigned to such term in the Settlement Agreement.

"Sale Process" has the meaning assigned to such term in the Settlement Agreement.

"Settlement Agreement" has the meaning assigned to such term above.

"Settlement Order" has the meaning assigned to such term in the Settlement Agreement.

"Special Purpose Entity" means a Person (other than a natural person) whose organizational documents contain restrictions on its purpose and activities and impose requirements to preserve its separateness that are substantially similar to those of the Partnership or the General Partner and which has a liquidation agent, an independent director or an independent manager whose function is similar to those of the Liquidation Agent.

"Special Purpose Provisions" means Sections 1, 4, 5, 7, 9, 10, 11, 12, 13, 15, 16(a), 16(b), 16(e) and 16(f) of this Agreement.

"Substituted Limited Partner" means a Person who is admitted to the Partnership by the General Partner according to Section 11(b).

"Transfer Date" has the meaning assigned to that term in the Settlement Agreement.

Section 2.    Formation and Agreement of Limited Partnership.

(a)    The Partners have caused the formation of WHITE EAGLE ASSET PORTFOLIO, LP, a Delaware limited partnership, by filing the Certificate of Limited Partnership on May 16, 2014;.

Section 3.    Name; Term; Places of Business; Registered Agent and Offices.

(a)    Name. The name of the Partnership is "WHITE EAGLE ASSET PORTFOLIO, LP". All business of the Partnership shall be conducted under such name and titles to all assets or property owned by the Partnership shall be held in such name.

(b)    Term. Subject to the provisions of Section 5 and Section 13 hereof, the term of the Partnership shall commence as of May 16, 2014; and shall, unless earlier dissolved pursuant to Section 13 hereof, continue for a period ending on the date on which the Partnership is dissolved by judicial decree. To the fullest extent permitted by law, each Partner expressly waives any right it might have to seek a judicial decree dissolving the Partnership for so long as any Obligations are outstanding.

(c)    Principal Place of Business. The principal place of business and the office of the Partnership and the address where records are kept for inspection purposes is the office of the General Partner as set forth in Section 3(d). General Partner may designate such other principal place of business or other places to be used as additional Partnership offices for the purpose of carrying on the business of the Partnership.

(d)    Address of General Partner. The address of the General Partner is One Lane Hill, East Broadway, Hamilton HM19, Bermuda, or such other location as may hereafter be determined by the General Partner.

(e)    Registered Office and Agent. The name of the Partnership's registered agent for service of process shall be Corporation Service Company, and the address of the Partnership's registered agent and the address of the Partnership's registered office in the State of Delaware shall be c/o Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901. The registered agent and the registered office of the Partnership may be changed from time to time by the General Partner.

4

(f)    <u>Names and Addresses of the Limited Partners</u>.  The name and business address of each Limited Partner is set forth on the attached <u>Schedule A</u>.

(g)    <u>Treatment of Interest</u>.  Each Partner's partner interest in the Partnership shall constitute a "security" within the meaning of (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 <u>Del. C.</u> § 8-101, <u>et seq.</u>) and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each partner interest in the Partnership shall be treated as such a "security" for all such purpose, including, without limitation perfection of the security interest therein under Article 8 and 9 of the applicable Uniform Commercial Code as the Partnership has "opted-in" to such provisions).  The Partnership shall maintain books for the purpose of registering the transfer of the partner interests in the Partnership.  Notwithstanding any other provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware (6 <u>Del. C.</u> § 8-101. <u>et seq.</u>), such provision of Article 8 shall control.

(h)    <u>Interest Certificates</u>.  Upon the issuance of a partner interest to a Partner in accordance with the provisions of this Agreement, the Partnership shall issue one or more Interest Certificates in the name of such Partner.  Each such Interest Certificate shall be denominated in terms of the percentage of partner interest evidenced by such Interest Certificate and shall be signed by the General Partner of the Partnership.  "Interest Certificate" means a certificate issued by the Partnership which evidences the ownership of one or more Interests.

Section 4.    <u>Purposes</u>.

(a)    The purpose to be conducted or promoted by the Partnership is to engage in the following activities:

(i)    to own, hold, transfer, otherwise deal with, and exercise any right, power, privilege, or other incident of ownership, possession, or control relating to life settlements ("<u>Policies</u>"), which Policies may be transferred to CLMG or one or more of its designees pursuant to the Settlement Agreement, Settlement Order and DIP Order;

(ii)    to execute and deliver, and to exercise and perform all of its rights and obligations under or relating to, the Settlement Agreement, Settlement Order and DIP Order;

(iii)    to engage in any lawful act or activity and to exercise any powers permitted to limited partnerships organized under the laws of the State of Delaware that are necessary, appropriate, or convenient to accomplishing the preceding purposes; and

(iv)    to take all other actions that are necessary to maintain the existence of the Partnership in good standing under the laws of the State of Delaware and to qualify the Partnership to do business in any other jurisdiction in which that qualification, in the judgment of the General Partner, is required or appropriate.

(b)    The Partnership, and the General Partner and, to the extent necessary to carry out Section 5(e), the Liquidation Agent, on behalf of the Partnership, may enter into and perform their respective obligations under the Settlement Agreement, Settlement Order and DIP Order and all documents, agreements, certificates or financing statements contemplated thereby or related thereto, all without any

further act, vote or approval of any other Partner or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation. The foregoing authorization shall not be deemed a restriction on the powers of the General Partner or any other Person to enter into other agreements on behalf of the Partnership.

        Section 5.        <u>Limits on Powers of the General Partners; Special Purpose Entity/Separateness</u>.

        (a)        Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Partnership, the General Partner, the Limited Partner or any other Person, until the Liquidation Agent Termination Date, none of the General Partner, the Limited Partner or any other Person shall be authorized or empowered, nor shall they permit the Partnership, without the prior unanimous written consent of the General Partner and CLMG, to take any Material Action unless expressly permitted pursuant to the Settlement Agreement, Settlement Order or DIP Order. From the Sale Trigger Event until the Liquidation Agent Termination Date, the Partnership shall not take any action that is inconsistent with, or that would interfere with or delay timely completion of, the Sale Process without the prior written consent of the Liquidation Agent.

        (b)        Without limiting any, and subject to all, other covenants of the Partnership contained in this Agreement, until the Liquidation Agent Termination Date, the Partnership shall conduct its business and operations separate and apart from that of any other Person and in furtherance of the foregoing:

        (i)        The Partnership shall maintain its accounts, financial statements, books, accounting and other records, and other documents of the Partnership separate from those of any other Person and ensure all audited financial statements of any Person that uses consolidated financial statements to include the Partnership contain notes clearly stating that (1) all of the Partnership's assets are owned by the Partnership and (2) the Partnership is a separate entity.

        (ii)        The Partnership shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person, and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Settlement Agreement, Settlement Order or DIP Order.

        (iii)        The Partnership shall conduct its own business in its own name and, for all purposes, shall not operate, or purport to operate, collectively as a single or consolidated business entity with respect to any Person.

        (iv)        The Partnership shall pay its own debts, liabilities and expenses (including overhead expenses, if any, and operating expenses) only out of its own assets as the same shall become due.

        (v)        The Partnership has observed, and shall observe all (A) Delaware limited partnership formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited partnership agreement in a manner that would adversely affect the existence of the Partnership as a bankruptcy-remote special purpose entity.

        (vi)        The Partnership does not, and shall not, (A) guarantee, become obligated for, or hold itself or its credit out to be responsible for or available to satisfy, the debts or

6

obligations of any other Person or (B) control the decisions or actions respecting the daily business or affairs of any other Person.

(vii)    The Partnership shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person.

(viii)   The Partnership shall not identify itself as a division of any other Person,

(ix)     The Partnership shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

(x)      The Partnership shall not use its separate existence to perpetrate a fraud in violation of applicable law.

(xi)     The Partnership shall not act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

(xii)    The Partnership shall maintain an arm's length relationship with its Affiliates.

(xiii)   Except as permitted by or pursuant to the Settlement Agreement, Settlement Order or DIP Order, the Partnership shall not grant a security interest or otherwise pledge its assets for the benefit of any other Person.

(xiv)    The Partnership shall not acquire any securities or debt instruments of any other Partnership, its Affiliates or any other Person.

(xv)     The Partnership shall not make loans or advances to any Person, without the prior written consent of CLMG, except as permitted by or pursuant to the Settlement Agreement, Settlement Order or DIP Order.

(xvi)    The Partnership shall make no transfer of its assets except as permitted by or pursuant to the Settlement Agreement, Settlement Order or DIP Order.

(xvii)   The Partnership shall file its own tax returns separate from those of any other Person or entity, except to the extent that the Partnership is not required to file tax returns under applicable law or is not permitted to file its own tax returns separate from those of any other Person.

(xviii)  The Partnership shall not acquire obligations or securities of its members.

(xix)    The Partnership shall use separate stationery, invoices and checks.

(xx)     The Partnership shall correct any known misunderstanding regarding its separate identity.

(xxi)    The Partnership shall intend to maintain adequate capital in light of its contemplated business operations.

Failure of the Partnership, the General Partner or the Limited Partner to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Partnership as a separate legal entity or the limited liability of the General Partner.

(c)      Until the Liquidation Agent Termination Date, White Eagle General Partner, LLC shall hold no more than a 0.10% interest in the Partnership and shall act as the General Partner. The General Partner shall not resign or be removed or replaced without the prior written consent of CLMG.

7

(d)    Notwithstanding anything to the contrary contained in this Agreement, until the Liquidation Agent Termination Date, the Partnership shall always have only one General Partner and one Limited Partner.

(e)    From the Effective Date until the Liquidation Agent Termination Date, the Partners shall cause the Partnership at all times to have engaged a Liquidation Agent. The initial Liquidation Agent shall be Joseph J. Farnan, Jr. The Liquidation Agent shall be treated as an independent contractor and his or her appointment hereunder shall not create the relationship of employee and employer between the Liquidation Agent and the Partnership, nor shall the Liquidation Agent be deemed to be a general partner, officer, director or manager of the Partnership or an agent of the General Partner. Unless otherwise restricted by law, the Liquidation Agent may resign, with or without cause, at any time on thirty (30) days' advance notice, and any vacancy caused by any such resignation shall be filled upon the written consent of the General Partner and CLMG; *provided*, that if the General Partner and CLMG are unable to agree on a replacement within thirty (30) days following such resignation, then the Bankruptcy Court shall select such replacement. Unless otherwise restricted by law, the Liquidation Agent may be removed, with or without cause, at any time by written consent of the General Partner and CLMG, and any vacancy caused by any such removal may be filled by written consent of the General Partner and CLMG. Notwithstanding the forgoing, to the fullest extent permitted by law, no removal of the Liquidation Agent, and no appointment of a successor Liquidation Agent, shall be effective until such successor (i) shall have accepted his or her appointment as the Liquidation Agent by a written instrument, which may be a counterpart signature page to this Agreement or another written instrument, and (ii) shall have executed a counterpart to this Agreement.

(f)    The General Partner hereby irrevocably delegates to the Liquidation Agent its rights, powers and authorities, to the extent necessary in order to permit, enable, empower and authorize the Liquidation Agent to fulfill the mandates to the Liquidation Agent set forth below, including all rights, powers and authorities incidental thereto, subject to the Settlement Agreement, Settlement Order and DIP Order and the limitations set forth herein:

(i)    The Liquidation Agent shall maximize the proceeds from the sale of the Collateral as he or she determines to be appropriate in his or her sole and absolute discretion and, in any event, consistent with traditional fiduciary duties owed by directors and officers of corporations under Delaware law to constituents of bankruptcy estates subject to complying with the Sale Process in all respects as set forth in the Settlement Agreement; *provided* that the Liquidation Agent may not, in exercising his or her duties, contest the Sale Process (including the Sale Deadlines), in any way or seek any relief from the Bankruptcy Court to modify the Sale Process (including the Sale Deadlines), or take any other action inconsistent with the terms of the Settlement Agreement, Settlement Order or DIP Order. Except as provided in this Section 5(f)(i), in exercising his or her rights and performing his or her duties under this Agreement, the Liquidation Agent shall not have any fiduciary duties to the Partners or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. The Liquidation Agent shall not at any time serve as trustee in bankruptcy for any Affiliate of the Partnership.

(ii)    From the Effective Date until immediately prior to the occurrence of a Sale Trigger Event, the Liquidation Agent's duties and authorities shall be limited to taking such actions as he or she determines in his or her sole and absolute discretion to be necessary or appropriate for the Partnership to be prepared to launch and implement the Sale Process upon the occurrence of a Sale Trigger Event; *provided* that, prior to the Sale Trigger Event, the Liquidation Agent shall not take any action to commence the marketing of the Collateral to third parties or to otherwise contact potential buyers about the Collateral. The

8

Liquidation Agent's duties and authorities pursuant to this <u>Section 5(f)</u> shall include, but shall not be limited to, engaging and overseeing Maple Life Analytics, LLC and any other advisors in connection with, and in preparation for, the Sale Process.

(iii)    If the Early Payoff Amount is not paid in full in cash to CLMG immediately on or before the occurrence of a Sale Trigger Event, the Liquidation Agent shall, automatically on the next Business Day after the occurrence of such Sale Trigger Event and without further order or other action by the General Partner or any other Person, have the sole authority and the express mandate to (A) notwithstanding anything to the contrary herein, have full power and authority (including the power and authority to bind the Partnership), in lieu of the Partners, to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described in this <u>Section 5(f)(iii)</u>, including all powers, statutory or otherwise, (B) conduct the Sale Process, (C) select winning bids for the Collateral, (D) close sale transactions on behalf of the Partnership with respect to the Collateral, (E) obtain DIP Financing in accordance with the Settlement Agreement, Settlement Order and DIP Order, (F) approve any DIP Budget in effect during the Sale Process and prohibit the Partnership from making any expenditure not specified in any such DIP Budget unless such expenditure is approved in writing by CLMG pursuant to the Settlement Agreement, Settlement Order and DIP Order, and (G) take all other actions as he or she determines in his or her sole and absolute discretion are necessary and appropriate to promptly implement and complete the Sale Process; *provided* that the Liquidation Agent may not cause the Partnership to transfer any Collateral to a purchaser without first (or simultaneously) receiving the proceeds of such sale. If the Liquidation Agent, acting reasonably and on the advice of Maple, anticipates that the Partnership or any of its affiliates will not have sufficient liquidity to service its obligations after the occurrence of a Sale Trigger Event, then the Liquidation Agent, on behalf of the Partnership, shall have full power and authority on behalf of the Partnership to (i) negotiate and enter into all necessary documentation regarding additional postpetition financing following the Sale Trigger Event and (ii) seek and obtain all necessary Bankruptcy Court approvals in connection therewith.

(iv)    Solely in furtherance of <u>Section 5(f)(iii)</u>, the Liquidation Agent shall have full power and authority on behalf of the Partnership to: (A) execute and deliver for value all necessary or appropriate agreements and other instruments, (B) defend any suit, action or proceeding brought against Partnership, and settling, compromising or adjusting any suit, action or proceeding described above and, in connection therewith, giving such discharges or releases as the Liquidation Agent may deem appropriate, (C) defend, file, prosecute, settle, compromise, or adjust any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by the Liquidation Agent, (D) sell, assign, convey, transfer, pledge, make any agreement with respect to or otherwise dealing with, any of the Collateral, and execute, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith, and (v) any and all other actions relevant or necessary for the Liquidation Agent to carry out his or her mandate under <u>Section 5(f)(iii)</u>.

(v)    Subject to the foregoing exclusive authority and mandate granted to the Liquidation Agent, the General Partner shall retain all of its other management and decision-making powers on behalf of the Partnership. The Liquidation Agent shall exercise the exclusive powers granted hereunder in the role of Bankruptcy Court-appointed independent liquidation agent, and he or she shall not be an officer, employee, manager, or director of the Partnership.

(vi)    All rights, authorities and powers of the Liquidation Agent pursuant to this <u>Section 5(f)</u> shall terminate immediately upon the earliest to occur of (y) CLMG confirming receipt of the Payoff Amount to White & Case LLP, and (z) the Transfer Date.

(g)    The Partnership shall afford to the Liquidation Agent and to any prospective purchaser pursuant to the Sale Process, during normal business hours, access, upon reasonable advance notice, to all of the books, records and properties of the Partnership and its subsidiaries, as applicable, and to make copies of such records and permit the Liquidation Agent to discuss all aspects of the Partnership or its subsidiaries, as applicable, with any officers, employees or accountants of the Partnership or its subsidiaries, and the Partnership and its subsidiaries shall provide to the Liquidation Agent responses to all reasonable written requests from the Liquidation Agent for information relating to the Partnership, its subsidiaries and their respective operations; provided, that such access does not unreasonably interfere with the business and operations of the Partnership or its subsidiaries. The Partnership and its subsidiaries shall instruct their independent accountants to discuss such aspects of the financial condition of the Partnership or its subsidiaries, as applicable, with the Liquidation Agent as he or she may reasonably request, and to permit the Liquidation Agent to inspect, copy and make extracts from such financial statements, analyses, work papers and other documents and information (including electronically stored documents and information) prepared with respect to the Partnership or its subsidiaries, as applicable, as may be reasonably requested by the Liquidation Agent.

Section 6.    <u>Capital Contributions; Percentage Interests</u>.

(a)    Each Partner will make Capital Contributions to the capital of the Partnership as soon as reasonably practicable and in amounts requested by the General Partner. The General Partner shall be under no obligation to request additional Capital Contributions from the Partners and the obligation of the Partners to make such Capital Contributions shall not be deemed to be an asset of the Partnership until such time as all of the Partners have made their pro rata share of such Capital Contribution to the Partnership.

(b)    Each Partner shall have an interest in the Partnership expressed as a percentage of the whole ("<u>Percentage Interest</u>"), with the current Percentage Interest in the Partnership of each Partner being as follows:

| Partner | Percentage Interest |
|---------|---------------------|
| White Eagle General Partner, LLC | 0.10% |
| Lamington Road Designated Activity Company | 99.90% |

(c)    The Limited Partner shall not be liable for any of the debts, obligations or other liabilities of the Partnership solely by reason of being a limited partner of the Partnership, and no Partner shall be required to contribute any additional capital to the Partnership other than the initial contributions heretofore made. No Partner will have any obligation to restore any negative or deficit balance in its capital account, including any negative or deficit balance in its capital account upon liquidation and dissolution of the Partnership. Any additional funds required by the Partnership to meet its cash requirements shall, to the extent possible, be provided by Partnership borrowings from third parties, upon such terms and conditions as determined appropriate by the Partners; <u>provided</u> that in lieu of causing the Partnership to borrow from third parties, with the unanimous approval of the Partners, the Partners may from time to time make additional Capital Contributions to the Partnership.

Section 7.    <u>Distributions</u>.

(a)    After providing for the satisfaction of all the current debts and obligations of the Partnership and after any required payments on any loan or other financing, the Partnership shall, as soon

10

as reasonably practical, make quarterly distributions and annual adjusting distributions of the Partnership's net cash flow available for distribution (as determined by the General Partner), including distributions of net cash flow from operations, net proceeds of any interim capital transaction and net proceeds available upon dissolution and winding up of the Partnership (in each case after establishment of appropriate and reasonable reserves, as determined by the General Partner), to the Partners in accordance with and in proportion to their respective Percentage Interests in the Partnership.

(b)     Notwithstanding the foregoing to the contrary, upon the dissolution and winding up of the Partnership, all assets of the Partnership, including cash, shall be distributed to the Partners in proportion to their respective positive capital account balances, as such balances have been adjusted to reflect allocations of gains and losses for all periods, and such distributions shall be made within the time periods set forth in Treasury Regulation Section 1.704- l(b)(2)(ii)(B)(3).

(c)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, shall not make a distribution to any Partner on account of its interest in the Partnership if such distribution would (i) violate the Act or other applicable law or (ii) or breach any of the terms or provisions of the Settlement Agreement, Settlement Order or DIP Order.

Section 8.     Bank Accounts; Books of Account: Reports; Fiscal Year.

(a)     Books and Records. The Partnership shall maintain, or cause to be maintained, in a manner customary and consistent with good accounting principles, practices and procedures, a comprehensive system of office records, books and accounts (which records, books and accounts shall be and remain the property of the Partnership) in which shall be entered fully and accurately each and every financial transaction with respect to the ownership and operation of the property of the Partnership. Such books and records of account shall be prepared and maintained at the principal place of business of the Partnership or such other place or places as may from time to time be determined by the General Partner. Each Partner or its duly authorized representative shall have the right to inspect, examine and copy such books and records of account at the Partnership's office during reasonable business hours. A reasonable charge for copying books and records may be charged by the Partnership.

(b)     Accounting and Fiscal Year. The books of the Partnership shall be kept on the accrual basis in accordance with generally accepted accounting principals and on a tax basis and the Partnership shall report its operations for tax purposes on the accrual method. The fiscal year of the Partnership shall end on December 31 of each year, unless a different fiscal year shall be required by the Code.

(c)     Reserves. Subject to the terms and conditions of the Settlement Agreement, Settlement Order and DIP Order, the General Partner may, subject to such conditions as it shall determine, establish reserves for the purposes and requirements as it may deem appropriate.

Section 9.     Rights and Obligations of the General Partner.

(a)     Subject to Section 5 or to the extent delegated by the written agreement of the General Partner, (i) the business and affairs of the Partnership shall be vested in and controlled exclusively by the General Partner, which shall have the exclusive power and authority, on behalf of the Partnership to take any action of any kind not inconsistent with this Agreement and to do anything and everything they deem necessary or appropriate to carry on the business of the Partnership, (ii) each of the General Partners (if there shall be more than one) shall have full, exclusive and complete discretion in the management and control of the Partnership for the purposes set forth above in Section 4, (iii) all decisions relating to the business and affairs of the Partnership including, without limitation, all decisions required or permitted to be made by the General Partner under this Agreement, may be made by, and all action proposed to be taken

11

by or on behalf of the Partnership, may be taken by any one of the General Partners (if there shall be more than one) and (iv) any one of the General Partners (if there shall be more than one) shall have full power and authority to execute all documents and take all other actions on behalf of the Partnership and thereby bind the Partnership and the Partners with respect thereto.

(b)       The implementation of decisions made by the General Partner may be through any Person selected by the General Partner.

(c)       The General Partner is, to the extent of their rights and powers set forth in this Agreement, an agent of the Partnership for the purpose of the Partnership's business, and the actions of the General Partner taken in accordance with such rights and powers shall bind the Partnership.

(d)       Any of the Partners and the Liquidation Agent may engage in or possess an interest in other business ventures of every nature and description, independently or with others, and none of the Partnership, the Partners or the Liquidation Agent shall have, or have the right to acquire, by virtue of this Agreement, any right in and to such venture or to the income or profit derived therefrom.

(e)       Until the Liquidation Agent Termination Date, (i) the General Partner shall be a Special Purpose Entity, (ii) no additional General Partner may be admitted and (iii) no General Partner shall be permitted to withdraw from the Partnership. A Person shall be deemed admitted as a General Partner at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a General Partner on the attached Schedule A.

(f)       Notwithstanding any other provision of this Agreement, the Bankruptcy of the General Partner shall not cause the General Partner to cease to be a general partner of the Partnership and upon the occurrence of such an event, the Partnership shall continue without dissolution. This Section 9(f), together with the definition of "Bankruptcy" set forth in this Agreement, is intended to and shall supersede the events of withdrawal set forth in Sections 17- 402(a)(4) & (5) of the Act,

Section 10.       Rights and Obligations of Limited Partners.

(a)       Limited Liability.  No Limited Partner shall be personally liable for any of the debts of the Partnership or any of the losses thereof other than (i) the amount contributed by the Limited Partner to the Partnership, (ii) the share of undistributed profits of the Partnership attributable to such Limited Partner, (iii) its obligation to make other payments expressly provided for in this Agreement and (iv) the amount of any distributions wrongfully distributed to it.

(b)       No Management Responsibility.  No Limited Partner, as such, shall take part in the management of the business or transact any business for the Partnership. All management responsibility is vested in the General Partner.

(c)       No Authority to Act.  No Limited Partner, as such, shall have the power to sign for or to bind the Partnership, All authority to act on behalf of the Partnership is vested in the General Partner.

(d)       Withdrawal.  No Limited Partner shall be entitled to withdraw from the Partnership.

(e)       Bankruptcy; Death.  The Bankruptcy, death, disability or declaration of incompetence of a Limited Partner shall not, in and of itself, dissolve the Partnership, but the rights of a Limited Partner to share in the profits and losses of the Partnership and to receive distributions of Partnership funds shall, on the happening of such an event, devolve upon the Limited Partner's personal representative (as defined in the Act), subject to this Agreement, and the Partnership shall continue as a limited partnership. The Limited Partner's personal representative shall be liable for all of the obligations

12

of the Limited Partner. In no event shall the personal representative become a substituted limited partner, except in accordance with <u>Section 11</u> or <u>Section 10(g)</u>.

(f)    <u>Admission</u>. A Person shall be deemed admitted as a Limited Partner at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Limited Partner on the attached <u>Schedule A</u>. Until the Liquidation Agent Termination Date, no additional Limited Partner may be admitted.

(g)    <u>Continuation of Partnership Notwithstanding Loss of Limited Partners</u>. Upon the occurrence of any event that would result in there being no limited partner in the Partnership, the Partnership shall not dissolve and the general partners or the personal representative of the last remaining limited partner is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such limited partner in the Partnership, agree in writing (i) to continue the Partnership, and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute limited partner of the Partnership, effective as of the occurrence of the event that terminated the continued membership of the last remaining limited partner of the Partnership in the Partnership.

(h)    Except as permitted pursuant to the Settlement Agreement, Settlement Order or DIP Order, no Limited Partner shall, directly or indirectly, assign, sell, transfer, dispose, pledge or encumber (each a "<u>Transfer</u>") in whole or in part its Percentage Interest in the Partnership without the written consent of CLMG.

Section 11.    <u>Transfer of Rights</u>.

(a)    <u>Conditions on Transfers by Limited Partners</u>. Subject to <u>Section 5</u> and <u>Section 10(f)</u> and <u>(h)</u>, any transfer of a Partner's Percentage Interest in the Partnership shall be subject to the conditions that no such Transfer may be made, to the fullest extent permitted by law, (i) except pursuant to an effective registration statement under all applicable federal and state securities laws or in a transaction which is exempt from registration under such laws, (ii) if such sale, assignment or transfer, when considered with all prior sales, assignments or transfers, would result in the termination of the Partnership for federal income tax purposes and (iii) (if the General Partner shall request) unless the transferor delivers to the General Partner an opinion, in form and substance and issued by counsel acceptable to the General Partner, covering such securities laws, tax and other aspects of the proposed transfer as the General Partner may request. Any Limited Partner who Transfers all or any portion of his interest in the Partnership shall promptly notify the General Partner of such transfer and furnish the General Partner the name and address of the transferee and such other information as might be required under Section 6050K of the Code and the Treasury Regulations thereunder. No Transfer of any direct or indirect ownership interest in the Partnership may be made except as permitted by this Agreement and the Settlement Agreement, Settlement Order or DIP Order.

(b)    <u>Substituted Limited Partner</u>. Subject to <u>Section 5</u>, <u>Section 5(f)</u> and <u>Section 11(f)</u>, each Partner hereby confers upon the General Partner the right to admit a transferee of the Percentage Interest of a Limited Partner as a Substituted Limited Partner in the Partnership. Any transferee who desires to become a Substituted Limited Partner shall (i) deliver to the General Partner such information and opinions of counsel, execute such documents, and take such other action as the General Partner may deem appropriate with respect to such substitution, including, without limitation, the written acceptance and adoption by the transferee of the provisions of this Agreement and the Act and the assumption by the transferee of the obligations of its transferor and (ii) pay all expenses incurred by the Partnership in connection with such Transfer and admission, including the cost of preparing and filing an amendment to the Certificate of Limited Partnership, if required, and such expenses shall not be deemed Capital Contributions by the Substituted Limited Partners. A transferee shall be deemed admitted to the Partnership

13

as a Substituted Limited Partner at the time such transferee is listed on the attached <u>Schedule A</u>. The Partnership shall continue with the same basis and capital account for the Substituted Limited Partner that was attributable to his transferor. The name, address and Percentage Interest of the Substituted Limited Partner shall be duly noted on the attached <u>Schedule A</u>.

        (c)    <u>Right of Transferee</u>, Unless and until any assignee, transferee, heir or legatee becomes a Substituted Limited Partner (in accordance with <u>Section 11(b)</u>, his status and rights shall be limited to the rights of an assignee of a limited partner interest under Section 17-702 of the Act.

        (d)    <u>Basis Adjustment</u>. Upon the Transfer of all or part of an interest in the Partnership, at the request of the transferee of the interest, the General Partner may, in its sole discretion, cause the Partnership to elect, pursuant to Section 754 of the Code or the corresponding provisions of subsequent law, to adjust the basis of the Partnership properties as provided by Sections 734 and 743 of the Code.

        (e)    <u>Transfer by General Partner</u>. The Limited Partners will be excused from accepting the performance of and rendering performance to any other person as general partner hereunder (including any trustee or assignee of or from the General Partner). Notwithstanding the foregoing, the General Partner may make an assignment of its interest as General Partner which vests in the assignee the rights of an assignee under the Act and which does not result in a change or substitution of the General Partner.

        (f)    <u>Special Loan Provisions</u>. Notwithstanding any provision of the Act or this Agreement to the contrary, to the fullest extent permitted by law, no Transfer of any direct or indirect ownership interest in the Partnership may be made except as expressly permitted hereby and by the Settlement Agreement, Settlement Order or DIP Order.

        (g)    <u>Withdrawal of Partner</u>. Subject to the provisions of <u>Section 5,</u> except as provided in <u>Section 11</u> and <u>Section 13</u>, no Partner shall, to the fullest extent permitted by law, be entitled to withdraw or retire from, or dissolve, the Partnership, or require any partition of the Property of the Partnership.

        Section 12.    <u>Amendment of Limited Partnership Agreement; Meetings</u>.

        (a)    <u>Amendments to be Adopted Solely by the General Partner</u>. Subject to <u>Section 5</u>, the General Partner may, without the consent of any Limited Partner, amend any provision of this Agreement, and execute whatever documents may be required in connection therewith, to reflect:

        (i)    a change in the name of the Partnership or the location of the principal place of business of the Partnership; provided, so long as any Obligation remains outstanding, the prior written consent of CLMG shall be required;

        (ii)    the admission of Substituted Limited Partners in accordance with the terms of <u>Section 11</u>;

        (iii)    a change which is necessary to qualify the Partnership as a Limited Partnership under the laws of any state or which is necessary and advisable in the opinion of the General Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes; or

        (iv)    any other amendments similar to the foregoing.

        (b)    <u>Other Amendments</u>. Subject to <u>Section 5</u>, amendments to this Agreement other than those described in <u>Section 12(a)</u> may be adopted by the affirmative vote of both the General Partner and a Majority in Interest of the Partners. The General Partner may seek the written vote of the Limited Partners or may call a meeting.

(c)    <u>Amendments not Allowable</u>.  Subject to <u>Section 5</u> and unless otherwise approved by the Partner(s) affected thereby, no amendment to this Agreement shall be permitted if the effect of same would be to:

(i)    increase the duties or liabilities of the General Partner or of any Limited Partner; or

(ii)   increase or decrease the interest of any Partner hereto in the assets, profits or losses of the Partnership.

(d)    <u>CLMG Consent</u>.  Notwithstanding anything to the contrary in this Agreement, until the Liquidation Agent Termination Date, neither this Agreement nor the Certificate of Limited Partnership may be modified, altered, supplemented or amended unless CLMG has consented in writing.

(e)    <u>Meetings of the Partners</u>.  Meetings of the Partners to vote upon any matters on which the Limited Partners are authorized to take action under this Agreement may be called by the General Partner or by the written request of Limited Partners holding not less than a majority of the total Percentage Interest in the Partnership.  The call will state the nature of the business to be transacted, and the meeting will be held at the offices of the General Partner (or at such other mutually-agreeable location), not less than 10 nor more than 60 days from the date of the notice.  The notice may also state that the meeting will be held via telephone conference.  Limited Partners may vote in person or by proxy at any such meetings.  Action may be taken without a meeting provided that the General Partner and the Limited Partners owning the requisite Percentage Interests in the Partnership sign written authorizations approving such action.  Limited Partners entitled to vote shall be those shown on the records of the General Partner to be Limited Partners in good standing as of a date 10 days prior to the meeting or the effective date of any written authorization.  Any Limited Partner who is in default under this Agreement shall not be entitled to vote and his Percentage Interest shall be excluded in calculating the percentage required for approval, unless and until the default is cured.

Section 13.    <u>Dissolution</u>.

(a)    <u>Causes</u>.  To the fullest extent permitted by law, each Partner expressly waives any right which it might otherwise have to dissolve the Partnership by affirmative vote or written consent of the partners or otherwise except as set forth in this <u>Section 13</u> and, until the Liquidation Agent Termination Date, waives any right withdraw from or assign its partnership interest if such withdrawal or assignment would result in a dissolution of the Partnership.  Subject to <u>Section 5</u>, the Partnership shall be dissolved upon the first to occur of one of the following events:

(i)    subject to Section 5, the occurrence entry of a judicial decree dissolving the Partnership pursuant to <u>Section 3(b)</u>;

(ii)   subject to <u>Section 10(g)</u>, at any time there are no limited partners of the Partnership, unless the business of the Partnership is continued in accordance with the Act;

(iii)  subject to <u>Section 9(f)</u>, any events that result in the General Partner ceasing to be a general partner of the Partnership under the Act, provided that the Partnership shall not be dissolved and required to be wound up in connection with any such event if (A) at the time of the occurrence of such event there is at least one remaining general partner of the Partnership who is hereby authorized to and does carry on the business of the Partnership, or (B) within 90 days after the occurrence of such event, a majority of the limited partners agree in writing or vote to continue the business of the Partnership and to the appointment, effective as of the date of

15

such event, if required, of one or more additional general partners of the Partnership; or

(iv) the date on which the Partnership is voluntarily dissolved by the agreement of the Partners as herein; provided; however, that the Partners hereby waive such right until the Liquidation Agent Termination Date.

(b) Notice of Dissolution. Upon the dissolution of the partnership, the General Partner or the liquidating trustee, as the case may be, shall promptly notify the Partners of such dissolution.

(c) Liquidation. Upon dissolution of the Partnership, the General Partner or, in the event that the dissolution is caused by an event described in Section 13(a)(iii) and there is no other General Partner within 90 days, a Person who may be approved by a Majority in Interest and CLMG, shall immediately commence to wind up the Partnership's affairs; provided that a reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the Partners to minimize the normal losses attendant upon the liquidation. The Partners shall continue to share profits and losses during liquidation in the same proportions as specified in Section 14(b) as before liquidation. Each Partner shall be furnished with a statement prepared by the Partnership's certified public accountant that shall set forth the assets and liabilities of the Partnership as of the date of dissolution. The proceeds of liquidation shall be distributed, as realized, in the following order and priority:

(i) first, to creditors of the Partnership, including Partners who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Partnership (whether by payment or the making of reasonable provision for payment thereof);

(ii) next, to the Partners in proportion to their respective positive capital account balances, as such balances have been adjusted to reflect allocations of gains and losses for all periods, until such capital accounts have been reduced to zero; and

(iii) thereafter, to the Partners the remaining proceeds of liquidation in accordance with the Percentage Interests of the Partners.

(d) Methods of Liquidation. The Partnership may be liquidated by either:

(i) selling the Partnership assets and distributing the net proceeds therefrom in the manner provided in Section 13(c). Any net gain or loss realized by the Partnership on the sale or other disposition of Partnership assets in the process of liquidation of the Partnership shall be allocated to the Partners in the ratios specified for allocating profits or losses in Section 14(b); or

(ii) subject to the order of priority set forth in Section 13(c), distributing the Partnership assets proportionately to the Partners in kind with each Partner accepting an undivided interest in the Partnership assets, subject to Partnership liabilities, in satisfaction of its proportionate interests in the Partnership; for the purpose of determining the amount distributed to each Partner, any property distributed in kind in the liquidation shall be valued at fair market value.

(e) Termination of Partnership. The Partnership shall terminate when all of the assets of the Partnership, after payment of or due provision for all debts, liabilities and obligations of the Partnership, shall have been distributed to the Partners in the manner provided for in Section 13, and the Certificate of Limited Partnership shall have been cancelled in the manner required by the Act. Upon cancellation of the Certificate of Limited Partnership in accordance with the Act, this Agreement shall terminate,

16

Section 14.    Tax Matters.

(a)    In accordance with the capital accounting rules of Treasury Regulation Section 1.704-1(b) (relating to maintenance of capital accounts), a separate capital account shall be determined and maintained for each Partner, and such capital accounts of the Partners shall be subject to such adjustments as may be required to comply with Treasury Regulation Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulation, Without limiting the generality of the foregoing, the General Partner may modify the manner in which capital accounts are maintained in order to comply with the provisions of Section 704(b) of the Code and Treasury Regulation Section 1.704-1(b).

(b)    For any taxable year of the Partnership all net income, net gains and net losses of the Partnership from operations, interim capital transactions or in connection with a dissolution and winding up of the Partnership shall be allocated to the Partners in accordance with and in proportion to their respective Percentage Interests in the Partnership.

(c)    Without limiting the generality of the foregoing, the General Partner may modify the manner in which the capital accounts are maintained in order to comply with the provisions of Section 704(b) of the Code and the Treasury Regulations thereunder. In addition, the Partners agree that the Partnership's income, gain and loss (or items thereof) shall be specially allocated to the Partners to the extent necessary to comply with the provisions of Section 704(b) and 704(c) of the Code, including minimum gain chargebacks, qualified income offsets, etc., as required by the Treasury Regulations thereunder. No allocation of income, gain or loss will be made to a Partner if the allocation would not have "economic effect" or otherwise would not be in accordance with the Partner's interest in the Partnership, in each case within the meaning of Treasury Regulation Section 1.704-1(b). The Partners will have authority to reallocate any item in accordance with the immediately preceding provisions of this Section 14(c).

(d)    The General Partner shall act as the "tax matters partner" within the meaning of Section 6231 (a)(7) of the Code.

(e)    For any taxable year of the Partnership in which the Partnership is not treated as a partnership for U.S. federal income tax purposes, (i) the provisions of Sections 14(a) through (d) shall not apply, (ii) the provisions in this Agreement relating to the maintenance of capital accounts shall not apply and (iii) the provisions in this Agreement which require determinations to be made with respect to capital accounts shall instead be read to require such determinations be made with respect to Percentage Interests, *mutatis mutandis*.

Section 15.    Indemnification.

(a)    No Partner or the Liquidation Agent shall be liable to the Partnership or to any other Partner for monetary damages for any losses, claims, damages or liabilities arising from any act or omission performed or omitted by it arising out of or in connection with this Agreement or the Partnership's business or affairs, except for any such loss, claim, damage or liability primarily attributable to such Partner's gross negligence or willful misconduct. The Partnership shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless each Partner and the Liquidation Agent (collectively, the "Covered Persons") against any losses, claims, damages or liabilities to which such Covered Person may become subject in connection with any matter arising out of or in connection with this Agreement or the Partnership's business or affairs, except for any such loss, claim, damage or liability primarily attributable to such Covered Person's gross negligence or willful misconduct. If any Covered Person becomes involved in any capacity in any action, proceeding or investigation in connection with any matter arising out of or in connection with this Agreement or the Partnership's business or affairs, the Partnership shall reimburse such Covered Person for its reasonable legal and other reasonable out-of-pocket expenses (including the cost of any investigation and preparation) as they are incurred in connection therewith; provided that such Covered Person shall promptly repay to the Partnership the amount of any such

17

reimbursed expenses paid to it if it shall ultimately be determined that such Covered Person was not entitled to be indemnified by the Partnership in connection with such action, proceeding or investigation. If for any reason (other than the gross negligence or willful misconduct of such Covered Person) the foregoing indemnification is unavailable to such Covered Person, or insufficient to hold it harmless, then the Partnership shall contribute to the amount paid or payable by such Covered Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect the relative benefits received by the Partnership on the one hand and such Covered Person on the other hand or, if such allocation is not permitted by applicable law, to reflect not only the relative benefits referred to above but also any other relevant equitable considerations. The provisions of this <u>Section 15</u> shall survive for a period of four years from the date of dissolution of the Partnership; provided that (i) if at the end of such period there are any actions, proceedings or investigations then pending, any Covered Person may so notify the Partnership and the other Partners at such time (which notice shall include a brief description of each such action, proceeding or investigation and the liabilities asserted therein) and the provisions of this <u>Section 15</u> shall survive with respect to each such action, proceeding or investigation set forth in such notice (or any related action, proceeding or investigation based upon the same or similar claim) until such date that such action, proceeding or investigation is finally resolved and (ii) the obligations of the Partnership under this <u>Section 15</u> shall be satisfied solely out of Partnership assets and no Covered Person shall have any personal liability on account thereof. Notwithstanding anything to the contrary contained in this Agreement, the obligations of the Partnership or any Covered Person under this <u>Section 15</u> shall (a) be in addition to any liability which the Partnership or such Covered Person may otherwise have and (b) inure to the benefit of such Covered Person, its Affiliates and their respective members, directors, officers, employees, agents and affiliates and any successors, assigns, heirs and personal representatives of such Persons.

(b)     Any indemnification obligations of the Partnership to a Covered Person under this Agreement shall be fully subordinated to any obligations under the Settlement Agreement, Settlement Order and DIP Order (including, without limitation, the Allowed Claim) and such indemnification obligations shall not constitute a claim against the Partnership in the event that cash flow in excess of amounts necessary to pay holders of such obligations under the Settlement Agreement, Settlement Order and DIP Order (including, without limitation, the Allowed Claim) is insufficient to pay such indemnification obligations.

(c)     The foregoing provisions of this Section 15 shall survive any termination of this Agreement.

Section 16.     <u>Miscellaneous Provisions</u>.

(a)     <u>Waiver of Partition; Nature of Interest</u>. To the fullest extent permitted by law, each Partner (and any additional partner admitted under <u>Section 11</u>) hereby irrevocably waives any right or power that such Person might have to cause the Partnership or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Partnership, to compel any sale of all or any portion of the assets of the Partnership pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Partnership. No Partner shall have any interest in any specific assets of the Partnership, and no Partner shall have the status of a creditor with respect to any distribution pursuant to <u>Section 7</u>. The interest of the Partners in the Partnership is personal property.

(b)     <u>Benefits of Agreement; No Third-Party Rights</u>. Except for CLMG, (i) none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Partnership or by any creditor of the Partners, (ii) nothing in this Agreement shall be deemed to create any right in any Person not a party hereto, and (iii) this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third person (except as provided in <u>Section 16(e)</u>). Until the Liquidation Agent Termination Date, each of CLMG and the Liquidation Agent shall be an intended third party beneficiary of this Agreement and may enforce the provisions hereof.

18

(c)    <u>Severability of Provisions</u>. Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

(d)    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

(e)    <u>Binding Agreement</u>. Notwithstanding any other provision of this Agreement, the Partners agree that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Partners, and is enforceable in accordance with its terms. This Agreement shall be binding upon the parties hereto and their respective executors, administrators, legal representatives, heirs, successors and assigns, and shall inure to the benefit of the parties hereto and, except as otherwise provided herein, their respective executors, administrators, legal representatives, heirs, successors and assigns.

(f)    <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

(g)    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument,

(h)    <u>Notices</u>. Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (i) in the case of the Partnership, to the Partnership at its address in <u>Section 3(c)</u>, (ii) in the case of a Partner, to such Partner at its address as listed on the attached <u>Schedule A</u> and (iii) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party,

(i)    <u>Attorney Fees</u>. If the Partnership or the General Partner obtains a judgment against any other Partner of the Partnership by reason of the breach of this Agreement or the failure to comply with the terms hereof, reasonable attorneys' fees and costs as fixed by the court shall be included in such judgment.

(j)    <u>Specific Performance</u>. In the event of a breach or a threatened breach by any party to this Agreement of its, his or her obligations under this Agreement, any party injured or to be injured by such breach, in addition to being entitled to exercise all rights granted by applicable law, including recovery of damages, shall be entitled to specific performance of its, his or her rights under this Agreement. The parties hereto agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for breach of such provision shall be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

(k)    <u>Construction</u>. Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation," and words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders. The terms "herein," "hereof and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a

19

particular document shall be references to such parts of this Agreement. All capitalized terms in this Agreement not defined herein shall have the meaning assigned to that term in the Settlement Agreement.

(l)    <u>Further Assurances</u>. The General Partner agrees to execute, acknowledge, deliver, file, record and publish such further instruments and documents, and do all such other acts and things as may be required by law, or as may be required to carry out the intent and purposes of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Agreement as of the date first above written.

GENERAL PARTNER:

WHITE EAGLE GENERAL PARTNER, LLC,
a Delaware limited liability company

By:
Name: DAVID THOMSON
Title: DIRECTOR

LIMITED PARTNER:

LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY,
an Irish designated activity company

By:
Name: DAVID THOMSON
Title: DIRECTOR

# SCHEDULE A

## Partners

| Name and Address | Percentage Interest |
|---|---|
| White Eagle General Partner, LLC c/o AMS Limited<br>The Continental Building<br>25 Church Street<br>PO Box Hm265<br>Hamilton HMAX<br>Bermuda | 0.10% |
| Lamington Road Designated Activity Company<br>2nd Floor Palmerston House<br>Fenian Street<br>Dublin 2<br>Ireland | 99.90% |
| TOTAL | 100% |

## EXHIBIT D

LLC Agreement

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**WHITE EAGLE GENERAL PARTNER, LLC**

This Amended and Restated Limited Liability Company Agreement (together with the Schedules attached hereto, this "Agreement") of White Eagle General Partner, LLC (the "Company"), is entered into by Lamington Road Designated Activity Company, an Irish designated activity company, as the sole equity member of the Company (the "Member"), effective as of June 5, 2019 (the "Effective Date"). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

WHEREAS, the Company was formed as a limited liability company on May 14, 2014 by the filing of a Certificate of Formation with the Secretary of State of Delaware pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.), as amended from time to time (the "Act");

WHEREAS, a limited liability company agreement of the Company was made and entered into as of May 16, 2014 (the "Previous LLC Agreement");

WHEREAS, on November 14, 2018, the Company commenced a chapter 11 case before the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on May 24, 2019, the Company and CLMG Corp., a Texas corporation ("CLMG"), among others, entered into that certain Settlement Agreement (the "Settlement Agreement"), pursuant to which, among other things, the Previous LLC Agreement shall be amended in order to appoint the Liquidation Agent;

WHEREAS, the Settlement Agreement was approved by the Bankruptcy Court on June 5, 2019, and subsequently went into effect;

WHEREAS, consistent with the Settlement Agreement, the parties hereto wish to amend and restate the Previous LLC Agreement in its entirety as set forth herein; and

WHEREAS, the parties hereto agree that the membership in and management of the Company shall be governed by the terms set forth herein.

NOW, THEREFORE, the parties hereto hereby amend and restate the Previous LLC Agreement in entirety and agree as follows:

Section 1.        Name.

The name of the limited liability company is White Eagle General Partner, LLC.

Section 2.        Principal Business Office.

The principal business office of the Company shall be located at One Lane Hill, East Broadway, Hamilton HM19, Bermuda, or such other location as may hereafter be determined by the Member.

Section 3.        Registered Office.

The address of the registered office of the Company in the State of Delaware is c/o Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901.

Section 4.        Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are Capitol Services, Inc., 1675 South State Street, Suite B, Dover, Delaware 19901.

Section 5.        Members.

(a)        The mailing address of the Member is set forth on Schedule B attached hereto.

The Member is hereby admitted to the Company as a member of the Company simultaneously with its execution of a counterpart signature page to this Agreement.

(b)        Subject to Section 9(d), the Member may act by written consent.

(c)        Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than (i) upon an assignment by the Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to Sections 19 and 21, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 20 and 21, an individual selected by CLMG and approved by the Bankruptcy Court shall, without any action of any Person and simultaneously with the Member ceasing to be a member of the Company, automatically be admitted to the Company as the Special Member and shall continue the Company without dissolution. The Special Member may not resign from the Company or transfer its rights as Special Member unless a successor Special Member has been admitted to the Company as the Special Member by executing a counterpart to this Agreement; provided, however, the Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member. The Special Member, in its capacity as Special Member, shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, the Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. The Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act or this Agreement, the Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company.

Section 6.        Certificates.

Robert S. Bernstein, whom the parties hereto hereby confirm was designated as an "authorized person" within the meaning of the Act, has executed, delivered and filed the initial Certificate of Formation with the Secretary of State of the State of Delaware and all actions taken by him or her in connection with the organization of the Company, including such filing of the Certificate of Formation and obtaining an Employer Identification Number for the Company, are hereby adopted, approved and ratified by the Member. Upon the filing of the initial Certificate of Formation with the Secretary of State of the State of Delaware, his or her powers as an "authorized person" ceased, and the Member thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act. The Member shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary or desirable for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act and this Agreement.

2

Section 7.        Purposes.

(a)        The purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)        to own, hold, manage and otherwise deal with its general partner interest in White Eagle Asset Portfolio, LP, a Delaware limited partnership (the "Partnership"), and to engage in such actions and exercise such authority as are consistent with being the general partner of the Partnership, in each case, in accordance with the terms and conditions of the Settlement Agreement, Settlement Order and DIP Order;

(ii)        to execute and deliver, and to exercise and perform all of its rights and obligations under or relating to, the Settlement Agreement, Settlement Order and DIP Order; and

(iii)        to cause the Partnership to engage in the following activities, in each case subject to the terms of the Settlement Agreement, Settlement Order and DIP Order:

A.        to own, hold, transfer, otherwise deal with, and exercise any right, power, privilege, or other incident of ownership, possession, or control relating to life settlements ("Policies"), which Policies may be transferred to CLMG or one or more of its designees pursuant to the Settlement Agreement, Settlement Order and DIP Order;

B.        to execute and deliver, and to exercise and perform all of its rights and obligations under or relating to, the Settlement Agreement, Settlement Order and DIP Order; and

C.        to engage in any lawful act or activity and to exercise any powers permitted to limited partnerships organized under the laws of the State of Delaware that are necessary, appropriate, or convenient to accomplishing the preceding purposes; and

D.        to take all other actions that are necessary to maintain the existence of the Partnership as a limited partnership in good standing under the laws of the State of Delaware and to qualify the Partnership to do business in any other jurisdiction in which that qualification, in the judgment of the Board is required or appropriate.

(iv)        to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies under the laws of the State of Delaware that are necessary, appropriate, or convenient to accomplishing the preceding purposes; and

(v)        to take all other actions that are necessary to maintain the existence of the Company as a limited liability company in good standing under the laws of the State of Delaware and to qualify the Company to do business in any other jurisdiction in which the at qualification, in the judgment of the Board, is required or appropriate.

(b)        The Company, and the Member and, to the extent necessary to carry out Section 10, the Liquidation Agent, on behalf of the Company, may enter into and perform their respective obligations under the Settlement Agreement, Settlement Order and DIP Order and all documents, agreements, instruments, certificates or financing statements contemplated thereby or related thereto, and any amendments thereto, all without any further act, vote or approval of any Liquidation Agent or other Person notwithstanding any

3

other provision of this Agreement or the Act. The foregoing authorization shall not be deemed a restriction on the powers of the Member to enter into other agreements or documents on behalf of the Company, so long as doing so is consistent with the terms and provisions of the Settlement Agreement, Settlement Order and DIP Order.

Section 8.    Powers.

Subject to Section 9(d) and Section 10, the Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.    Management.

(a)    Member Management. Subject to Section 9(d) and Section 10, the business and affairs of the Company shall be managed by or under the direction of the Member.

(b)    Powers. Subject to Section 9(d) and Section 10, the Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise. Subject to Sections 7, 9 and 10, the Member has the authority to bind the Company.

(c)    Designation of Officers. The Member may, from time to time, designate one or more persons to be officers of the Company (the "Officers"), which officers include a chief executive officer, a chief operating officer, a president, one or more vice presidents, a secretary, treasurer and one or more assistant secretaries. Until such person shall die, be removed by the Member or resign, or until his or her successor shall be duly appointed or designated by the Member, the following persons shall hold the following offices:

| Miriam Martinez | Chief Financial Officer |
| David Thompson | Vice President |

(d)    Limitations on the Company's Activities.

(i)    This Section 9(d) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

(ii)    From the Effective Date until the earliest to occur of (y) the Transfer Date, and (z) the date on which CLMG has confirmed to White & Case LLP, pursuant to the Settlement Agreement, that it has received the Early Payoff Amount or the Payoff Amount, as applicable, (such earliest date, the "Liquidation Agent Termination Date") and in accordance with the Settlement Agreement, neither the Company nor the Member shall amend, alter, change or repeal the definitions of "Liquidation Agent" or Sections 5(c), 7, 8, 9, 10, 15, 18, 19, 20, 21, 22, 23, 24, 27, 28, 29, 30 or Schedule A of this Agreement (collectively, the "Special Purpose Provisions") without the written consent of the Member and CLMG. Subject to this Section 9(d), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 29 and the Settlement Agreement, Settlement Order and DIP Order.

(iii)    Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Member, the Liquidation Agent or

4

any other Person, until the Liquidation Agent Termination Date, none of the Member, the Liquidation Agent or any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior written consent of CLMG, to take any Material Action unless expressly permitted pursuant to the Settlement Agreement, Settlement Order or DIP Order.

(iv)    Without limiting any, and subject to all, other covenants of the Company contained in this Agreement, until the Liquidation Agent Termination Date, the Company shall conduct its business and operations separate and apart from that of any other Person and in furtherance of the foregoing:

A.    The Company shall maintain its accounts, financial statements, books, accounting and other records, and other documents of the Company separate from those of any other Person and ensure all audited financial statements of any Person that uses consolidated financial statements to include the Company contain notes clearly stating that (1) all of the Company's assets are owned by the Company and (2) the Company is a separate entity.

B.    The Company shall not commingle or pool any of its funds or assets with those of any Affiliate or any other Person, and it shall hold all of its assets in its own name, except as otherwise permitted or required under the Settlement Agreement, Settlement Order or DIP Order.

C.    The Company shall conduct its own business in its own name and, for all purposes, shall not operate, or purport to operate, collectively as a single or consolidated business entity with respect to any Person.

D.    The Company shall pay its own debts, liabilities and expenses (including overhead expenses, if any, and operating expenses) only out of its own assets as the same shall become due.

E.    The Company has observed, and shall observe all (A) Delaware limited liability company formalities and (B) other organizational formalities, in each case to the extent necessary or advisable to preserve its separate existence, and shall preserve its existence, and it shall not, nor shall it permit any Affiliate or any other Person to, amend, modify or otherwise change its limited liability company agreement in a manner that would adversely affect the existence of the Company as a bankruptcy-remote special purpose entity.

F.    The Company does not, and shall not, (A) guarantee, become obligated for, or hold itself or its credit out to be responsible for or available to satisfy, the debts or obligations of any other Person or (B) control the decisions or actions respecting the daily business or affairs of any other Person.

G.    The Company shall, at all times, hold itself out to the public as a legal entity separate and distinct from any other Person.

H.    The Company shall not identify itself as a division of any other Person.

5

I.     The Company shall maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other Person.

J.     The Company shall not use its separate existence to perpetrate a fraud in violation of applicable law.

K.     The Company shall not act with an intent to hinder, delay or defraud any of its creditors in violation of applicable law.

L.     The Company shall maintain an arm's length relationship with its Affiliates.

M.     Except as permitted by or pursuant to the Settlement Agreement, Settlement Order or DIP Order, the Company shall not grant a security interest or otherwise pledge its assets for the benefit of any other Person.

N.     The Company shall not acquire any securities or debt instruments of any other Company, its Affiliates or any other Person.

O.     The Company shall not make loans or advances to any Person, without the prior written consent of CLMG, except as permitted by or pursuant to the Settlement Agreement, Settlement Order or DIP Order.

P.     The Company shall make no transfer of its assets except as permitted by or pursuant to the Settlement Agreement, Settlement Order or DIP Order.

Q.     The Company shall file its own tax returns separate from those of any other Person or entity, except to the extent that the Company is not required to file tax returns under applicable law or is not permitted to file its own tax returns separate from those of any other Person.

R.     The Company shall not acquire obligations or securities of its members.

S.     The Company shall use separate stationery, invoices and checks.

T.     The Company shall correct any known misunderstanding regarding its separate identity.

U.     The Company shall intend to maintain adequate capital in light of its contemplated business operations.

Failure of the Company, or the Member on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Member.

(v)     From the Sale Trigger Event until the Liquidation Agent Termination Date, the Company shall not take any action that is inconsistent with, or that would interfere with or delay timely completion of, the Sale Process without the prior written consent of the Liquidation Agent.

Section 10.     <u>Liquidation Agent</u>.

(a)     From the Effective Date until the Liquidation Agent Termination Date, the Member shall cause the Company at all times to have appointed a Liquidation Agent. The initial Liquidation Agent shall

6

be Joseph J. Farnan, Jr. The Liquidation Agent shall be treated as an independent contractor and his or her appointment shall not create the relationship of employee and employer between the Liquidation Agent and the Company, nor shall the Liquidation Agent be deemed to be a manager, director or officer of the Company.

(b)     The Liquidation Agent shall maximize the proceeds from the sale of the Collateral as he or she determines to be appropriate in his or her sole and absolute discretion and, in any event, consistent with traditional fiduciary duties owed by directors and officers of corporations under Delaware law to constituents of bankruptcy estates subject to complying with the Sale Process in all respects as set forth in the Settlement Agreement; *provided* that the Liquidation Agent may not, in exercising his or her duties, contest the Sale Process (including the Sale Deadlines), in any way or seek any relief from the Bankruptcy Court to modify the Sale Process (including the Sale Deadlines), or take any other action inconsistent with the terms of the Settlement Agreement, Settlement Order or DIP Order. Except as provided in this <u>Section 10(b)</u>, in exercising its rights and performing its duties under this Agreement, the Liquidation Agent shall not have any fiduciary duties to the Member or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. The Liquidation Agent shall not at any time serve as trustee in bankruptcy for any Affiliate of the Company.

(c)     Unless otherwise restricted by law, the Liquidation Agent may resign, with or without cause, at any time on thirty (30) days' advance notice, and any vacancy caused by any such resignation shall be filled upon the written consent of the Member and CLMG; *provided*, that if the Member and CLMG are unable to agree on a replacement within thirty (30) days following such resignation, then the Bankruptcy Court shall select such replacement. Unless otherwise restricted by law, the Liquidation Agent may be removed, with or without cause, at any time by written consent of the Member and CLMG, and any vacancy caused by any such removal may be filled by written consent of the Member and CLMG. Notwithstanding the forgoing, to the fullest extent permitted by law, no removal of the Liquidation Agent, and no appointment of a successor Liquidation Agent, shall be effective until such successor (i) shall have accepted his or her appointment as the Liquidation Agent by a written instrument, which may be a counterpart signature page to this Agreement or another written instrument, and (ii) shall have executed a counterpart to this Agreement.

(d)     Subject to the Settlement Agreement, Settlement Order and DIP Order, from the Effective Date until immediately prior to the occurrence of a Sale Trigger Event, the Liquidation Agent's duties and authorities shall be limited to taking such actions as he or she determines in his or her sole and absolute discretion to be necessary or appropriate for the Company and the Partnership to be prepared to launch and implement the Sale Process upon the occurrence of a Sale Trigger Event; *provided* that, prior to the Sale Trigger Event, the Liquidation Agent shall not take any action to commence the marketing of the Collateral to third parties or to otherwise contact potential buyers about the Collateral. The Liquidation Agent's duties and authorities pursuant to this <u>Section 10(d)</u> shall include, but shall not be limited to, engaging and overseeing Maple and any other advisors in connection with, and in preparation for, the Sale Process.

(e)     If the Early Payoff Amount is not paid in full in cash to CLMG immediately on or before the occurrence of a Sale Trigger Event, the Liquidation Agent shall, automatically on the next Business Day after the occurrence of such Sale Trigger Event and without further order or other action by the Member or any other Person, have the sole authority and the express mandate to (A) notwithstanding anything to the contrary herein, have full power and authority (including the power and authority to bind the Company and/or the Partnership), to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described in this <u>Section 10(e)</u>, including all powers, statutory or otherwise, (B) conduct the Sale Process, (C) select winning bids for the Collateral, (D) close sale transactions on behalf of the Company and the Partnership with respect to the Collateral, (E) obtain DIP Financing in accordance with the Settlement Agreement, Settlement Order and DIP Order, (F) approve any DIP Budget in effect during the Sale Process and prohibit the Company and the Partnership from making any expenditure not specified

7

in any such DIP Budget unless such expenditure is approved in writing by CLMG pursuant to the Settlement Agreement, Settlement Order and DIP Order, and (G) take all other actions as he or she determines in his or her sole and absolute discretion are necessary and appropriate to promptly implement and complete the Sale Process; *provided* that the Liquidation Agent may not cause the Company or the Partnership to transfer any Collateral to a purchaser without first (or simultaneously) receiving the proceeds of such sale. If the Liquidation Agent, acting reasonably and on the advice of Maple, anticipates that the Company or the Partnership or any of their affiliates will not have sufficient liquidity to service its obligations after the occurrence of a Sale Trigger Event, then the Liquidation Agent, on behalf of the Company, shall have full power and authority on behalf of the Company to (i) negotiate and enter into all necessary documentation regarding additional postpetition financing following the Sale Trigger Event and (ii) seek and obtain all necessary Bankruptcy Court approvals in connection therewith.

(f)    Solely in furtherance of <u>Section 10(e), the Liquidation Agent shall have full power and authority on behalf of the Company to:</u> (i) execute and deliver for value all necessary or appropriate agreements and other instruments, (ii) defend any suit, action or proceeding brought against Company, and settling, compromising or adjusting any suit, action or proceeding described above and, in connection therewith, giving such discharges or releases as the Liquidation Agent may deem appropriate, (iii) defend, file, prosecute, settle, compromise, or adjust any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by the Liquidation Agent, (iv) sell, assign, convey, transfer, pledge, make any agreement with respect to or otherwise dealing with, any of the Collateral, and execute, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith, and (v) any and all other actions relevant or necessary for the Liquidation Agent to carry out his or her mandate under <u>Section 10(e)</u>.

(g)    Subject to the foregoing exclusive authority and mandate granted to the Liquidation Agent, the Member shall retain all of its other management and decision-making powers on behalf of the Company. The Liquidation Agent shall exercise the exclusive powers granted hereunder in the role of Bankruptcy Court-appointed independent liquidation agent, and he shall not be an officer, employee, manager, or director of the Company.

(h)    The Company shall afford to the Liquidation Agent and to any prospective purchaser pursuant to the Sale Process, during normal business hours, access, upon reasonable advance notice, to all of the books, records and properties of the Company and its subsidiaries, as applicable, and to make copies of such records and permit the Liquidation Agent to discuss all aspects of the Company or its subsidiaries, as applicable, with any officers, employees or accountants of the Company or its subsidiaries, and the Company and its subsidiaries shall provide to the Liquidation Agent responses to all reasonable written requests from the Liquidation Agent for information relating to the Company, its subsidiaries and their respective operations; provided, that such access does not unreasonably interfere with the business and operations of the Company or its subsidiaries.  The Company and its subsidiaries shall instruct their independent accountants to discuss such aspects of the financial condition of the Company or its subsidiaries, as applicable, with the Liquidation Agent as he or she may reasonably request, and to permit the Liquidation Agent to inspect, copy and make extracts from such financial statements, analyses, work papers and other documents and information (including electronically stored documents and information) prepared with respect to the Company or its subsidiaries, as applicable, as may be reasonably requested by the Liquidation Agent.

(i)    The rights, authorities and powers of the Liquidation Agent set forth in this <u>Section 10</u> are hereby irrevocably delegated by the Member, subject to the limitations set forth herein, including the following sentence. All rights, authorities and powers of the Liquidation Agent delegated pursuant to this <u>Section 10</u> shall terminate immediately upon the Liquidation Agent Termination Date.

8

Section 11.    Limited Liability.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Member, the Special Member or the Liquidation Agent shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Special Member or Liquidation Agent of the Company.

Section 12.    Capital Contributions.

The Member has contributed to the Company property of an agreed value as listed on Schedule B attached hereto. In accordance with Section 5(c), the Special Member shall not be required to make any capital contributions to the Company.

Section 13.    Additional Contributions.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member. To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise Schedule B of this Agreement. The provisions of this Agreement, including this Section 13, are intended to benefit the Member and the Special Member and, to the fullest extent permitted by law, other than as provided in Section 24 of this Agreement, shall not be construed as conferring any benefit upon any creditor of the Company (other than Covered Persons) (and, other than as provided in Section 24 of this Agreement, no such creditor of the Company (other than Covered Persons) shall be a third-party beneficiary of this Agreement) and the Member and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Section 14.    Allocation of Profits and Losses; Tax Characterization and Returns.

(a)    The Company's profits and losses shall be allocated to the Member.

(b)    Until such time as the Company shall have more than one member of the Company, it is the intention of the Member that the Company be disregarded for federal and all relevant state tax purposes and that the activities of the Company be deemed to be activities of the Member for such purposes. All provisions of the Certificate of Formation and this Agreement are to be construed so as to preserve such tax status. The Member is hereby authorized to file any necessary elections with any tax authorities and shall be required to file any necessary tax returns on behalf of the Company with any such tax authorities.

Section 15.    Distribution.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or the Settlement Agreement, Settlement Order or DIP Order.

Section 16.    Books and Records.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The books of the Company shall at all times be maintained by the Member. The Company's books of account shall be kept using the method of accounting determined by the Member. The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 17.    <u>Other Business</u>.

Notwithstanding any duty otherwise existing or anything to the contrary at law (whether common or statutory) or in equity, the Member, the Special Member, the Liquidation Agent, any employee or agent of the Company and any Affiliate of the Member, the Special Member or the Liquidation Agent may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 18.    <u>Exculpation and Indemnification</u>.

(a)    To the fullest extent permitted by applicable law, none of the Member, the Liquidation Agent, the Special Member, any employee, officer, or agent of the Company or any employee, officer, representative, agent or Affiliate of the Member, the Liquidation Agent or the Special Member (collectively, the "<u>Covered Persons</u>") shall be liable to the Company or any other Person that is a party to or is otherwise bound by this Agreement or who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; <u>provided</u>, <u>however</u>, that any indemnity under this <u>Section 18</u> by the Company shall be provided out of and to the extent of Company assets only, and the Member, the Liquidation Agent and the Special Member shall not have personal liability on account thereof; and <u>provided</u>, <u>further</u>, that so long as the Payment Amount or the Early Payment Amount, as applicable, is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under this <u>Section 18</u> shall be payable from amounts allocable to any other Person pursuant to the Settlement Agreement, Settlement Order or DIP Order.

(c)    To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this <u>Section 18</u>.

(d)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid,

10

(e)     To the extent that, at law (whether common or statutory) or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall, to the fullest extent permitted by applicable law, not be liable to the Company, to any other Covered Person or to any other Person that is a party to or is otherwise bound by this Agreement for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law (whether common or statutory) or in equity, are agreed by the Member, the Liquidation Agent and the Special Member to replace such other duties and liabilities of such Covered Person.

(f)     Any indemnification obligations of the Company to a Covered Person under this Agreement shall be fully subordinated to any obligations under the Settlement Agreement, Settlement Order or DIP Order (including, without limitation, the Allowed Claim) and such indemnification obligations shall not constitute a claim against the Company in the event that cash flow in excess of amounts necessary to pay holders of such obligations under the Settlement Agreement, Settlement Order or DIP Order (including, without limitation, the Allowed Claim) is insufficient to pay such indemnification obligations.

(g)     The foregoing provisions of this <u>Section 18</u> shall survive any termination of this Agreement.

Section 19.     <u>Assignments</u>.

Except as permitted pursuant to the Settlement Agreement, Settlement Order or DIP Order, the Member shall not, directly or indirectly, assign, sell, transfer, dispose, pledge or encumber (each a "<u>Transfer</u>") in whole or in part its limited liability company interest in the Company without the written consent of CLMG. If the Member is permitted to assign all or a portion of its limited liability company interest, subject to this <u>Section 19</u> or <u>Section 21</u>, the transferee of a limited liability company interest in the Company shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. If the Member transfers all of its limited liability company interest in the Company pursuant to this <u>Section 19</u>, such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.

Section 20.     <u>Resignation</u>.

The Member may not resign, except as permitted under the Settlement Agreement, Settlement Order or DIP Order or with the written consent of CLMG. If the Member is permitted to resign pursuant to this <u>Section 20</u>, an additional member of the Company shall be admitted to the Company, subject to <u>Section 21</u>, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 21.     <u>Admission of Additional Members</u>.

Without limiting the provisions of <u>Sections 5(c) or 22(a)</u>, one or more additional members of the Company may be admitted to the Company with the written consent of the Member; provided however, that, notwithstanding the foregoing, until the Liquidation Agent Termination Date, no additional members may be admitted.

11

Section 22.    Dissolution.

(a)    Subject to Section 9(d), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) without limitation of the provisions of Section 5(c), the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. If, following the application of the provisions of Section 5(c), there shall, for any reason, nevertheless occur any event that causes the last remaining member of the Company to cease to be a member of the Company, to the fullest extent permitted by law, the personal representative (as defined in the Act) of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of the Member or the Special Member shall not cause the Member or the Special Member, respectively, to cease to be a member of the Company or cause the Company to be dissolved or its affairs to be wound up and upon the occurrence of such an event, the Company shall continue without dissolution. Except as otherwise required by law, notwithstanding any other provision of this Agreement, the dissolution or death of the Member or the Special Member shall not, by itself, cause the Company to be dissolved or its affairs to be wound up.

(c)    Notwithstanding any other provision of this Agreement, each of the Member and the Special Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or the Special Member or the occurrence of an event that causes the Member or the Special Member to cease to be a member of the Company.

(d)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 23.    Waiver of Partition; Nature of Interest.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member and the Special Member hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to Section 15 hereof The interest of the Member in the Company is personal property.

12

Section 24.    Benefits of Agreement; No Third-Party Rights.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company (other than Covered Persons) or by any creditor of the Member or the Special Member, except CLMG. Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons and CLMG) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons and except as provided in the following sentence and in Section 27). Until the Liquidation Agent Termination Date, each of CLMG and the Liquidation Agent shall be an intended third party beneficiary of this Agreement and may enforce the provisions hereof.

Section 25.    Severability of Provisions.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 26.    Entire Agreement.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 27.    Binding Agreement.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Member by the Liquidation Agent, in accordance with its terms. In addition, the Liquidation Agent shall be an intended beneficiary of this Agreement.

Section 28.    Governing Law.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws. The parties hereto hereby consent to (i) the non-exclusive jurisdiction of the courts of the State of Delaware, and (ii) service of process in accordance with Section 32.

Section 29.    Amendments.

Subject to Section 9(d), this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member. Notwithstanding anything to the contrary in this Agreement, until the Liquidation Agent Termination Date, this Agreement may not be modified, altered, supplemented or amended unless CLMG consents in writing.

Section 30.    Opt-in to Article 8.

(a)    Interests. A Member's interests in the Company shall be represented by the Interests issued to such Member by the Company. No more than one class of Interests shall be issued. All of a Member's Interests, in the aggregate, represent such Member's entire limited liability company interest in the Company. The Member hereby agrees that its Interests shall for all purposes be personal property. A Member has no interest in specific property of the Company.

(b)    Article 8 Opt-In. Each Interest in the Company shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Title 11, Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) Article 8 of the Uniform

13

Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all such purposes, including, without limitation perfection of the security interest therein under Articles 8 and 9 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions). The Company shall maintain books for the purpose of registering the transfer of the Interests. Notwithstanding any provision of this Agreement to the contrary, to the extent that any provision of this Agreement is inconsistent with any non-waivable provision of Article 8 of the Uniform Commercial Code as in effect in the State of Delaware (6 Del C. § 8-101, et seq.), (the "UCC"), such provision of Article 8 of the UCC shall control.

    (c)    <u>Interest Certificates</u>.

        (i)    Upon the issuance of Interests to any Member in accordance with the provisions of this Agreement, the Company shall issue one or more Interest Certificates (as defined herein) in the name of such Member. Each such Interest Certificate shall be denominated in terms of the percentage of Interests evidenced by such Interest Certificate and shall be signed by the Company. "Interest Certificate" means a certificate issued by the Company which evidences the ownership of one or more Interests. Each Interest Certificate shall bear, in effect, the following legend: "Each limited liability company interest in the Company represented by this certificate evidences an interest in the Company and shall constitute a "security" within the meaning of, and governed by, (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995 (and each limited liability company interest in the Company shall be treated as such a "security" for all such purposes, including, without limitation perfection of the security interest therein under Articles 8 and 9 of each applicable Uniform Commercial Code as the Company has "opted-in" to such provisions)." This provision shall not be amended, and no such purported amendment to this provision shall be effective until all outstanding certificates have been surrendered for cancellation.

        (ii)    The Company shall issue a new Interest Certificate in place of any Interest Certificate previously issued if the holder of the Interests represented by such Interest Certificate, as reflected on the books and records of the Company:

            A.    makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Interest Certificate has been lost, stolen or destroyed.

            B.    requests the issuance of a new Interest Certificate before the Company has notice that such previously issued Interest Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

            C.    if requested by the Company, delivers to the Company a bond, in form and substance satisfactory to the Company, with such surety or sureties as the Company may direct, to indemnify the Company against any claim that

may be made on account of the alleged loss, destruction or theft of the previously issued Interest Certificate; and

D.     satisfies any other reasonable requirements imposed by the Company.

(iii)     Subject to the restrictions set forth in the Settlement Agreement, Settlement Order and DIP Order, upon a Member's Transfer in accordance with the provisions of this Agreement of any or all Interests represented by an Interest Certificate, the transferee of such Interests shall deliver such endorsed Interest Certificate to the Company for cancellation, and the Company shall thereupon issue a new Interest Certificate to such transferee for the percentage of Interests being transferred and, if applicable, cause to be issued to such transferor a new Interest Certificate for that percentage of Interests that were represented by the canceled Interest Certificate and that are not being Transferred.

Section 31.     Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 32.     Notices.

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 2, (b) in the case of the Member, to the Member at its address as listed on Schedule B attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 33.     Specific Performance.

In the event of a breach or a threatened breach by any party to this Agreement of its, his or her obligations under this Agreement, any party injured or to be injured by such breach, in addition to being entitled to exercise all rights granted by applicable law, including recovery of damages, shall be entitled to specific performance of its, his or her rights under this Agreement. The parties hereto agree that the provisions of this Agreement shall be specifically enforceable, it being agreed by the parties that the remedy at law, including monetary damages, for breach of such provision shall be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

Section 34.     Effectiveness.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the Effective Date.

[SIGNATURE PAGE FOLLOWS]

15

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the Effective Date.

MEMBER:

LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY

By: _____

Name: THOMAS BARRY

Title: DIRECTOR

## SCHEDULE A

## DEFINITIONS

A.    <u>Definitions</u>

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"<u>Act</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Affiliate</u>" means, as to any Person, any other Person (i) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, (ii) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of voting securities/equities of such Person, or (iii) ten percent (10%) or more of the voting securities/equities of which is directly or indirectly beneficially owned or held by the Person in question.  The term "<u>control</u>" as used in this definition means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of voting securities/equities, by control, or otherwise.

"<u>Agreement</u>" means this Amended and Restated Limited Liability Company Agreement of the Company, together with the Schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"<u>Allowed Claim</u>" has the meaning assigned to that term in the Settlement Agreement.

"<u>Bankruptcy</u>" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) if sixty (60) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within sixty (60) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within sixty (60) days after the expiration of any such stay, the appointment is not vacated.  The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the Recitals above.

"<u>Business Day</u>" has the meaning assigned to such term in the Settlement Agreement.

"<u>Certificate of Formation</u>" means the initial Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on May 14, 2014, as amended or amended and restated from time to time.

"<u>CLMG</u>" has the meaning assigned to such term in the Recitals above.

"<u>Collateral</u>" has the meaning assigned to such term in the Settlement Agreement.

"Company" means White Eagle General Partner LLC, a Delaware limited liability company.

"Covered Persons" has the meaning set forth in Section 18(a).

"DIP Budget" has the meaning assigned to such term in the Settlement Agreement.

"DIP Financing" has the meaning assigned to such term in the Settlement Agreement.

"DIP Order" has the meaning assigned to such term in the Settlement Agreement.

"Early Payoff Amount" has the meaning assigned to such term in the Settlement Agreement.

"Liquidation Agent" means an individual who is not a present or former director, manager, officer, employee, supplier, customer or five percent (5%) beneficial owner of the outstanding equity interests of the Company or any of its Affiliates; provided, however, that an individual shall not be deemed to be ineligible to be the Liquidation Agent solely because such individual serves or has served in the capacity of a "liquidation agent" or similar capacity for special purpose entities formed by the Company or any Affiliate of the Company. Notwithstanding any other provision of this Agreement or the Act, the Liquidation Agent is not a "manager" of the Company within the meaning of Section 18-101(10) of the Act.

"Maple" has the meaning assigned to such term in the Settlement Agreement.

"Material Action" means to consolidate or merge the Company with or into any Person or sell all or substantially all of the assets of the Company, or institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or declare or effectuate a moratorium on the payment of any obligation, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

'"Member" means Lamington Road Designated Activity Company, an Irish designated activity company, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Member.

"Partnership" has the meaning set forth in Section 7(a)(i).

"Payoff Amount" has the meaning assigned to such term in the Settlement Agreement.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited partnership, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Sale Deadlines" has the meaning assigned to such term in the Settlement Agreement.

"Sale Process" has the meaning assigned to such term in the Settlement Agreement.

"Settlement Agreement" has the meaning assigned to such term in the Recitals above.

"Settlement Order" has the meaning assigned to such term in the Settlement Agreement.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), the person selected to be the Special Manager pursuant to Section 5(c), in such person's capacity as a member of the Company. The Special Member shall only have the rights and duties expressly set forth in this Agreement.

"Transfer Date" has the meaning assigned to that term in the Settlement Agreement.

B.      Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation," and words of masculine, feminine or neuter gender shall mean and include the correlative words of the other genders. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement. All capitalized terms in this Agreement not defined herein shall have the meaning assigned to that term in the Settlement Agreement.

## SCHEDULE B

## MEMBER

| Name | Mailing Address | Agreed Value of Capital Contribution | Limited Liability Company Interest |
|---|---|---|---|
| Lamington Road Designated Activity Company | Grand Canal House 2nd Floor Palmerston House Fenian Street Dublin 2 Ireland | $1,000.00 | 100% |

## EXHIBIT E

Power of Attorney

**EXECUTION VERSION**

## POWER OF ATTORNEY

This Power of Attorney is executed and delivered by Lamington Road Designated Activity Company, an Irish designated activity company (the "*Company*") to (i) CLMG Corp., a Texas corporation ("*CLMG*"), and (ii) Joseph J. Farnan, Jr., as liquidation agent (in such capacity the "*Liquidation Agent*" and, each of the Liquidation Agent, the Company and CLMG, a "*Party*" and collectively the "Parties").

1.1    No person to whom this Power of Attorney is presented, as authority for the Liquidation Agent to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from the Company as to the authority of the Liquidation Agent to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to the Liquidation Agent irrevocably and unconditionally the authority to take and perform the actions contemplated herein, subject to the limitations contained herein, and the Company irrevocably and unconditionally waives any right to commence any suit or action, in law or equity, against any person or entity that acts in reliance upon or acknowledges the authority granted under this Power of Attorney. The power of attorney granted hereby is coupled with an interest and may not be revoked or canceled by the Company. All capitalized terms in this Power of Attorney not defined herein shall have the meaning assigned to that term in that certain Settlement Agreement (the "Settlement Agreement"), dated as of May 24, 2019 between, among others, the Company and CLMG.

1.2    From the date hereof until the earliest to occur of (y) the Transfer Date, and (z) the date on which CLMG has confirmed to White & Case LLP, pursuant to the Settlement Agreement, that CLMG has received the Early Payoff Amount or the Payoff Amount (such date, the "Liquidation Agent Termination Date"), as applicable and in accordance with the Settlement Agreement, the Company hereby irrevocably and unconditionally constitutes and appoints the Liquidation Agent, with full power of substitution, as the Company's true and lawful attorney-in-fact with full irrevocable power and authority in the Company's place and stead and at the Company's expense and in the Company's name or in the Liquidation Agent's own name, from time to time in the Liquidation Agent's sole and absolute discretion, to take any and all of the following actions, in each case subject to the Settlement Agreement, Settlement Order and DIP Order and the limitations set forth herein:

(a)    From the date hereof until immediately prior to the occurrence of a Sale Trigger Event, the Liquidation Agent's duties and authorities shall be limited to taking such actions as he determines in his sole and absolute discretion to be necessary or appropriate for the Company and the Partnership to be prepared to launch and implement the Sale Process upon the occurrence of a Sale Trigger Event; *provided* that, prior to the Sale Trigger Event, the Liquidation Agent shall not take any action to commence the marketing of the Collateral to third parties or to otherwise contact potential buyers about the Collateral. The Liquidation Agent's duties and authorities pursuant to this Section 1.2(a) shall include, but shall not be limited to, engaging and overseeing Maple and any other advisors in connection with, and in preparation for, the Sale Process;

(b)    If the Early Payoff Amount is not paid in full in cash to CLMG immediately on or before the occurrence of a Sale Trigger Event, the Liquidation Agent shall, automatically on the next Business Day after the occurrence of such Sale Trigger Event and without further order or other action by the Company or any other Person, have the sole authority and the express mandate to (i) notwithstanding anything to the contrary herein, have full power and authority (including the power and authority to bind the Company), to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described in this Section 1.2(b), including all powers, statutory or otherwise, (ii) conduct the Sale Process, (iii) select winning bids for the Collateral, (iv) close sale transactions on behalf of the Company and the Partnership with respect to the Collateral, (v) obtain DIP Financing in accordance with the Settlement Agreement, Settlement Order and DIP Order, (vi) approve any DIP Budget in effect during the Sale Process

and prohibit the Company from making any expenditure not specified in any such DIP Budget unless such expenditure is approved in writing by CLMG pursuant to the Settlement Agreement, Settlement Order and DIP Order, Settlement Order and DIP Order, and (vii) take all other actions as he determines in his sole and absolute discretion are necessary and appropriate to promptly implement and complete the Sale Process; *provided* that the Liquidation Agent may not cause the Company or the Partnership to transfer any Collateral to a purchaser without first (or simultaneously) receiving the proceeds of such sale. If the Liquidation Agent, acting reasonably and on the advice of Maple, anticipates that the Company or any of its affiliates will not have sufficient liquidity to service its obligations after the occurrence of a Sale Trigger Event, then the Liquidation Agent, on behalf of the Company, shall have full power and authority on behalf of the Company to (i) negotiate and enter into all necessary documentation regarding additional postpetition financing following the Sale Trigger Event and (ii) seek and obtain all necessary Bankruptcy Court approvals in connection therewith.

(c)    Solely in furtherance of <u>Section 1.2(b)</u>: (i) executing and delivering for value all necessary or appropriate agreements and other instruments, (ii) defending any suit, action or proceeding brought against Company, and settling, compromising or adjusting any suit, action or proceeding described above and, in connection therewith, giving such discharges or releases as the Liquidation Agent may deem appropriate, (iii) defending, filing, prosecuting, settling, compromising, or adjusting any claim, litigation, suit or proceeding in any court of competent jurisdiction or before any arbitrator, or take any other action otherwise deemed appropriate by the Liquidation Agent, (iv) selling, assigning, conveying, transferring, pledging, making any agreement with respect to or otherwise dealing with, any of the Collateral, and executing, in connection with such sale or action, any endorsements, assignments or other instruments of conveyance or transfer in connection therewith, and (v) taking any and all other actions relevant or necessary for the Liquidation Agent to carry out his or her mandate under <u>Section 1.2(b)</u>. From the Sale Trigger Event until the Liquidation Agent Termination Date, the Company shall not take any action that is inconsistent with, or that would interfere with or delay timely completion of, the Sale Process without the prior written consent of the Liquidation Agent.

(d)    Subject to the foregoing exclusive authority and mandate granted to the Liquidation Agent, the existing management of the Company shall retain all of their other respective management and decision-making powers on behalf of the Company. The Liquidation Agent shall exercise the exclusive powers granted hereunder in the role of Bankruptcy Court-appointed independent liquidation agent, and he shall not be an officer, employee, manager, or director of the Company.

1.3    The Liquidation Agent shall exercise his powers, rights and authority pursuant to Section 1.2 in order to maximize the proceeds from the sale of the Collateral as he determines to be appropriate in his sole and absolute discretion and, in any event, consistent with traditional fiduciary duties owed by directors and officers of corporations under Delaware law to constituents of bankruptcy estates subject to complying with the Sale Process in all respects as set forth in the Settlement Agreement; *provided* that the Liquidation Agent may not, in exercising his duties, contest the Sale Process (including the Sale Deadlines), in any way or seek any relief from the Bankruptcy Court to modify the Sale Process (including the Sale Deadlines), or take any other action inconsistent with the terms of the Settlement Agreement, Settlement Order or DIP Order. Except as provided herein, in exercising his rights and performing its duties under this Power of Attorney, the Liquidation Agent shall not have any fiduciary duties to any equityholder of the Company or any other Party; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. The Liquidation Agent shall not at any time serve as trustee in bankruptcy for any Affiliate of the Company.

1.4    The Company shall afford to the Liquidation Agent and to any prospective purchaser pursuant to the Sale Process, during normal business hours, access, upon reasonable advance notice, to all of the books, records and properties of the Company and its subsidiaries, as applicable, and to make copies of such records and permit the Liquidation Agent to discuss all aspects of the Company or its subsidiaries, as applicable, with any officers, employees or accountants of the Company or its subsidiaries, and the Company and its subsidiaries shall provide to the Liquidation Agent responses to all reasonable written requests from the Liquidation Agent for information relating to the Company, its subsidiaries and their respective operations; provided, that such access does not unreasonably interfere with the business and operations of the Company or its subsidiaries.  The Company and its subsidiaries shall instruct their independent accountants to discuss such aspects of the financial condition of the Company or its subsidiaries, as applicable, with the Liquidation Agent as he may reasonably request, and to permit the Liquidation Agent to inspect, copy and make extracts from such financial statements, analyses, work papers and other documents and information (including electronically stored documents and information) prepared with respect to the Company or its subsidiaries, as applicable, as may be reasonably requested by the Liquidation Agent.

1.5    The Company hereby ratifies and confirms, to the extent permitted by law, all that said the Liquidation Agent (or any substitute) shall lawfully do or cause to be done hereunder or pursuant hereto and in accordance with the terms hereof.

1.6    This Power of Attorney shall terminate upon the earliest to occur of: (i) the delivery of joint written notice by CLMG and the Company to the Liquidation Agent, (ii) thirty (30) days following the delivery of written notice by the Liquidation Agent to the Company and CLMG, (iii) the death or incapacity of the Liquidation Agent, and (iv) the Liquidation Agent Termination Date.

1.7    This Power of Attorney shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.  The Parties hereby consent to the non-exclusive jurisdiction of the courts of the State of Delaware.

1.8    In the event of a breach or a threatened breach by any Party to this Power of Attorney of its, his obligations under this Power of Attorney, any Party injured or to be injured by such breach, in addition to being entitled to exercise all rights granted by applicable law, including recovery of damages, shall be entitled to specific performance under this Power of Attorney.  The Parties agree that the provisions of this Power of Attorney shall be specifically enforceable, it being agreed by the Parties that the remedy at law, including monetary damages, for breach of such provision shall be inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Until the Liquidation Agent Termination Date, each of CLMG and the Liquidation Agent shall be entitled to enforce the provisions hereof.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Power of Attorney is executed by the Company pursuant to the authority of its managers and/or members as of this 5th day of June , 2019.

Signed for and on behalf of

LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY
By:

Name:    THOMAS BARRY
Title:    Director    DIRECTOR

Accepted and acknowledged by:

CLMG CORP.:

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, this Power of Attorney is executed by the Company pursuant to the authority of its managers and/or members as of this 5th day of  June , 2019.

Signed for and on behalf of

LAMINGTON ROAD DESIGNATED ACTIVITY COMPANY

By: _____
Name:
Title:  Director

Accepted and acknowledged by:

CLMG CORP.:

By: _____
Name:
Title:     **James Erwin**
          **President**

POWER OF ATTORNEY